## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-cv-11191-GAD-CI |
| v. | ) | |
| | ) | Judge Gershwin A. Drain |
| EES COKE BATTERY, LLC | ) | Magistrate Judge Ivy |
| | ) | |
| Defendant. | ) | |
| | ) | |

## UNITED STATES' MOTION
## FOR SUMMARY JUDGMENT ON LIABILITY

Under the Clean Air Act, when a facility makes a change that increases pollution, it must go through a permitting process and install pollution controls. Here, EES Coke sharply increased its pollution, but failed to get the required permits or install the required controls at its facility on Zug Island, River Rouge. This failure is causing ongoing harm to the health of downwind residents. EES Coke's own data establish liability, making partial summary judgment on liability ripe now.

The United States requests a ruling that (i) the 2014 permit change was a major modification triggering New Source Review requirements for the pollutants sulfur

dioxide and fine particulate matter; and (ii) EES Coke violated the New Source Review notification requirements by failing to inform the State of the pollution increases. These two findings will resolve the liability portion of this case and allow the Parties to focus on the appropriate remedy for the violations.

Pursuant to Local Rule 7.1(a), the undersigned counsel met with counsel for EES Coke on August 26, 2022 to request concurrence in the motion, and concurrence was not obtained.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources
Division

*s/ Thomas A. Benson*
THOMAS A. BENSON
*(MA Bar # 660308*)
SAMANTHA M. RICCI
(Cal. Bar # 324517)
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-5261
thomas.benson@usdoj.gov

*OF COUNSEL*
CHRISTOPHER GRUBB
JUSTIN BERCHIOLLI
Associate Regional Counsel
U.S. EPA Region 5
Chicago, IL
77 W. Jackson Blvd.

TERESA DYKES
Air Enforcement Division
U.S. EPA
1200 Pennsylvania Ave. NW

*LOCAL COUNSEL*:
DAWN N. ISON
United States Attorney
Eastern District of Michigan

Washington D.C. 20460

SUSAN K. DeCLERCQ (P60545)
U.S. Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, MI 48226
susan.declerq@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 30, 2022, I electronically filed the foregoing pleading using the CM/ECF system which will send notice of electronic filing to all counsel of record.


*/s/ Thomas A. Benson*
Thomas A. Benson

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-cv-11191-GAD-CI |
| v. | ) | |
| | ) | Judge Gershwin A. Drain |
| | ) | |
| EES COKE BATTERY, LLC | ) | Magistrate Judge Ivy |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNITED STATES' BRIEF IN SUPPORT OF**

**MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................... 1

BACKGROUND ............................................................................... 2

STATEMENT OF MATERIAL FACTS ................................................. 9

ARGUMENT ................................................................................... 15

    I.  Summary Judgment Standard.................................................15

    II. EES Coke's Permit Change Was A Major Modification Under Both The
       Nonattainment New Source Review And PSD Programs........................16

    III.EES Coke Failed To Provide The Required Notice Of Its Pollution
        Increase ....................................................................20

    IV. Summary Judgment Is Appropriate At The Outset Of This Case...........21

CONCLUSION ................................................................................. 23

# TABLE OF AUTHORITIES

Cases

*Alabama Power Co. v. Costle*,
 636 F.2d 323 (D.C. Cir. 1979)....................................................................7

*Am. Farm Bureau Fed'n v. E.P.A.*,
 559 F.3d 512 (D.C. Cir. 2009)....................................................................5

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ...................................................................................15

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ...................................................................................15

*Envtl. Def. v. Duke Energy Corp.*,
 549 U.S. 561 (2007) .....................................................................................7

*Local Union 369, Intern. Broth. of Elec. Workers, AFL-CIO v. ADT Sec. Services, Inc.*,
 393 Fed. App'x 290 (6th Cir. 2010)..........................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986) ...................................................................................15

*New York v. U.S. E.P.A.*,
 413 F.3d 3 (D.C. Cir. 2005)........................................................................18

*Plott v. Gen. Motors Corp., Packard Elec. Div.*,
 71 F.3d 1190 (6th Cir. 1995) ................................................................ 21, 22

*United States v. Ameren Missouri*,
 421 F. Supp. 3d 729 (E.D. Mo. 2019) .........................................................5

*United States v. Ameren Missouri*,
 No. 4:11 CV 77 RWS, 2016 WL 728234 (E.D. Mo. Feb. 24, 2016)...... 16, 18, 19

*United States v. DTE Energy Co.*,
 711 F.3d 643 (6th Cir. 2013) ....................................................................7, 9

*United States v. First City Nat'l Bank of Houston*,
 386 U.S. 361 (1967) ...................................................................................19

*United States v. TRW, Inc.*,
 4 F.3d 417 (6th Cir. 1993) ..........................................................................15

Statutes

42 U.S.C. § 7401(b)(1)...................................................................................7
42 U.S.C. § 7409 .............................................................................................7

42 U.S.C. § 7410 ..................................................................................7
42 U.S.C. § 7413(a) ..............................................................................7

Rules

Fed. R. Civ. P. 56(c) .........................................................................15
Fed. R. Civ. P. 56(c)(1)(A) ...............................................................16

Regulations

40 C.F.R. § 52.23 .................................................................................7
73 Fed. Reg. 28,321 (May 16, 2008) ...................................................8
75 Fed. Reg. 35,519 (June 22, 2010) ...................................................6
78 Fed. Reg. 53,272 (Aug. 29, 2013) .................................................10
78 Fed. Reg. 47,191 (Aug. 5, 2013)....................................................10
75 Fed. Reg. 35,519 (June 22, 2010) ...................................................6
Mich. Admin. Code R. 336.2801 .......................................................16
Mich. Admin. Code R. 336.2818 .........................................................8
Mich. Admin. Code R. 336.2901 .................................... 8, 9, 16, 17, 18
Mich. Admin. Code R. 336.2902 ....................................... 8, 9, 20, 22

## ISSUES PRESENTED

Pursuant to Local Rule 7.1(d)(2), the issues presented by this motion are:

1.  Whether the 2014 permit change at the EES Coke facility is a major modification under the applicable New Source Review rules.

2.  Whether EES Coke was required to submit emission reports to the State of Michigan for calendar years 2018 and 2019 under the applicable New Source Review rules.

The leading authority supporting Plaintiff's argument is set forth on the next page.

## LEADING AUTHORITY FOR THE RELIEF SOUGHT

*1. Whether the 2014 permit change at the EES Coke facility is a major modification under the applicable New Source Review rules.*

**Cases**

*New York v. U.S. E.P.A.*, 413 F.3d 3, 31-33 (D.C. Cir. 2005)

*United States v. Ameren Missouri*, No. 4:11 CV 77 RWS, 2016 WL 728234, at *2 (E.D. Mo. Feb. 24, 2016)

**Regulations**

Mich. Admin. Code R. 336.2801 to .2823 and 336.2901 to .2908

*2. Whether EES Coke was required to submit emission reports to the State of Michigan for calendar years 2018 and 2019 under the applicable New Source Review rules.*

**Regulations**

Mich. Admin. Code R. 336.2902

## INTRODUCTION

Under the Clean Air Act, when a facility makes a change that increases pollution, it must go through a permitting process and install pollution controls. Here, EES Coke sharply increased its pollution, but failed to get the required permits or install the required controls. EES Coke's own data establish its liability, making an early, partial summary judgment ruling ripe to reduce this case to the matters truly in dispute.

EES Coke operates an industrial facility on Zug Island, between Detroit and River Rouge. It emits thousands of tons of sulfur dioxide ("$SO_2$") pollution each year, making it one of the largest sources of $SO_2$ in the State. In 2014, EES Coke requested that the State of Michigan remove a limit in the facility's air permit that restricted the amount of fuel it could burn at a certain location. EES Coke told Michigan that the pollution impact from the change would be minimal. Instead, the facility's actual $SO_2$ pollution increased by as much as 77% (1,569 tons per year) after the permit change. The undisputed facts show that EES Coke violated the New Source Review provisions of the Clean Air Act in two distinct ways: by increasing emissions without obtaining a permit and installing pollution controls, and by failing to notify the State of the pollution increase.

The pollution from the EES Coke facility causes grave health impacts. $SO_2$ emissions cause harm on their own and convert into fine particulate matter in the

atmosphere. These fine particulates—known as $PM_{2.5}$—can lodge deep in the lungs and cause a range of health impacts from asthma attacks to premature death. The serious nature of the harm makes it critical to determine EES Coke's liability as quickly as possible and turn to crafting the appropriate remedy.

The United States therefore requests that this Court find EES Coke liable for violating the New Source Review permitting program. Specifically, the United States requests a ruling that (i) the 2014 permit change was a major modification triggering New Source Review requirements for $SO_2$ and $PM_{2.5}$; and (ii) EES Coke violated the New Source Review notification requirements by failing to inform the State of the pollution increases. These two findings will resolve the liability portion of this case and allow the Parties to focus on the appropriate remedy for the violations.

## BACKGROUND

### The EES Coke Facility

The EES Coke Facility ("Facility") processes coal in a coke oven battery to produce metallurgical coke, an input used in steel manufacturing. The next page shows an overhead picture of the Facility.



*See* Ex. 1, Declaration of Virginia Galinsky ("Galinsky Dec.") ¶ 19.

As the Facility produces coke, it also generates coke oven gas. Coke oven gas can be sent to other facilities to use as fuel, burned at a flare at the Facility, or burned to power the Facility's coke ovens—a process called "underfire combustion." *See* Galinsky Dec. ¶ 21. When burned, coke oven gas emits $SO_2$, among other pollutants.

To control emissions of harmful pollutants, the Facility's 1990 State air permit limited the amount of coke oven gas that could be burned for underfire combustion to 2,850,000 million British thermal units per year (mmBtu/yr). *See* Galinsky Dec. ¶ 27. In 2014, EES Coke applied for a revised permit with several changes, including removal of the underfire combustion limit. *Id.* ¶ 29. This change would allow the company to burn more coke oven gas, resulting in more pollution. EES Coke said it did so to avoid using another fuel that it found was damaging the coke ovens. *See* Galinsky Dec. ¶ 29. That permit revision is the basis for this case.

**Harm from EES Coke's Pollution**

While not necessary to establish EES Coke's liability, the harm from the Facility's excess pollution shows why an early ruling on liability is important.

The Facility's pollution affects a surrounding area already burdened by $SO_2$ above federal health standards and disproportionate asthma levels. The Michigan Department of Health & Human Services has found that adult Detroit residents are 46% more likely to have asthma and four times more likely to be hospitalized for asthma symptoms than residents statewide. Ex. 1-D, *Detroit: The Current Status of Asthma Burden (2021 Update)*. The Asthma and Allergy Foundation of America estimates that Detroit is sixth among the nation's cities in asthma prevalence and eighth in total asthma-related deaths. Ex. 1-E, Asthma Capitals 2021: The Most Challenging Places to Live With Asthma.

The Facility is consistently one of the largest sources of $SO_2$ in Michigan. In recent years, it has accounted for more than 4% of the State's total $SO_2$ pollution. Galinsky Dec. ¶ 40. The year before the permit change, the Facility was the 15th biggest $SO_2$ polluter in the state—in the years since the change, it has been as high as the fifth largest. *Id.* ¶ 26. While the Facility's $SO_2$ pollution varies each year, it regularly exceeds 3,000 tons per year and surpassed 3,600 tons in 2021. *Id.* ¶ 24.

Had EES Coke complied with the New Source Review, its $SO_2$ pollution over the last several years would be a small fraction of what the Facility actually emitted.

Based on controls operating at similar sources, complying with New Source Review would reduce the Facility's $SO_2$ emissions by over 80% each year. Galinsky Dec. ¶ 52. With required controls, EES Coke's 2021 $SO_2$ emissions would be around 500 tons—rather than about 3,600. *Id.* ¶ 52.

Those 3,000+ tons the Facility should not have emitted last year harmed public health. Some of the $SO_2$ pollution from the Facility converts to $PM_{2.5}$ once emitted, and "[t]he health effects from $PM_{2.5}$ are well-established." *United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 773 (E.D. Mo. 2019), *rev'd on other grounds,* 9 F.4th 989 (8th Cir. 2021). Those effects include increased risk of high blood pressure, hardened arteries, heart attacks, strokes, asthma attacks, and premature death. *Id.*; *see also Am. Farm Bureau Fed'n v. E.P.A.*, 559 F.3d 512, 515 (D.C. Cir. 2009). A plethora of public health organizations agree, from the U.S. Centers for Disease Control and Prevention, to the American Heart Association, to the World Health Organization. *Ameren*, 421 F. Supp. 3d at 773. In *Ameren*, the judge concluded that the source's $SO_2$ pollution "has harmed—and continues to harm—public health." *Id.* at 774. While the pollution source in *Ameren* was bigger than the Facility here, that court found a scientific consensus that there is no safe level of $PM_{2.5}$, so any increase in exposure poses a health risk. *Id.* at 773.[1] Moreover, even short-term exposure to $SO_2$ pollution, ranging from five minutes to 24 hours,

---

[1] Notably, none of the *Ameren* findings discussed here were challenged on appeal.

is linked to an array of adverse respiratory effects including increased asthma symptoms. 75 Fed. Reg. 35,519 (June 22, 2010).

Scientists have developed tools to estimate the health effects of pollution from sources like the Facility. Studies show adverse health effects ranging from asthma incidences and missed workdays to heart attacks and premature death. Based on a publicly available EPA tool, the estimated health impacts from 3,000 tons of $SO_2$ from a coke oven battery like the Facility include:

- 16 premature deaths

- 2–17 non-fatal heart attacks

- 4,530 asthma attacks (requiring an inhaler)

- 1,701 lost days of work

Galinsky Dec. ¶ 54; Ex. 1-C, EPA Technical Support Document, Estimating the Benefit per Ton of Reducing Directly-Emitted $PM_{2.5}$, $PM_{2.5}$ Precursors and Ozone Precursors from 21 Sectors ("TSD").[2] EPA's data also shows that the financial impact of these health effects is about $146 million.[3] Galinsky Dec. ¶ 55. These impacts are calculated per ton of $SO_2$, so will scale with the Facility's pollution level.

---

[2] These documents and data are *available at* https://www.epa.gov/benmap/estimating-benefit-ton-reducing-directly-emitted-pm25-pm25-precursors-and-ozone-precursors (last updated Jan. 13, 2022).

[3] The EPA documents estimate some of the social costs by estimating the cost of treatment or the value of reducing the risk of certain health impacts. *See* TSD at 10.

**The Clean Air Act and New Source Review**

Congress passed the 1970 Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The Act requires EPA to protect human health and the environment by setting air-quality standards for each of six pollutants. 42 U.S.C. § 7409. States are then required to develop state implementation plans to meet those standards, using New Source Review as one of the tools to control emissions. 42 U.S.C. § 7410. Upon EPA approval, state requirements become federally enforceable, as Michigan's are here. 42 U.S.C. § 7413(a), (b); 40 C.F.R. § 52.23; Galinsky Dec. ¶ 7.

Congress passed the New Source Review program in 1977 after finding that the 1970 Act was progressing too slowly. *See Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 567-68 (2007). The central premise of New Source Review is that no one can build or expand a major source of air pollution without getting a permit and applying the best possible pollution controls. *See generally United States v. DTE Energy Co.*, 711 F.3d 643, 644-45 (6th Cir. 2013). Facilities that operated when the law was passed were grandfathered temporarily from New Source Review. *Id.* at 645. But, as the D.C. Circuit explained in an early case, "If these plants increase pollution, they will generally need a permit." *Alabama Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979).

7

New Source Review has two sets of provisions, depending on whether an area is in attainment with federal air quality standards. The program for attainment areas is called the Prevention of Significant Deterioration (or "PSD") program, and the program for nonattainment areas is called the Nonattainment New Source Review program. Here, both programs apply because EES Coke is in an area that is in attainment for $PM_{2.5}$, and out of attainment for $SO_2$. The programs have similar liability provisions and are discussed together below. (Citations are for Nonattainment New Source Review; the PSD provisions are substantively the same.)

New Source Review applies where a new source or modification increases one of several pollutants. *See* Mich. Admin. Code R. 336.2902. The rules set forth how an emissions increase is calculated. They require comparing a "baseline" period of actual emissions before the change at issue to the projected and/or actual emissions after the project.[4] Mich. Admin. Code R. 336.2902(2)(b) and (c). For $SO_2$, if the increase is 40 tons or more, New Source Review applies.[5]

---

[4] To trigger New Source Review, the change must cause a significant emissions increase and a significant net emissions increase. The latter analysis allows a source to reduce its emissions increase based on qualifying emissions decreases elsewhere at the source. *See* Mich. Admin. Code R. 336.2901(w). Here, there are no qualifying emissions decreases, so no netting analysis is required.

[5] Because $SO_2$ can convert to $PM_{2.5}$ once in the atmosphere, it is regulated as a pollutant in its own right and as a "precursor" to $PM_{2.5}$. 73 Fed. Reg. 28,321, 28,327-28 (May 16, 2008). Thus, a 40 ton per year increase of $SO_2$ also requires New Source Review compliance for $PM_{2.5}$. Mich. Admin. Code R. 336.2818.

The applicable rules[6] require sources to evaluate in advance whether a particular change will increase emissions. Mich. Admin. Code R. 336.2901(s). A New Source Review violation occurs if either (i) the source should have anticipated an emissions increase before the change or (ii) an emissions increase actually occurred after the change. Mich. Admin. Code R. 336.2902(2)(b); *DTE Energy*, 711 F.3d at 651-52. A modification can be the physical expansion of a facility, but it can also be a non-physical change that increases emissions—such as the removal of a permit provision that limits pollution. *See* Mich. Admin. Code R. 336.2901(s), 336.2902(5)(b).

## STATEMENT OF MATERIAL FACTS

1.      EES Coke is a person under the applicable law, and is the owner and operator of the Zug Island Facility. Galinsky Dec. ¶ 19; Doc. No. 3 ("Answer") ¶ 17 (PageID.29).

2.      The Facility is a major emitting facility and a major stationary source for $SO_2$ and $PM_{2.5}$ under the Clean Air Act and Parts 18 and 19 of the Michigan state implementation plan. Galinsky Dec. ¶ 25.

---

[6] The applicable New Source Review rules are part of the Michigan state implementation plan, which EPA approved. Galinsky Dec. ¶ 7.

3.     The Facility is in an area that is in attainment for $PM_{2.5}$, so the PSD program applies. 78 Fed. Reg. 53,272 (Aug. 29, 2013); Galinsky Dec. ¶ 23.

4.     The Facility is in an area that is in nonattainment for $SO_2$, so the Nonattainment New Source Review program applies. 78 Fed. Reg. 47,191 (Aug. 5, 2013); Galinsky Dec. ¶ 22.

5.     EPA provided sufficient pre-filing notice of the violations alleged in the complaint to EES Coke and to the State of Michigan, and provided notice of the filing of this case to the State. Galinsky Dec. ¶ 48.

**State Permit History**

6.     The State issued a Permit to Install to EES Coke's predecessor in 1990. Galinsky Dec. ¶ 27.

7.     The 1990 Permit to Install included several provisions to ensure that emissions would not increase and trigger New Source Review. Galinsky Dec. ¶ 27.

8.     One of those provisions limited the amount of coke oven gas that could be burned at underfire to 2,850,000 mmBtu/yr. Galinsky Dec. ¶ 27.

9.     In 2014, EES Coke submitted an application to the State to change several requirements of its State Permit to Install. Galinsky Dec. ¶ 29; Ex. 1-A, EES Coke Permit to Install Application, June 13, 2014 ("Permit App."); Answer ¶ 60 (PageID.39).

10.    One of the changes EES Coke sought was to remove the provision limiting the amount of coke oven gas the Facility could burn at underfire. Galinsky Dec. ¶ 29; Permit App., at 4; Answer ¶ 3 & 60 (PageID.26, 39).

11.    The State issued a new permit on November 21, 2014. Ex. 1-B, EES Coke Permit to Install, 51-08C, Nov. 21, 2014. Among other changes, that permit omitted the underfire combustion limit, as EES Coke requested. Galinsky Dec. ¶ 29.

**EES Coke's New Source Review Emissions Analysis**

12.    EES Coke's 2014 permit application included a proposed New Source Review emissions analysis for several pollutants, including $SO_2$. Galinsky Dec. ¶ 30; Permit App., at 30-41.

13.    EES Coke's application stated that the permit change could trigger New Source Review if it caused a qualifying emissions increase. EES Coke found that the change triggered New Source Review requirements for two pollutants (nitrogen oxides and greenhouse gases), but not for other pollutants, including $SO_2$ and $PM_{2.5}$. Galinsky Dec. ¶ 30; Permit App., at 36.

14.    In the $SO_2$ emissions analysis included in its permit application, EES Coke stated that:

a.  The baseline actual emissions of $SO_2$ were 2,091 tons per year;

b.  The $SO_2$ emissions the Facility could accommodate during the baseline were 3,097.5 tons per year;

   c.  The projected actual emissions of $SO_2$ were 3,118 tons per year; and

   d.  The projected increase in $SO_2$ emissions was 21.01 tons per year above what the Facility could accommodate in the baseline.

Galinsky Dec. ¶ 31; Permit App., at 116. EES Coke explained that baseline actual emissions reflect what the Facility actually emitted in the relevant 24-month period before the project, while the value for what the Facility could accommodate reflects "the highest amount the unit could have legally and physically emitted before the modification." Permit App., at 31-32, 36-37.

15.  EES Coke determined that the project was not a "major modification" for $SO_2$, and thus New Source Review permitting was not needed for $SO_2$ or $PM_{2.5.}$ Permit App., at 2; Answer ¶ 60 (PageID.39).

16.  EES Coke did not identify any net decreases in its New Source Review emissions analysis, so its emissions increase and net emissions increase are the same. Galinsky Dec. ¶¶ 30, 48 n.12.

17.  There is no basis for EES Coke to net out any portion of its emissions increase. Galinsky Dec. ¶¶ 30, 48 n.12.

18.  After review of the application and discussion with EES Coke, the State adopted the following values for the $SO_2$ emissions analysis.

   a.  The baseline actual emissions of $SO_2$ were 2,039.4 tons per year;

b. The $SO_2$ emissions the Facility could accommodate during the baseline were 3,097.5 tons per year;

c. The projected actual emissions of $SO_2$ were 3,117 tons per year; and

d. The projected increase in $SO_2$ emissions was 19.54 tons per year.

Galinsky Dec. ¶ 32; Answer ¶ 61 (PageID.39-40).

**EES Coke's Increased Emissions and Major Modification Status**

19.    EES Coke provided records of its actual $SO_2$ emissions to EPA. It also provided the amount of coke oven gas burned at underfire and the $SO_2$ content of the gas, which can be used to calculate the $SO_2$ emissions from underfire combustion. Galinsky Dec. ¶ 38.

20.    This data shows that after the permit change, the Facility regularly exceeded the baseline actual $SO_2$ emissions, the emissions EES Coke stated it could accommodate during the baseline, and the projected actual emissions. Galinsky Dec. ¶¶ 42-44; Answer ¶ 63 (PageID.40).

21.    The data shows multiple 12-month periods where all of these increases are greater than 40 tons of $SO_2$ per year. Galinsky Dec. ¶¶ 42-44.

22.    For instance, the Facility emitted 3,273 tons of $SO_2$ in 2018, a 1,233-ton increase in $SO_2$ compared to the baseline. This reflects a 175-ton increase in $SO_2$ compared to what the Facility could accommodate before the change. Galinsky Dec.

¶ 42. Of the 3,273 tons, 573 tons came from burning more coke oven gas at underfire than the previous permit limit allowed. *Id.*

23.     Because actual emissions from the Facility increased by more than 40 tons per year over the baseline, and over what could have been accommodated; and because at least 40 tons of the increase resulted from removing the permit limit, the 2014 permit change was a major modification under the Nonattainment New Source Review program for $SO_2$ and the PSD program for $PM_{2.5}$. Galinsky Dec. ¶ 44.

24.     EES Coke has not obtained a New Source Review permit, installed best available control technology for $SO_2$, or complied with the lowest available emissions rate for $SO_2$ at its Facility. Galinsky Dec. ¶ 45.

**State Notice**

25.     In 2018 and 2019, EES Coke exceeded its baseline actual emissions and projected actual emissions, triggering a requirement to notify the State of the emissions increase. Galinsky Dec. ¶¶ 46-47.

26.     EES Coke did not provide notice to the State of its post-change emission increases within the 60 days required by the regulations. *Id.*¶¶ 47, 49.

27.     EPA issued a notice of violation to EES Coke on September 16, 2020, notifying EES Coke that it failed to submit emissions reports to the State as required by law. Galinsky Dec. ¶ 48; Answer ¶ 12 (PageID.28).

28.     On November 20, 2020, EES Coke submitted reports to the State addressing the emissions increases for 2018 and 2019. Galinsky Dec. ¶ 49; Answer ¶ 73 (PageID.42).

29.     EES Coke submitted the report for 2018 630 days late, and submitted the report for 2019 264 days late. Galinsky Dec. ¶ 49.

## ARGUMENT

## I.     Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *United States v. TRW, Inc.*, 4 F.3d 417, 424 (6th Cir. 1993).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322. If the moving party successfully carries this burden, the burden then shifts to the nonmoving party to direct the Court's attention to evidence setting forth specific facts sufficient to establish that a genuine issue of material fact exists. *Id.* at 322-24.

But the nonmoving party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986). A party asserting that a fact is genuinely disputed must support the assertion by citing particular materials in the record. Fed. R. Civ. P. 56(c)(1)(A). If a party fails to support a factual dispute with evidence in the record, "the court may . . . consider the fact undisputed for purposes of the motion." Local Rule 56.2.

## II.   EES Coke's Permit Change Was A Major Modification Under Both The Nonattainment New Source Review And PSD Programs

To prove a New Source Review violation, the United States must show:

1. That EES Coke is a person that owns or operates the Facility;

2. That the Facility is a major emitting facility and a major stationary source for the relevant pollutant;

3. The attainment status for each pollutant at issue; and

4. That there was a major modification.

*United States v. Ameren Missouri*, No. 4:11 CV 77 RWS, 2016 WL 728234, at *2 (E.D. Mo. Feb. 24, 2016); Mich. Admin. Code R. 336.2801(aa) and 336.2901(s). Here, the first two elements are beyond dispute. Statement of Material Facts ("SOF") 1-2. For the third element, the area is non-attainment for $SO_2$ and attainment for $PM_{2.5}$, so both New Source Review programs apply. SOF 3-4.

The principal issue before the Court is whether the permit change was a major modification (the fourth element of proof). Section II.A shows that the permit change resulted in a qualifying emissions increase, making the project a major modification

16

under both the Nonattainment New Source Review and PSD programs. Section II.B addresses a defense we anticipate EES Coke will raise, but for which the company cannot meet its burden.

### A.    The undisputed facts show that EES Coke's permit change resulted in an emissions increase that qualifies as a major modification

The undisputed evidence establishes the prima facie case that the 2014 permit change was a major modification for $SO_2$.

A major modification results when a change at a source causes a qualifying emissions increase. Mich. Admin. Code R. 336.2901(t). Here, the question is whether $SO_2$ pollution increased by at least 40 tons per year as a result of the permit change in any 12-month period after the change.

The evidence shows it did. The data that EES Coke itself compiled shows more than three dozen rolling 12-month periods where $SO_2$ increased as a result of the permit change. For instance, the Facility emitted 3,273 tons of $SO_2$ in 2018—an increase of 1,233 tons compared to the baseline. SOF 22. Of that increase, 573 tons of $SO_2$ came from the additional coke oven gas burned at underfire. *Id.* Thus about half of the pollution increase came from burning more coke oven gas at underfire than the prior permit allowed. That additional pollution was caused by the permit change and was more than 10 times the 40-ton threshold required to trigger New Source Review.

17

The undisputed evidence therefore satisfies the prima facie New Source Review liability case. And, as the next subsection explains, EES Coke cannot make out a defense to liability.

### B.   The undisputed facts show that the demand growth exclusion cannot apply

While we anticipate EES Coke will assert an affirmative defense,[7] the undisputed facts show that it cannot prevail.

We expect EES Coke will argue that the thousand-ton pollution increases shown in the data can all be excluded under the affirmative defense known as the demand growth exclusion. The rules allow a source to exclude from its post-project emissions total emissions that "[1] could have accommodated during the consecutive 24-month period used to establish the baseline actual emissions and that [2] are also unrelated to the particular project." *See* Mich. Admin. Code R. 336.2901 (ee)(ii)(C). Successfully claiming the demand growth exclusion requires a source to establish both "that the unit 'could have accommodated' the emissions at baseline and that those increases were unrelated to the project." *Ameren Missouri*, 2016 WL 728234, at *11; *New York v. U.S. E.P.A.*, 413 F.3d 3, 31-33 (D.C. Cir. 2005). As with any affirmative defense, EES Coke has the burden of proving that the demand growth

---

[7] *See* Answer, PageID.45 (Tenth and Eleventh Defenses).

exclusion applies. *See United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967); *Ameren Missouri*, 2016 WL 728234, at \*11.

Data provided by EES Coke shows that the company cannot satisfy either prong of the demand growth exclusion.

EES Coke cannot satisfy the first prong of the exclusion because its post-change pollution regularly exceeded what it told the State it could emit during the baseline. In its 2014 permit application, EES Coke concluded that its Facility could accommodate 3,097.5 tons per year of $SO_2$—describing this figure as "the highest amount the unit could have legally and physically emitted before the modification." *See* SOF 14. Since the permit change, the Facility has regularly exceeded that amount. Turning again to 2018 as an example, the Facility produced 3,273 tons of $SO_2$—175 tons more than the maximum it stated it could accommodate during the baseline. SOF 22. Thus EES Coke cannot meet its burden on prong one of the demand growth exclusion: the undisputed actual emissions are larger than what the Facility could accommodate before the permit change.

Nor can EES Coke satisfy the second prong of the exclusion, because the permit change caused a significant portion of the emission increase. Before 2014, the permit limited how much coke oven gas EES Coke could burn at underfire. When that limit was removed, the Facility burned more coke oven gas at underfire, accounting for a significant portion of the $SO_2$ emissions increase. SOF 20-22. As

19

explained in Section II.A, there is no dispute that EES Coke *did* burn more coke oven gas at underfire than the prior limit allowed. In 2018, the additional coke oven gas at underfire (beyond what the former limit allowed) caused 573 tons of $SO_2$. SOF 22. EES Coke cannot exclude that portion of the pollution increase because it is related to the permit change.

EES Coke's own data shows it cannot meet either prong of the demand growth exclusion, making summary judgment appropriate.

## III.   EES Coke Failed To Provide The Required Notice Of Its Pollution Increase

EES Coke violated the requirement to notify the State of its actual emissions increase. The company only sent the required reports *after* receiving a notice of violation from EPA.

A source that determines New Source Review does not apply must keep records of its emissions calculation and provide notice of certain emissions increases. Mich. Admin. Code R. 336.2902(6). EES Coke was required to send an emissions report to the State if its post-change pollution (i) exceeded the baseline by at least 40 tons and (ii) differed from the company's pre-change projections. Mich. Admin. Code R. 336.2902(6)(e). The rules require that the report be sent within 60 days of the end of the emissions period. *Id*.

For calendar years 2018 and 2019, the Facility's pollution increase met the criteria requiring notice to the State. SOF 25. For both years, EES Coke did not send

the required report within 60 days. SOF 26. Instead, EES Coke sent reports for both years on November 20, 2020, two months after receiving a notice of violation from EPA. SOF 27-28. EES Coke sent the report for calendar year 2018 630 days late, and sent the report for calendar year 2019 264 days late. SOF 29.

## IV.    Summary Judgment Is Appropriate At The Outset Of This Case

This is the rare case where summary judgment on liability is appropriate at the very beginning of the case. Deciding liability now will allow the Court and the Parties to focus on the appropriate remedy for EES Coke's violations, serving both judicial economy and public health.

Summary judgment is appropriate before discovery begins where discovery is "irrelevant to the dispositive issue." *Local Union 369, Intern. Broth. of Elec. Workers, AFL-CIO v. ADT Sec. Services, Inc.*, 393 Fed. App'x 290, 295 (6th Cir. 2010). If EES Coke believes discovery is necessary, it bears the burden of showing necessity. *See Plott v. Gen. Motors Corp., Packard Elec. Div.*, 71 F.3d 1190, 1196 (6th Cir. 1995). EES Coke cannot carry this burden.

First, there are no disputed material facts. EES Coke provided the pollution information that shows it violated the law. The Parties may disagree on how to apply the law, but the relevant facts are beyond dispute.

Second, to the extent any factual dispute arises, EES Coke does not need discovery. The company has the information related to its own actions and pollution,

21

including the very data serving as the basis for the United States' claims. *See Answer* ¶¶ 61-63 (PageID.39-40) (admitting relevant emissions data and pollution increase). Indeed, the company was required to (i) assess whether pollution would increase before the permit change and (ii) report if pollution did increase after the change. Mich. Admin. Code R. 336.2902(2)(b), 336.2902(6)(e). Thus the New Source Review rules require EES Coke to have already assessed the precise issues presented by this motion. Summary judgment cannot be delayed where the non-movant already has access to the relevant information. *Plott*, 71 F.3d at 1196 (to defer summary judgment until after discovery, non-movant must produce affidavits claiming that it does not have facts essential to justify its opposition).

Third, EES Coke's continuing violation is harming thousands of people downwind of its Facility. Every year of uncontrolled pollution adds incidents of asthma attacks, heart attacks, and premature deaths, among other effects, in a community already disproportionately harmed by air pollution. Given that harm, it is important to resolve EES Coke's liability as quickly as possible, so the Court may turn to crafting the appropriate remedy.

Finally, one of the core purposes of the New Source Review program is to *prevent* pollution increases. Congress made that goal clear in requiring permitting before construction and in the very name of the Prevention of Significant Deterioration program. EES Coke should have expected that removing the permit

limit would increase pollution and should have complied with New Source Review requirements in 2014, avoiding the increased pollution that has since occurred. EES Coke should not get the benefit of further delay while the public pays the price.

If the Court grants the United States' motion, the next step would be to determine the appropriate remedy for the violations. The United States plans to seek an order requiring EES Coke to obtain the permits and install the pollution controls that New Source Review requires, take steps to remediate the excess pollution stemming from the years of violation, and pay a civil penalty.

## CONCLUSION

For the principle claim at issue—whether the permit change triggered New Source Review requirements—there are three questions that determine liability. EES Coke's own information provides each answer.

*1. Did emissions increase significantly?*

Yes, as shown by the data EES Coke provided to EPA. SOF 20-22.

*2. Did the permit change cause a significant portion of the increase?*

Yes, EES Coke's data shows that the Facility burned significantly more at underfire than was previously allowed. Simple math shows the $SO_2$ emissions associated with that extra fuel. SOF 20-22.

3. *Can EES Coke prove the demand growth exclusion exempts it from New Source Review?*

No, for two reasons. First, the actual emissions exceeded the amount that EES Coke's own permit application said was the maximum amount it could emit before the change. SOF 20-22. Second, as noted in the prior answer, company data shows that the permit change caused a significant portion of the pollution increase. *Id*. Thus EES Coke cannot prove that the emissions increases were unrelated to the change.

\*\*\*

The United States asks this Court to grant this motion for partial summary judgment and find that (i) the 2014 permit change was a major modification triggering New Source Review requirements for $SO_2$ and $PM_{2.5}$; and (ii) EES Coke violated the New Source Review notification requirements by failing to notify the State of the pollution increases.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*s/Thomas A. Benson*
THOMAS A. BENSON
(Mass. Bar # 660308)
SAMANTHA M. RICCI

*OF COUNSEL*
CHRISTOPHER GRUBB
JUSTIN BERCHIOLLI
Associate Regional Counsel
U.S. EPA Region 5
Chicago, IL
77 W. Jackson Blvd.

TERESA DYKES
Air Enforcement Division
U.S. EPA
1200 Pennsylvania Ave. NW
Washington D.C. 20460

(Cal. Bar # 324517)
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-5261
thomas.benson@usdoj.gov

*LOCAL COUNSEL*:
DAWN N. ISON
United States Attorney
Eastern District of Michigan

SUSAN K. DeCLERCQ (P60545)
U.S. Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, MI 48226
susan.declerq@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 30, 2022, I electronically filed the foregoing pleading using the CM/ECF system which will send notice of electronic filing to all counsel of record.


<u>*s/ Thomas A. Benson*    </u>
Thomas A. Benson