# Exhibit 2.H

MDEQ, Agency Report to the Joint Committee on Administrative Rules, (Apr. 17, 2008) (included as Attachment F to EGLE, Revision to State of Michigan State Implementation Plan (Mar. 23, 2009)



STEVEN E. CHESTER
DIRECTOR

# REVISION TO

# STATE OF MICHIGAN

# STATE IMPLEMENTATION PLAN

## for

### Part 19.  New Source Review for Major Sources
### Impacting Nonattainment Areas.

### R 336.2901 to R 336.2903, R 336.2907, and
### R 336.2908 of the
### Michigan Administrative Code are added

## March 23, 2009

*Prepared by:*

*Michigan Department of Environmental Quality*
*Air Quality Division*
*P.O. Box 30260*
*Lansing, MI 48909*
*INTERNET: http://www.michigan.gov/deqair*



JENNIFER M. GRANHOLM
GOVERNOR

# TABLE OF CONTENTS

**Item** **Page**

## COMPLETENESS REVIEW

COMPLETENESS REVIEW CHECKLIST ........................................................ 1

## ATTACHMENTS

**ATTACHMENT A**   Final form of adopted rule(s), Part 19, effective June 20, 2008.

**ATTACHMENT B**   Certificate of Adoption from the Director of the Michigan Department of Environmental Quality (MDEQ), Steven E. Chester, dated May 21, 2008.

Letter from MDEQ Director Steven E. Chester to State Office of Administrative Hearings and Rules (SOAHR) forwarding Certificate of Adoption, dated May 23, 2008.

**ATTACHMENT C**   Delegation of authority from Governor Jennifer M. Granholm, letter dated February 22, 2003.

**ATTACHMENT D**   Certificate of approval from Legislative Service Bureau, dated May 12, 2008.

Certification of legality and authority from SOAHR, dated May 14, 2008.

Letter from SOAHR submitting rules sent to the Joint Committee on Administrative Rules, dated May 14, 2008.

**ATTACHMENT E**   Secretary of State's notice of filing Administrative Rules, dated June 20, 2008.

**ATTACHMENT F**   Agency Report, dated April 1, 2008.

**ATTACHMENT G**   Opening statements for December 20, 2006 and July 19, 2007, public hearings.

**ATTACHMENT H**   Newspaper affidavits dated November 16, 2006, and June 11, 2007.
Michigan Register dated November 15, 2006, and June 15, 2007.

## COMPLETENESS REVIEW

### Administrative Materials

1.  **A formal letter of submittal from the governor or designee requesting EPA approval of the revision.**

    Cover letter dated March 19, 2009, from Steven E. Chester, Director of the Michigan Department of Environmental Quality (MDEQ) to Mr. Bharat Mathur, Acting Regional Administrator, EPA Region 5, requesting approval of SIP revision.

2.  **Evidence that the state has adopted the revision in the state code or body of regulations; or issued the permit, order, or consent agreement (hereafter document) in final form. That evidence should include the date of adoption or final issuance as well as the effective date of the revision if different from the adoption/issuance date.**

    The final form of the adopted rule in Part 19, which went into effect on June 20, 2008, is included in Attachment A.

    The Certificate of Adoption dated May 21, 2008, signed by MDEQ Director Steven E. Chester, is included in Attachment B.

    A letter dated May 23, 2008, from MDEQ Director Steven E. Chester to the State Office of Administrative Hearings and Rules (SOAHR) is included in Attachment B.

3.  **Evidence that the state has the necessary legal authority under state law to adopt and implement the revision.**

    A letter dated February 22, 2003, from Governor Jennifer M. Granholm to EPA Region 5 delegates authority to the Director of MDEQ to make any submittal, request, or application under the Clean Air Act (Attachment C).

    The certification dated May 14, 2008, from SOAHR certifies that the rules are within the scope of the authority of the MDEQ (Attachment D).

4.  **A copy of the actual regulation or document submitted for approval and incorporation by reference into the SIP, including indication of the changes made to the existing approved SIP, where applicable. The submittal should be a copy of the official state regulation/document signed, stamped, and dated by the appropriate state official indicating that it is fully enforceable by the state. The effective date of the regulation/document should, whenever possible, be indicated in the document itself.**

    The Secretary of State's Notice of Filing Administrative Rules for Part 19, dated June 20, 2008, is included in Attachment E.

The final form of the adopted rules, Part 19, with the effective date of June 20, 2008, is included in Attachment A.

All Part 19 rules are new, as shown in Attachment H. As Part 19 rules dictate New Source Review for major sources impacting nonattainment areas, it replaces Rule 220. Rule 220 has been rescinded, as described in the SIP revision submittal for Part 2, Air Use Approval.

5.    **Evidence that the state followed all of the requirements of its administrative procedures act (or equivalent) in conducting and completing the adoption/issuance of the revision.**

The SOAHR certification, dated May 14, 2008, certifies that the rules are in conformity with the requirements of the Administrative Procedures Act, MCL 24.201 et seq. (Attachment D).

6.    **Evidence that public notice was given of the proposed change consistent with procedures approved by EPA, including date of publication of such notice.**

The affidavits of publication from four newspapers that published the notice of public hearing on November 16, 2006 and June 11, 2007, and the notice that was published in the <u>Michigan Register</u> on November 15, 2006 and June 15, 2007, are included in Attachment H.

7.    **Certification that public hearings were held in accordance with the information provided in the public notice and the state's administrative procedures act (or equivalent), if applicable.**

The May 14, 2008 certification from the SOAHR certifies that the rules have been promulgated in conformity with the requirements of the Administrative Procedures Act (Attachment D).

The Opening Statements for the December 20, 2006 and July 19, 2007 public hearing includes information on the notice of public hearing and instructions on how the hearing was to be conducted (Attachment G).

8.    **Compilation of public comments and state's response thereto.**

Summaries of the comments received and the MDEQ responses are in Section 11 of the Agency Report (Attachment F).

## <u>Technical support</u>

1.    **Justification of rules revisions.**

The "Purpose of the Proposed Rules and Background," Section 2, and "Summary of Proposed Rules," Section 3, of the Agency Report provides the purpose and justification of the proposed rules (Attachment F).

# ATTACHMENT A

DEPARTMENT OF ENVIRONMENTAL QUALITY

AIR QUALITY DIVISION

AIR POLLUTION CONTROL

Filed with the Secretary of State on June 20, 2008.
These rules become effective immediately upon filing with the Secretary of State
unless adopted under sections 33, 44, 45a(6), or 48 of 1969 PA 306. Rules adopted
under these sections become effective 7 days after filing with the Secretary of State.

(By authority conferred on the director of the department of environmental quality by
sections 5503, 5505, and 5512 of 1994 PA 451, MCL 324.5503, 324.5505, and
324.5512, and Executive Reorganization Order No. 1995-18, MCL 324.99903)

R 336.2901, R 336.2901a, R 336.2902, R 336.2903, R 336.2907, R 336.2908, and
R 336.2910 of the Michigan Administrative Code are added as follows:

PART 19. NEW SOURCE REVIEW FOR MAJOR SOURCES IMPACTING
NONATTAINMENT AREAS

R 336.2901 Definitions.
Rule 1901. The following definitions apply to terms used in this part. If a term
defined here is also defined elsewhere in these rules, then the definition contained
here supersedes for this part only:
(a) "Actual emissions" means the actual rate of emissions of a regulated new
source review pollutant from an emissions unit, as determined under R 336.1101(b),
except that this definition shall not apply for calculating whether a significant
emissions increase has occurred, or for establishing a plantwide applicability limit
under R 336.2907. Instead, the terms "projected actual emissions" and "baseline
actual emissions" shall apply for those purposes.
(b) "Baseline actual emissions" means the rate of emissions, in tons per year, of a
regulated new source review pollutant, as determined by the following:
(i) For any existing electric utility steam generating unit, baseline actual emissions
means the average rate, in tons per year, at which the unit actually emitted the
pollutant during any consecutive 24-month period selected by the owner or operator
within the 5-year period immediately preceding when the owner or operator begins
actual construction of the project. The department shall allow the use of a different
time period upon a determination that it is more representative of normal source
operation. The following shall apply:
(A) The average rate shall include fugitive emissions to the extent quantifiable, and
emissions associated with startups, shutdowns, and malfunctions.

(B) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24-month period.

(C) For a regulated new source review pollutant, when a project involves multiple emissions units, only 1 consecutive 24-month period shall be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24-month period may be used for each regulated new source review pollutant.

(D) The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (i)(B) of this subdivision.

(ii) For an existing emissions unit, other than an electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 10-year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the department for a permit required under R 336.1201, whichever is earlier, except that the 10-year period shall not include any period earlier than November 15, 1990. All of the following shall apply:

(A) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(B) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24-month period.

(C) The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the major stationary source must currently comply, had the major stationary source been required to comply with the limitations during the consecutive 24-month period. However, if an emission limitation is part of a maximum achievable control technology standard that the United States environmental protection agency proposed or promulgated under 40 C.F.R. part 63, then the baseline actual emissions need only be adjusted if the department has taken credit for such emissions reductions in an attainment demonstration or maintenance plan. Title 40 C.F.R. part 63 is adopted by reference in R 336.2901a.

(D) For a regulated new source review pollutant, when a project involves multiple emissions units, only 1 consecutive 24-month period shall be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24-month period may be used for each regulated new source review pollutant.

(E) The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by subparagraphs (B) and (C) of this paragraph.

(iii) For a new emissions unit, the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and

operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit.

(iv) For a plantwide applicability limit for a major stationary source, the baseline actual emissions shall be calculated for existing electric utility steam generating units under paragraph (i) of this subdivision, for other existing emissions units under paragraph (ii) of this subdivision, and for a new emissions unit under paragraph (iii) of this subdivision.

(c) "Begin actual construction" means, in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework, and construction of permanent storage structures. "A change in method of operation" refers to those on-site activities other than preparatory activities which mark the initiation of the change.

(d) "Best available control technology" or "BACT" means an emissions limitation, including a visible emissions standard, based on the maximum degree of reduction for each regulated new source review pollutant which would be emitted from any proposed major stationary source or major modification which the department, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. Application of best available control technology shall not result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 C.F.R. part 60 or 61, adopted by reference in R 336.2901a. If the department determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, then a design, equipment, work practice, operational standard, or combination thereof, may be prescribed instead to satisfy the requirement for the application of BACT. The standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of the design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

(e) "Building, structure, facility, or installation" means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on 1 or more contiguous or adjacent properties, and are under the control of the same person, or persons under common control, except the activities of any vessel. Pollutant-emitting activities are part of the same industrial grouping if they have the same 2-digit major group code associated with their primary activity. Major group codes and primary activities are described in the standard industrial classification manual, 1987. For assistance in converting north American industrial classification system codes to standard industrial classification codes see http://www.census.gov/epcd/naics02/.

(f) "Clean coal technology" means any technology, including technologies applied at the precombustion, combustion, or post-combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or

oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(g) "Clean coal technology demonstration project" means a project using funds appropriated under the heading "department of energy-clean coal technology," up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the United States environmental protection agency. The federal contribution for a qualifying project shall be at least 20% of the total cost of the demonstration project.

(h) [Reserved]

(i) "Commence" as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and has either of the following:

(i) Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time.

(ii) Entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

(j) "Construction" means any physical change or change in the method of operation, including fabrication, erection, installation, demolition, or modification of an emissions unit, that would result in a change in emissions.

(k) "Continuous emissions monitoring system" or "CEMS" means all of the equipment that may be required to meet the data acquisition and availability requirements of this rule, to sample, condition, if applicable, analyze, and provide a record of emissions on a continuous basis.

(l) "Continuous emissions rate monitoring system" or "CERMS" means the total equipment required for the determination and recording of the pollutant mass emissions rate, in terms of mass per unit of time.

(m) "Continuous parameter monitoring system" or "CPMS" means all of the equipment necessary to meet the data acquisition and availability requirements of this rule, to monitor process and control device operational parameters and other information, and to record average operational parameter values on a continuous basis.

(n) "Electric utility steam generating unit" means any steam electric generating unit that is constructed for the purpose of supplying more than 1/3 of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(o) "Emissions unit" means any part of a stationary source that emits or would have the potential to emit any regulated new source review pollutant. The term emissions unit includes an electric steam generating unit. Each emissions unit can be classified as either new or existing based on the following:

-5-

(i) A new emissions unit is any emissions unit that is, or will be, newly constructed and that has existed for less than 2 years from the date the emissions unit first operated.

(ii) An existing emissions unit is any emissions unit that does not meet the definition of a new emissions unit. A replacement unit is an existing emissions unit and no creditable emission reductions shall be generated from shutting down the existing emissions unit that is replaced. Replacement unit means all of the following:

(A) The emissions unit is a reconstructed unit as defined within R 336.1118(b) or the emissions unit completely takes the place of an existing emissions unit.

(B) The emissions unit is identical to or functionally equivalent to the replaced emissions unit.

(C) The replacement does not alter the basic design parameters of the process unit.

(D) The replaced emissions unit is permanently removed from the major stationary source, otherwise permanently disabled, or permanently barred from operation by a permit that is enforceable as a practical matter. If the replaced emissions unit is brought back into operation, it shall constitute a new emissions unit.

(p) "Federal land manager" means, with respect to any lands in the United States, the secretary of the department with authority over such lands.

(q) "Hydrocarbon combustion flare" means either a flare used to comply with an applicable new source performance standard or maximum achievable control technology standard, including uses of flares during startup, shutdown, or malfunction permitted under such a standard, or a flare that serves to control emissions of waste streams comprised predominately of hydrocarbons and containing not more than 230 milligrams per dry standard cubic meter hydrogen sulfide.

(r) "Lowest achievable emission rate" or "LAER" means, for any source, the more stringent rate of emissions based on either of the following:

(i) The most stringent emissions limitation that is contained in the implementation plan of any state for the same class or category of stationary source, unless the owner or operator of the proposed stationary source demonstrates that the limitations are not achievable.

(ii) The most stringent emissions limitation that is achieved in practice by the same class or category of stationary sources. This limitation, when applied to a modification, means the lowest achievable emissions rate for the new or modified emissions units within a stationary source. Application of the term shall not permit a proposed new or modified stationary source to emit any pollutant in excess of the amount allowable under an applicable new source performance standard.

(s) "Major modification" means the following:

(i) Any physical change in or change in the method of operation of a major stationary source that would result in both of the following:

(A) A significant emissions increase of a regulated new source review pollutant.

(B) A significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase from any emissions units or net emissions increase at a major stationary source that is significant for volatile organic compounds shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include any of the following:

(A) Routine maintenance, repair, and replacement.

(B) Use of an alternative fuel or raw material by reason of an order under sections 2 (a) and (b) of the energy supply and environmental coordination act of 1974, 15 U.S.C. §792 et seq., or any superseding legislation, or by reason of a natural gas curtailment plan under the federal power act of 1995, 16 U.S.C. §791-828c et seq.

(C) Use of an alternative fuel by reason of an order or rule under section 125 of the clean air act.

(D) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste.

(E) Use of an alternative fuel or raw material by a stationary source which meets either of the following:

(1) The source was capable of accommodating before December 21, 1976, unless the change would be prohibited under any federally enforceable permit condition that was established after December 12, 1976, under prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations.

(2) The source is approved to use under any permit issued under R 336.1201(1)(a).

(F) An increase in the hours of operation or in the production rate, unless such change is prohibited under any federally enforceable permit condition that was established after December 21, 1976, under R 336.1201(1)(a).

(G) Any change in ownership at a stationary source.

(H) [Reserved]

(I) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with both of the following:

(1) The state implementation plan.

(2) Other requirements necessary to attain and maintain the national ambient air quality standard during the project and after it is terminated.

(iv) This definition shall not apply with respect to a particular regulated new source review pollutant when the major stationary source is complying with the requirements of R 336.2907 for a plantwide applicability limit for that pollutant. Instead, the definition in R 336.2907(1)(h) shall apply.

(v) For the purposes of applying the requirements of R 336.2902(8) to modifications at major stationary sources of nitrogen oxides located in ozone nonattainment areas or in ozone transport regions, whether or not subject to subpart 2, part D, title 1 of the clean air act, any significant net emissions increase of nitrogen oxides is considered significant for ozone.

(vi) Any physical change in, or change in the method of operation of, a major stationary source of volatile organic compounds that results in any increase in emissions of volatile organic compounds from any discrete operation, emissions

unit, or other pollutant emitting activity at the source shall be considered a significant net emissions increase and a major modification for ozone, if the major stationary source is located in an extreme ozone nonattainment area that is subject to subpart 2, part D, title 1 of the clean air act.

(t) "Major stationary source" means all of the following:

(i) Any of the following:

(A) Any stationary source of air pollutants that emits or has the potential to emit 100 tons per year or more of any regulated new source review pollutant, except that lower emissions thresholds shall apply in areas subject to subpart 2, subpart 3, or subpart 4 of part D, title 1 of the clean air act, according to the following:

(1) In any serious ozone nonattainment area, 50 tons per year of volatile organic compounds.

(2) In an area within an ozone transport region except for any severe or extreme ozone nonattainment area, 50 tons per year of volatile organic compounds.

(3) In any severe ozone nonattainment area, 25 tons per year of volatile organic compounds.

(4) In any extreme ozone nonattainment area, 10 tons per year of volatile organic compounds.

(5) In any serious nonattainment area for carbon monoxide, where the department has determined that stationary sources contribute significantly to carbon monoxide levels in the area, 50 tons per year of carbon monoxide.

(6) In any serious nonattainment area for PM-10, 70 tons per year of PM-10.

(B) For the purposes of applying the requirements of R 336.2902(8) to stationary sources of nitrogen oxides located in an ozone nonattainment area or in an ozone transport region, any stationary source which emits, or has the potential to emit, 100 tons per year or more of nitrogen oxide emissions, except that the following emission thresholds shall apply in areas subject to subpart 2 of part D, title 1 of the clean air act:

(1) In any ozone nonattainment area classified as marginal or moderate, 100 tons per year or more of nitrogen oxides.

(2) In any ozone nonattainment area classified as a transitional, submarginal, or incomplete or no data area, when such area is located in an ozone transport region, 100 tons per year or more of nitrogen oxides.

(3) In any area designated under section 107(d) of the clean air act as attainment or unclassifiable for ozone that is located in an ozone transport region, 100 tons per year or more of nitrogen oxides.

(4) In any serious nonattainment area for ozone, 50 tons per year or more of nitrogen oxides.

(5) In any severe nonattainment area for ozone, 25 tons per year or more of nitrogen oxides.

(6) In any extreme nonattainment area for ozone, 10 tons per year or more of nitrogen oxides.

(C) Any physical change that would occur at a stationary source not qualifying under R 336.2901(t)(i)(A) or (B) as a major stationary source, if the change would constitute a major stationary source by itself.

(ii)  A major stationary source that is major for volatile organic compounds shall be considered major for ozone.

(iii)  The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this paragraph whether it is a major stationary source, unless the source belongs to 1 of the following categories of stationary sources:

(A)  Coal cleaning plants, with thermal dryers.

(B)  Kraft pulp mills.

(C)  Portland cement plants.

(D)  Primary zinc smelters.

(E)  Iron and steel mills.

(F)  Primary aluminum ore reduction plants.

(G)  Primary copper smelters.

(H)  Municipal incinerators capable of charging more than 250 tons of refuse per day.

(I)  Hydrofluoric, sulfuric, or nitric acid plants.

(J)  Petroleum refineries.

(K)  Lime plants.

(L)  Phosphate rock processing plants.

(M)  Coke oven batteries.

(N)  Sulfur recovery plants.

(O)  Carbon black plants, furnace process.

(P)  Primary lead smelters.

(Q)  Fuel conversion plants.

(R)  Sintering plants.

(S)  Secondary metal production plants.

(T)  Chemical process plants.

(U)  Fossil-fuel boilers, or combination thereof, totaling more than 250 million British thermal units per hour heat input.

(V)  Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels.

(W)  Taconite ore processing plants.

(X)  Glass fiber processing plants.

(Y)  Charcoal production plants.

(Z)  Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input.

(AA)  Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the clean air act.

(u)  "Necessary preconstruction approvals or permits" means a permit issued under R 336.1201(1)(a) that is required by R 336.2802 or R 336.2902.

(v)  "Net emissions increase" means all of the following:

(i)  With respect to any regulated new source review pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

(A)  The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated under R 336.2902(2).

(B) Any other increases and decreases in actual emissions at the major stationary source that occur within the contemporaneous period and are otherwise creditable.

(ii) The contemporaneous period must meet all of the following:

(A) Begins on the date 5 years before construction on the particular change commences.

(B) Ends on the date that the increase from the particular change occurs.

(iii) An increase or decrease in actual emissions is creditable only if the department has not relied on it in issuing a permit under R 336.1201(1)(a) or R 336.1214a, which permit is in effect when the increase in actual emissions from the particular change occurs.

(iv) The magnitude of a creditable, contemporaneous increase in actual emissions is determined by the amount that the allowable emissions following the increase exceed the emission unit's baseline actual emissions prior to the increase. This means allowable emissions and baseline actual emissions are determined from the date of the contemporaneous increase. Baseline actual emissions shall be determined as provided in the definition of baseline actual emissions, except that paragraphs (b)(i)(C) and (b)(ii)(D) of this subdivision shall not apply.

(v) A contemporaneous decrease in actual emissions is creditable only to the extent that all of the following occur:

(A) The magnitude of a creditable contemporaneous decrease is determined by the lower of the following:

(1) The amount by which the emission unit's baseline emissions prior to the decrease exceed the level of allowable emissions following the decrease.

(2) The amount by which the emission unit's allowable emissions prior to the decrease exceed the level of allowable emissions following the decrease.

(3) In determining the magnitude of a creditable contemporaneous decrease, allowable emissions and baseline actual emissions are determined from the date of the contemporaneous decrease. Baseline actual emissions shall be determined as provided in the definition of baseline actual emissions except that paragraphs (b)(i)(C) and (b)(ii)(D) of this subdivision shall not apply.

(B) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins.

(C) The department has not relied on it in issuing any permit under R 336.1201(1)(a) or R 336.1214a.

(D) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change.

(vi) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

(w) "Nonattainment major new source review" or "NSR" program means the requirements of this rule, R 336.1220, or R 336.1221. A permit issued under any of these rules is a major new source review permit.

(x) [Reserved]

(y) [Reserved]

(z) "Potential to emit" means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design only if the limitation or the effect it would have on emissions is legally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(aa) "Predictive emissions monitoring system" or "PEMS" means all of the equipment necessary to monitor process and control device operational parameters and other information and calculate and record the mass emissions rate on a continuous basis.

(bb) "Prevention of significant deterioration" or "PSD" permit means any permit that is issued under R 336.2802 or the prevention of significant deterioration of air quality regulations under 40 C.F.R. §52.21, adopted by reference in R 336.2901a.

(cc) "Project" means a physical change in, or change in the method of operation of, an existing major stationary source.

(dd) "Projected actual emissions" means the following:

(i) The maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated new source review pollutant in any 1 of the 5 12-month periods following the date the unit resumes regular operation after the project, or in any 1 of the 10 12-month periods following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit of that regulated new source review pollutant and full utilization of the unit would result in a significant emissions increase or a significant net emissions increase at the major stationary source.

(ii) In determining the projected actual emissions before beginning actual construction, the owner or operator of the major stationary source shall do the following:

(A) Consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the state or federal regulatory authorities, and compliance plans under the approved state implementation plan.

(B) Include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(C) Exclude, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24-month period used to establish the baseline actual emissions of this rule and that are also unrelated to the particular project, including any increased utilization due to product demand growth.

(D) Elect to use the emissions unit's potential to emit in tons per year instead of calculating projected actual emissions.

(ee) "Regulated new source review pollutant" means any of the following:

(i) Nitrogen oxides or any volatile organic compounds.

-11-

(ii) Any pollutant for which a national ambient air quality standard has been promulgated.

(iii) Any pollutant that is a constituent or precursor of a general pollutant listed under paragraphs (i) or (ii) of this subdivision, provided that a constituent or precursor pollutant may only be regulated under new source review as part of regulation of the general pollutant.

(ff) "Secondary emissions" means emissions that would occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. For the purpose of this rule, secondary emissions shall be specific, well defined, quantifiable, and impact the same general area as the stationary source or modification which causes the secondary emissions. Secondary emissions include emissions from any off-site support facility that would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification. Secondary emissions do not include any emissions that come directly from a mobile source such as emissions from the tailpipe of a motor vehicle, from a train, or a vessel.

(gg) "Significant" means all of the following:

(i) "Significant" means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants at a rate of emissions that would equal or exceed any of the following pollutant emission rates:

(A) Carbon monoxide: 100 tons per year.

(B) Nitrogen oxides: 40 tons per year.

(C) Sulfur dioxide: 40 tons per year.

(D) Ozone: 40 tons per year of volatile organic compounds or of nitrogen oxides.

(E) Lead: 0.6 tons per year.

(F) PM-10: 15 tons per year of PM-10.

(ii) Notwithstanding the significant emissions rate for ozone in R 336.2901(gg)(i)(D), significant means, in reference to an emissions increase or a net emissions increase, any increase in actual emissions of volatile organic compounds that would result from any physical change in, or change in the method of operation of, a major stationary source located in a serious or severe ozone nonattainment area that is subject to subpart 2, part D, title 1 of the clean air act, if such emissions increase of volatile organic compounds exceeds 25 tons per year.

(iii) For the purposes of applying the requirements of R 336.2902(8) to modifications at major stationary sources of nitrogen oxides located in an ozone nonattainment area or in an ozone transport region, the significant emission rates and other requirements for volatile organic compounds in R 336.2901(gg)(i)(D), R 336.2901(gg)(ii) and R 336.2901(gg)(v) shall apply to nitrogen oxides emissions.

(iv) Notwithstanding the significant emissions rate for carbon monoxide in R 336.2901(gg)(i)(A), significant means, in reference to an emissions increase or a net emissions increase, any increase in actual emissions of carbon monoxide that would result from any physical change in, or change in the method of operation of, a major stationary source in a serious nonattainment area for carbon monoxide if such increase equals or exceeds 50 tons per year, provided that the United States

environmental protection agency has determined that the stationary sources contribute significantly to carbon monoxide levels in that area.

(v) Notwithstanding the significant emissions rates for ozone in R 336.2901(gg)(i)(D) and R 336.2901(gg)(ii), any increase in actual emissions of volatile organic compounds from any emissions unit at a major stationary source of volatile organic compounds located in an extreme ozone nonattainment area that is subject to subpart 2, part D, title 1 of the clean air act shall be considered a significant net emissions increase.

(hh) "Significant emissions increase" means, for a regulated new source review pollutant, an increase in emissions that is significant for that pollutant.

(ii) "Stationary source" means any building, structure, facility, or installation which emits or may emit a regulated new source review pollutant.

(jj) "Temporary clean coal technology demonstration project" means a clean coal technology demonstration project that is operated for a period of 5 years or less, and that complies with the state implementation plan and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

R 336.2901a  Adoption by reference.

Rule 1901a. For the purpose of clarifying the definitions in these rules, the following documents are adopted by reference in these rules. Copies of the documents are available for inspection and purchase at the Air Quality Division, Department of Environmental Quality, 525 West Allegan Street, P.O. Box 30260, Lansing, Michigan 48909-7760, at a cost as of the time of adoption of these rules (AQD price). Copies of may be obtained from the Superintendent of Documents, Government Printing Office, P.O. Box 371954, Pittsburgh, Pennsylvania, 15250-7954, at a cost as of the time of adoption of these rules (GPO), or on the United States government printing office internet web site at http://www.access.gpo.gov.

(a) Title 40 C.F.R. 51.902(b), 40 C.F.R., part 51, appendix S, section IV, "Sources That Would Locate in a Designated Nonattainment Area," (2006), AQD price $55.00/GPO price $45.00.

(b) Title 40 C.F.R., §52.21, "Prevention of Significant Deterioration of Air Quality," (2006), AQD price $70.00/GPO price $60.00.

(c) Title 40 C.F.R., part 60, "Standards of Performance for New Stationary Sources," (2006), AQD price $68.00/GPO price $58.00 for 60.1-end and AQD price $67.00/GPO price $57.00 for the appendices.

(d) Title 40 C.F.R., part 61, "National Emission Standards for Hazardous Air Pollutants," (2006), AQD price $55.00/GPO price $45.00.

(e) Title 40 C.F.R., part 63, "National Emission Standards for Hazardous Air Pollutants for Source Categories," (2006), AQD $68.00/GPO $58.00 for 63.1-63.599; AQD $60.00/GPO $50.00 for 63.600-63.1199; AQD $60.00/GPO $50.00 for 63.1200-63.1439; AQD $42.00/GPO $32.00 for 63.1440-63.6175; AQD $42.00/GPO $32.00 for 63.6580-63.8830; and AQD $45.00/GPO $35.00 for 63.8980-end.

(f) Table 1 of the United States environmental protection agency's "Recommended Policy on Control of Volatile Organic Compounds," 42 FR 35314,

July 8, 1977, at no cost. Copies of table 1 may be obtained from the Library of Michigan, State Law Library, 525 West Ottawa Street, P.O. Box 30007, Lansing, Michigan 48909, E-mail lmlawlib@michigan.gov, at no cost.

R 336.2902 Applicability.
  Rule 1902. (1) This part applies to the construction of each new major stationary source or major modification that is both of the following:
  (a) Located in a nonattainment area.
  (b) Major for the pollutant for which the area is designated nonattainment.
  For areas designated as nonattainment for ozone, this part shall apply only to any new major stationary source or major modification that is major for volatile organic compounds or nitrogen oxides.
  (2) This part applies to the construction of new major sources and major modifications to existing sources as follows:
  (a) Except as otherwise provided in subrule (3) of this rule, and consistent with the definition of major modification, a project is a major modification for a regulated new source review pollutant if it causes both of the following emissions increases:
  (i) A significant emissions increase.
  (ii) A significant net emissions increase.
The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.
  (b) The procedure for calculating whether a significant emissions increase will occur depends upon the type of emissions units being modified. The procedure for calculating whether a significant net emissions increase will occur at the major stationary source is contained in the definition of net emissions increase. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.
  (c) The actual-to-projected-actual applicability test may be used for projects that only involve existing emissions units. A significant emissions increase of a regulated new source review pollutant is projected to occur if the sum of the difference between the projected actual emissions and the baseline actual emissions, for each existing emissions unit, equals or exceeds the significant amount for that pollutant.
  (d) The actual-to-potential test may be used for projects that involve construction of new emissions units or modification of existing emissions units. A significant emissions increase of a regulated new source review pollutant is projected to occur if the sum of the difference between the potential to emit from each new and modified emissions unit following completion of the project and the baseline actual emissions of these units before the project equals or exceeds the significant amount for that pollutant.
  (e) The hybrid test may be used for projects that involve multiple types of emissions units. A significant emissions increase of a regulated new source review pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the appropriate methods specified above in this subrule as

applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant.

(3) Any major stationary source for a plantwide applicability limit for a regulated new source review pollutant shall comply with R 336.2907.

(4) The provisions of this rule do not apply to a source or modification that would be a major stationary source or major modification only if fugitive emissions to the extent quantifiable are considered in calculating the potential to emit of the stationary source or modification and the source does not belong to any of the following categories:

(a) Coal cleaning plants, with thermal dryers.

(b) Kraft pulp mills.

(c) Portland cement plants.

(d) Primary zinc smelters.

(e) Iron and steel mills.

(f) Primary aluminum ore reduction plants.

(g) Primary copper smelters.

(h) Municipal incinerators capable of charging more than 250 tons of refuse per day.

(i) Hydrofluoric, sulfuric, or citric acid plants.

(j) Petroleum refineries.

(k) Lime plants.

(l) Phosphate rock processing plants.

(m) Coke oven batteries.

(n) Sulfur recovery plants.

(o) Carbon black plants, furnace process.

(p) Primary lead smelters.

(q) Fuel conversion plants.

(r) Sintering plants.

(s) Secondary metal production plants.

(t) Chemical process plants.

(u) Fossil-fuel boilers, or combination thereof, totaling more than 250 million British thermal units per hour heat input.

(v) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels.

(w) Taconite ore processing plants.

(x) Glass fiber processing plants.

(y) Charcoal production plants.

(z) Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input.

(aa) Any other stationary source category which, as of August 7, 1980, is regulated under section 111 or 112 of the clean air act.

(5) The following additional construction and permitting requirements apply:

(a) Approval to construct shall not relieve any owner or operator of the responsibility to comply fully with any other applicable requirements and any other requirements under local, state, or federal law.

-15-

(b) At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforcement limitation that was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements of R 336.2908 shall apply to the source or modification as though construction had not yet commenced on the source or modification.

(6) The following provisions apply to projects at existing emissions units at a major stationary source that is subject to either prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations in circumstances where there is a reasonable possibility that a project that is not a part of a major modification may result in a significant emissions increase and the owner or operator elects to use the method in R 336.2901(dd) or R 336.2801(ll) for calculating projected actual emissions:

(a) Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

(i) A description of the project.

(ii) Identification of the emissions units whose emissions of a regulated new source review pollutant may be affected by the project.

(iii) A description of the applicability test used to determine that the project is not a major modification for any regulated new source review pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under R 336.2901(dd)(ii)(C) and an explanation for why such amount was excluded, and any netting calculations, if applicable.

(b) If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information required by subdivision (a) of this subrule to the department. This subdivision does not require the owner or operator of such a unit to obtain any determination from the department before beginning actual construction.

(c) The owner or operator shall monitor the emissions of any regulated new source review pollutant that could increase as a result of the project and that is emitted by any emissions units identified under subdivision (a)(ii) of this subrule and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit of that regulated new source review pollutant at the emissions unit.

(d) If the unit is an existing electric utility steam generating unit, then the owner or operator shall submit a report to the department within 60 days after the end of each year during which records shall be generated under subdivision (c) of this subrule setting out the unit's annual emissions during the year that preceded submission of the report.

(e) If the unit is an existing unit other than an electric utility steam generating unit, then the owner or operator shall submit a report to the department if the annual emissions, in tons per year, from the project identified pursuant to this subrule, exceed the baseline actual emissions by a significant amount for that regulated new

source review pollutant, and if such emissions differ from the preconstruction projection. The report shall be submitted to the department within 60 days after the end of such year. The report shall contain all of the following information:

(i) The name, address and telephone number of the major stationary source.

(ii) The annual emissions as calculated under subdivision (c) of this subrule.

(iii) Any other information that the owner or operator wishes to include in the report, for example, an explanation as to why the emissions differ from the preconstruction projection.

(f) A reasonable possibility that a project may result in a significant emissions increase occurs when the project is subject to R 336.1201(1)(a) and is not exempted from the requirement to obtain a permit to install by R 336.1278 to R 336.1290. If the owner or operator determines that the project is exempted by R 336.1278 to R 336.1290, then the owner or operator may proceed with the project without obtaining a permit to install. If an owner or operator develops calculations for the project pursuant to R 336.2901(dd) or R 336.2801(ll), the calculations may be used for the purpose of demonstrating compliance with R 336.1278a(1)(c).

(7) The owner or operator of the source shall make the information required to be documented and maintained under this rule available for review upon a request for inspection by the department, or the general public under section 5516(2) of the act, MCL 324.5516(2).

(8) The requirements of this part that apply to major stationary sources and major modifications of volatile organic compounds shall also apply to nitrogen oxides emissions from major stationary sources and major modifications of nitrogen oxides in an ozone transport region or in any ozone nonattainment area, except in ozone nonattainment areas or portions of an ozone transport region where the United States environmental protection agency has granted a NOx waiver applying the standards set forth under section 182(f) of the clean air act and the waiver continues to apply.

R 336.2903 Additional permit requirements for sources impacting nonattainment areas.

Rule 1903. (1) No new major stationary source or major modification shall be constructed in an area designated as attainment or unclassifiable for any national ambient air quality standard under section 107 of the clean air act, without first applying for a permit to install under R 336.1201(1)(a). The department shall not approve any permit to install that would cause or contribute to a violation of any national ambient air quality standard.

(2) A major source or major modification shall be considered to cause or contribute to a violation of a national ambient air quality standard when the source or modification would, at a minimum, exceed the following significance levels in Table 191 at any locality that does not or would not meet the applicable national standard:

-17-

Table 191

| Pollutant | Averaging time (hours) | | | | |
|---|---|---|---|---|---|
| | Annual | 24 | 8 | 3 | 1 |
| Sulfur dioxide | 1.0 ug/m$^3$ | 5 ug/m$^3$ | | 25 ug/m$^3$ | |
| PM-10 | 1.0 ug/m$^3$ | 5 ug/m$^3$ | | | |
| Nitrogen dioxide | 1.0 ug/m$^3$ | | | | |
| Carbon Monoxide | | | 500 ug/m$^3$ | | 2000 ug/m$^3$ |

(3) The owner of a major stationary source or major modification subject to this rule may reduce the impact of its emissions upon air quality by obtaining sufficient emission reductions to, at a minimum, compensate for its adverse ambient impact where the major source or major modification would otherwise cause or contribute to a violation of any national ambient air quality standard. In the absence of such emission reductions, the department shall deny the proposed construction.

(4) This rule shall not apply to a major stationary source or major modification with respect to a particular pollutant if the owner or operator demonstrates that, as to that pollutant, the source or modification is located in a nonattainment area.

R 336.2907 Actuals plantwide applicability limits or PALs.

Rule 1907. (1) The following definitions apply to the use of actuals PALs. If a term is not defined in these paragraphs, then it shall have the meaning given in R 336.2901:

(a) "Actuals PAL for a major stationary source" means a PAL based on the baseline actual emissions of all emissions units at the source that emit or have the potential to emit the PAL pollutant.

(b) "Allowable emissions" means allowable emissions as defined in R 336.1101(k), except this definition is modified in the following manner:

(i) The allowable emissions for any emissions unit shall be calculated considering any emission limitations that are enforceable as a practical matter on the emissions unit's potential to emit.

(ii) An emissions unit's potential to emit shall be determined using the definition in R 336.2901(z), except that the words "or enforceable as a practical matter" shall be added after "legally enforceable."

(c) "Small emissions unit" means an emissions unit that emits or has the potential to emit the PAL pollutant in an amount less than the significant level for that PAL pollutant.

(d) "Major emissions unit" means either of the following:

(i) Any emissions unit that emits or has the potential to emit 100 tons per year or more of the PAL pollutant in an attainment area.

(ii) Any emissions unit that emits or has the potential to emit the PAL pollutant in an amount that is equal to or greater than the major source threshold for the PAL pollutant as defined by the clean air act for nonattainment areas. For example, in accordance with the definition of major stationary source in section 182(c) of the clean air act, an emissions unit is a major emissions unit for volatile organic compounds if the emissions unit is located in a serious ozone nonattainment area

and it emits or has the potential to emit 50 or more tons of volatile organic compounds per year.

(e) "Plantwide applicability limitation" or "PAL" means an emission limitation, expressed in tons per year, for a pollutant at a major stationary source that is enforceable as a practical matter and established source-wide in accordance with this rule.

(f) "PAL effective date" generally means the date of issuance of the PAL permit. However, the PAL effective date for an increased PAL is the date any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(g) "PAL effective period" means the period beginning with the PAL effective date and ending 10 years later.

(h) "PAL major modification" means, notwithstanding R 336.2901(s) and (v), the definitions for major modification and net emissions increase, any physical change in or change in the method of operation of the PAL source that causes it to emit the PAL pollutant at a level equal to or greater than the PAL.

(i) "PAL permit" means the permit to install that establishes a PAL for a major stationary source.

(j) "PAL pollutant" means the pollutant for which a PAL is established at a major stationary source.

(k) "Significant emissions unit" means an emissions unit that emits or has the potential to emit a PAL pollutant in an amount that is equal to or greater than the significant level  for that PAL pollutant, but less than the amount that would qualify the unit as a major emissions unit.

(2) The following requirements pertain to applicability:

(a) The department may approve the use of an actuals PAL for any existing major stationary source if the PAL meets the requirements of this rule.  "PAL" means "actuals PAL" in this rule.

(b) The department shall not allow an actuals PAL for volatile organic compounds or nitrogen oxides for any major stationary source located in an extreme ozone nonattainment area.

(c) For physical change in or change in the method of operation of a major stationary source that maintains its total source-wide emissions below the PAL level, meets the requirements of this rule, and complies with the PAL permit, all of the following shall apply:

(i) Is not a major modification for the PAL pollutant.

(ii) Does not have to be approved through the permitting requirements of this rule.

(iii) Is not subject to the provisions in R 336.2902(5)(b), restrictions on relaxing enforceable emission limitations that the major stationary source used to avoid applicability of the nonattainment major new source review program.

(d) Except as provided under subdivision (c)(iii) of this subrule, a major stationary source shall continue to comply with all applicable federal, state, or local requirements, emission limitations, and work practice requirements that were established before the effective date of the PAL.

(3) As part of a permit application requesting a PAL, the owner or operator of a major stationary source shall submit all of the following information to the department for approval:

(a) A list of all emissions units at the source designated as small, significant, or major based on their potential to emit. In addition, the owner or operator of the source shall indicate which, if any, federal, state, or local applicable requirements, emission limitations, or work practices apply to each unit.

(b) Calculations of the baseline actual emissions with supporting documentation. Baseline actual emissions shall include emissions associated not only with operation of the unit, but also emissions associated with startup, shutdown, and malfunction.

(c) The calculation procedures that the major stationary source owner or operator proposes to use to convert the monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total for each month as required by subrule (13)(a) of this rule.

(4) The following general requirements apply for establishing PALs:

(a) The department may establish a PAL at a major stationary source, provided that, at a minimum, all the following requirements are met:

(i) The PAL shall impose an annual emission limitation in tons per year, which is enforceable as a practical matter, for the entire major stationary source. For each month during the PAL effective period after the first 12 months of establishing a PAL, the major stationary source owner or operator shall show that the sum of the monthly emissions from each emissions unit under the PAL for the previous 12 consecutive months is less than the PAL (a 12-month total, rolled monthly). For each month during the first 11 months from the PAL effective date, the major stationary source owner or operator shall show that the sum of the preceding monthly emissions from the PAL effective date for each emissions unit under the PAL is less than the PAL.

(ii) The PAL shall be established in a permit to install that meets the public participation requirements in subrule (5) of this rule.

(iii) The PAL permit to install shall contain all the requirements of subrule (7) of this rule.

(iv) The PAL shall include fugitive emissions, to the extent quantifiable, from all emissions units that emit or have the potential to emit the PAL pollutant at the major stationary source.

(v) Each PAL shall regulate emissions of only 1 pollutant.

(vi) Each PAL shall have a PAL effective period of 10 years.

(vii) The owner or operator of the major stationary source with a PAL shall comply with the monitoring, recordkeeping, and reporting requirements provided in subrules (12) to (14) of this rule for each emissions unit under the PAL through the PAL effective period.

(b) At no time, during or after the PAL effective period, are emissions reductions of a PAL pollutant, which occur during the PAL effective period, creditable as decreases for purposes of offsets under R 336.2908(5) unless the level of the PAL is reduced by the amount of such emissions reductions and such reductions would be creditable in the absence of the PAL.

(5) PALs for existing major stationary sources shall be established, renewed, or increased through a permit to install issued under R 336.1201(1)(a). The department shall provide the public with notice of the proposed approval of a PAL permit and at least a 30-day period for submittal of public comment. The department shall address all material comments before taking final action on the permit.

(6) The following apply to setting the 10-year actuals PAL level.

(a) Except as provided in subdivision (b) of this subrule, the actuals PAL level for a major stationary source shall be established as the sum of the baseline actual emissions of the PAL pollutant for each emissions unit at the source; plus an amount equal to the applicable significant level for the PAL pollutant. When establishing the actuals PAL level, for a PAL pollutant, only 1 consecutive 24-month period shall be used to determine the baseline actual emissions for all existing emissions units. However, a different consecutive 24-month period may be used for each different PAL pollutant. Emissions associated with units that were permanently shut down after this 24-month period shall be subtracted from the PAL level. The department shall specify a reduced PAL level, in tons per year, in the PAL permit to become effective on the future compliance date of any applicable federal or state regulatory requirements before issuance of the PAL permit. For instance, if the source owner or operator will be required to reduce emissions from industrial boilers in half from baseline emissions of 60 parts per million nitrogen oxides to a new rule limit of 30 parts per million, then the permit shall contain a future effective PAL level that is equal to the current PAL level reduced by half of the original baseline emissions of such unit.

(b) For newly constructed units, which do not include modifications to existing units, on which actual construction began after the 24-month period, instead of adding the baseline actual emissions as specified in subdivision (a) of this subrule, the emissions shall be added to the PAL level in an amount equal to the potential to emit of the units.

(7) The PAL permit shall contain, at a minimum, all of the following information:

(a) The PAL pollutant and the applicable source-wide emission limitation in tons per year.

(b) The PAL permit effective date and the expiration date of the PAL (PAL effective period).

(c) Specification in the PAL permit that if a major stationary source owner or operator applies to renew a PAL under subrule (10) of this rule before the end of the PAL effective period, then the PAL shall not expire at the end of the PAL effective period. The PAL shall remain in effect until a revised PAL permit is issued by the department.

(d) A requirement that emission calculations for compliance purposes include emissions from startups, shutdowns, and malfunctions.

(e) A requirement that, once the PAL expires, the major stationary source is subject to subrule (9) of this rule.

(f) The calculation procedures that the major stationary source owner or operator shall use to convert the monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total for each month as required by subrule (13)(a) of this rule.

-21-

(g) A requirement that the major stationary source owner or operator monitor all emissions units under subrule (12) of this rule.

(h) A requirement to retain on-site the records required under subrule (13) of this rule. The records may be retained in an electronic format.

(i) A requirement to submit the reports required under subrule (14) of this rule by the required deadlines.

(j) Any other requirements that the department determines necessary to implement and enforce the PAL.

(8) The following shall apply to the PAL effective period and reopening of the PAL permit:

(a) The department shall specify a PAL effective period of 10 years.

(b) The following shall apply to reopening of the PAL permit:

(i) During the PAL effective period, the department shall reopen the PAL permit to do any of the following:

(A) Correct typographical or calculation errors made in setting the PAL or reflect a more accurate determination of emissions used to establish the PAL.

(B) Reduce the PAL if the owner or operator of the major stationary source creates creditable emissions reductions for use as offsets under R 336.2908(5)(b) through (h).

(C) Revise the PAL to reflect an increase in the PAL as provided under subrule (11) of this rule.

(ii) The department may reopen the PAL permit for any of the following:

(A) Reduce the PAL to reflect newly applicable federal requirements with compliance dates after the PAL effective date.

(B) Reduce the PAL consistent with any other requirement, that is enforceable as a practical matter, and that the department may impose on the major stationary source under the state implementation plan.

(C) Reduce the PAL if the department determines that a reduction is necessary to avoid causing or contributing to a national ambient air quality standard or PSD increment violation, or to an adverse impact on an air quality related value that has been identified for a federal class I area by a federal land manager and for which information is available to the general public.

(iii) Except for a permit reopening for the correction of typographical or calculation errors that do not increase the PAL level, all other reopenings shall be carried out in accordance with the public participation requirements of subrule (5) of this rule.

(9) Any PAL, which is not renewed in accordance with the procedures in subrule (10) of this rule, shall expire at the end of the PAL effective period, and the following requirements of this paragraph shall apply:

(a) Each emissions unit, or each group of emissions units, that existed under the PAL shall comply with an allowable emission limitation under a revised permit established according to the following procedures:

(i) Within the time frame specified for PAL renewals in subrule (10)(b) of this rule, the major stationary source shall submit a proposed allowable emission limitation for each emissions unit, or each group of emissions units, if such a distribution is more appropriate as determined by the department, by distributing the PAL allowable emissions for the major stationary source among each of the emissions units that

MICHIGAN STATE IMPLEMENTATION PLAN

-22-

existed under the PAL. If the PAL had not yet been adjusted for an applicable requirement that became effective during the PAL effective period, as required under subrule (10)(e) of this rule, then the distribution shall be made as if the PAL had been adjusted.

(ii) The department shall determine whether and how the PAL allowable emissions will be distributed and issue a revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as the department determines is appropriate.

(b) Each emissions unit shall comply with the allowable emission limitation on a 12-month rolling basis. The department may approve the use of monitoring systems other than CEMS, CERMS, PEMS or CPMS to demonstrate compliance with the allowable emission limitation.

(c) Until the department issues the revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, the source shall continue to comply with a source-wide, multi-unit emissions cap equivalent to the level of the PAL emission limitation.

(d) Any physical change or change in the method of operation at the major stationary source shall be subject to the nonattainment major new source review requirements if the change meets the definition of major modification in R 336.2901(s).

(e) The major stationary source owner or operator shall continue to comply with all state, federal, or local applicable requirements that may have applied either during the PAL effective period or before the PAL effective period, except for those emission limitations that were eliminated by the PAL under subrule (2)(c)(iii) of this rule.

(10) The following shall apply to renewal of a PAL:

(a) The department shall follow the procedures specified in subrule (5) of this rule in approving any request to renew a PAL for a major stationary source, and shall provide both the proposed PAL level and a written rationale for the proposed PAL level to the public for review and comment. During such public review, any person may propose a PAL level for the source for consideration by the department.

(b) A major stationary source owner or operator shall submit a timely application to the department to request renewal of a PAL. A timely application is one that is submitted at least 6 months before, but not earlier than 18 months from, the date of permit expiration. This deadline for application submittal is to ensure that the permit will not expire before the permit is renewed. If the owner or operator of a major stationary source submits a complete application to renew the PAL within this time period, then the PAL shall continue to be effective until the revised permit with the renewed PAL is issued.

(c) The application to renew a PAL permit shall contain all of the following information:

(i) The information required in subrule (3) of this rule.

(ii) A proposed PAL level.

(iii) The sum of the potential to emit of all emissions units under the PAL with supporting documentation.

(iv) Any other information the owner or operator wishes the department to consider in determining the appropriate level for renewing the PAL.

(d) In determining whether and how to adjust the PAL, the department shall consider either of the options outlined in paragraphs (i) and (ii) of this subdivision. The adjustment shall comply with paragraph (iii) of this subdivision.

(i) If the emissions level calculated in accordance with subrule (6) of this rule is equal to or greater than 80% of the PAL level, the department may renew the PAL at the same level without considering the factors in paragraph (ii) of this subdivision.

(ii) The department may set the PAL at a level that it determines to be more representative of the source's baseline actual emissions, or that it determines to be appropriate considering air quality needs, advances in control technology, anticipated economic growth in the area, desire to reward or encourage the source's voluntary emissions reductions, or other factors as specifically identified by the department in its written rationale.

(iii) Notwithstanding paragraphs (i) and (ii) of this subdivision, both of the following shall apply:

(A) If the potential to emit of the major stationary source is less than the PAL, then the department shall adjust the PAL to a level not greater than the potential to emit of the source.

(B) The department shall not approve a renewed PAL level higher than the current PAL, unless the major stationary source has complied with subrule (11) of this rule.

(e) If the compliance date for a state, federal, or local requirement that applies to the PAL source occurs during the PAL effective period, and if the department has not already adjusted for such requirement, then the PAL shall be adjusted at the time of PAL permit renewal or renewable operating permit renewal, whichever occurs first.

(11) The following shall apply to increasing a PAL during the PAL effective period:

(a) The department may increase a PAL emission limitation only if the major stationary source complies with the following provisions:

(i) The owner or operator of the major stationary source shall submit a complete application to request an increase in the PAL limit for a PAL major modification. The application shall identify the emissions units contributing to the increase in emissions so as to cause the major stationary source's emissions to equal or exceed its PAL.

(ii) As part of this application, the major stationary source owner or operator shall demonstrate that the sum of the baseline actual emissions of the small emissions units, plus the sum of the baseline actual emissions of the significant and major emissions units assuming application of BACT equivalent controls, plus the sum of the allowable emissions of the new or modified emissions units exceeds the PAL. The level of control that would result from BACT equivalent controls on each significant or major emissions unit shall be determined by conducting a new BACT analysis at the time the application is submitted, unless the emissions unit is currently required to comply with a BACT or LAER requirement that was established within the preceding 10 years. In such a case, the assumed control level for that emissions unit shall be equal to the level of BACT or LAER with which that emissions unit shall currently comply.

(iii) The owner or operator obtains a major new source review permit for all emissions units identified in paragraph (i) of this subdivision, regardless of the magnitude of the emissions increase resulting from them (that is, no significant levels apply). These emissions units shall comply with any emissions requirements resulting from the nonattainment major new source review program process (for example, LAER), even though they have also become subject to the PAL or continue to be subject to the PAL.

(iv) The PAL permit shall require that the increased PAL level shall be effective on the day any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(b) The department shall calculate the new PAL as the sum of the allowable emissions for each modified or new emissions unit, plus the sum of the baseline actual emissions of the significant and major emissions units, assuming application of BACT equivalent controls as determined in subdivision (a)(ii) of this subrule, plus the sum of the baseline actual emissions of the small emissions units.

(c) The PAL permit shall be revised to reflect the increased PAL level under the public notice requirements of subrule (5) of this rule.

(12) The following shall apply to monitoring requirements for PALs:

(a) The following general requirements shall apply:

(i) Each PAL permit shall contain enforceable requirements for the monitoring system that accurately determines plantwide emissions of the PAL pollutant in terms of mass per unit of time. Any monitoring system authorized for use in the PAL permit shall be based on sound science and meet generally acceptable scientific procedures for data quality and manipulation. Additionally, the information generated by the system shall meet minimum legal requirements for admissibility in a judicial proceeding to enforce the PAL permit.

(ii) The PAL monitoring system shall employ 1 or more of the 4 general monitoring approaches meeting the minimum requirements set forth in subdivision (b) of this subrule and shall be approved by the department.

(iii) Notwithstanding paragraph (ii) of this subdivision, an owner or operator may also employ an alternative monitoring approach that meets paragraph (i) of this subdivision if approved by the department.

(iv) Failure to use a monitoring system that meets the requirements of this rule renders the PAL invalid.

(b) Minimum performance requirements for approved monitoring approaches. The following are acceptable general monitoring approaches when conducted in accordance with the minimum requirements in subdivisions (c) to (i) of this subrule:

(i) Mass balance calculations for activities using coatings or solvents.

(ii) CEMS.

(iii) CPMS or PEMS.

(iv) Emission factors.

(c) An owner or operator using mass balance calculations to monitor PAL pollutant emissions from activities using coating or solvents shall meet all of the following requirements:

(i) Provide a demonstrated means of validating the published content of the PAL pollutant that is contained in or created by all materials used in or at the emissions unit.

(ii) Assume that the emissions unit emits all of the PAL pollutant that is contained in or created by any raw material or fuel used in or at the emissions unit, if it cannot otherwise be accounted for in the process.

(iii) Where the vendor of a material or fuel, which is used in or at the emissions unit, publishes a range of pollutant content from such material, then the owner or operator shall use the highest value of the range to calculate the PAL pollutant emissions unless the department determines there is site-specific data or a site-specific monitoring program to support another content within the range.

(d) An owner or operator using CEMS to monitor PAL pollutant emissions shall meet both of the following requirements:

(i) CEMS shall comply with applicable performance specifications found in 40 C.F.R. part 60, appendix B, adopted by reference in R 336.2901a.

(ii) CEMS shall sample, analyze, and record data at least every 15 minutes while the emissions unit is operating.

(e) An owner or operator using CPMS or PEMS to monitor PAL pollutant emissions shall meet both of the following requirements:

(i) The CPMS or the PEMS shall be based on current site-specific data demonstrating a correlation between the monitored parameters and the PAL pollutant emissions across the range of operation of the emissions unit.

(ii) Each CPMS or PEMS shall sample, analyze, and record data at least every 15 minutes, or at another less frequent interval approved by the department, while the emissions unit is operating.

(f) An owner or operator using emission factors to monitor PAL pollutant emissions shall meet all of the following requirements:

(i) All emission factors shall be adjusted, if appropriate, to account for the degree of uncertainty or limitations in the factors' development.

(ii) The emissions unit shall operate within the designated range of use for the emission factor, if applicable.

(iii) If technically practicable, the owner or operator of a significant emissions unit that relies on an emission factor to calculate PAL pollutant emissions shall conduct validation testing to determine a site-specific emission factor within 6 months of PAL permit issuance, unless the department determines that testing is not required.

(g) A source owner or operator shall record and report maximum potential emissions without considering enforceable emission limitations or operational restrictions for an emissions unit during any period of time that there is no monitoring data, unless another method for determining emissions during such periods is specified in the PAL permit.

(h) Notwithstanding the requirements in subdivision (c) to (g) of this subrule, if an owner or operator of an emissions unit cannot demonstrate a correlation between the monitored parameters and the PAL pollutant emissions rate at all operating points of the emissions unit, then the department shall, at the time of permit issuance do either of the following:

(i)  Establish default values for determining compliance with the PAL based on the highest potential emissions reasonably estimated at such operating points.

(ii)  Determine that operation of the emissions unit during operating conditions when there is no correlation between monitored parameters and the PAL pollutant emissions is a violation of the PAL.

(i)  All data used to establish the PAL pollutant must be re-validated through performance testing or other scientifically valid means approved by the department. Testing shall occur at least once every 5 years after issuance of the PAL.

(13)  All of the following recordkeeping requirements shall apply:

(a)  The PAL permit shall require an owner or operator to retain a copy of all records necessary to determine compliance with this rule and of the PAL, including a determination of each emissions unit's 12-month rolling total emissions, for 5 years from the date of the record.

(b)  The PAL permit shall require an owner or operator to retain a copy of all of the following records for the duration of the PAL effective period plus 5 years:

(i)  A copy of the PAL permit application and any applications for revisions to the PAL.

(ii)  Each annual certification of compliance pursuant to renewable operating permit and the data relied on in certifying the compliance.

(14)  The owner or operator shall submit semiannual monitoring reports and prompt deviation reports to the department in accordance with the source's renewable operating permit.  The reports shall meet all of the following requirements:

(a)  The semiannual report shall be submitted to the department within 30 days of the end of each reporting period.  This report shall contain all of the following information:

(i)  The identification of owner and operator and the permit number.

(ii)  Total annual emissions, tons per year, based on a 12-month rolling total for each month in the reporting period recorded under subrule (13)(a) of this rule.

(iii)  All data relied upon, including, but not limited to, any quality assurance or quality control data, in calculating the monthly and annual PAL pollutant emissions.

(iv)  A list of any emissions units modified or added to the major stationary source during the preceding 6-month period.

(v)  The number, duration, and cause of any deviations or monitoring malfunctions, other than the time associated with zero and span calibration checks, and any corrective action taken.

(vi)  A notification of a shutdown of any monitoring system, whether the shutdown was permanent or temporary, the reason for the shutdown, the anticipated date that the monitoring system will be fully operational or replaced with another monitoring system, whether the emissions unit monitored by the monitoring system continued to operate, and the calculation of the emissions of the pollutant or the number determined by method included in the permit, as provided by subrule (12)(g) of this rule.

(vii)  A signed statement by the responsible official, as defined by the applicable renewable operating permit, certifying the truth, accuracy, and completeness of the information provided in the report.

-27-

(b) The major stationary source owner or operator shall promptly submit reports of any deviations or exceedance of the PAL requirements, including periods where no monitoring is available. A report submitted under R 336.1213(3)(c)(ii) shall satisfy this reporting requirement. The deviation reports shall be submitted within the time limits prescribed by the source's renewable operating permit. The reports shall contain all of the following information:

(i) The identification of owner and operator and the permit number.

(ii) The PAL requirement that experienced the deviation or that was exceeded.

(iii) Emissions resulting from the deviation or the exceedance.

(iv) A signed statement by the responsible official, as defined by the source's renewable operating permit, certifying the truth, accuracy, and completeness of the information provided in the report.

(c) The owner or operator shall submit to the department the results of any re-validation test or method within 3 months after completion of the test or method.

R 336.2908  Conditions for approval of a major new source review permit in a nonattainment area.

Rule 1908.  (1) The department may only issue a permit approving the construction of a new major stationary source or major modification in a nonattainment area if the department has determined that the owner or operator of the major stationary source or major modification will comply with all of the provisions of this rule.

(2) The owner or operator of the proposed major stationary source or major modification shall provide an analysis of alternative sites, sizes, production processes, and environmental control techniques for the proposed major stationary source or major modification which demonstrates that the benefits of the proposed major stationary source or major modification significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.

(3) The major stationary source or major modification shall comply with the lowest achievable emissions rate for each regulated new source review pollutant for which the area is designated as nonattainment.

(4) All stationary sources which have a potential to emit 100 or more tons per year of any air contaminant regulated under the clean air act, which are located in the state, and which are owned or controlled by the owner, operator, or an entity controlling, controlled by, or under common control with, the owner or operator of the proposed major stationary source or major modification shall be in compliance with all applicable local, state, and federal air quality regulations and shall be in compliance with a legally enforceable permit condition or order of the department specifying a plan and timetable for compliance.

(5) Before the start-up of the new major stationary source or major modification, an emission reduction offset for each major nonattainment air contaminant shall be provided consistent with the following provisions:

(a) The baseline for determining credit for emissions reductions is the emissions limit under the state implementation plan in effect at the time the application to

construct is filed, except that the offset baseline shall be the actual emissions of the source from which offset credit is obtained where either of the following occurs:

(i) The demonstration of reasonable further progress and attainment of ambient air quality standards is based upon the actual emissions of sources located within the nonattainment area.

(ii) The state implementation plan does not contain an emissions limitation for that source or source category.

(b) The following requirements apply to emissions offset credits:

(i) Where the allowable emissions are greater emissions than the potential to emit of the source, emissions offset credit shall be allowed only for control below this potential.

(ii) For an existing fuel combustion source, credit shall be based on the source's allowable emissions for the type of fuel being burned at the time the application to construct is filed. If the existing source commits to switch to a cleaner fuel at some future date, then emissions offset credit based on the allowable, or actual, emissions for the fuels involved is not acceptable, unless the permit is conditioned to require the use of a specified alternative control measure which would achieve the same degree of emissions reduction should the source switch back to a dirtier fuel at some later date. The department shall ensure that adequate long-term supplies of the new fuel are available before granting emissions offset credit for fuel switches.

(c) An emission reduction credit shall not be creditable as an emission offset unless it meets the following requirements:

(i) Emissions reductions that have been achieved by shutting down an existing emission unit or curtailing production or operating hours may be generally credited for offsets only if they meet all of the following requirements:

(A) The reductions are surplus, permanent, quantifiable and federally enforceable.

(B) The shutdown or curtailment occurred after the last day of the base year for the SIP planning process. The department may choose to consider a prior shutdown or curtailment to have occurred after the last day of the base year if the projected emissions inventory used to develop the attainment demonstration explicitly includes emissions from such previously shutdown or curtailed emission units. However, credit shall not be given for shutdowns that occurred before August 7, 1977.

(ii) Emissions reductions that are achieved by shutting down an existing emissions unit or curtailing production or operating hours and that do not meet the requirements of R 336.2908(5)(c)(i)(B) may be generally credited only if they meet either of the following:

(A) The shutdown or curtailment occurred on or after the date the construction permit application is filed.

(B) The applicant can establish that the proposed new emissions unit is a replacement for the shutdown or curtailed emissions unit, and the emissions reductions are surplus, permanent, quantifiable and federally enforceable.

(d) Emissions credit shall not be allowed for replacing 1 hydrocarbon compound with another of lesser reactivity, except for those compounds listed in table 1 of the United States environmental protection agency's "Recommended Policy on Control of Volatile Organic Compounds," 42 FR 35314, July 8, 1977, adopted by reference in R 336.2901a.

(e)  All emission reductions claimed as offset credit shall be federally enforceable.

(f)  Offsets shall be obtained from the same nonattainment area as the proposed major source or major modification, except another nonattainment area may be used if both of the following conditions are met:

(i)  The other area has an equal or higher nonattainment classification than the area in which the proposed source is located.

(ii)  Nonattainment air contaminant emissions from the other area contribute to a violation of a national ambient air quality standard in the nonattainment area in which the proposed major source or major modification would be located.

(g)  Credit for an emissions reduction may be claimed to the extent that the reviewing authority has not relied on it in issuing any permit required by R 336.1220 or R 336.2902 and the department has not relied on it in demonstrating attainment or reasonable further progress.

(h)  The total tonnage of increased emissions, in tons per year, resulting from a major modification that must be offset shall be determined by summing the difference between the allowable emissions after the modification and the actual emissions before the modification for each emissions unit.  Unless specified otherwise in this rule, the offset ratio for each nonattainment air pollutant that will be emitted in significant amounts from a new major source or major modification located in a nonattainment area that is subject to subpart 1, part D, title 1of the clean air act shall be at least 1:1.

(i)  The provisions of this subrule do not apply to emissions resulting from proposed major sources or major modifications to the extent that the emissions are temporary and will not prevent reasonable further progress towards attainment of any applicable standard.  Examples of temporary emissions include emissions from all of the following:

(i)  Pilot plants.

(ii)  Portable facilities which will be relocated outside the nonattainment area within 18 months.

(iii)  The construction phase of a new major stationary source or major modification.

(6)  For facilities meeting the emissions offset requirements of R 336.2908(5) for ozone nonattainment areas that are subject to subpart 2, part D, title 1 of the clean air act, the facility must meet the following requirements:

(a)  The ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be as follows:

(i)  In any marginal nonattainment area for ozone, the ratio shall be 1.1:1.

(ii)  In any moderate nonattainment area for ozone, the ratio shall be 1.15:1.

(iii)  In any serious nonattainment area for ozone, the ratio shall be 1.2:1.

(iv)  In any severe nonattainment area for ozone, the ratio shall be 1.3:1, except that the ratio may be 1.2:1 if all existing major sources in the severe nonattainment area use BACT for the control of VOC.

(v)  In any extreme nonattainment area for ozone, the ratio shall be 1.5:1, except that the ratio may be 1.2:1 if all existing major sources in the extreme nonattainment area use BACT for the control of VOC.

(b)  Not withstanding the requirements of R 336.2908(6)(a) for meeting the requirements of R 336.2908(5), the ratio of total actual emissions reductions of VOC

to the emissions increase of VOC shall be 1.15:1 for all areas within an ozone transport region that is subject to subpart 2, part D, title 1 of the clean air act except for serious, severe, and extreme ozone nonattainment areas that are subject to subpart 2, part D, title 1 of the clean air act.

(c)  For each facility meeting the emissions offset requirements of R 336.2908(5) for ozone nonattainment areas that are subject to subpart 1, part D, title 1 of the clean air act but are not subject to subpart 2, part D, title 1 of the clean air act, including 8-hour ozone nonattainment areas subject to 40 C.F.R. 51.902(b), the ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be 1:1.  Title 40 C.F.R. 51.902(b) is adopted by reference in R 336.2901a.

(7)  The requirements of this section that apply to major stationary sources and major modifications of PM-10 shall also apply to major stationary sources and major modifications of PM-10 precursors, except when the department determines that such sources do not contribute significantly to PM-10 levels that exceed the PM-10 ambient standards in the area.

R 336.2910  Administrative hearings.

Rule 1910.  A person aggrieved by an action or inaction of the department under prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations may request a formal hearing, under 1969 PA 306, MCL 24.201.  The following apply:

(a)  The request shall be received by the department within 30 days after the person received notice of the decision to approve or deny the permit.

(b)  The final decision in granting a contested case hearing lies with the department.  To receive a contested case hearing, a person shall demonstrate 1 of the following:

(i)  The person is the permit applicant.

(ii)  The person participated in the permit review process, either by submitting written comments during the 30-day public notice period or by attending the public hearing and making comments for the official record, and the comments were not adequately addressed by the department in the permit review process.

(iii)  The terms or conditions of the permit for which the person requests a hearing were added by the department after the 30-day notice period expired, and no additional opportunity for public input was offered by the department.

(c)  When the department issues a permit pursuant to the requirements of the prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations, the permit is valid upon issuance and it is not automatically stayed if a person requests a formal hearing pursuant to this rule.  A permittee may immediately initiate construction after permit issuance.  However, the permittee faces the risk that a subsequent hearing may alter the terms or conditions of the permit.

MICHIGAN STATE IMPLEMENTATION PLAN

# ATTACHMENT B



STATE OF MICHIGAN
## DEPARTMENT OF ENVIRONMENTAL QUALITY
LANSING



JENNIFER M. GRANHOLM
GOVERNOR

STEVEN E. CHESTER
DIRECTOR


## <u>CERTIFICATE OF ADOPTION</u>


I, Steven E. Chester, Director of the Department of Environmental Quality, do formally adopt the attached administrative rules by adding R 336.2901, R 336.2901a, R 336.2902, R 336.2903, R 336.2907, R 336.2908, and R 336.2910 of the Michigan Administrative Code.

These rules are adopted pursuant to Sections 5503 and 5512 of Part 55, Air Pollution Control, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, and Executive Order 1995-18.


$5-21-08$
_____
Date

_____
Steven E. Chester, Director


SOAHR 2004-054EQ



STATE OF MICHIGAN
DEPARTMENT OF ENVIRONMENTAL QUALITY
LANSING



JENNIFER M. GRANHOLM
GOVERNOR

STEVEN E. CHESTER
DIRECTOR

May 23, 2008

Ms. Norene Lind, Administrative Rules Manager
State Office of Administrative Hearings and Rules
Department of Labor and Economic Growth
Ottawa Building - Fourth Floor
611 West Ottawa
Lansing, Michigan 48933-1070

Dear Ms. Lind:

SUBJECT:  Certificate of Adoption for Administrative Rules Promulgated Pursuant to
Part 55, Air Pollution Control, of the Natural Resources and Environmental
Protection Act, 1994 PA 451, as Amended (Act 451), SOAHR 2004-054EQ

The Certificate of Adoption for the administrative rules promulgated pursuant to Part 55
of Act 451 is being forwarded to you, along with a reference copy of the administrative
rules, in accordance with the provisions of Executive Order 2005-1 and the January 5,
1996, memorandum from the former Office of Regulatory Reform. These rules are
necessary to implement a complete, modern New Source Review program that meets
all federal requirements for permitting major sources in nonattainment areas.

The rules were certified by the Legislative Service Bureau on May 12, 2008, and were
formally approved by your office on May 14, 2008. The rules were delivered to the Joint
Committee on Administrative Rules on May 14, 2008.

If you have questions or comments regarding the rule changes, please contact
Ms. Susan Maul, Acting Regulatory Reform Officer, at 517-241-1552, or you may
contact me.

Sincerely,

Steven E. Chester
Director
517-373-7917

Enclosures

Ms. Norene Lind                                    2                                  May 23, 2008


cc:  Mr. Jim Sygo, Deputy Director, DEQ
     Ms. Susan Maul, Acting Regulatory Reform Officer, DEQ
     Mr. G. Vinson Hellwig, DEQ
     Ms. Jane Permoda, DEQ
     Mr. Jeffrey Rathbun, DEQ
cc/enc:  AQD, SOAHR 2004-054EQ File

# ATTACHMENT C



**STATE OF MICHIGAN**
OFFICE OF THE GOVERNOR

**JENNIFER M. GRANHOLM**
JENNIFER M. GRANHOLM
GOVERNOR

February 22, 2003

Mr. Thomas V. Skinner, Regional Administrator
U.S. Environmental Protection Agency
Region 5
77 West Jackson Boulevard (R-19J)
Chicago, Illinois 60604-3507

Dear Mr. Skinner:

The federal Clean Air Act (CAA) requires Michigan to submit revisions to the State Implementation Plan. It also provides an opportunity for the state to request delegations and make grant applications to fund air quality programs.

I hereby delegate my authority to make any submittal, request, or application under the CAA to Director Steven E. Chester of the Michigan Department of Environmental Quality (MDEQ). This delegation was effective on January 1, 2003.

Sincerely,

Jennifer M. Granholm
Governor

cc: Mr. Steven E. Chester, Director, MDEQ
    Mr. Stanley F. Pruss, Deputy Director, MDEQ

PRINTED ON
RECYCLED PAPER

# ATTACHMENT D

MICHIGAN STATE IMPLEMENTATION PLAN



**L**EGISLATIVE
**S**ERVICE
**B**UREAU

Since 1941

**Legal Division**

**John C. Bollman, Director**

## CERTIFICATE OF APPROVAL

I hereby certify that the Legislative Service Bureau has examined the attached proposed rules of the Department of Environmental Quality, dated March 26, 2008, adding R 336.2901, R 336.2901a, R 336.2902, R 336.2903, R 336.2907, R 336.2908, and R 336.2910 to the Department's rules entitled "Air Pollution Control," and further certify that, pursuant to section 45 of 1969 PA 306, MCL 24.245, the Legislative Service Bureau approves the rules as to form, classification, and arrangement.

Dated: May 12, 2008

LEGISLATIVE SERVICE BUREAU

By _____
        Elliott Smith, Director



STATE OF MICHIGAN

JENNIFER M. GRANHOLM
GOVERNOR

STATE OFFICE OF ADMINISTRATIVE HEARINGS AND RULES

PETER L. PLUMMER
EXECUTIVE DIRECTOR

# **LEGAL CERTIFICATION OF RULES**

I certify that I have examined the attached administrative rules, dated March 26, 2008, in which the Department of Environmental Quality proposes to modify a portion of the Michigan Administrative Code entitled, "**Air Pollution Control - Part 19. New Source Review for Major Sources of Nonattainment Areas,**" by:

♦ Adding R 336.2901, R 336.2901a, R 336.2902, R 336.2903, R 336.2907, R 336.2908, and R 336.2910.

The Legislative Service Bureau has approved the proposed rules as to form, classification, and arrangement.

I approve the rules as to legality pursuant to the Administrative Procedures Act, MCL 24.201 *et seq.* and Executive Order No. 2005-1. In certifying the rules as to legality, I have determined that they are within the scope of the authority of the agency, do not violate constitutional rights, and are in conformity with the requirements of the Administrative Procedures Act.

Dated: _5- 14- 08_

State Office of Administrative Hearings and Rules

By: _____

Peter L. Plummer, Executive Director

2004-054 EQ

MICHIGAN STATE IMPLEMENTATION PLAN



STATE OF MICHIGAN

JENNIFER M. GRANHOLM
GOVERNOR

STATE OFFICE OF ADMINISTRATIVE HEARINGS AND RULES
LANSING

PETER L. PLUMMER
EXECUTIVE DIRECTOR

May 14, 2008

Ms. Colleen Curtis
Joint Committee on Administrative Rules
Boji Tower; 4th Floor - 124 W. Allegan
P.O. 30036
Lansing, Michigan 48909-7536

Dear Ms. Curtis:

On behalf of the State Office of Administrative Hearings and Rules, I hereby submit the
following rule set for consideration by the Joint Committee on Administrative Rules:

**(2004-054 EQ)      Air Pollution Control – Part 19. New Source Review
for Major Sources of Nonattainment Areas**

Enclosed, you will find copies of the following:

1. 1 copy of the LSB formal certificate.
2. 1 copy of the SOAHR formal certificate.
3. 1 copy of the Regulatory Impact Statement.
4. 1 copy of the draft rules.
5. 1 copy of the JCAR Agency Report.

Please let me know if you have any questions. I can be reached at 1-4146.

Thanks.

Sincerely,

Norene Lind, Administrative Rules Manager
State Office of Administrative Hearings and Rules

enclosures

State Office of Administrative Hearings and Rules
611 W. Ottawa St. • P.O. BOX 30695 • Lansing, Michigan 48909-8195
www.michigan.gov • (517) 335-2484

# ATTACHMENT E

MICHIGAN STATE IMPLEMENTATION PLAN

STATE OF MICHIGAN
TERRI LYNN LAND, SECRETARY OF STATE
DEPARTMENT OF STATE
LANSING

**RECEIVED**

JUN 2 6 2008

AIR QUALITY DIV

June 20, 2008

### NOTICE OF FILING
### ADMINISTRATIVE RULES

To: Secretary of the Senate
    Clerk of the House of Representatives
    Joint Committee on Administrative Rules
    State Office of Administrative Hearings and Rules (08-06-08)
    Legislative Service Bureau (2004-054 EQ)
    Department of Labor and Economic Growth
  ✓ Department of Environmental Quality

In accordance with the provisions of Section 46(1) of Act 306, Public Acts of 1969, as amended, and Executive Order 1995-6 this is to advise you that the Michigan Department of Labor and Economic Growth, State Office of Administrative Hearings and Rules filed at 4:39 P.M. this date, administrative rule (08-06-08) for the Department of Environmental Quality "Part 19 – New Source Review for Major Sources Impacting Nonattainment Areas."

These rules take effect immediately after filing with the Secretary of State.

Sincerely,

Terri Lynn Land
Secretary of State

Robin Houston, Office Supervisor
Office of the Great Seal

Enclosure

MICHIGAN STATE IMPLEMENTATION PLAN

# ATTACHMENT F

Agency Report to the
**JOINT COMMITTEE ON ADMINISTRATIVE RULES**

This form must be completed by the department/agency that has the statutory authority for promulgating the rules. Please send an electronic copy of this form to the State Office of Administrative Hearings and Rules (SOAHR) at **soahr_rules@michigan.gov**. The SOAHR will review the document, the newspaper advertisements, and the corresponding rules prior to completing the legal certification of the rules. Please be sure to send to the SOAHR proofs of publication for the three newspaper advertisements required by MCL 24.242(1). You may mail them or send them as a scanned attachment.

**Department**
Environmental Quality

**Division/agency/bureau:**
Air Quality Division (AQD)

**Rule set number (as assigned by SOAHR)**
2004-054EQ

**Title of rules:**
Michigan Air Pollution Control Rules; Part 19, New Source Review for Major Sources Impacting Nonattainment Areas

**1.     Name, address, FAX and phone numbers of agency contact person:**
Mary Ann Halbeisen, Constitution Hall; Phone 517-373-7045; Fax 517-241-7499

**2.     Purpose for the proposed rules and background:**
Rule packages SOAHR 2004-006EQ, 2004-007EQ, and 2005-054EQ contain the rules necessary to implement a complete, modern New Source Review (NSR) program that meets all federal requirements for permitting major sources in nonattainment areas. These rules were developed, together with SOAHR 2004-008EQ (which consists of rules for NSR permitting in attainment areas), for the purpose of achieving a complete NSR permitting State Implementation Plan (SIP) for Michigan. Currently, the AQD permits major sources of air pollution located in nonattainment areas through R 336.1220. R 336.1220 has been approved by the U.S. Environmental Protection Agency (EPA) into Michigan's SIP; however, it reflects federal requirements from the mid-1980's.

These rule packages adopt the most recent federal permitting requirements (40 C.F.R. §51.165). These changes are necessary to satisfy a federal mandate, because the EPA required that all states adopt these rules (that is, 40 C.F.R. §51.165) by January 2, 2006. This mandate, known as a "SIP Call," was published in the *Federal Register* on December 31, 2002, at 67 F.R. 80186, 80240-41. The EPA could sanction Michigan for

not meeting the federal mandate. Sanctions could include a moratorium on new construction in the state, a loss of federal grant funds, and a loss of federal highway funds.

These rules are the product of extensive stakeholder input. The stakeholder group consisted mainly of members of the industrial sector and representatives of the environmental community. The first stakeholder meeting was held on March 19, 2004, and the final meeting was held on March 14, 2006. All of the proposed rules are supported by the stakeholder workgroup. Additionally, the Department of Environmental Quality's (DEQ's) Environmental Advisory Council was briefed on the rule development on June 17, 2004.

A public hearing was originally held on this rules package on December 20, 2006. Additional information pertinent to the draft rules was received after the public comment was closed. The draft rules were revised and a second public hearing was held on July 19, 2007, to take public comment on two changes to proposed Rule 1901.

### 3.    Summary of proposed rules:

Original Proposal

This rules package creates a new Part 19 and adds seven new rules. The package adds R 336.2901 through R 336.2903, R 336.2907, R 336.2908, and R 336.2910 (Rules 1901-1903, 1907, 1908, and 1910).

The new rules reflect all requirements of the Clean Air Act (CAA), 42 U.S.C. 7501 – 7509a, and also reflect recent changes to 40 C.F.R. §51.165. These changes were promulgated by the EPA in an effort to make applicability more flexible by encouraging efficient, emission-reducing improvements at existing permitted sources. The new rules mirror the federal requirements. However, the format has been changed to reflect Michigan administrative rule promulgation requirements.

Rule 1910 allows the administrative appeal of permit application decisions. It does not mirror the requirements of 40 C.F.R. §51.165. However, this rule was added to ensure that the administrative procedures for processing permits to install in a state-administered permitting program would be as similar as possible to the federal administrative appeal process that is currently in place for the PSD permitting program.

Two portions of the Part 19 rules contain language that is intended to apply in attainment areas (i.e. the Part 18 rules) as well as in nonattainment areas. This language addresses issues that arose after the public hearing was held for the Part 18 rules. Including this language in the Part 19 rules will ensure that interested members of the public have adequate opportunity to review and comment. The two provisions are described as follows:

- Rule 1902(6)(f) states that a major stationary source that uses the projected actual emissions method to determine that its modification is insignificant must verify the projection on an annual basis for five years after the change whenever there is a reasonable possibility that the modification could be significant. The rule then defines the term "reasonable possibility" to mean any modification that is subject to the AQD minor permitting program. This addresses recent concerns expressed by the D.C. Circuit Court regarding the federal rules and is consistent with the way the AQD is currently implementing the federal PSD permitting rules.

- Rule 1910(c) explicitly states that a permit is valid upon issuance and it is not subsequently stayed if a contested case hearing is requested. Since absent a rule or law that requires a stay upon appeal a permit is valid upon issuance, the AQD did not include this language in the Part 18 PSD rules package. However, the lack of this language has caused uncertainty among the stakeholders, so clarifying language has been included in Part 19. The AQD anticipates that, under a future rulemaking, the language in Rule 1910 will be moved to Part 17, Hearings, of the Air Pollution Control Rules, and Rules 1910 and 1830 will be rescinded.

Additional Information Received and Associated Proposed Changes

Two significant changes have been made to the Part 19 rules since the December 20, 2006, public hearing. The first of these changes is the addition of the definition "replacement unit" under the definition for "emissions unit" in Rule 1901(o). This change is proposed because the definition was inadvertently omitted in the original proposal because it was the DEQ's understanding that all federal requirements relating to routine maintenance, repair and replacement were stayed by a court decision. The DEQ has since learned that this was not the case.

The second change affects Rule 1901(v), which is the definition for "net emissions increase." While working with the new Part 18 PSD rules, the DEQ identified that this definition was not identical to the federal requirements. The definition for "net emissions increase" found in both the Part 18 PSD rules and draft Part 19 rules is more restrictive. This was not the DEQ's intent. While the definition for "net emissions increase" will be changed in the Part 18 PSD rules during a future rulemaking, the Part 19 definition for "net emissions increase" is proposed to be amended at this time so that it also mirrors the federal requirements.

Each of the draft Part 19 rules are summarized as follows:

R 336.2901 Definitions

This new rule will replace Rule 220, which contains the nonattainment requirements that are currently effective in Michigan. This rule contains definitions for terms used in Part 19's nonattainment permitting program. These definitions apply to terms used in Part 19 only. If a term used in Part 19 is not defined in Rule 1901, then the definition from Part 1 applies. If the term is also not defined in Part 1, then the common understanding should be used.

With the exception of some formatting changes, these rules are identical to 40 C.F.R. §51.165 — the federal minimum requirements for state nonattainment permitting programs. Several other minor wording changes were made to meet state rule promulgation requirements. No substantive changes were made from the federal requirements.

R 336.2901a Adoption by reference

This new rule adopts a number of documents by reference for the sole purpose of clarifying the definitions in these rules.

R 336.2902 Applicability

This new rule will also replace R 336.1220, which contains the applicability requirements for the federal nonattainment rule currently effective in Michigan. This rule defines the applicability of the Part 19 nonattainment permitting program. The rule applies to the construction of any new major stationary source or major modification that is major for the pollutant for which the area in which the proposed major stationary source or major modification is designated as a nonattainment area. The rule states that major modifications occur when a project causes a significant increase in an air pollutant.

With the exception of some formatting changes, these rules are identical to 40 C.F.R. §51.165(a)(2), (a)(4), (a)(5), (a)(6), (a)(7) and (a)(8) – the federal minimum requirements for state nonattainment permitting programs. No substantive changes were made from the federal requirements.

R 336.2903 Additional permit requirements for nonattainment areas

This new rule defines the permitting requirements for new major stationary sources or major modifications to sources that are located in any area designated as attainment or unclassifiable for any National Ambient Air Quality Standard but impacting a nonattainment area.

With the exception of some formatting changes, these rules are identical to 40 C.F.R. §51.165(b) – the federal minimum requirements for state nonattainment permitting programs. No substantive changes were made from the federal requirements.

Case 2:22-cv-11191-GAD-CI **MICHIGAN STATE IMPLEMENTATION PLAN** ECF No. 29-16, PageID.1598 Filed 10/04/22 Page 54 of 134

- 5 -

R 336.2907 Actuals plantwide applicability limits or PALs

This new rule defines Plantwide Applicability Limits (PALs) and contains the applicability requirements for new or existing major stationary sources that choose to accept a federally enforceable PAL.

With the exception of some formatting changes, these rules are identical to 40 C.F.R. §51.165(f) – the federal minimum requirements for state nonattainment permitting programs. No substantive changes were made from the federal requirements.

R336.2908 Conditions for approval of a major new source review permit in a nonattainment area.

This new rule consolidates the requirements an applicant must meet to obtain a new source review permit for a source located in a nonattainment area. The requirements consolidated under this rule include Lowest Achievable Emission Rate (LAER), offsets and an analysis of alternative sites, sizes, production processes and environmental control techniques.

With the exception of some formatting changes, these rules are identical to 40 C.F.R. §51.165(a)(3), (a)(9) and (a)(10) – the federal minimum requirements for state nonattainment permitting programs. These rules are also identical to the Clean Air Act, Title I, Part D, Section 173 (a)(1), (a)(2), (a)(3) and (a)(5). No substantive changes were made from the federal requirements.

R 336.2910 Administrative hearings

This new rule is intended to provide a parallel appeal procedure to the one that is currently in place for the federal nonattainment program that is effective in 40 C.F.R. §124.

The rule creates a right to an administrative hearing before a state administrative law judge that is similar to the current appeal rights under the federal PSD permitting program. Rule 1910 is not intended to be submitted as part of Michigan's SIP.

**4.    Name of newspapers and date of publication in newspapers (minimum 3 newspapers of general circulation, representing different parts of the state, one of which must be located in the Upper Peninsula):**

The notice for the December 20, 2006, public hearing was published November 16, 2006, in the following newspapers:
- Lansing State Journal
- Grand Rapids Press
- Pontiac Oakland Press
- Marquette Mining Journal

The notice for the July 19, 2007, public hearing was published June 11, 2007, in the following newspapers:
- Lansing State Journal
- Pontiac Oakland Press
- Marquette Mining Journal

**5.** **Time, date, location and duration of public hearings:**

| |
|---|
| December 20, 2006; 10:00-10:35 a.m.; Constitution Hall, 525 West Allegan Street, Lansing |
| July 19, 2007, 10:00-10:50 a.m., Constitution Hall, 525 West Allegan Street, Lansing |

**6.** **Date of publication of rules and public hearing notice in *Michigan Register:***

| |
|---|
| November 15, 2006, for the December 20, 2006, public hearing |
| June 15, 2007, for the July 19, 2007, public hearing |

**7.** **Agency representative(s) attending hearing (include agency name and title of representative[s]):**

The following attended the December 20, 2006, public hearing:

Bryce Feighner, Supervisor, Chemical Process Unit, Permit Section, AQD
Lynn Fiedler, Supervisor, Permit Section, AQD
Mary Ann Halbeisen, Administrative Rules Coordinator, AQD
Marion Hart, Supervisor, Administration Section, AQD
Jeffrey Rathbun, Engineer, Permit Section, AQD
Holly Gohlke, Environmental Quality Analyst, Water Bureau
James Ostrowski, Environmental Quality Analyst, Environmental Science and Services Division

The following attended the July 19, 2007, public hearing:

Mary Ann Dolehanty, Supervisor, Thermal Process Unit, AQD
Mary Ann Halbeisen, Administrative Rules Coordinator, AQD
Asadullah Khan, Environmental Engineer, AQD
Steve Kish, Environmental Engineer Specialist, AQD
Susan Maul, DEQ Regulatory Reform Officer
Mary Maupin, Environmental Quality Specialist, AQD
Jeffrey Rathbun, Environmental Engineer, AQD
Barbara Rosenbaum, Supervisor, Air Quality Evaluation Section, AQD
Teresa Walker, Environmental Quality Analyst, AQD

**8.      Names, organizations and (complete) addresses of persons attending the hearing:**

The following attended the December 20, 2006, public hearing:

Kent Evans, Director, Air Quality Services, Consumers Energy, 1945 West Parnell Road, Jackson, MI 49201
Mike Johnston, Director of Regulatory Affairs, Michigan Manufacturers Association, 620 Capitol Avenue, Lansing, MI 48933
Angela Riess, Michigan Department of Agriculture, 525 West Allegan Street, Lansing, MI 48933

No one attended the July 19, 2007, public hearing.


**9.      Persons submitting letters, comments and testimony of support:**

The following comments were submitted for the December 20, 2006, public hearing:

- Julie C. Becker, Alliance of Automobile Manufacturers, 1401 Eye Street, NW, Suite 900, Washington, DC 20005-6562
- Kent Evans, Director, Air Quality Services, Consumers Energy
- Jason M. Prentice, Consumers Energy
- Mike Johnston, Director of Regulatory Affairs, Michigan Manufacturers Association

The following comments were submitted for the July 19, 2007, public hearing:

- Melissa Trustman, Director, Government Relations, Detroit Regional Chamber, One Woodward Avenue, Suite 1900, P.O. Box 33840, Detroit, MI 48232-0840
- Michael Johnston, Director of Regulatory Affairs, Michigan Manufacturers Association, 320 South Capitol Avenue, Lansing, MI 48933-4247


**10.      Persons submitting letters, comments and testimony for changes:**

The following submitted comments for the December 20, 2006, public hearing:

- Julie C. Becker, Alliance of Automobile Manufacturers, 1401 Eye Street, NW, Suite 900, Washington, DC 20005-6562
- Kent Evans, Director, Air Quality Services, Consumers Energy
- Jason M. Prentice, Consumers Energy
- Mike Johnston, Director of Regulatory Affairs, Michigan Manufacturers Association

The following submitted comments for the July 19, 2007, public hearing:
- Dennis J. Karl, Regional Manager, Environmental Quality Office, Ford Motor Company, Three Parklane Boulevard, Suite 950 West, Dearborn, MI 48126
- Laura L. Cossa, Region V, U.S. Environmental Protection Agency (U.S. EPA), 77 West Jackson Boulevard, Chicago, IL 60604-3507

- 8 -

**11a.    Summary of suggestions to modify proposed rules from December 20, 2006, hearing:**

### R 336.2901(z) and R 336.2907(1)(b)(ii)

**Comment:** The DEQ received three similar comments regarding the definition for "potential to emit:" Continuing the theme of uniformity with federal law for competitive reasons, the definition of "potential to emit" should clearly limit enforceability to the state level, ensuring enforceability as a practical matter and not handing that authority over Michigan sources to the federal government. In the wake of the U.S. Court of Appeals Decision in *Clean Air Implementation Project v. EPA No. 96-1224 (D.C. Cir. 1996),* the EPA eliminated this requirement and Michigan should not individually hand it back to them.

**AQD Response:** The AQD agrees with this comment and has changed the term of "federally enforceable" to "legally enforceable" in R 336.2901(z) and R 336.2907(1)(b)(ii) because of this comment.

### R 336.2902(6)(f)

**Comment:** The DEQ received three similar comments regarding the definition of "reasonable possibility:" In light of the opinion in *New York I,* DEQ has included a definition of the term "reasonable possibility" in its proposed rule, R 336.2902(6)(f). Certain recordkeeping and reporting requirements apply to projects for which there is a reasonable possibility that an increase greater than the applicable significance level may occur. The Department proposes that a reasonable possibility exists when the source is otherwise triggering the requirement to obtain a minor NSR permit. While we believe that many projects that require minor NSR permits do not have a reasonable possibility of causing a significant emissions increase, we understand that the Department is trying to establish an easily implemented test that sources and DEQ permitting staff can apply to determine when the recordkeeping/reporting requirements apply. Given the remand by the Court in *New York I,* we believe that the Department could wait for EPA to complete its rulemaking to define reasonable possibility. To the extent that EPA adopts a different test for reasonable possibility in the future, however, the Department should revise this rule to reflect that test as appropriate.

**AQD Response:** The AQD believes that we already have a mechanism in place (R 336.1278 through R 336.1290) that addresses the requirements of keeping records if there is a reasonable possibility of an increase that is greater than applicable significance levels. These rules are well understood by the regulated community and are consistent with one of the two EPA proposals for defining the test of determining reasonable possibility. The AQD will not make any changes to the definition of reasonable possibility at this time, but if we deem it necessary to make a change once EPA promulgates new language, we will re-open these rules to make the change at that time.

### R 336.2901(s)(iii)(E)(2)

**Comment:** Lines 215 & 216: Comprise citation R 336.2901(s)(iii)(E)(2), and corresponds to federal rule 51.165(a)(1)(v)(C)(5)(ii). The corresponding federal rule references a permit issued under the nonattainment new source review (NA-NSR) rules. Therefore, for purposes of consistency with the federal rule, R 336.2901(s)(iii)(E)(2) should be revised as follows:

> *(2) The source is approved to use under any permit issued under R 336.1~~201(a)~~220 or R 336.2902.*

**AQD Response:** The AQD disagrees with the comment. Any permit to install issued by the AQD is issued under the authority of R 336.1201(a), regardless of whether the facility is located in a nonattainment area.

### R 336.2901(s)(iv)

**Comment:** Lines 228 to 231: Comprise citation R 336.2901(s)(iv), and corresponds to federal rule 51.165(a)(1)(v)(D). For purposes of consistency with the associated federal rule, R 336.2901(s)(iv) should be revised as follows:

> *(iv) This definition shall not apply with respect to a particular regulated new source review pollutant when the major stationary source is complying with the requirements of R 336.2907 for a plantwide applicability limit for that pollutant. Instead, the definition in R 336.2907**(1)(h)** shall apply.*

**AQD Response:** The AQD agrees with this comment and has made the change as described.

### R 336.2901(bb)

**Comment:** Lines 381 to 383: Comprise citation R 336.2901(bb), and corresponds to federal rule 51.165(a)(1)(xli). For purposes of consistency with the associated federal rule. R 336.2901(bb) should be revised as follows:

> *(bb) "Prevention of significant deterioration " or "PSD "permit means any permit that is issued under **R 336.2802 or the** prevention of significant deterioration of air quality regulations ~~or~~ under 40 C.F.R. §52.21, adopted by reference in R 336.2901a.*

**AQD Response:** The AQD agrees with this comment and has made the change as described.

### R 336.2901(ee)(ii)

**Comment:** Line 415: Comprises citation R 336.2901(ee)(ii), and corresponds to federal rule 51.165(a)(1)(xxxvii)(B). The associated federal rule references any pollutant for which a national ambient air quality standard has been promulgated. Rather than take this approach, the current Michigan draft rule lists specific pollutants (ozone, sulfur dioxide, oxides of nitrogen, PM-10, lead and carbon monoxide). This approach seems problematic in that any time a national ambient air quality standard is developed for a pollutant that was not previously regulated, it will

be necessary to revise R 336.2901(ee)(ii). Furthermore, the rule should list nitrogen dioxide rather than oxides of nitrogen, and the rule does not include PM-2.5. In order to maintain consistency with the federal rule, R 336.2901(ee)(ii) should be revised as follows:

>  *(ii) Any pollutant for which a national ambient air quality standard has been promulgated.* ~~Ozone, sulfur dioxide, oxides of nitrogen, Pm-10, lead and carbon monoxide.~~

**AQD Response:** The AQD agrees with this comment and has made the change as described.

### R 336.2901(gg)(i)(A) through (E)
**Comment:** Lines 435 to 439: Comprise citation R 336.2901(gg)(i)(A) through (E), and corresponds to federal rule 51.165(a)(1)(x)(A). The corresponding federal rule lists significant emission rates for carbon monoxide, nitrogen oxides, sulfur dioxide, ozone, lead and PM-10. The proposed rule currently does not include a significant emission rate for PM-10. Therefore, R 336.2901(gg)(i)(F) should be added in order to list a significant emission rate for PM-10. The proposed regulatory text is as follows:

>  *(F) PM-10: 15 tons per year of PM-10.*

**AQD Response:** The AQD agrees with this comment and has made the change as described.

### R 336.2902(2)
**Comment:** Lines 516 & 517 - Comprise citation R 336.2902(2), and corresponds to federal rule 51.165(a)(2)(ii). The current proposed rule language includes the term "offset" in the context of a major source. The term "major offset source" is not defined within the Part 1 or Part 19 Rules, nor is it used anywhere else within the Part 19 rule. Therefore, R 336.2902(2) should be revised as follows:

>  *(2) This part applies to the construction of new major* ~~offset~~ *sources and major modifications to existing sources as follows:*

**AQD Response:** The AQD agrees with this comment and has made the change as described.

### R 336.2902(2)(d)
**Comment:** Lines 538-544: Comprise citation R 336.2902(2)(d), and corresponds to federal rule 51.165(a)(2)(ii)(D). The current proposed rule language includes the term "reconstruction" in the context of a change to an existing emissions unit. The federal NA-NSR rules do not include the concept of reconstruction, and R 336.2902(2)(d) should be revised as follows:

*(d) The actual-to potential test may be used for projects that involve construction of new emissions units or modification ~~or reconstruction~~ of existing emissions units. A significant emissions increase of a regulated new source review pollutant is projected to occur if the sum of the difference between the potential to emit from each new **and** modified~~, or reconstructed~~ emissions unit following completion of the project and the baseline actual emissions of these units before the project equals or exceeds the significant amount for that pollutant.*

**AQD Response:** The AQD agrees with this comment and has made the change as described.

### R 336.2903(2)

**Comment:** Lines 683-684: Comprise Table 191 of R 336.2903(2), and corresponds to the table associated with federal rule 51.165(b)(2). Table 191 in the proposed rule lists oxides of nitrogen. However, to be consistent with the federal rule, the Table 191 should actually list nitrogen dioxide rather than oxides of nitrogen, as there are no national ambient air quality standards for oxides of nitrogen. Thus, Table 191 should be revised as follows:

### ~~Oxides of nitrogen~~**Nitrogen Dioxide**

**AQD Response:** The AQD agrees with this comment and has made the change as described. Also, to be consistent with the federal regulations, the AQD has changed the term "oxides of nitrogen" to nitrogen oxides" in the following rules: R 336.2901(ee)(i), R 336.2901(gg)(i)(B), R 336.2902(1)(b), R 336.2907(2)(b) and R 336.2907(6)(a).

### R 336.2907(4)(a)(i)

**Comment:** Lines 783-792: Comprise R 336.2907(4)(a)(i), and corresponds to federal rule 51.165(f)(4)(i)(A). Although the language of this proposed rule is consistent with the federal rule, the proposed rule references a "12-month average, rolled monthly," which is then compared to the PAL (expressed in tons per year). In reviewing both the draft rule and the underlying federal rule, it appears as though the language should actually be a "12-month total, rolled monthly." Therefore, R 336.2907(4)(a)(i) should be revised as follows:

*(i) The PAL shall impose an annual emission limitation in tons per year, which is enforceable as a practical matter, for the entire major stationary source. For each month during the PAL effective period after the first 12 months of establishing a PAL, the major stationary source owner or operator shall show that the sum of the monthly emissions from each emissions unit under the PAL for the previous 12 consecutive months is less than the PAL (a 12-month ~~average~~ **total**, rolled monthly). For each month during the first 11 months from the PAL effective date, the major stationary source owner or operator shall show that the sum of the preceding monthly emissions from the PAL effective date for each emissions unit under the PAL is less than the PAL.*

- 12 -

**AQD Response:** The AQD agrees with this comment and will make the change as described.

### R 336.2907(4)(ii)
**Comment:** Lines 793-794: Comprise R 336.2907(4)(a)(ii), and corresponds to federal rule 51.165(f)(4)(i)(B). In order to maintain consistency with the federal rule, the term "permit to install" within the proposed rule should be replaced with "PAL permit." Therefore, R 336.2907(4)(a)(ii) should be revised as follows:

*(ii) The PAL shall be established in a ~~permit to install~~ **PAL permit** that meets the public participation requirements in subrule (5) of this rule.*

**AQD Response:** The AQD does not agree with this change. Any NSR/nonattainment air permit issued by the AQD is issued as a Permit to Install. Therefore, a permit issued with a PAL limit will be a permit to install for a facility seeking PAL status.

### R 336.2907(8)(b)(i)(B)
**Comment:** Lines 873-874: Comprise R 336.2907(8)(b)(i)(B), and corresponds to federal rule 51.165(f)(8)(ii)(A)(2). The federal rule references creditable emissions reductions "for use as offsets under 51.165(a)(3)(ii)." For purposes of clarification, proposed R 336.2907(8)(b)(i)(B) should be revised to be consistent with the federal rule (Note: R 336.2908(5)(b) is equivalent to 51.165(a)(3)(ii)).

*(B) Reduce the PAL if the owner or operator of the major stationary source creates creditable emissions reductions for use as offsets **under R 336.2908(5)(b)**.*

**AQD Response:** The AQD agrees with this comment and will make a change but AQD believes that along with citing R 336.2908(5)(b) we should also cite R 336.2908(5)(c) through (h) because (c) through (h) all come from 51.165(a)(3)(ii).

### R 336.2908(3)
**Comment:** Lines 1155-1157: Comprise citation R 336.2908(3), and corresponds to the federal Clean Air Act (CAA), Title 1, Part D, Section 173(a)(2). For purposes of clarification, proposed R 336.2908(3) should be revised as follows:

*(3) The major stationary source or major modification shall comply with the lowest achievable emissions rate for each regulated new source review pollutant for which the area is designated as nonattainment **and for which there is both a significant emissions increase and a significant net emissions increase.***

**AQD Response:** The AQD does not agree with this comment, adding the language is redundant, because this language is already included in the definitions for major stationary source and major modification.

## R 336.2908(5)(c)(ii)

**Comment:** Lines 1203-1206: Comprise citation R 336.2908(5)(c)(ii), and corresponds to federal rule 51.165(a)(3)(ii)(C)(2). The federal rule states that the emissions reductions must meet the requirements in 51.165(a)(3)(ii)(C)(1)(ii). The current proposed rule references R 336.2908(5)(c)(i)(A), which is equivalent to federal rule 51.165(a)(3)(i)(C)(1)(i). To maintain consistency with the underlying federal rule, R 336.2908(5)(c)(ii) should be revised as follows:

*(ii) Emissions reductions that are achieved by shutting down an existing emissions unit or curtailing production or operating hours and that do not meet the requirements of R 336.2908(5)(c)(i)(A)(**B**)may be generally credited only if meet either of the following:*

**AQD Response:** The AQD agrees with this comment and will make the change as specified.

**11b.  Summary of suggestions to modify proposed rules from July 19, 2007, hearing:**
## R 336.2901(v)

**Comment:** Regarding R 336.2901(v), one commenter has requested the AQD change the definition of "net emissions increase" to clarify the proper procedure for calculating the magnitude of a contemporaneous increase or decrease. This change is based on the difference of using "baseline actual emissions" versus "allowable emissions" in the calculation. Both of these terms are defined in the rules. The commenter requested the changes as follows:

*(v) "Net emissions increase" means all of the following:*

*(i)  With respect to any regulated new source review pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:*

*(A)  The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated under R 336.2902(2).*

*(B)  Any other increases and decreases in actual emissions at the major stationary source that occur within the contemporaneous period and are otherwise creditable.*

*(ii)  The contemporaneous period must meet all of the following:*

*(A)  Begins on the date 5 years before construction on the particular change commences.*

*(B)  Ends on the date that the increase from the particular change occurs.*

*(iii)  An increase or decrease in actual emissions is creditable only if the department has not relied on it in issuing a permit under R 336.1201(1)(a) or R 336.1214a, which permit is in effect when the increase in actual emissions from the particular change occurs.*

*(iv)  The magnitude of a creditable, contemporaneous increase in actual emissions is determined by the amount that the new level of actual emissions **allowable emissions** following the increase exceeds the emissions unit's baseline actual emissions prior to the increase. This means actual-**allowable** emissions and baseline actual emissions are determined from the date of the*

- 14 -

*contemporaneous increase. Baseline actual emissions shall be determined as provided in the definition of baseline actual emissions, except that paragraphs (b)(i)(C) and (b)(ii)(D) of this subdivision shall not apply.*

*(v) A contemporaneous decrease in actual emissions is creditable only to the extent that all of the following occur:*

*(A) The magnitude of a creditable contemporaneous decrease is determined by the lower of the following:*

*(1) The amount by which the emission unit's baseline actual emissions prior to the decrease exceed the level of ~~actual~~ **allowable** emissions following the decrease.*

*(2) The amount by which the emission unit's allowable emissions prior to the decrease exceed the level of ~~actual~~ **allowable** emissions following the decrease.*

*(3) In determining the magnitude of a creditable contemporaneous decrease, ~~actual~~ **allowable** emissions and baseline actual emissions are determined from the date of the contemporaneous decrease. Baseline actual emissions shall be determined as provided in the definition of baseline actual emissions except that paragraphs (b)(i)(C) and (b)(ii)(D) of this subdivision shall not apply.*

*(B) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins.*

*(C) The department has not relied on it in issuing any permit under R 336.1201(1)(a) or R 336.1214a.*

*(D) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change.*

*(vi) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.*

*~~(vii) The definition of actual emissions in R 336.1101(b) shall not apply for determining creditable increases and decreases after a change, instead the definitions of the terms "projected actual emissions" and "baseline emissions" shall be used.~~*

**AQD Response:** The AQD agrees with this comment and has made the changes to the definition for "net emissions increase" as specified by the commenter.

### R 336.2902(1)(b)
**Comment:** Regarding R 336.2902(1)(b), EPA asked what the applicable federal requirement is for this rule.

**AQD Response:** R 336.2902(1)(b) was written based on the requirements in 40 CFR §51.165, 2006 edition, pages 190 and 201.

### R 336.2902(2)(d)
**Comment:** Regarding R 336.2902(2)(d), EPA asked what the applicable federal requirement is for this rule. The EPA believes the federal rule only applies to new emission units, but Rule 1902(2)(d) includes modifications of existing emissions units as well.

**AQD Response:** The AQD believes Rule 1902(2)(d) follows the requirements as specified in 40 CFR §51.165, 2006 edition, page 197. The AQD also believes that including modifications to existing emission units makes Rule 1902(2)(d) more stringent than the federal requirements.

### R 336.2902(6)(f)
**Comment:** Regarding R 336.2902(6)(f), EPA asked what the applicable federal requirement is for this rule. Also, R 336.1278 through R 336.1290 are referenced but these rules are not SIP approved.

**AQD Response:** The AQD believes Rule 1902(6)(f) follows the requirements as specified in 40 CFR §51.165, 2006 edition, page 204. The AQD also believes that referencing the state only exemption (Rules 278–290) does not make Rule 1902(6)(f) any less stringent than the federal requirements.

### R 336.2907(14)(b)
**Comment:** Regarding R 336.2907(14)(b), EPA asked if the reference to R 336.1213(3)(c)(i) should be R 336.1213(3)(c)(ii) instead. Also, can the AQD include the requirements of Rule 213(3)(c)(ii) in Rule 1907(14)(b), since Rule 213(3)(c)(ii) is not SIP approved.

**AQD Response:** The AQD agrees with the first part of the comment and will change the reference to R 336.1213(3)(c)(ii) as follows. The AQD does not agree with the second part of the comment and will not include the requirements of Rule 213(3)(c)(ii) since these requirements are already in Rule 213(3)(c)(ii). The EPA has allowed Michigan to reference rules that were not SIP approved in previous SIP submittals. The AQD does not believe this situation should be treated any differently.

> *(b) The major stationary source owner or operator shall promptly submit reports of any deviations or exceedance of the PAL requirements, including periods where no monitoring is available. A report submitted under R 336.1213(3)(c)(i)(ii) shall satisfy this reporting requirement. The deviation reports shall be submitted within the time limits prescribed by the source's renewable operating permit. The reports shall contain all of the following information:*

### R 336.2908(4)
**Comment:** Regarding R 336.2908(4), EPA asked what the applicable federal requirement is for this rule. The EPA does not believe Rule 1908(4) follows the federal requirements because in one part of this rule the word "or" is used but it should be an "and" because this part should not be an option.

**AQD Response:** The AQD believes Rule 1908(4) follows the requirements of the Clean Air Act, Section 173(a)(3), but with one minor change. The AQD has changed the "or" to "and" to make this rule as stringent as the federal requirements.

*(4) All stationary sources which have a potential to emit 100 or more tons per year of any air contaminant regulated under the clean air act, which are located in the state, and which are owned or controlled by the owner, operator, or an entity controlling, controlled by, or under common control with, the owner or operator of the proposed major stationary source or major modification shall be in compliance with all applicable local, state, and federal air quality regulations or and shall be in compliance with a legally enforceable permit condition or order of the department specifying a plan and timetable for compliance.*

### R 336.2908(5)(c)(i)
**Comment:** Regarding R 336.2908(5)(c)(i), EPA asked what the applicable federal requirement is for this rule. The EPA does not believe Rule 1908(5)(c)(i) follows the federal requirements.

**AQD Response:** The AQD believes Rule 1908(5)(c)(i) follows the requirements as specified in 40 CFR §51.165, 2006 edition, page 20.

### R 336.2908(5)(h)
**Comment:** Regarding R 336.2908(5)(h), EPA asked what the applicable federal requirement is for this rule. The EPA does not believe Rule 1908(5)(h) follows the federal requirements.

**AQD Response:** The AQD believes the intent of Rule 1908(5)(h) matches the requirements as specified in the Clean Air Act, Section 173(c). The AQD will add the words "at least" prior to the ratio of 1:1 at the end of this rule.

*(h) The total tonnage of increased emissions, in tons per year, resulting from a major modification that must be offset shall be determined by summing the difference between the allowable emissions after the modification and the actual emissions before the modification for each emissions unit. Unless specified otherwise in this rule, the offset ratio for each nonattainment air pollutant that will be emitted in significant amounts from a new major source or major modification located in a nonattainment area that is subject to subpart 1, part D, title 1of the clean air act shall be **at least** 1:1.*

### General Comments
**Comment:** The EPA asked why the definition for the term "federally enforceable" is not included in the Part 19 rules because it is defined in the CAA and under Section 173, the CAA requires some conditions to be "federally enforceable."

**AQD Response:** The AQQ does not believe this definition needs to be included in the Part 19 rules because the term "federally enforceable" is a federal definition and these rules are state rules that mirror the federal requirements. The AQD believes the term "legally enforceable" is more stringent than the term "federally enforceable" and has used "legally enforceable" throughout the Part 19 rules in place of "federally enforceable."

**Comment:** The EPA asked why the term "pollution prevention" is not included in the Part 19 rules.

**AQD Response:** The AQD does not believe the term "pollution prevention" is necessary because this term is not used in any requirement within the Part 19 Rules and the federal requirements that this term is referenced in (Pollution Control Project and Clean Unit) were vacated by a court decision. Therefore, it is not necessary to include the term "pollution prevention" in the Part 19 rules.

**Name of person completing this report:**

Jeffrey Rathbun & Mary Ann Halbeisen

**Date report completed:**

April 17, 2008

(SOAHR-JCAR June 2005)

# ATTACHMENT G

### Department of Environmental Quality

### Opening Statement
### By: Marion Hart, Hearings Officer

### December 20, 2006

#### Introduction

Good morning ladies and gentlemen. My name is Marion Hart, and I am the Supervisor of the Administration Section in the Air Quality Division of the Michigan Department of Environmental Quality. I will be serving as the Hearing Officer for this public hearing on the revision of Parts 1 and 2 of the Air Pollution Control Rules and the addition of Part 19.

With me today are other DEQ staff who will be assisting with this hearing. Seated with me on my right are Jeffrey Rathbun, of the Permit Section, who prepared the rule revisions, and on my left Lynn Fiedler, Supervisor of the Permit Section, who is representing the Director of the Department of Environmental Quality, the decision-maker on administrative rules.

#### Hearing Agenda

To describe how this is going to work today, I will begin with some background information about why we are here today. I will then describe the purpose of the hearing and how your comments will be used. Following that, I will outline the procedures under which we will take your comments and then describe what will happen after today's hearing. It will then be your time to provide comments, and we will spend the majority of time today listening to those comments. At the end of the hearing, I will provide a short summary and closing.

#### Background Information

By way of background information, the Air Quality Division is responsible for protecting Michigan's air resources. The law governing those responsibilities is Sections 5503, 5505, and 5512 of Part 55, Air Pollution Control, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended.. We are here today for a public hearing on amendments to Parts 1 and 2 and the addition of Part 19 to the administrative rules for Air Pollution Control, SOAHR Nos. 2004-006EQ, 2004-007EQ, and 2004-054EQ.

I will now ask Jeff Rathbun to briefly summarize the proposed revisions.

#### Purpose of Public Hearing

In order for rule promulgation to occur, the DEQ must follow the procedures set forth in the Administration Procedures Act of 1969 and the State Office of Administrative Hearings and Rule's procedures.

The purpose of today's hearing is to give anyone interested in the proposed rules an opportunity to provide information that the DEQ can use in making the decision. Please recognize that the DEQ can only use the information you provide if it relates to the criteria that the DEQ must use in making a decision.

#### Procedures

1

In just a minute, I will outline the procedures we will use in taking your comments today. Before I do so, however, I need to mention that the notice of this hearing was published in the <u>Oakland Press</u>, <u>Grand Rapids Press</u>, <u>Lansing State Journal</u>, and <u>Marquette Mining Journal</u> on November 16, 2006. The notice and proposed rules were also published in the <u>Michigan Register</u> on November 15, 2006. Copies of the hearing notice, Regulatory Impact Statement, proposed rules, and summary of the proposed rules were made available to those interested and are available here today.

As you came today, you were given an opportunity to fill out a public comment card. We request that everybody fill out a card and indicate if you wish to make comments. We will use these cards to maintain a record of people interested in the proposed rules and to call upon those who want to make a statement today. To ensure that the hearing is conducted in a fair manner, we will follow these steps:

1. I will call on those who have indicated on the cards that they would like to speak in the general order in which the cards were turned in. When all the cards have been completed, I will ask if anyone else would like to make a statement.

2. When your name is called, please come to the microphone, face me, and make your statement. If you have written comments or materials you would like to present, please hand them to me as you come to the microphone. As you begin your comments, please state your name and any group or association you may represent.

### How the Information Will be Used

This hearing is being recorded and your comments will be a part of the information the DEQ will consider in making its decision on the proposed rules. The public comment period for the proposed rules ends today at 5:00 p.m.

Following the public hearing, the DEQ staff will review all comments and prepare an Agency Report, which includes the response to comments. The Agency Report will be available on the DEQ website or by contacting the Air Quality Division office. The proposed rules and the Agency Report will be submitted to the State Office of Administrative Hearings and Rules and the Joint Committee on Administrative Rules. Following JCAR, the rules will be filed with the Secretary of State and become effective immediately. It is estimated this process will take approximately four to five months.

Thank you for your attention. I will now begin calling the names of those who have indicated they would like to make a statement.

### Closing Statement

Thank you for your comments and cooperation today. We appreciate your interest in these proposed rules and that you took the time to be here today.

As indicated at the beginning of the hearing, the closing date of the public comment period is today at 5:00 p.m. and an Agency Report will be prepared.

The hearing is now closed. Thank you again.

MICHIGAN STATE IMPLEMENTATION PLAN

**Department of Environmental Quality**

**Opening Statement
By: Barbara Rosenbaum, Hearings Officer**

**July 19, 2007**

**Introduction**

Good morning ladies and gentlemen. My name is Barbara Rosenbaum, and I am the Supervisor of the Air Quality Evaulation Section in the Air Quality Division of the Michigan Department of Environmental Quality. I will be serving as the Hearing Officer for this public hearing on the revision of Parts 4 and 6, the rescission of Part 12, and the addition of Part 19 of the Air Pollution Control Rules.

With me today are other DEQ staff who will be assisting with this hearing. Seated with me are Teresa Walker, Steve Kish, Asad Khan, and Jeffrey Rathbun, who prepared the rule revisions, and Vince Hellwig, Chief of the Air Quality Division, who is representing the Director of the Department of Environmental Quality, the decision-maker on administrative rules.

**Hearing Agenda**

To describe how this is going to work today, I will begin with some background information about why we are here today. I will then describe the purpose of the hearing and how your comments will be used. Following that, I will outline the procedures under which we will take your comments and then describe what will happen after today's hearing. It will then be your time to provide comments, and we will spend the majority of time today listening to those comments. At the end of the hearing, I will provide a short summary and closing.

**Background Information**

By way of background information, the Air Quality Division is responsible for protecting Michigan's air resources. The law governing those responsibilities is Sections 5503 and 5512 of Part 55, Air Pollution Control, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended.. We are here today for a public hearing four rule packages on amendments to the administrative rules for Air Pollution Control:

- 2005-036EQ, Part 4, Emission Limitations and Prohibitions—Sulfur-bearing Compounds.
- 2007-005EQ, Part 12, Emission Averaging and Emission Reduction Credit Trading.
- 2007-006EQ, Part 6, Consumer Product Rules.
- 2004-054EQ, Part 19, New Source Review for Major Sources Impacting Nonattaiment Areas.

Teresa Walker will summarize the proposed revisions to Part 4 (2005-036EQ) and Part 12 (2007-005EQ).

Asad Khan will summarize the proposed revisions to Part 6 (2007-006EQ).

Jeff Rathbun will summarize the proposed new rules for Part 19 (2004-054EQ).

## Purpose of Public Hearing

In order for rule promulgation to occur, the DEQ must follow the procedures set forth in the Administration Procedures Act of 1969 and the State Office of Administrative Hearings and Rule's procedures.

The purpose of today's hearing is to give anyone interested in the proposed rules an opportunity to provide information that the DEQ can use in making the decision. Please recognize that the DEQ can only use the information you provide if it relates to the criteria that the DEQ must use in making a decision. Some of you may want to simply express your support or opposition to the proposed action. We will be happy to make note of your position, but please understand that the DEQ is, by law, not allowed to base our decision on whether or not there is widespread support or opposition to the proposed action.

## Procedures

In just a minute, I will outline the procedures we will use in taking your comments today. Before I do so, however, I need to mention that the notice of this hearing was published in the Oakland Press, La nsing State Journal, and Marquette Mining Journal on June 11, 2007. The notice and proposed rules were also published in the Michigan Register on June 15, 2007. Copies of the hearing notice, Regulatory Impact Statement, proposed rules, and summary of the proposed rules were made available to those interested and are available here today.

As you came today, you were given an opportunity to fill out a public comment card. We request that everybody fill out a card and indicate if you wish to make comments. We will use these cards to maintain a record of people interested in the proposed rules and to call upon those who want to make a statement today. To ensure that the hearing is conducted in a fair manner, we will follow these steps:

1. I will call on those who have indicated on the cards that they would like to speak in the general order in which the cards were turned in. When all the cards have been completed, I will ask if anyone else would like to make a statement.

2. When your name is called, please come to the microphone, face me, and make your statement. If you have written comments or materials you would like to

2

present, please hand them to me as you come to the microphone. As you begin your comments, please state your name and any group or association you may represent.

3. Each person will be given five minutes to make their comments. I will indicate to you when you have one minute left. Please begin wrapping up your comments and end within the allotted time. If need be, I will indicate when your time has ended.

I ask that we all be courteous and respectful to one another today. Only one person should be speaking at a time. Please do not interrupt a speaker and please also recognize that the DEQ staff are here today to provide a fair opportunity for you to express your comments on the proposed rules and to listen to those comments.

### How the Information Will be Used

This hearing is being recorded and your comments will be a part of the information the DEQ will consider in making its decision on the proposed rules. The public comment period for the proposed rules ends today at 5:00 p.m.

Following the public hearing, the DEQ staff will review all comments and prepare an Agency Report, which includes the response to comments. The Agency Report will be available on the DEQ website or by contacting the Air Quality Division office. The proposed rules and the Agency Report will be submitted to the State Office of Administrative Hearings and Rules and the Joint Committee on Administrative Rules. Following JCAR, the rules will be filed with the Secretary of State and become effective immediately. It is estimated this process will take approximately four to five months.

Thank you for your attention. I will now begin calling the names of those who have indicated they would like to make a statement.

### Closing Statement

Thank you for your comments and cooperation today. We appreciate your interest in these proposed rules and that you took the time to be here today.

As indicated at the beginning of the hearing, the closing date of the public comment period is today at 5:00 p.m. and an Agency Report will be prepared.

The hearing is now closed. Thank you again.

3

# ATTACHMENT H

# GRAND RAPIDS PRESS

THE GRAND RAPIDS PRESS

A12 THURSDAY, NOVEMBER 16, 2006



# LANSING STATE JOURNAL

**Thursday, November 16, 2006**

Legals

Lansing State Journal — www.lsj.com

## NOTICE OF PUBLIC HEARING DEPARTMENT OF ENVIRONMENTAL QUALITY AIR QUALITY DIVISION

The Michigan Department of Environmental Quality (DEQ), Air Quality Division, will conduct a public hearing on proposed administrative rules promulgated pursuant to Part 55, Air Pollution Control, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (Act 451). The proposed rules will amend the air permit programs by adding Part 19, New Source Review (NSR) Impacting Nonattainment Areas for submittal to the U.S. Environmental Protection Agency as a revision to the State Implementation Plan. In addition, the proposed rules will modify the definitions in Part 1, General Provisions, including the definition of volatile organic compound in R 336.1122. The DEQ proposes to rescind R 336.1220, which will be replaced by the new NSR in Nonattainment areas Part 19 rules, and all relevant citations in the Part 2, Air Use Approval, rules will be changed to reflect the state's new permitting authority in the new Part 18 and Part 19 rules.

The public hearing will be held on December 20, 2006, at 10:00 a.m., in the ConCon Conference Room, Constitution Hall, Atrium South, 525 West Allegan Street, Lansing, Michigan.

Copies of the proposed rules (SOAHR 2004-006EQ, 2004-007EQ, and 2004-054EQ) can be downloaded from the Internet at: http://www.michigan.gov/deqair. These rules can also be downloaded from the Internet through the State Office of Administrative Hearings and Rules at http://www.michigan.gov/orr. Copies of the rules may also be obtained by contacting the Lansing office at:

Air Quality Division
Michigan Department of Environmental Quality
P.O. Box 30260
Lansing, Michigan
48909-7760
Phone: 517-373-7045
Fax: 517-241-7499
E-mail: hellwigc@Michigan.gov

All interested persons are invited to attend and present their views. It is requested that all statements be submitted in writing for the hearing record. Anyone unable to attend may submit comments in writing to the address above. Written comments must be received by 5:00 p.m. on December 20, 2006.

Persons needing accommodations for effective participation in the meeting should contact the Air Quality Division at 517-373-7045 one week in advance to request mobility, visual, hearing, or other assistance.

This notice of public hearing is given in accordance with Sections 41 and 42 of Michigan's Administrative Procedures Act, 1969 PA 306, as amended, being Sections 24.241 and 24.242 of the Michigan Compiled Laws. Administration of the rules is by authority conferred on the Director of the DEQ by Sections 5503, 5505, and 5512 of Act 451, being Sections 324.5503, 324.5505, and 324.5512 of the Michigan Compiled Laws, and Executive Order 1995-18. These rules take immediate effect after filing with the Secretary of State.

G. Vinson Hellwig, Chief
Air Quality Division
11-26

# MARQUETTE MINING JOURNAL

## Page 8B – The Mining Journal, Thursday, November 16, 2006

**Legals**

FC G 248.593.1310
Trott & Trott, P.C.
Attorneys For Servicer
30400 Telegraph Rd. Ste.
200
Bingham Farms, Michigan
48025-5822
File #113004F01
4 times
11-2, 9, 16, 23-06

**NOTICE OF PUBLIC
HEARING
DEPARTMENT OF
ENVIRONMENTAL
QUALITY
AIR QUALITY DIVISION**

The Michigan Department of Environmental Quality (DEQ), Air Quality Division, will conduct a public hearing on proposed administrative rules promulgated pursuant to Part 55, Air Pollution Control, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (Act 451). The proposed rules will amend the air permit programs by adding Part 19, New Source Review (NSR) in Nonattainment Areas for submittal to the U.S. Environmental Protection Agency as a revision to the State Implementation Plan. In addition, the proposed rules will modify the definitions in Part 1, General Provisions, including the definition of volatile organic compound in R 336.1122. The DEQ proposes to rescind R 336.1220, which will be replaced by the new NSR in Nonattainment areas Part 19 rules; and, all relevant citations in the Part 2, Air Use Approval, rules will be changed to reflect the state's new permitting authority in the new Part 18 and Part 19 rules.

The public hearing will be held on December 20, 2006, at 10:00 a.m. in the ConCon Conference Room, Constitution Hall, Atrium South, 525 West Allegan Street, Lansing, Michigan.

Copies of the proposed rules (SOAHR 2004-006EQ, 2004-007EQ, and 2004-054EQ) can be downloaded from the Internet at http://www.michigan.gov/deq. These rules can also be downloaded from the Internet through the State Office of Administrative Hearings and Rules at http://www.michigan.gov/orr. Copies of the rules may also be obtained by contacting the Lansing office at:

Air Quality Division
Michigan Department of Environmental Quality
P.O. Box 30260
Lansing, Michigan
48909-7760
Phone: 517-373-7045
Fax: 517-241-7499
E-Mail:
halbelsm@Michigan.gov

All interested persons are invited to attend and present their views. It is requested that all statements be submitted in writing for the hearing record. Anyone unable to attend may submit comments in writing to the address above. Written comments must be received by 5:00 p.m. on December 20, 2006.

Persons needing accommodations for effective participation in the meeting should contact the Air Quality Division at 517-373-7045 one week in advance to request mobility, visual, hearing, or other assistance.

This notice of public hearing is given in accordance with Sections 41 and 42 of Michigan's Administrative Procedures Act, 1969 PA 306, as amended, being Sections 24.241 and 24.242 of the Michigan Compiled Laws - Administration of the rules is by authority conferred on the Director of the DEQ by Sections 5503, 5505, and 5512 of Act 451, being Sections 324.5503, 324.5505, and 324.5512 of the Michigan Compiled Laws; and Executive Order 1995-18. These rules take immediate effect after filing with the Secretary of State.

G. Vinson Hellwig, Chief
Air Quality Division

1 time
11-16-2006

County of Oakland } ss.
STATE OF MICHIGAN,

Mary Ward

..................................................................being duly sworn,

Legal Rep

deposes and says that I am the..................................................of
THE OAKLAND PRESS, a newspaper printed and circulated
daily in Oakland County, Michigan, and that I held such position
during the publication of the notice hereto annexed; that a notice
of............................................................................................................

Public Notice

..................................................................................................................
of which the annexed notice is a true copy, was published in the
said OAKLAND PRESS.............................................................................

*Once*

..................................................................immediately preceding the
*17 of NOV.*.................that the annexed printed copy of said notice
was taken from the said newspaper. That the dates of

publication of said notice were... *November 16, 2006*

..................................................................................................................
and further deponent sayeth not.

*Mary Ward*
..................................................................................................................

Subscribed and sworn to before me this..........*16*..........day of

*November*..........................................................A.D. 20 *06*

*Tina McCrown*

NOTARY PUBLIC, OAKLAND COUNTY, MICHIGAN

TINA M. CROWN
NOTARY PUBLIC LAPEER CO., MI
MY COMMISSION EXPIRES Mar 30, 2008

*acting in Oakland Cty*

**DEPARTMENT OF**
**ENVIRONMENTAL QUALITY**
**AIR QUALITY DIVISION**

The Michigan Department of Environmental Quality (DEQ), Air Quality Division, will conduct a public hearing on proposed administration rules promulgated pursuant to Part 55, Air Pollution Control, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (Act 451). The proposed rules will amend the air permit programs by adding Part 19, New Source Review (NSR) Impacting Nonattainment Areas for submittal to the U.S. Environmental Protection Agency as a revision to the State Implementation Plan. In addition, the proposed rules will modify the definitions in Part 1, General Provisions, including the definition of volatile organic compound in R 336.1122. The DEQ proposes to rescind R 336.1220, which will be replaced by the new NSR in Nonattainment areas Part 19 rules, and all relevant citations in the part 2 Air Use Approval rules will be changed to reflect the state's new permitting authority in the new Part 18 and Part 19 rules.

The public hearing will be held on December 20, 2006, at 10:00 a.m., in the ConCon Conference Room, Constitution Hall, Atrium South, 525 West Allegan Street, Lansing, Michigan.

Copies of the proposed rules (SOAHR 2004-006EQ, 2004-006EQ, 2004-007EQ, and 2004-054EQ) can be downloaded from the Internet at: http://www.michigan.gov/deqair. These rules can also be downloaded from the Internet through the State Office of Administrative Hearings and Rules at http://www.michigan.gov/orr. Copies of the rules may also be obtained by contacting the Lansing office at:

Air Quality Division
Michigan Department
of Environmental Quality
P.O. Box 30260
Lansing, Michigan 48909-7760
Phone: 517-373-7045
Fax: 517-241-7499
E-Mail: halbeism@Michigan.gov

All interested persons are invited to attend and present their views. It is requested that all statements be submitted in writing for the hearing record. Anyone unable to attend may submit comments in writing to the address above. Written comments must be received by 5:00 p.m. on December 20, 2006.

Persons needing accommodations for effective participation in the meeting should contact the Air Quality Division at 517-373-7045 one week in advance to request mobility, visual, hearing, or other assistance.

This notice of public hearing is given in accordance with Sections 41 and 42 of Michigan's Administrative Procedures Act, 1969 PA 306, as amended, being Sections 24.241 and 24.242 of the Michigan Compiled Laws. Administration of the rules is by authority conferred on the Director of the DEQ by Sections 5503, 5505, and 5512 of Act 451, being Sections 324.5503, 324.5505, and 324.5512 of the Michigan Compiled Laws, and Executive Order 1995-18. These rules take immediate effect after filing with the Secretary of State.

G. Vinson Hellwig, Chief
Air Quality Division

# Michigan

# Register

Issue No. 20– 2006 (Published November 15, 2006)



# Michigan Register

**Published pursuant to § 24.208 of
The Michigan Compiled Laws**



### Issue No. 20— 2006

(This issue, published November 15, 2006, contains
documents filed from October 15, 2006 to November 1, 2006)

Compiled and Published by the

## State Office of Administrative Hearings and Rules

# CONTENTS

## PROPOSED ADMINISTRATIVE RULES,
## NOTICES OF PUBLIC HEARINGS

**Department of Environmental Quality**
Air Quality Division (SOAHR # 2004-006)
        Part 1. General Provisions ...........................................................................2-16

**Department of Environmental Quality**
Air Quality Division (SOAHR # 2004-007)
        Part 2. Air Use Approval ...........................................................................17-47

**Department of Environmental Quality**
Air Quality Division (SOAHR # 2004-054)
        Part 19. New Source Review for Major Sources Impacting
        Nonattainment Areas ...............................................................................48-72

**Department of Treasury**
Bureau of Bond Finance (SOAHR # 2005-096)
        School Bond Qualifications, Approval, and Loan Rules....................73-81

**Department of Community Health**
Director's Office (SOAHR # 2006-044)
        Board of Psychology – General Rules................................................82-92

**Department of Treasury**
Bureau of Bond Finance (SOAHR # 2006-060)
        General Sales and Use Tax Rules.......................................................93-99

## ENROLLED SENATE AND HOUSE
## BILLS SIGNED INTO LAW OR VETOED

Table (2006 Session) ...................................................................................101-154

## MICHIGAN ADMINISTRATIVE CODE TABLE

Table (2006 Session) ...................................................................................156-160

## CUMULATIVE INDEX

Cumulative Index (2006) .............................................................................161-166

## PROPOSED ADMINISTRATIVE RULES

SOAHR 2004-054

DEPARTMENT OF ENVIRONMENTAL QUALITY

AIR QUALITY DIVISION

AIR POLLUTION CONTROL

Filed with the Secretary of State on

These rules become effective immediately upon filing with the Secretary of State unless adopted under sections 33, 44, 45a(6), or 48 of 1969 PA 306.  Rules adopted under these sections become effective 7 days after filing with the Secretary of State.

(By authority conferred on the director of the department of environmental quality by sections 5503, 5505, and 5512 of 1994 PA 451, MCL 324.5503, 324.5505, and 324.5512, and Executive Reorganization Order No. 1995-18, MCL 324.99903)

Draft October 25, 2006

R 336.2901, R 336.2901a, R 336.2902, R 336.2903, R 336.2907, R 336.2908, and R 336.2910 of the Michigan Administrative Code are added as follows:

PART 19. NEW SOURCE REVIEW FOR MAJOR SOURCES IMPACTING NONATTAINMENT AREAS

R 336.2901  Definitions.

Rule 1901.  The following definitions apply to terms used in this part.  If a term defined here is also defined elsewhere in these rules, then the definition contained here supersedes for this part only:

(a)  "Actual emissions" means the actual rate of emissions of a regulated new source review pollutant from an emissions unit, as determined under R 336.1101(b), except that this definition shall not apply for calculating whether a significant emissions increase has occurred, or for establishing a plantwide applicability limit under R 336.2907.  Instead, the terms "projected actual emissions" and "baseline actual emissions" shall apply for those purposes.

(b)  "Baseline actual emissions" means the rate of emissions, in tons per year, of a regulated new source review pollutant, as determined by the following:

(i)  For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 5-year period immediately preceding when the owner or operator begins actual construction of the project.  The department shall allow the use of a different time period upon a determination that it is more representative of normal source operation. The following shall apply:

(A)  The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

  (B)  The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24-month period.

  (C)  For a regulated new source review pollutant, when a project involves multiple emissions units, only 1 consecutive 24-month period shall be used to determine the baseline actual emissions for the emissions units being changed.  A different consecutive 24-month period may be used for each regulated new source review pollutant.

  (D)  The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (i)(B) of this subdivision.

  (ii)  For an existing emissions unit, other than an electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 10-year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the department for a permit required under R 336.1201, whichever is earlier, except that the 10-year period shall not include any period earlier than November 15, 1990.  All of the following shall apply:

  (A)  The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

  (B)  The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24-month period.

  (C)  The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the major stationary source must currently comply, had the major stationary source been required to comply with the limitations during the consecutive 24-month period.  However, if an emission limitation is part of a maximum achievable control technology standard that the United States environmental protection agency proposed or promulgated under 40 C.F.R. part 63, then the baseline actual emissions need only be adjusted if the department has taken credit for such emissions reductions in an attainment demonstration or maintenance plan.  Title 40 C.F.R. part 63 is adopted by reference in R 336.2901a.

  (D)  For a regulated new source review pollutant, when a project involves multiple emissions units, only 1 consecutive 24-month period shall be used to determine the baseline actual emissions for the emissions units being changed.  A different consecutive 24-month period may be used for each regulated new source review pollutant.

  (E)  The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by subparagraphs (B) and (C) of this paragraph.

  (iii)  For a new emissions unit, the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit.

  (iv)  For a plantwide applicability limit for a major stationary source, the baseline actual emissions shall be calculated for existing electric utility steam generating units under paragraph (i) of this subdivision, for other existing emissions units under paragraph (ii) of this subdivision, and for a new emissions unit under paragraph (iii) of this subdivision.

  (c)  "Begin actual construction" means, in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature.  Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework, and construction of

permanent storage structures.  "A change in method of operation" refers to those on-site activities other than preparatory activities which mark the initiation of the change.

 (d)  "Best available control technology" or "BACT" means an emissions limitation, including a visible emissions standard, based on the maximum degree of reduction for each regulated new source review pollutant which would be emitted from any proposed major stationary source or major modification which the department, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. Application of best available control technology shall not result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 C.F.R. part 60 or 61, adopted by reference in R 336.2901a.  If the department determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, then a design, equipment, work practice, operational standard, or combination thereof, may be prescribed instead to satisfy the requirement for the application of BACT.  The standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of the design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

 (e)  "Building, structure, facility, or installation" means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on 1 or more contiguous or adjacent properties, and are under the control of the same person, or persons under common control, except the activities of any vessel.  Pollutant-emitting activities are part of the same industrial grouping if they have the same 2-digit major group code associated with their primary activity.  Major group codes and primary activities are described in the standard industrial classification manual, 1987.  For assistance in converting north American industrial classification system codes to standard industrial classification codes see http://www.census.gov/epcd/naics02/.

 (f)  "Clean coal technology" means any technology, including technologies applied at the precombustion, combustion, or post-combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

 (g)  "Clean coal technology demonstration project" means a project using funds appropriated under the heading "department of energy-clean coal technology," up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the United States environmental protection agency.  The federal contribution for a qualifying project shall be at least 20% of the total cost of the demonstration project.

 (h)  [Reserved]

 (i)  "Commence" as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and has either of the following:

 (i)  Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time.

 (ii)  Entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

 (j)  "Construction" means any physical change or change in the method of operation, including fabrication, erection, installation, demolition, or modification of an emissions unit, that would result in a change in emissions.

(k) "Continuous emissions monitoring system" or "CEMS" means all of the equipment that may be required to meet the data acquisition and availability requirements of this rule, to sample, condition, if applicable, analyze, and provide a record of emissions on a continuous basis.

(l) "Continuous emissions rate monitoring system" or "CERMS" means the total equipment required for the determination and recording of the pollutant mass emissions rate, in terms of mass per unit of time.

(m) "Continuous parameter monitoring system" or "CPMS" means all of the equipment necessary to meet the data acquisition and availability requirements of this rule, to monitor process and control device operational parameters and other information, and to record average operational parameter values on a continuous basis.

(n) "Electric utility steam generating unit" means any steam electric generating unit that is constructed for the purpose of supplying more than 1/3 of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(o) "Emissions unit" means any part of a stationary source that emits or would have the potential to emit any regulated new source review pollutant. The term emissions unit includes an electric steam generating unit. Each emissions unit can be classified as either new or existing based on the following:

(i) A new emissions unit is any emissions unit that is, or will be, newly constructed and that has existed for less than 2 years from the date the emissions unit first operated.

(ii) An existing emissions unit is any emissions unit that does not meet the definition of a new emissions unit.

(p) "Federal land manager" means, with respect to any lands in the United States, the secretary of the department with authority over such lands.

(q) "Hydrocarbon combustion flare" means either a flare used to comply with an applicable new source performance standard or maximum achievable control technology standard, including uses of flares during startup, shutdown, or malfunction permitted under such a standard, or a flare that serves to control emissions of waste streams comprised predominately of hydrocarbons and containing not more than 230 milligrams per dry standard cubic meter hydrogen sulfide.

(r) "Lowest achievable emission rate" or "LAER" means, for any source, the more stringent rate of emissions based on either of the following:

(i) The most stringent emissions limitation that is contained in the implementation plan of any state for the same class or category of stationary source, unless the owner or operator of the proposed stationary source demonstrates that the limitations are not achievable.

(ii) The most stringent emissions limitation that is achieved in practice by the same class or category of stationary sources. This limitation, when applied to a modification, means the lowest achievable emissions rate for the new or modified emissions units within a stationary source. Application of the term shall not permit a proposed new or modified stationary source to emit any pollutant in excess of the amount allowable under an applicable new source performance standard.

(s) "Major modification" means the following:

(i) Any physical change in or change in the method of operation of a major stationary source that would result in both of the following:

(A) A significant emissions increase of a regulated new source review pollutant.

(B) A significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase from any emissions units or net emissions increase at a major stationary source that is significant for volatile organic compounds shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include any of the following:

(A) Routine maintenance, repair, and replacement.

(B) Use of an alternative fuel or raw material by reason of an order under sections 2 (a) and (b) of the energy supply and environmental coordination act of 1974, 15 U.S.C. §792 et seq., or any superseding legislation, or by reason of a natural gas curtailment plan under the federal power act of 1995, 16 U.S.C. §791-828c et seq.

(C) Use of an alternative fuel by reason of an order or rule under section 125 of the clean air act.

(D) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste.

(E) Use of an alternative fuel or raw material by a stationary source which meets either of the following:

(1) The source was capable of accommodating before December 21, 1976, unless the change would be prohibited under any federally enforceable permit condition that was established after December 12, 1976, under prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations.

(2) The source is approved to use under any permit issued under R 336.1201(1)(a).

(F) An increase in the hours of operation or in the production rate, unless such change is prohibited under any federally enforceable permit condition that was established after December 21, 1976, under R 336.1201(1)(a).

(G) Any change in ownership at a stationary source.

(H) [Reserved]

(I) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with both of the following:

(1) The state implementation plan.

(2) Other requirements necessary to attain and maintain the national ambient air quality standard during the project and after it is terminated.

(iv) This definition shall not apply with respect to a particular regulated new source review pollutant when the major stationary source is complying with the requirements of R 336.2907 for a plantwide applicability limit for that pollutant. Instead, the definition in R 336.2907 shall apply.

(v) For the purposes of applying the requirements of R 336.2902(8) to modifications at major stationary sources of nitrogen oxides located in ozone nonattainment areas or in ozone transport regions, whether or not subject to subpart 2, part D, title 1 of the clean air act, any significant net emissions increase of nitrogen oxides is considered significant for ozone.

(vi) Any physical change in, or change in the method of operation of, a major stationary source of volatile organic compounds that results in any increase in emissions of volatile organic compounds from any discrete operation, emissions unit, or other pollutant emitting activity at the source shall be considered a significant net emissions increase and a major modification for ozone, if the major stationary source is located in an extreme ozone nonattainment area that is subject to subpart 2, part D, title 1 of the clean air act.

(t) "Major stationary source" means all of the following:

(i) Any of the following:

(A) Any stationary source of air pollutants that emits or has the potential to emit 100 tons per year or more of any regulated new source review pollutant, except that lower emissions thresholds shall apply in areas subject to subpart 2, subpart 3, or subpart 4 of part D, title 1 of the clean air act, according to the following:

(1) In any serious ozone nonattainment area, 50 tons per year of volatile organic compounds.

(2) In an area within an ozone transport region except for any severe or extreme ozone nonattainment area, 50 tons per year of volatile organic compounds.

(3)  In any severe ozone nonattainment area, 25 tons per year of volatile organic compounds.

(4)  In any extreme ozone nonattainment area, 10 tons per year of volatile organic compounds.

(5)  In any serious nonattainment area for carbon monoxide, where the department has determined that stationary sources contribute significantly to carbon monoxide levels in the area, 50 tons per year of carbon monoxide.

(6)  In any serious nonattainment area for PM-10, 70 tons per year of PM-10.

(B)  For the purposes of applying the requirements of R 336.2902(8) to stationary sources of nitrogen oxides located in an ozone nonattainment area or in an ozone transport region, any stationary source which emits, or has the potential to emit, 100 tons per year or more of nitrogen oxide emissions, except that the following emission thresholds shall apply in areas subject to subpart 2 of part D, title 1 of the clean air act:

(1)  In any ozone nonattainment area classified as marginal or moderate, 100 tons per year or more of nitrogen oxides.

(2)  In any ozone nonattainment area classified as a transitional, submarginal, or incomplete or no data area, when such area is located in an ozone transport region, 100 tons per year or more of nitrogen oxides.

(3)  In any area designated under section 107(d) of the clean air act as attainment or unclassifiable for ozone that is located in an ozone transport region, 100 tons per year or more of nitrogen oxides.

(4)  In any serious nonattainment area for ozone, 50 tons per year or more of nitrogen oxides.

(5)  In any severe nonattainment area for ozone, 25 tons per year or more of nitrogen oxides.

(6)  In any extreme nonattainment area for ozone, 10 tons per year or more of nitrogen oxides.

(C)  Any physical change that would occur at a stationary source not qualifying under R 336.2901(t)(i)(A) or (B) as a major stationary source, if the change would constitute a major stationary source by itself.

(ii)  A major stationary source that is major for volatile organic compounds shall be considered major for ozone.

(iii)  The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this paragraph whether it is a major stationary source, unless the source belongs to 1 of the following categories of stationary sources:

(A)  Coal cleaning plants, with thermal dryers.

(B)  Kraft pulp mills.

(C)  Portland cement plants.

(D)  Primary zinc smelters.

(E)  Iron and steel mills.

(F)  Primary aluminum ore reduction plants.

(G)  Primary copper smelters.

(H)  Municipal incinerators capable of charging more than 250 tons of refuse per day.

(I)  Hydrofluoric, sulfuric, or nitric acid plants.

(J)  Petroleum refineries.

(K)  Lime plants.

(L)  Phosphate rock processing plants.

(M)  Coke oven batteries.

(N)  Sulfur recovery plants.

(O)  Carbon black plants, furnace process.

(P)  Primary lead smelters.

(Q)  Fuel conversion plants.

(R)  Sintering plants.

(S)  Secondary metal production plants.

 (T)  Chemical process plants.

 (U)  Fossil-fuel boilers, or combination thereof, totaling more than 250 million British thermal units per hour heat input.

 (V)  Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels.

 (W)  Taconite ore processing plants.

 (X)  Glass fiber processing plants.

 (Y)  Charcoal production plants.

 (Z)  Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input.

 (AA)  Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the clean air act.

 (u)  "Necessary preconstruction approvals or permits" means a permit issued under R 336.1201(1)(a) that is required by R 336.2802 or R 336.2902.

 (v)  "Net emissions increase" means all of the following:

 (i)  With respect to any regulated new source review pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

 (A)  The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated under R 336.2902(2).

 (B)  Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable.  Baseline actual emissions for calculating increases and decreases shall be determined as provided in the definition of baseline actual emissions, except that subdivisions (b)(i)(C) and (b)(ii)(D) of this rule shall not apply.

 (ii)  An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs before the date that the increase from the particular change occurs.

 (iii)  An increase or decrease in actual emissions is creditable only if all of the following occur:

 (A)  It occurs within a 5-year period.

 (B)  The department has not relied on it in previously issuing a permit for the source under R 336.1201(1)(a) or R 336.1214a, which permit is in effect when the increase in actual emissions from the particular change occurs.

 (iv)  An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

 (v)  A decrease in actual emissions is creditable only to the extent that all of the following occur:

 (A)  The old level of actual emission or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions.

 (B)  It is enforceable as a practical matter at and after the time that actual construction on the particular change begins.

 (C)  The department has not relied on it in issuing any permit under R 336.1201(1)(a) or R 336.1214a.

 (D)  It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change.

 (vi)  An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant.  Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

 (vii)  The definition of actual emissions in R 336.1101(b) shall not apply for determining creditable increases and decreases after a change, instead the definitions of the terms "projected actual emissions" and "baseline emissions" shall be used.

(w)  "Nonattainment major new source review" or "NSR" program means the requirements of this rule, R 336.1220, or R 336.1221.  A permit issued under any of these rules is a major new source review permit.

(x)  [Reserved]

(y)  [Reserved]

(z)  "Potential to emit" means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design.  Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design only if the limitation or the effect it would have on emissions is federally enforceable.  Secondary emissions do not count in determining the potential to emit of a stationary source.

(aa)  "Predictive emissions monitoring system" or "PEMS" means all of the equipment necessary to monitor process and control device operational parameters and other information and calculate and record the mass emissions rate on a continuous basis.

(bb)  "Prevention of significant deterioration" or "PSD" permit means any permit that is issued under prevention of significant deterioration of air quality regulations or under 40 C.F.R. §52.21, adopted by reference in R 336.2901a.

(cc)  "Project" means a physical change in, or change in the method of operation of, an existing major stationary source.

(dd)  "Projected actual emissions" means the following:

(i)  The maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated new source review pollutant in any 1 of the 5 12-month periods following the date the unit resumes regular operation after the project, or in any 1 of the 10 12-month periods following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit of that regulated new source review pollutant and full utilization of the unit would result in a significant emissions increase or a significant net emissions increase at the major stationary source.

(ii)  In determining the projected actual emissions before beginning actual construction, the owner or operator of the major stationary source shall do the following:

(A)  Consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the state or federal regulatory authorities, and compliance plans under the approved state implementation plan.

(B)  Include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(C)  Exclude, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24-month period used to establish the baseline actual emissions of this rule and that are also unrelated to the particular project, including any increased utilization due to product demand growth.

(D)  Elect to use the emissions unit's potential to emit in tons per year instead of calculating projected actual emissions.

(ee)  "Regulated new source review pollutant" means any of the following:

(i)  Oxides of nitrogen or any volatile organic compounds.

(ii)  Ozone, sulfur dioxide, oxides of nitrogen, PM-10, lead, and carbon monoxide.

(iii)  Any pollutant that is a constituent or precursor of a general pollutant listed under paragraphs (i) or (ii) of this subdivision, provided that a constituent or precursor pollutant may only be regulated under new source review as part of regulation of the general pollutant.

  (ff)  "Secondary emissions" means emissions that would occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself.  For the purpose of this rule, secondary emissions shall be specific, well defined, quantifiable, and impact the same general area as the stationary source or modification which causes the secondary emissions.  Secondary emissions include emissions from any off-site support facility that would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification.  Secondary emissions do not include any emissions that come directly from a mobile source such as emissions from the tailpipe of a motor vehicle, from a train, or a vessel.

  (gg)  "Significant" means all of the following:

  (i)  "Significant" means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants at a rate of emissions that would equal or exceed any of the following pollutant emission rates:

  (A)  Carbon monoxide:  100 tons per year.

  (B)  Oxides of nitrogen:  40 tons per year.

  (C)  Sulfur dioxide:  40 tons per year.

  (D)  Ozone:  40 tons per year of volatile organic compounds or of nitrogen oxides.

  (E)  Lead:  0.6 tons per year.

  (ii)  Notwithstanding the significant emissions rate for ozone in R 336.2901(gg)(i)(D), significant means, in reference to an emissions increase or a net emissions increase, any increase in actual emissions of volatile organic compounds that would result from any physical change in, or change in the method of operation of, a major stationary source located in a serious or severe ozone nonattainment area that is subject to subpart 2, part D, title 1 of the clean air act, if such emissions increase of volatile organic compounds exceeds 25 tons per year.

  (iii)  For the purposes of applying the requirements of R 336.2902(8) to modifications at major stationary sources of nitrogen oxides located in an ozone nonattainment area or in an ozone transport region, the significant emission rates and other requirements for volatile organic compounds in R 336.2901(gg)(i)(D), R 336.2901(gg)(ii) and R 336.2901(gg)(v) shall apply to nitrogen oxides emissions.

  (iv)  Notwithstanding the significant emissions rate for carbon monoxide in R 336.2901(gg)(i)(A), significant means, in reference to an emissions increase or a net emissions increase, any increase in actual emissions of carbon monoxide that would result from any physical change in, or change in the method of operation of, a major stationary source in a serious nonattainment area for carbon monoxide if such increase equals or exceeds 50 tons per year, provided that the United States environmental protection agency has determined that the stationary sources contribute significantly to carbon monoxide levels in that area.

  (v)  Notwithstanding the significant emissions rates for ozone in R 336.2901(gg)(i)(D) and R 336.2901(gg)(ii), any increase in actual emissions of volatile organic compounds from any emissions unit at a major stationary source of volatile organic compounds located in an extreme ozone nonattainment area that is subject to subpart 2, part D, title 1 of the clean air act shall be considered a significant net emissions increase.

  (hh)  "Significant emissions increase" means, for a regulated new source review pollutant, an increase in emissions that is significant for that pollutant.

  (ii)  "Stationary source" means any building, structure, facility, or installation which emits or may emit a regulated new source review pollutant.

  (jj)  "Temporary clean coal technology demonstration project" means a clean coal technology demonstration project that is operated for a period of 5 years or less, and that complies with the state

implementation plan and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

R 336.2901a  Adoption by reference.

Rule 1901a.  For the purpose of clarifying the definitions in these rules, the following documents are adopted by reference in these rules.  Copies of the documents are available for inspection and purchase at the Air Quality Division, Department of Environmental Quality, 525 West Allegan Street, P.O. Box 30260, Lansing, Michigan 48909-7760, at a cost as of the time of adoption of these rules (AQD price). Copies of may be obtained from the Superintendent of Documents, Government Printing Office, P.O. Box 371954, Pittsburgh, Pennsylvania, 15250-7954, at a cost as of the time of adoption of these rules (GPO), or on the United States government printing office internet web site at http://www.access.gpo.gov.

(a)  Title 40 C.F.R. 51.902(b), 40 C.F.R., part 51, appendix S, section IV, "Sources That Would Locate in a Designated Nonattainment Area," (2006), AQD price $55.00/GPO price $45.00.

(b)  Title 40 C.F.R., §52.21, "Prevention of Significant Deterioration of Air Quality," (2006), AQD price $70.00/GPO price $60.00.

(c)  Title 40 C.F.R., part 60, "Standards of Performance for New Stationary Sources," (2006), AQD price $68.00/GPO price $58.00 for 60.1-end and AQD price $67.00/GPO price $57.00 for the appendices.

(d)  Title 40 C.F.R., part 61, "National Emission Standards for Hazardous Air Pollutants," (2006), AQD price $55.00/GPO price $45.00.

(e)  Title 40 C.F.R., part 63, "National Emission Standards for Hazardous Air Pollutants for Source Categories," (2006), AQD $68.00/GPO $58.00 for 63.1-63.599; AQD $60.00/GPO $50.00 for 63.600-63.1199; AQD $60.00/GPO $50.00 for 63.1200-63.1439; AQD $42.00/GPO $32.00 for 63.1440-63.6175; AQD $42.00/GPO $32.00 for 63.6580-63.8830; and AQD $45.00/GPO $35.00 for 63.8980-end.

(f)  Table 1 of the United States environmental protection agency's "Recommended Policy on Control of Volatile Organic Compounds," 42 FR 35314, July 8, 1977, at no cost.  Copies of table 1 may be obtained from the Library of Michigan, State Law Library, 525 West Ottawa Street, P.O. Box 30007, Lansing, Michigan 48909, E-mail lmlawlib@michigan.gov, at no cost.

R 336.2902  Applicability.

Rule 1902.  (1)  This part applies to the construction of each new major stationary source or major modification that is both of the following:

(a)  Located in a nonattainment area.

(b)  Major for the pollutant for which the area is designated nonattainment.

For areas designated as nonattainment for ozone, this part shall apply only to any new major stationary source or major modification that is major for volatile organic compounds or oxides of nitrogen.

(2)  This part applies to the construction of new major offset sources and major modifications to existing sources as follows:

(a)  Except as otherwise provided in subrule (3) of this rule, and consistent with the definition of major modification, a project is a major modification for a regulated new source review pollutant if it causes both of the following emissions increases:

(i)  A significant emissions increase.

(ii)  A significant net emissions increase.

The project is not a major modification if it does not cause a significant emissions increase.  If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(b) The procedure for calculating whether a significant emissions increase will occur depends upon the type of emissions units being modified. The procedure for calculating whether a significant net emissions increase will occur at the major stationary source is contained in the definition of net emissions increase. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

(c) The actual-to-projected-actual applicability test may be used for projects that only involve existing emissions units. A significant emissions increase of a regulated new source review pollutant is projected to occur if the sum of the difference between the projected actual emissions and the baseline actual emissions, for each existing emissions unit, equals or exceeds the significant amount for that pollutant.

(d) The actual-to-potential test may be used for projects that involve construction of new emissions units or modification or reconstruction of existing emissions units. A significant emissions increase of a regulated new source review pollutant is projected to occur if the sum of the difference between the potential to emit from each new, modified, or reconstructed emissions unit following completion of the project and the baseline actual emissions of these units before the project equals or exceeds the significant amount for that pollutant.

(e) The hybrid test may be used for projects that involve multiple types of emissions units. A significant emissions increase of a regulated new source review pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the appropriate methods specified above in this subrule as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant.

(3) Any major stationary source for a plantwide applicability limit for a regulated new source review pollutant shall comply with R 336.2907.

(4) The provisions of this rule do not apply to a source or modification that would be a major stationary source or major modification only if fugitive emissions to the extent quantifiable are considered in calculating the potential to emit of the stationary source or modification and the source does not belong to any of the following categories:

(a) Coal cleaning plants, with thermal dryers.

(b) Kraft pulp mills.

(c) Portland cement plants.

(d) Primary zinc smelters.

(e) Iron and steel mills.

(f) Primary aluminum ore reduction plants.

(g) Primary copper smelters.

(h) Municipal incinerators capable of charging more than 250 tons of refuse per day.

(i) Hydrofluoric, sulfuric, or citric acid plants.

(j) Petroleum refineries.

(k) Lime plants.

(l) Phosphate rock processing plants.

(m) Coke oven batteries.

(n) Sulfur recovery plants.

(o) Carbon black plants, furnace process.

(p) Primary lead smelters.

(q) Fuel conversion plants.

(r) Sintering plants.

(s) Secondary metal production plants.

(t) Chemical process plants.

(u)  Fossil-fuel boilers, or combination thereof, totaling more than 250 million British thermal units per hour heat input.

(v)  Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels.

(w)  Taconite ore processing plants.

(x)  Glass fiber processing plants.

(y)  Charcoal production plants.

(z)  Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input.

(aa)  Any other stationary source category which, as of August 7, 1980, is regulated under section 111 or 112 of the clean air act.

(5)  The following additional construction and permitting requirements apply:

(a)  Approval to construct shall not relieve any owner or operator of the responsibility to comply fully with any other applicable requirements and any other requirements under local, state, or federal law.

(b)  At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforcement limitation that was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements of R 336.2908 shall apply to the source or modification as though construction had not yet commenced on the source or modification.

(6)  The following provisions apply to projects at existing emissions units at a major stationary source that is subject to either prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations in circumstances where there is a reasonable possibility that a project that is not a part of a major modification may result in a significant emissions increase and the owner or operator elects to use the method in R 336.2901(dd) or R 336.2801(ll) for calculating projected actual emissions:

(a)  Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

(i)  A description of the project.

(ii)  Identification of the emissions units whose emissions of a regulated new source review pollutant may be affected by the project.

(iii)  A description of the applicability test used to determine that the project is not a major modification for any regulated new source review pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under R 336.2901(dd)(ii)(C) and an explanation for why such amount was excluded, and any netting calculations, if applicable.

(b)  If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information required by subdivision (a) of this subrule to the department.  This subdivision does not require the owner or operator of such a unit to obtain any determination from the department before beginning actual construction.

(c)  The owner or operator shall monitor the emissions of any regulated new source review pollutant that could increase as a result of the project and that is emitted by any emissions units identified under subdivision (a)(ii) of this subrule and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit of that regulated new source review pollutant at the emissions unit.

(d)  If the unit is an existing electric utility steam generating unit, then the owner or operator shall submit a report to the department within 60 days after the end of each year during which records shall be generated under subdivision (c) of this subrule setting out the unit's annual emissions during the year that preceded submission of the report.

(e)  If the unit is an existing unit other than an electric utility steam generating unit, then the owner or operator shall submit a report to the department if the annual emissions, in tons per year, from the project identified pursuant to this subrule, exceed the baseline actual emissions by a significant amount for that regulated new source review pollutant, and if such emissions differ from the preconstruction projection.  The report shall be submitted to the department within 60 days after the end of such year.  The report shall contain all of the following information:

  (i)  The name, address and telephone number of the major stationary source.

  (ii)  The annual emissions as calculated under subdivision (c) of this subrule.

  (iii)  Any other information that the owner or operator wishes to include in the report, for example, an explanation as to why the emissions differ from the preconstruction projection.

  (f)  A reasonable possibility that a project may result in a significant emissions increase occurs when the project is subject to R 336.1201(1)(a) and is not exempted from the requirement to obtain a permit to install by R 336.1278 to R 336.1290.  If the owner or operator determines that the project is exempted by R 336.1278 to R 336.1290, then the owner or operator may proceed with the project without obtaining a permit to install.  If an owner or operator develops calculations for the project pursuant to R 336.2901(dd) or R 336.2801(ll), the calculations may be used for the purpose of demonstrating compliance with R 336.1278a(1)(c).

  (7)  The owner or operator of the source shall make the information required to be documented and maintained under this rule available for review upon a request for inspection by the department, or the general public under section 5516(2) of the act, MCL 324.5516(2).

  (8)  The requirements of this part that apply to major stationary sources and major modifications of volatile organic compounds shall also apply to nitrogen oxides emissions from major stationary sources and major modifications of nitrogen oxides in an ozone transport region or in any ozone nonattainment area, except in ozone nonattainment areas or portions of an ozone transport region where the United States environmental protection agency has granted a NOx waiver applying the standards set forth under section 182(f) of the clean air act and the waiver continues to apply.


R 336.2903  Additional permit requirements for sources impacting nonattainment areas.

  Rule 1903.  (1)  No new major stationary source or major modification shall be constructed in an area designated as attainment or unclassifiable for any national ambient air quality standard under section 107 of the clean air act, without first applying for a permit to install under R 336.1201(1)(a).  The department shall not approve any permit to install that would cause or contribute to a violation of any national ambient air quality standard.

  (2)  A major source or major modification shall be considered to cause or contribute to a violation of a national ambient air quality standard when the source or modification would, at a minimum, exceed the following significance levels in Table 191 at any locality that does not or would not meet the applicable national standard:

Table 191

| Pollutant | Averaging time (hours) | | | | |
|---|---|---|---|---|---|
| | Annual | 24 | 8 | 3 | 1 |
| Sulfur dioxide | 1.0 ug/m$^3$ | 5 ug/m$^3$ | | 25 ug/m$^3$ | |
| PM-10 | 1.0 ug/m$^3$ | 5 ug/m$^3$ | | | |
| Oxides of nitrogen | 1.0 ug/m$^3$ | | | | |
| Carbon Monoxide | | | 500 ug/m$^3$ | | 2000 ug/m$^3$ |

(3)  The owner of a major stationary source or major modification subject to this rule may reduce the impact of its emissions upon air quality by obtaining sufficient emission reductions to, at a minimum, compensate for its adverse ambient impact where the major source or major modification would otherwise cause or contribute to a violation of any national ambient air quality standard.  In the absence of such emission reductions, the department shall deny the proposed construction.

(4)  This rule shall not apply to a major stationary source or major modification with respect to a particular pollutant if the owner or operator demonstrates that, as to that pollutant, the source or modification is located in a nonattainment area.

R 336.2907  Actuals plantwide applicability limits or PALs.

Rule 1907.  (1)  The following definitions apply to the use of actuals PALs.  If a term is not defined in these paragraphs, then it shall have the meaning given in R 336.2901:

(a)  "Actuals PAL for a major stationary source" means a PAL based on the baseline actual emissions of all emissions units at the source that emit or have the potential to emit the PAL pollutant.

(b)  "Allowable emissions" means allowable emissions as defined in R 336.1101(k), except this definition is modified in the following manner:

(i)  The allowable emissions for any emissions unit shall be calculated considering any emission limitations that are enforceable as a practical matter on the emissions unit's potential to emit.

(ii)  An emissions unit's potential to emit shall be determined using the definition in R 336.2901(z), except that the words "or enforceable as a practical matter" shall be added after "federally enforceable."

(c)  "Small emissions unit" means an emissions unit that emits or has the potential to emit the PAL pollutant in an amount less than the significant level for that PAL pollutant.

(d)  "Major emissions unit" means either of the following:

(i)  Any emissions unit that emits or has the potential to emit 100 tons per year or more of the PAL pollutant in an attainment area.

(ii)  Any emissions unit that emits or has the potential to emit the PAL pollutant in an amount that is equal to or greater than the major source threshold for the PAL pollutant as defined by the clean air act for nonattainment areas.  For example, in accordance with the definition of major stationary source in section 182(c) of the clean air act, an emissions unit is a major emissions unit for volatile organic compounds if the emissions unit is located in a serious ozone nonattainment area and it emits or has the potential to emit 50 or more tons of volatile organic compounds per year.

(e)  "Plantwide applicability limitation" or "PAL" means an emission limitation, expressed in tons per year, for a pollutant at a major stationary source that is enforceable as a practical matter and established source-wide in accordance with this rule.

(f)  "PAL effective date" generally means the date of issuance of the PAL permit. However, the PAL effective date for an increased PAL is the date any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(g)  "PAL effective period" means the period beginning with the PAL effective date and ending 10 years later.

(h)  "PAL major modification" means, notwithstanding R 336.2901(s) and (v), the definitions for major modification and net emissions increase, any physical change in or change in the method of operation of the PAL source that causes it to emit the PAL pollutant at a level equal to or greater than the PAL.

(i)  "PAL permit" means the permit to install that establishes a PAL for a major stationary source.

(j)  "PAL pollutant" means the pollutant for which a PAL is established at a major stationary source.

(k)  "Significant emissions unit" means an emissions unit that emits or has the potential to emit a PAL pollutant in an amount that is equal to or greater than the significant level  for that PAL pollutant, but less than the amount that would qualify the unit as a major emissions unit.

(2)  The following requirements pertain to applicability:

(a)  The department may approve the use of an actuals PAL for any existing major stationary source if the PAL meets the requirements of this rule.  "PAL" means "actuals PAL" in this rule.

(b)  The department shall not allow an actuals PAL for volatile organic compounds or oxides of nitrogen for any major stationary source located in an extreme ozone nonattainment area.

(c)  For physical change in or change in the method of operation of a major stationary source that maintains its total source-wide emissions below the PAL level, meets the requirements of this rule, and complies with the PAL permit, all of the following shall apply:

(i)  Is not a major modification for the PAL pollutant.

(ii)  Does not have to be approved through the permitting requirements of this rule.

(iii)  Is not subject to the provisions in R 336.2902(5)(b), restrictions on relaxing enforceable emission limitations that the major stationary source used to avoid applicability of the nonattainment major new source review program.

(d)  Except as provided under subdivision (c)(iii) of this subrule, a major stationary source shall continue to comply with all applicable federal, state, or local requirements, emission limitations, and work practice requirements that were established before the effective date of the PAL.

(3)  As part of a permit application requesting a PAL, the owner or operator of a major stationary source shall submit all of the following information to the department for approval:

(a)  A list of all emissions units at the source designated as small, significant, or major based on their potential to emit.  In addition, the owner or operator of the source shall indicate which, if any, federal, state, or local applicable requirements, emission limitations, or work practices apply to each unit.

(b)  Calculations of the baseline actual emissions with supporting documentation. Baseline actual emissions shall include emissions associated not only with operation of the unit, but also emissions associated with startup, shutdown, and malfunction.

(c)  The calculation procedures that the major stationary source owner or operator proposes to use to convert the monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total for each month as required by subrule (13)(a) of this rule.

(4)  The following general requirements apply for establishing PALs:

(a)  The department may establish a PAL at a major stationary source, provided that, at a minimum, all the following requirements are met:

(i)  The PAL shall impose an annual emission limitation in tons per year, which is enforceable as a practical matter, for the entire major stationary source.  For each month during the PAL effective period after the first 12 months of establishing a PAL, the major stationary source owner or operator shall show that the sum of the monthly emissions from each emissions unit under the PAL for the previous 12 consecutive months is less than the PAL (a 12-month average, rolled monthly).  For each month during the first 11 months from the PAL effective date, the major stationary source owner or operator shall show that the sum of the preceding monthly emissions from the PAL effective date for each emissions unit under the PAL is less than the PAL.

(ii)  The PAL shall be established in a permit to install that meets the public participation requirements in subrule (5) of this rule.

(iii)  The PAL permit to install shall contain all the requirements of subrule (7) of this rule.

(iv)  The PAL shall include fugitive emissions, to the extent quantifiable, from all emissions units that emit or have the potential to emit the PAL pollutant at the major stationary source.

(v)  Each PAL shall regulate emissions of only 1 pollutant.

(vi)  Each PAL shall have a PAL effective period of 10 years.

(vii)  The owner or operator of the major stationary source with a PAL shall comply with the monitoring, recordkeeping, and reporting requirements provided in subrules (12) to (14) of this rule for each emissions unit under the PAL through the PAL effective period.

(b)  At no time, during or after the PAL effective period, are emissions reductions of a PAL pollutant, which occur during the PAL effective period, creditable as decreases for purposes of offsets under R 336.2908(5) unless the level of the PAL is reduced by the amount of such emissions reductions and such reductions would be creditable in the absence of the PAL.

  (5)  PALs for existing major stationary sources shall be established, renewed, or increased through a permit to install issued under R 336.1201(1)(a).  The department shall provide the public with notice of the proposed approval of a PAL permit and at least a 30-day period for submittal of public comment. The department shall address all material comments before taking final action on the permit.

  (6)  The following apply to setting the 10-year actuals PAL level.

  (a)  Except as provided in subdivision (b) of this subrule, the actuals PAL level for a major stationary source shall be established as the sum of the baseline actual emissions of the PAL pollutant for each emissions unit at the source; plus an amount equal to the applicable significant level for the PAL pollutant.  When establishing the actuals PAL level, for a PAL pollutant, only 1 consecutive 24-month period shall be used to determine the baseline actual emissions for all existing emissions units. However, a different consecutive 24-month period may be used for each different PAL pollutant. Emissions associated with units that were permanently shut down after this 24-month period shall be subtracted from the PAL level.  The department shall specify a reduced PAL level, in tons per year, in the PAL permit to become effective on the future compliance date of any applicable federal or state regulatory requirements before issuance of the PAL permit.  For instance, if the source owner or operator will be required to reduce emissions from industrial boilers in half from baseline emissions of 60 parts per million oxides of nitrogen to a new rule limit of 30 parts per million, then the permit shall contain a future effective PAL level that is equal to the current PAL level reduced by half of the original baseline emissions of such unit.

  (b)  For newly constructed units, which do not include modifications to existing units, on which actual construction began after the 24-month period, instead of adding the baseline actual emissions as specified in subdivision (a) of this subrule, the emissions shall be added to the PAL level in an amount equal to the potential to emit of the units.

  (7)  The PAL permit shall contain, at a minimum, all of the following information:

  (a)  The PAL pollutant and the applicable source-wide emission limitation in tons per year.

  (b)  The PAL permit effective date and the expiration date of the PAL (PAL effective period).

  (c)  Specification in the PAL permit that if a major stationary source owner or operator applies to renew a PAL under subrule (10) of this rule before the end of the PAL effective period, then the PAL shall not expire at the end of the PAL effective period.  The PAL shall remain in effect until a revised PAL permit is issued by the department.

  (d)  A requirement that emission calculations for compliance purposes include emissions from startups, shutdowns, and malfunctions.

  (e)  A requirement that, once the PAL expires, the major stationary source is subject to subrule (9) of this rule.

  (f)  The calculation procedures that the major stationary source owner or operator shall use to convert the monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total for each month as required by subrule (13)(a) of this rule.

  (g)  A requirement that the major stationary source owner or operator monitor all emissions units under subrule (12) of this rule.

  (h)  A requirement to retain on-site the records required under subrule (13) of this rule.  The records may be retained in an electronic format.

  (i)  A requirement to submit the reports required under subrule (14) of this rule by the required deadlines.

(j)  Any other requirements that the department determines necessary to implement and enforce the PAL.

(8)  The following shall apply to the PAL effective period and reopening of the PAL permit:

(a)  The department shall specify a PAL effective period of 10 years.

(b)  The following shall apply to reopening of the PAL permit:

(i)  During the PAL effective period, the department shall reopen the PAL permit to do any of the following:

(A)  Correct typographical or calculation errors made in setting the PAL or reflect a more accurate determination of emissions used to establish the PAL.

(B)  Reduce the PAL if the owner or operator of the major stationary source creates creditable emissions reductions for use as offsets.

(C)  Revise the PAL to reflect an increase in the PAL as provided under subrule (11) of this rule.

(ii)  The department may reopen the PAL permit for any of the following:

(A)  Reduce the PAL to reflect newly applicable federal requirements with compliance dates after the PAL effective date.

(B)  Reduce the PAL consistent with any other requirement, that is enforceable as a practical matter, and that the department may impose on the major stationary source under the state implementation plan.

(C)  Reduce the PAL if the department determines that a reduction is necessary to avoid causing or contributing to a national ambient air quality standard or PSD increment violation, or to an adverse impact on an air quality related value that has been identified for a federal class I area by a federal land manager and for which information is available to the general public.

(iii)  Except for a permit reopening for the correction of typographical or calculation errors that do not increase the PAL level, all other reopenings shall be carried out in accordance with the public participation requirements of subrule (5) of this rule.

(9)  Any PAL, which is not renewed in accordance with the procedures in subrule (10) of this rule, shall expire at the end of the PAL effective period, and the following requirements of this paragraph shall apply:

(a)  Each emissions unit, or each group of emissions units, that existed under the PAL shall comply with an allowable emission limitation under a revised permit established according to the following procedures:

(i)  Within the time frame specified for PAL renewals in subrule (10)(b) of this rule, the major stationary source shall submit a proposed allowable emission limitation for each emissions unit, or each group of emissions units, if such a distribution is more appropriate as determined by the department, by distributing the PAL allowable emissions for the major stationary source among each of the emissions units that existed under the PAL.  If the PAL had not yet been adjusted for an applicable requirement that became effective during the PAL effective period, as required under subrule (10)(e) of this rule, then the distribution shall be made as if the PAL had been adjusted.

(ii)  The department shall determine whether and how the PAL allowable emissions will be distributed and issue a revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as the department determines is appropriate.

(b)  Each emissions unit shall comply with the allowable emission limitation on a 12-month rolling basis.  The department may approve the use of monitoring systems  other than CEMS, CERMS, PEMS or CPMS to demonstrate compliance with the allowable emission limitation.

(c)  Until the department issues the revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, the source shall continue to comply with a source-wide, multi-unit emissions cap equivalent to the level of the PAL emission limitation.

(d)  Any physical change or change in the method of operation at the major stationary source shall be subject to the nonattainment major new source review requirements if the change meets the definition of major modification in R 336.2901(s).

(e)  The major stationary source owner or operator shall continue to comply with all state, federal, or local applicable requirements that may have applied either during the PAL effective period or before the PAL effective period, except for those emission limitations that were eliminated by the PAL under subrule (2)(c)(iii) of this rule.

(10)  The following shall apply to renewal of a PAL:

(a)  The department shall follow the procedures specified in subrule (5) of this rule in approving any request to renew a PAL for a major stationary source, and shall provide both the proposed PAL level and a written rationale for the proposed PAL level to the public for review and comment.  During such public review, any person may propose a PAL level for the source for consideration by the department.

(b)  A major stationary source owner or operator shall submit a timely application to the department to request renewal of a PAL.  A timely application is one that is submitted at least 6 months before, but not earlier than 18 months from, the date of permit expiration.  This deadline for application submittal is to ensure that the permit will not expire before the permit is renewed. If the owner or operator of a major stationary source submits a complete application to renew the PAL within this time period, then the PAL shall continue to be effective until the revised permit with the renewed PAL is issued.

(c)  The application to renew a PAL permit shall contain all of the following information:

(i)  The information required in subrule (3) of this rule.

(ii)  A proposed PAL level.

(iii)  The sum of the potential to emit of all emissions units under the PAL with supporting documentation.

(iv)  Any other information the owner or operator wishes the department to consider in determining the appropriate level for renewing the PAL.

(d)  In determining whether and how to adjust the PAL, the department shall consider either of the options outlined in paragraphs (i) and (ii) of this subdivision.  The adjustment shall comply with paragraph (iii) of this subdivision.

(i)  If the emissions level calculated in accordance with subrule (6) of this rule is equal to or greater than 80% of the PAL level, the department may renew the PAL at the same level without considering the factors in paragraph (ii) of this subdivision.

(ii)  The department may set the PAL at a level that it determines to be more representative of the source's baseline actual emissions, or that it determines to be appropriate considering air quality needs, advances in control technology, anticipated economic growth in the area, desire to reward or encourage the source's voluntary emissions reductions, or other factors as specifically identified by the department in its written rationale.

(iii)  Notwithstanding paragraphs (i) and (ii) of this subdivision, both of the following shall apply:

(A)  If the potential to emit of the major stationary source is less than the PAL, then the department shall adjust the PAL to a level not greater than the potential to emit of the source.

(B)  The department shall not approve a renewed PAL level higher than the current PAL, unless the major stationary source has complied with subrule (11) of this rule.

(e)  If the compliance date for a state, federal, or local requirement that applies to the PAL source occurs during the PAL effective period, and if the department has not already adjusted for such requirement, then the PAL shall be adjusted at the time of PAL permit renewal or renewable operating permit renewal, whichever occurs first.

(11)  The following shall apply to increasing a PAL during the PAL effective period:

(a)  The department may increase a PAL emission limitation only if the major stationary source complies with the following provisions:

(i)  The owner or operator of the major stationary source shall submit a complete application to request an increase in the PAL limit for a PAL major modification.  The application shall identify the emissions units contributing to the increase in emissions so as to cause the major stationary source's emissions to equal or exceed its PAL.

(ii)  As part of this application, the major stationary source owner or operator shall demonstrate that the sum of the baseline actual emissions of the small emissions units, plus the sum of the baseline actual emissions of the significant and major emissions units assuming application of BACT equivalent controls, plus the sum of the allowable emissions of the new or modified emissions units exceeds the PAL.  The level of control that would result from BACT equivalent controls on each significant or major emissions unit shall be determined by conducting a new BACT analysis at the time the application is submitted, unless the emissions unit is currently required to comply with a BACT or LAER requirement that was established within the preceding 10 years.  In such a case, the assumed control level for that emissions unit shall be equal to the level of BACT or LAER with which that emissions unit shall currently comply.

(iii)  The owner or operator obtains a major new source review permit for all emissions units identified in paragraph (i) of this subdivision, regardless of the magnitude of the emissions increase resulting from them (that is, no significant levels apply).  These emissions units shall comply with any emissions requirements resulting from the nonattainment major new source review program process (for example, LAER), even though they have also become subject to the PAL or continue to be subject to the PAL.

(iv)  The PAL permit shall require that the increased PAL level shall be effective on the day any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(b)  The department shall calculate the new PAL as the sum of the allowable emissions for each modified or new emissions unit, plus the sum of the baseline actual emissions of the significant and major emissions units, assuming application of BACT equivalent controls as determined in subdivision (a)(ii) of this subrule, plus the sum of the baseline actual emissions of the small emissions units.

(c)  The PAL permit shall be revised to reflect the increased PAL level under the public notice requirements of subrule (5) of this rule.

(12)  The following shall apply to monitoring requirements for PALs:

(a)  The following general requirements shall apply:

(i)  Each PAL permit shall contain enforceable requirements for the monitoring system that accurately determines plantwide emissions of the PAL pollutant in terms of mass per unit of time.  Any monitoring system authorized for use in the PAL permit shall be based on sound science and meet generally acceptable scientific procedures for data quality and manipulation.  Additionally, the information generated by the system shall meet minimum legal requirements for admissibility in a judicial proceeding to enforce the PAL permit.

(ii)  The PAL monitoring system shall employ 1 or more of the 4 general monitoring approaches meeting the minimum requirements set forth in subdivision (b) of this subrule and shall be approved by the department.

(iii)  Notwithstanding paragraph (ii) of this subdivision, an owner or operator may also employ an alternative monitoring approach that meets paragraph (i) of this subdivision if approved by the department.

(iv)  Failure to use a monitoring system that meets the requirements of this rule renders the PAL invalid.

(b)  Minimum performance requirements for approved monitoring approaches.  The following are acceptable general monitoring approaches when conducted in accordance with the minimum requirements in subdivisions (c) to (i) of this subrule:

(i)  Mass balance calculations for activities using coatings or solvents.

(ii)  CEMS.

(iii)  CPMS or PEMS.

(iv)  Emission factors.

(c)  An owner or operator using mass balance calculations to monitor PAL pollutant emissions from activities using coating or solvents shall meet all of the following requirements:

(i)  Provide a demonstrated means of validating the published content of the PAL pollutant that is contained in or created by all materials used in or at the emissions unit.

(ii)  Assume that the emissions unit emits all of the PAL pollutant that is contained in or created by any raw material or fuel used in or at the emissions unit, if it cannot otherwise be accounted for in the process.

(iii)  Where the vendor of a material or fuel, which is used in or at the emissions unit, publishes a range of pollutant content from such material, then the owner or operator shall use the highest value of the range to calculate the PAL pollutant emissions unless the department determines there is site-specific data or a site-specific monitoring program to support another content within the range.

(d)  An owner or operator using CEMS to monitor PAL pollutant emissions shall meet both of the following requirements:

(i)  CEMS shall comply with applicable performance specifications found in 40 C.F.R. part 60, appendix B, adopted by reference in R 336.2901a.

(ii)  CEMS shall sample, analyze, and record data at least every 15 minutes while the emissions unit is operating.

(e)  An owner or operator using CPMS or PEMS to monitor PAL pollutant emissions shall meet both of the following requirements:

(i)  The CPMS or the PEMS shall be based on current site-specific data demonstrating a correlation between the monitored parameters and the PAL pollutant emissions across the range of operation of the emissions unit.

(ii)  Each CPMS or PEMS shall sample, analyze, and record data at least every 15 minutes, or at another less frequent interval approved by the department, while the emissions unit is operating.

(f)  An owner or operator using emission factors to monitor PAL pollutant emissions shall meet all of the following requirements:

(i)  All emission factors shall be adjusted, if appropriate, to account for the degree of uncertainty or limitations in the factors' development.

(ii)  The emissions unit shall operate within the designated range of use for the emission factor, if applicable.

(iii)  If technically practicable, the owner or operator of a significant emissions unit that relies on an emission factor to calculate PAL pollutant emissions shall conduct validation testing to determine a site-specific emission factor within 6 months of PAL permit issuance, unless the department determines that testing is not required.

(g)  A source owner or operator shall record and report maximum potential emissions without considering enforceable emission limitations or operational restrictions for an emissions unit during any period of time that there is no monitoring data, unless another method for determining emissions during such periods is specified in the PAL permit.

(h)  Notwithstanding the requirements in subdivision (c) to (g) of this subrule, if an owner or operator of an emissions unit cannot demonstrate a correlation between the monitored parameters and the PAL pollutant emissions rate at all operating points of the emissions unit, then the department shall, at the time of permit issuance do either of the following:

(i)  Establish default values for determining compliance with the PAL based on the highest potential emissions reasonably estimated at such operating points.

(ii)  Determine that operation of the emissions unit during operating conditions when there is no correlation between monitored parameters and the PAL pollutant emissions is a violation of the PAL.

(i)  All data used to establish the PAL pollutant must be re-validated through performance testing or other scientifically valid means approved by the department.  Testing shall occur at least once every 5 years after issuance of the PAL.

(13)  All of the following recordkeeping requirements shall apply:

(a)  The PAL permit shall require an owner or operator to retain a copy of all records necessary to determine compliance with this rule and of the PAL, including a determination of each emissions unit's 12-month rolling total emissions, for 5 years from the date of the record.

(b)  The PAL permit shall require an owner or operator to retain a copy of all of the following records for the duration of the PAL effective period plus 5 years:

(i)  A copy of the PAL permit application and any applications for revisions to the PAL.

(ii)  Each annual certification of compliance pursuant to renewable operating permit and the data relied on in certifying the compliance.

(14)  The owner or operator shall submit semiannual monitoring reports and prompt deviation reports to the department in accordance with the source's renewable operating permit.  The reports shall meet all of the following requirements:

(a)  The semiannual report shall be submitted to the department within 30 days of the end of each reporting period.  This report shall contain all of the following information:

(i)  The identification of owner and operator and the permit number.

(ii)  Total annual emissions, tons per year, based on a 12-month rolling total for each month in the reporting period recorded under subrule (13)(a) of this rule.

(iii)  All data relied upon, including, but not limited to, any quality assurance or quality control data, in calculating the monthly and annual PAL pollutant emissions.

(iv)  A list of any emissions units modified or added to the major stationary source during the preceding 6-month period.

(v)  The number, duration, and cause of any deviations or monitoring malfunctions, other than the time associated with zero and span calibration checks, and any corrective action taken.

(vi)  A notification of a shutdown of any monitoring system, whether the shutdown was permanent or temporary, the reason for the shutdown, the anticipated date that the monitoring system will be fully operational or replaced with another monitoring system, whether the emissions unit monitored by the monitoring system continued to operate, and the calculation of the emissions of the pollutant or the number determined by method included in the permit, as provided by subrule (12)(g) of this rule.

(vii)  A signed statement by the responsible official, as defined by the applicable renewable operating permit, certifying the truth, accuracy, and completeness of the information provided in the report.

(b)  The major stationary source owner or operator shall promptly submit reports of any deviations or exceedance of the PAL requirements, including periods where no monitoring is available.  A report submitted under R 336.1213(3)(c)(i) shall satisfy this reporting requirement.  The deviation reports shall be submitted within the time limits prescribed by the source's renewable operating permit.  The reports shall contain all of the following information:

(i)  The identification of owner and operator and the permit number.

(ii)  The PAL requirement that experienced the deviation or that was exceeded.

(iii)  Emissions resulting from the deviation or the exceedance.

(iv)  A signed statement by the responsible official, as defined by the source's renewable operating permit, certifying the truth, accuracy, and completeness of the information provided in the report.

(c)  The owner or operator shall submit to the department the results of any re-validation test or method within 3 months after completion of the test or method.

R 336.2908  Conditions for approval of a major new source review permit in a nonattainment area.
  Rule 1908.  (1)  The department may only issue a permit approving the construction of a new major stationary source or major modification in a nonattainment area if the department has determined that the owner or operator of the major stationary source or major modification will comply with all of the provisions of this rule.
  (2)  The owner or operator of the proposed major stationary source or major modification shall provide an analysis of alternative sites, sizes, production processes, and environmental control techniques for the proposed major stationary source or major modification which demonstrates that the benefits of the proposed major stationary source or major modification significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.
  (3)  The major stationary source or major modification shall comply with the lowest achievable emissions rate for each regulated new source review pollutant for which the area is designated as nonattainment.
  (4)  All stationary sources which have a potential to emit 100 or more tons per year of any air contaminant regulated under the clean air act, which are located in the state, and which are owned or controlled by the owner, operator, or an entity controlling, controlled by, or under common control with, the owner or operator of the proposed major stationary source or major modification shall be in compliance with all applicable local, state, and federal air quality regulations or shall be in compliance with a legally enforceable permit condition or order of the department specifying a plan and timetable for compliance.
  (5)  Before the start-up of the new major stationary source or major modification, an emission reduction offset for each major nonattainment air contaminant shall be provided consistent with the following provisions:
  (a)  The baseline for determining credit for emissions reductions is the emissions limit under the state implementation plan in effect at the time the application to construct is filed, except that the offset baseline shall be the actual emissions of the source from which offset credit is obtained where either of the following occurs:
  (i)  The demonstration of reasonable further progress and attainment of ambient air quality standards is based upon the actual emissions of sources located within the nonattainment area.
  (ii)  The state implementation plan does not contain an emissions limitation for that source or source category.
  (b)  The following requirements apply to emissions offset credits:
  (i)  Where the allowable emissions are greater emissions than the potential to emit of the source, emissions offset credit shall be allowed only for control below this potential.
  (ii)  For an existing fuel combustion source, credit shall be based on the source's allowable emissions for the type of fuel being burned at the time the application to construct is filed.  If the existing source commits to switch to a cleaner fuel at some future date, then emissions offset credit based on the allowable, or actual, emissions for the fuels involved is not acceptable, unless the permit is conditioned to require the use of a specified alternative control measure which would achieve the same degree of emissions reduction should the source switch back to a dirtier fuel at some later date.  The department shall ensure that adequate long-term supplies of the new fuel are available before granting emissions offset credit for fuel switches.
  (c)  An emission reduction credit shall not be creditable as an emission offset unless it meets the following requirements:
  (i)  Emissions reductions that have been achieved by shutting down an existing emission unit or curtailing production or operating hours may be generally credited for offsets only if they meet all of the following requirements:
  (A)  The reductions are surplus, permanent, quantifiable and federally enforceable.

(B)  The shutdown or curtailment occurred after the last day of the base year for the SIP planning process.  The department may choose to consider a prior shutdown or curtailment to have occurred after the last day of the base year if the projected emissions inventory used to develop the attainment demonstration explicitly includes emissions from such previously shutdown or curtailed emission units. However, credit shall not be given for shutdowns that occurred before August 7, 1977.

 (ii)  Emissions reductions that are achieved by shutting down an existing emissions unit or curtailing production or operating hours and that do not meet the requirements of R 336.2908(5)(c)(i)(A) may be generally credited only if they meet either of the following:

(A)  The shutdown or curtailment occurred on or after the date the construction permit application is filed.

(B)  The applicant can establish that the proposed new emissions unit is a replacement for the shutdown or curtailed emissions unit, and the emissions reductions are surplus, permanent, quantifiable and federally enforceable.

 (d)  Emissions credit shall not be allowed for replacing 1 hydrocarbon compound with another of lesser reactivity, except for those compounds listed in table 1 of the United States environmental protection agency's "Recommended Policy on Control of Volatile Organic Compounds," 42 FR 35314, July 8, 1977, adopted by reference in R 336.2901a.

 (e)  All emission reductions claimed as offset credit shall be federally enforceable.

 (f)  Offsets shall be obtained from the same nonattainment area as the proposed major source or major modification, except another nonattainment area may be used if both of the following conditions are met:

 (i)  The other area has an equal or higher nonattainment classification than the area in which the proposed source is located.

 (ii)  Nonattainment air contaminant emissions from the other area contribute to a violation of a national ambient air quality standard in the nonattainment area in which the proposed major source or major modification would be located.

 (g)  Credit for an emissions reduction may be claimed to the extent that the reviewing authority has not relied on it in issuing any permit required by R 336.1220 or R 336.2902 and the department has not relied on it in demonstrating attainment or reasonable further progress.

 (h)  The total tonnage of increased emissions, in tons per year, resulting from a major modification that must be offset shall be determined by summing the difference between the allowable emissions after the modification and the actual emissions before the modification for each emissions unit.  Unless specified otherwise in this rule, the offset ratio for each nonattainment air pollutant that will be emitted in significant amounts from a new major source or major modification located in a nonattainment area that is subject to subpart 1, part D, title 1of the clean air act shall be 1:1.

 (i)  The provisions of this subrule do not apply to emissions resulting from proposed major sources or major modifications to the extent that the emissions are temporary and will not prevent reasonable further progress towards attainment of any applicable standard.  Examples of temporary emissions include emissions from all of the following:

 (i)  Pilot plants.

 (ii)  Portable facilities which will be relocated outside the nonattainment area within 18 months.

 (iii)  The construction phase of a new major stationary source or major modification.

 (6)  For facilities meeting the emissions offset requirements of R 336.2908(5) for ozone nonattainment areas that are subject to subpart 2, part D, title 1 of the clean air act, the facility must meet the following requirements:

 (a)  The ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be as follows:

 (i)  In any marginal nonattainment area for ozone, the ratio shall be 1.1:1.

(ii)  In any moderate nonattainment area for ozone, the ratio shall be 1.15:1.

(iii)  In any serious nonattainment area for ozone, the ratio shall be 1.2:1.

(iv)  In any severe nonattainment area for ozone, the ratio shall be 1.3:1, except that the ratio may be 1.2:1 if all existing major sources in the severe nonattainment area use BACT for the control of VOC.

(v)  In any extreme nonattainment area for ozone, the ratio shall be 1.5:1, except that the ratio may be 1.2:1 if all existing major sources in the extreme nonattainment area use BACT for the control of VOC.

(b)  Not withstanding the requirements of R 336.2908(6)(a) for meeting the requirements of R 336.2908(5), the ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be 1.15:1 for all areas within an ozone transport region that is subject to subpart 2, part D, title 1 of the clean air act except for serious, severe, and extreme ozone nonattainment areas that are subject to subpart 2, part D, title 1 of the clean air act.

(c)  For each facility meeting the emissions offset requirements of R 336.2908(5) for ozone nonattainment areas that are subject to subpart 1, part D, title 1 of the clean air act but are not subject to subpart 2, part D, title 1 of the clean air act, including 8-hour ozone nonattainment areas subject to 40 C.F.R. 51.902(b), the ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be 1:1.  Title 40 C.F.R. 51.902(b) is adopted by reference in R 336.2901a.

(7)  The requirements of this section that apply to major stationary sources and major modifications of PM-10 shall also apply to major stationary sources and major modifications of PM-10 precursors, except when the department determines that such sources do not contribute significantly to PM-10 levels that exceed the PM-10 ambient standards in the area.


R 336.2910  Administrative hearings.

  Rule 1910.  A person aggrieved by an action or inaction of the department under prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations may request a formal hearing, under 1969 PA 306, MCL 24.201.  The following apply:

(a)  The request shall be received by the department within 30 days after the person received notice of the decision to approve or deny the permit.

(b)  The final decision in granting a contested case hearing lies with the department.  To receive a contested case hearing, a person shall demonstrate 1 of the following:

(i)  The person is the permit applicant.

(ii)  The person participated in the permit review process, either by submitting written comments during the 30-day public notice period or by attending the public hearing and making comments for the official record, and the comments were not adequately addressed by the department in the permit review process.

(iii)  The terms or conditions of the permit for which the person requests a hearing were added by the department after the 30-day notice period expired, and no additional opportunity for public input was offered by the department.

(c)  When the department issues a permit pursuant to the requirements of the prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations, the permit is valid upon issuance and it is not automatically stayed if a person requests a formal hearing pursuant to this rule.  A permittee may immediately initiate construction after permit issuance.  However, the permittee faces the risk that a subsequent hearing may alter the terms or conditions of the permit.

2006 MR 20 – November 15, 2006

---

**NOTICE OF PUBLIC HEARING**

---

SOAHR 2004-054
NOTICE OF PUBLIC HEARING
DEPARTMENT OF ENVIRONMENTAL QUALITY
AIR QUALITY DIVISION

The Michigan Department of Environmental Quality (DEQ), Air Quality Division, will conduct a public hearing on proposed administrative rules promulgated pursuant to Part 55, Air Pollution Control, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (Act 451). The proposed rules will amend the air permit programs by adding Part 19, New Source Review (NSR) Impacting Nonattainment Areas for submittal to the U.S. Environmental Protection Agency as a revision to the State Implementation Plan. In addition, the proposed rules will modify the definitions in Part 1, General Provisions, including the definition of volatile organic compound in R 336.1122. The DEQ proposes to rescind R 336.1220, which will be replaced by the new NSR in Nonattainment areas Part 19 rules, and all relevant citations in the Part 2, Air Use Approval, rules will be changed to reflect the state's new permitting authority in the new Part 18 and Part 19 rules.

The public hearing will be held on December 20, 2006, at 10:00 a.m., in the ConCon Conference Room, Constitution Hall, Atrium South, 525 West Allegan Street, Lansing, Michigan.

Copies of the proposed rules (SOAHR 2004-006EQ, 2004-007EQ, and 2004-054EQ) can be downloaded from the Internet at: http://www.michigan.gov/deqair. These rules can also be downloaded from the Internet through the State Office of Administrative Hearings and Rules at http://www.michigan.gov/orr. Copies of the rules may also be obtained by contacting the Lansing office at:

Air Quality Division
Michigan Department of Environmental Quality
P.O. Box 30260
Lansing, Michigan 48909-7760
Phone: 517-373-7045
Fax: 517-241-7499
E-Mail: halbeism@Michigan.gov

All interested persons are invited to attend and present their views. It is requested that all statements be submitted in writing for the hearing record. Anyone unable to attend may submit comments in writing to the address above. Written comments must be received by 5:00 p.m. on December 20, 2006.

Persons needing accommodations for effective participation in the meeting should contact the Air Quality Division at 517-373-7045 one week in advance to request mobility, visual, hearing, or other assistance.

This notice of public hearing is given in accordance with Sections 41 and 42 of Michigan's Administrative Procedures Act, 1969 PA 306, as amended, being Sections 24.241 and 24.242 of the Michigan Compiled Laws. Administration of the rules is by authority conferred on the Director of the DEQ by Sections 5503, 5505, and 5512 of Act 451, being Sections 324.5503, 324.5505, and 324.5512 of the Michigan Compiled Laws, and Executive Order 1995-18. These rules take immediate effect after filing with the Secretary of State.

_____
G. Vinson Hellwig, Chief
Air Quality Division

# Michigan

# Register

Issue No. 10– 2007 (Published June 15, 2007)



# Michigan Register

**Published pursuant to § 24.208 of**
**The Michigan Compiled Laws**



Issue No. 10— 2007
(This issue, published June 15, 2007, contains
documents filed from May 15, 2007 to June 1, 2007)

Compiled and Published by the
## State Office of Administrative Hearings and Rules

# CONTENTS

## ADMINISTRATIVE RULES FILED
## WITH SECRETARY OF STATE

**Department of Military and Veterans Affairs**
Board of Managers (SOAHR # 2005-029)
  Veterans Home Rules ....................................................................2-8

**Department of Labor & Economic Growth**
Occupational Health Standards (SOAHR # 2007-002)
  Part 526 Digging and Coating Operations........................................9-11

**Department of Labor & Economic Growth**
General Industry Safety Standards (SOAHR # 2007-003)
  Part 76 Spray Finishing Using Flammable and Combustible Materials..........................12-15

## PROPOSED ADMINISTRATIVE RULES,
## NOTICES OF PUBLIC HEARINGS

**Department of Environmental Quality**
Air Quality Division (SOAHR # 2004-054)
  Part 19 New Source Review for Major Sources Impacting Non-attainment
  Areas ...........................................................................................17-42

**Department of Environmental Quality**
Air Quality Division (SOAHR # 2005-036)
  Part 4 Emissions Limitations and Prohibitions Sulfur Bearing Compounds...................43-50

**Department of Environmental Quality**
Land and Water Management Division (SOAHR # 2006-073)
  Great lakes Bottomland Preserve Grand Traverse bay ...................................51-52

**Department of Environmental Quality**
Air Quality Division (SOAHR # 2007-005)
  Part 12 Emissions Averaging and Emission Reduction Credit Trading..........................53-75

**Department of Environmental Quality**
Air Quality Division (SOAHR # 2007-006)
  Part 6 Emissions Limitations and Prohibitions Existing Sources of Volatile
  Organic Compound Emissions ...........................................................76-79

SOAHR 2004-054

DEPARTMENT OF ENVIRONMENTAL QUALITY

AIR QUALITY DIVISION

AIR POLLUTION CONTROL

Filed with the Secretary of State on

These rules become effective immediately upon filing with the Secretary of State unless adopted under sections 33, 44, 45a(6), or 48 of 1969 PA 306. Rules adopted under these sections become effective 7 days after filing with the Secretary of State.

Draft May 22, 2007

(By authority conferred on the director of the department of environmental quality by sections 5503, 5505, and 5512 of 1994 PA 451, MCL 324.5503, 324.5505, and 324.5512, and Executive Reorganization Order No. 1995-18, MCL 324.99903)

R 336.2901, R 336.2901a, R 336.2902, R 336.2903, R 336.2907, R 336.2908, and R 336.2910 of the Michigan Administrative Code are added as follows:

PART 19. NEW SOURCE REVIEW FOR MAJOR SOURCES IMPACTING NONATTAINMENT AREAS

R 336.2901 Definitions.
  Rule 1901. The following definitions apply to terms used in this part. If a term defined here is also defined elsewhere in these rules, then the definition contained here supersedes for this part only:
  (a) "Actual emissions" means the actual rate of emissions of a regulated new source review pollutant from an emissions unit, as determined under R 336.1101(b), except that this definition shall not apply for calculating whether a significant emissions increase has occurred, or for establishing a plantwide applicability limit under R 336.2907. Instead, the terms "projected actual emissions" and "baseline actual emissions" shall apply for those purposes.
  (b) "Baseline actual emissions" means the rate of emissions, in tons per year, of a regulated new source review pollutant, as determined by the following:
  (i) For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 5-year period immediately preceding when the owner or operator begins actual construction of the project. The department shall allow the use of a different time period upon a determination that it is more representative of normal source operation. The following shall apply:
  (A) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(B)   The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24-month period.

(C)   For a regulated new source review pollutant, when a project involves multiple emissions units, only 1 consecutive 24-month period shall be used to determine the baseline actual emissions for the emissions units being changed.   A different consecutive 24-month period may be used for each regulated new source review pollutant.

(D)   The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (i)(B) of this subdivision.

(ii)   For an existing emissions unit, other than an electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 10-year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the department for a permit required under R 336.1201, whichever is earlier, except that the 10-year period shall not include any period earlier than November 15, 1990.   All of the following shall apply:

(A)   The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(B)   The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24-month period.

(C)   The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the major stationary source must currently comply, had the major stationary source been required to comply with the limitations during the consecutive 24-month period. However, if an emission limitation is part of a maximum achievable control technology standard that the United States environmental protection agency proposed or promulgated under 40 C.F.R. part 63, then the baseline actual emissions need only be adjusted if the department has taken credit for such emissions reductions in an attainment demonstration or maintenance plan.   Title 40 C.F.R. part 63 is adopted by reference in R 336.2901a.

(D)   For a regulated new source review pollutant, when a project involves multiple emissions units, only 1 consecutive 24-month period shall be used to determine the baseline actual emissions for the emissions units being changed.   A different consecutive 24-month period may be used for each regulated new source review pollutant.

(E)   The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by subparagraphs (B) and (C) of this paragraph.

(iii)   For a new emissions unit, the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit.

(iv)   For a plantwide applicability limit for a major stationary source, the baseline actual emissions shall be calculated for existing electric utility steam generating units under paragraph (i) of this subdivision, for other existing emissions units under paragraph (ii) of this subdivision, and for a new emissions unit under paragraph (iii) of this subdivision.

(c)   "Begin actual construction" means, in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature.   Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework, and construction of

permanent storage structures. "A change in method of operation" refers to those on-site activities other than preparatory activities which mark the initiation of the change.

(d)  "Best available control technology" or "BACT" means an emissions limitation, including a visible emissions standard, based on the maximum degree of reduction for each regulated new source review pollutant which would be emitted from any proposed major stationary source or major modification which the department, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. Application of best available control technology shall not result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 C.F.R. part 60 or 61, adopted by reference in R 336.2901a. If the department determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, then a design, equipment, work practice, operational standard, or combination thereof, may be prescribed instead to satisfy the requirement for the application of BACT. The standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of the design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

(e)  "Building, structure, facility, or installation" means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on 1 or more contiguous or adjacent properties, and are under the control of the same person, or persons under common control, except the activities of any vessel. Pollutant-emitting activities are part of the same industrial grouping if they have the same 2-digit major group code associated with their primary activity. Major group codes and primary activities are described in the standard industrial classification manual, 1987. For assistance in converting north American industrial classification system codes to standard industrial classification codes see http://www.census.gov/epcd/naics02/.

(f)     "Clean coal technology" means any technology, including technologies applied at the precombustion, combustion, or post-combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(g)  "Clean coal technology demonstration project" means a project using funds appropriated under the heading "department of energy-clean coal technology," up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the United States environmental protection agency. The federal contribution for a qualifying project shall be at least 20% of the total cost of the demonstration project.

(h)  [Reserved]

(i)  "Commence" as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and has either of the following:

(i)  Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time.

(ii)  Entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

(j)  "Construction" means any physical change or change in the method of operation, including fabrication, erection, installation, demolition, or modification of an emissions unit, that would result in a change in emissions.

19

2007 MR 10 – June 15, 2007

(k)  "Continuous emissions monitoring system" or "CEMS" means all of the equipment that may be required to meet the data acquisition and availability requirements of this rule, to sample, condition, if applicable, analyze, and provide a record of emissions on a continuous basis.

(l)  "Continuous emissions rate monitoring system" or "CERMS" means the total equipment required for the determination and recording of the pollutant mass emissions rate, in terms of mass per unit of time.

(m)  "Continuous parameter monitoring system" or "CPMS" means all of the equipment necessary to meet the data acquisition and availability requirements of this rule, to monitor process and control device operational parameters and other information, and to record average operational parameter values on a continuous basis.

(n)  "Electric utility steam generating unit" means any steam electric generating unit that is constructed for the purpose of supplying more than 1/3 of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale.  Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(o)  "Emissions unit" means any part of a stationary source that emits or would have the potential to emit any regulated new source review pollutant.  The term emissions unit includes an electric steam generating unit.  Each emissions unit can be classified as either new or existing based on the following:

(i)  A new emissions unit is any emissions unit that is, or will be, newly constructed and that has existed for less than 2 years from the date the emissions unit first operated.

(ii)  An existing emissions unit is any emissions unit that does not meet the definition of a new emissions unit.  A replacement unit is an existing emissions unit and no creditable emission reductions shall be generated from shutting down the existing emissions unit that is replaced.  Replacement unit means all of the following:

(A)  The emissions unit is a reconstructed unit as defined within R 336.1118(b) or the emissions unit completely takes the place of an existing emissions unit.

(B)  The emissions unit is identical to or functionally equivalent to the replaced emissions unit.

(C)  The replacement does not alter the basic design parameters of the process unit.

(D)  The replaced emissions unit is permanently removed from the major stationary source, otherwise permanently disabled, or permanently barred from operation by a permit that is enforceable as a practical matter.  If the replaced emissions unit is brought back into operation, it shall constitute a new emissions unit.

(p)  "Federal land manager" means, with respect to any lands in the United States, the secretary of the department with authority over such lands.

(q)  "Hydrocarbon combustion flare" means either a flare used to comply with an applicable new source performance standard or maximum achievable control technology standard, including uses of flares during startup, shutdown, or malfunction permitted under such a standard, or a flare that serves to control emissions of waste streams comprised predominately of hydrocarbons and containing not more than 230 milligrams per dry standard cubic meter hydrogen sulfide.

(r)  "Lowest achievable emission rate" or "LAER" means, for any source, the more stringent rate of emissions based on either of the following:

(i)  The most stringent emissions limitation that is contained in the implementation plan of any state for the same class or category of stationary source, unless the owner or operator of the proposed stationary source demonstrates that the limitations are not achievable.

(ii)  The most stringent emissions limitation that is achieved in practice by the same class or category of stationary sources.  This limitation, when applied to a modification, means the lowest achievable emissions rate for the new or modified emissions units within a stationary source.  Application of the

term shall not permit a proposed new or modified stationary source to emit any pollutant in excess of the amount allowable under an applicable new source performance standard.

(s) "Major modification" means the following:

(i) Any physical change in or change in the method of operation of a major stationary source that would result in both of the following:

(A) A significant emissions increase of a regulated new source review pollutant.

(B) A significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase from any emissions units or net emissions increase at a major stationary source that is significant for volatile organic compounds shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include any of the following:

(A) Routine maintenance, repair, and replacement.

(B) Use of an alternative fuel or raw material by reason of an order under sections 2 (a) and (b) of the energy supply and environmental coordination act of 1974, 15 U.S.C. §792 et seq., or any superseding legislation, or by reason of a natural gas curtailment plan under the federal power act of 1995, 16 U.S.C. §791-828c et seq.

(C) Use of an alternative fuel by reason of an order or rule under section 125 of the clean air act.

(D) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste.

(E) Use of an alternative fuel or raw material by a stationary source which meets either of the following:

(1) The source was capable of accommodating before December 21, 1976, unless the change would be prohibited under any federally enforceable permit condition that was established after December 12, 1976, under prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations.

(2) The source is approved to use under any permit issued under R 336.1201(1)(a).

(F) An increase in the hours of operation or in the production rate, unless such change is prohibited under any federally enforceable permit condition that was established after December 21, 1976, under R 336.1201(1)(a).

(G) Any change in ownership at a stationary source.

(H) [Reserved]

(I) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with both of the following:

(1) The state implementation plan.

(2) Other requirements necessary to attain and maintain the national ambient air quality standard during the project and after it is terminated.

(iv) This definition shall not apply with respect to a particular regulated new source review pollutant when the major stationary source is complying with the requirements is R 336.2907 for a plantwide applicability limit for that pollutant. Instead, the definition in R 336.2907(1)(h) shall apply.

(v) For the purposes of applying the requirements of R 336.2902(8) to modifications at major stationary sources of nitrogen oxides located in ozone nonattainment areas or in ozone transport regions, whether or not subject to subpart 2, part D, title 1 of the clean air act, any significant net emissions increase of nitrogen oxides is considered significant for ozone.

(vi) Any physical change in, or change in the method of operation of, a major stationary source of volatile organic compounds that results in any increase in emissions of volatile organic compounds from any discrete operation, emissions unit, or other pollutant emitting activity at the source shall be considered a significant net emissions increase and a major modification for ozone, if the major

stationary source is located in an extreme ozone nonattainment area that is subject to subpart 2, part D, title 1 of the clean air act.

(t)  "Major stationary source" means all of the following:

(i)  Any of the following:

(A)  Any stationary source of air pollutants that emits or has the potential to emit 100 tons per year or more of any regulated new source review pollutant, except that lower emissions thresholds shall apply in areas subject to subpart 2, subpart 3, or subpart 4 of part D, title 1 of the clean air act, according to the following:

(1)  In any serious ozone nonattainment area, 50 tons per year of volatile organic compounds.

(2)  In an area within an ozone transport region except for any severe or extreme ozone nonattainment area, 50 tons per year of volatile organic compounds.

(3)  In any severe ozone nonattainment area, 25 tons per year of volatile organic compounds.

(4)  In any extreme ozone nonattainment area, 10 tons per year of volatile organic compounds.

(5)  In any serious nonattainment area for carbon monoxide, where the department has determined that stationary sources contribute significantly to carbon monoxide levels in the area, 50 tons per year of carbon monoxide.

(6)  In any serious nonattainment area for PM-10, 70 tons per year of PM-10.

(B)  For the purposes of applying the requirements of R 336.2902(8) to stationary sources of nitrogen oxides located in an ozone nonattainment area or in an ozone transport region, any stationary source which emits, or has the potential to emit, 100 tons per year or more of nitrogen oxide emissions, except that the following emission thresholds shall apply in areas subject to subpart 2 of part D, title 1 of the clean air act:

(1)  In any ozone nonattainment area classified as marginal or moderate, 100 tons per year or more of nitrogen oxides.

(2)  In any ozone nonattainment area classified as a transitional, submarginal, or incomplete or no data area, when such area is located in an ozone transport region, 100 tons per year or more of nitrogen oxides.

(3)  In any area designated under section 107(d) of the clean air act as attainment or unclassifiable for ozone that is located in an ozone transport region, 100 tons per year or more of nitrogen oxides.

(4)  In any serious nonattainment area for ozone, 50 tons per year or more of nitrogen oxides.

(5)  In any severe nonattainment area for ozone, 25 tons per year or more of nitrogen oxides.

(6)  In any extreme nonattainment area for ozone, 10 tons per year or more of nitrogen oxides.

(C)   Any physical change that would occur at a stationary source not qualifying under R 336.2901(t)(i)(A) or (B) as a major stationary source, if the change would constitute a major stationary source by itself.

(ii)  A major stationary source that is major for volatile organic compounds shall be considered major for ozone.

(iii)  The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this paragraph whether it is a major stationary source, unless the source belongs to 1 of the following categories of stationary sources:

(A)  Coal cleaning plants, with thermal dryers.

(B)  Kraft pulp mills.

(C)  Portland cement plants.

(D)  Primary zinc smelters.

(E)  Iron and steel mills.

(F)  Primary aluminum ore reduction plants.

(G)  Primary copper smelters.

(H)  Municipal incinerators capable of charging more than 250 tons of refuse per day.

(I)  Hydrofluoric, sulfuric, or nitric acid plants.

(J)  Petroleum refineries.

(K)  Lime plants.

(L)  Phosphate rock processing plants.

(M)  Coke oven batteries.

(N)  Sulfur recovery plants.

(O)  Carbon black plants, furnace process.

(P)  Primary lead smelters.

(Q)  Fuel conversion plants.

(R)  Sintering plants.

(S)  Secondary metal production plants.

(T)  Chemical process plants.

(U)  Fossil-fuel boilers, or combination thereof, totaling more than 250 million British thermal units per hour heat input.

(V)  Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels.

(W)  Taconite ore processing plants.

(X)  Glass fiber processing plants.

(Y)  Charcoal production plants.

(Z)  Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input.

(AA)  Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the clean air act.

(u)  "Necessary preconstruction approvals or permits" means a permit issued under R 336.1201(1)(a) that is required by R 336.2802 or R 336.2902.

(v)  "Net emissions increase" means all of the following:

(i)  With respect to any regulated new source review pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

(A)  The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated under R 336.2902(2).

(B)  Any other increases and decreases in actual emissions at the major stationary source that occur within the contemporaneous period and are otherwise creditable.

(ii)  The contemporaneous period must meet all of the following:

(A)  Begins on the date 5 years before construction on the particular change commences.

(B)  Ends on the date that the increase from the particular change occurs.

(iii)  An increase or decrease in actual emissions is creditable only if the department has not relied on it in issuing a permit under R 336.1201(1)(a) or R 336.1214a, which permit is in effect when the increase in actual emissions from the particular change occurs.

(iv)  The magnitude of a creditable, contemporaneous increase in actual emissions is determined by the amount that the new level of actual emissions following the increase exceeds the emissions unit's baseline actual emissions prior to the increase.  This means actual emissions and baseline actual emissions are determined from the date of the contemporaneous increase.  Baseline actual emissions shall be determined as provided in the definition of baseline actual emissions, except that paragraphs (b)(i)(C) and (b)(ii)(D) of this subdivision shall not apply.

(v)  A contemporaneous decrease in actual emissions is creditable only to the extent that all of the following occur:

(A)  The magnitude of a creditable contemporaneous decrease is determined by the lower of the following:

(1) The amount by which the emission unit's baseline emissions prior to the decrease exceed the level of actual emissions following the decrease.

(2) The amount by which the emission unit's allowable emissions prior to the decrease exceed the level of actual emissions following the decrease.

(3) In determining the magnitude of a creditable contemporaneous decrease, actual emissions and baseline actual emissions are determined from the date of the contemporaneous decrease. Baseline actual emissions shall be determined as provided in the definition of baseline actual emissions except that paragraphs (b)(i)(C) and (b)(ii)(D) of this subdivision shall not apply.

(B) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins.

(C) The department has not relied on it in issuing any permit under R 336.1201(1)(a) or R 336.1214a.

(D) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change.

(vi) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

(vii) The definition of actual emissions in R 336.1101(b) shall not apply for determining creditable increases and decreases after a change, instead the definitions of the terms "projected actual emissions" and "baseline emissions" shall be used.

(w) "Nonattainment major new source review" or "NSR" program means the requirements of this rule, R 336.1220, or R 336.1221. A permit issued under any of these rules is a major new source review permit.

(x) [Reserved]

(y) [Reserved]

(z) "Potential to emit" means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design only if the limitation or the effect it would have on emissions is legally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(aa) "Predictive emissions monitoring system" or "PEMS" means all of the equipment necessary to monitor process and control device operational parameters and other information and calculate and record the mass emissions rate on a continuous basis.

(bb) "Prevention of significant deterioration" or "PSD" permit means any permit that is issued under R 336.2802 or the prevention of significant deterioration of air quality regulations under 40 C.F.R. §52.21, adopted by reference in R 336.2901a.

(cc) "Project" means a physical change in, or change in the method of operation of, an existing major stationary source.

(dd) "Projected actual emissions" means the following:

(i) The maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated new source review pollutant in any 1 of the 5 12-month periods following the date the unit resumes regular operation after the project, or in any 1 of the 10 12-month periods following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit of that regulated new source review pollutant and full utilization of the unit would result in a significant emissions increase or a significant net emissions increase at the major stationary source.

(ii) In determining the projected actual emissions before beginning actual construction, the owner or operator of the major stationary source shall do the following:

(A)  Consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the state or federal regulatory authorities, and compliance plans under the approved state implementation plan.

(B)  Include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(C)  Exclude, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24-month period used to establish the baseline actual emissions of this rule and that are also unrelated to the particular project, including any increased utilization due to product demand growth.

(D)  Elect to use the emissions unit's potential to emit in tons per year instead of calculating projected actual emissions.

(ee)  "Regulated new source review pollutant" means any of the following:

(i)  Nitrogen oxides or any volatile organic compounds.

(ii)  Any pollutant for which a national ambient air quality standard has been promulgated.

(iii)  Any pollutant that is a constituent or precursor of a general pollutant listed under paragraphs (i) or (ii) of this subdivision, provided that a constituent or precursor pollutant may only be regulated under new source review as part of regulation of the general pollutant.

(ff)  "Secondary emissions" means emissions that would occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself.  For the purpose of this rule, secondary emissions shall be specific, well defined, quantifiable, and impact the same general area as the stationary source or modification which causes the secondary emissions.  Secondary emissions include emissions from any off-site support facility that would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification.  Secondary emissions do not include any emissions that come directly from a mobile source such as emissions from the tailpipe of a motor vehicle, from a train, or a vessel.

(gg)  "Significant" means all of the following:

(i)  "Significant" means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants at a rate of emissions that would equal or exceed any of the following pollutant emission rates:

(A)  Carbon monoxide:  100 tons per year.

(B)  Nitrogen oxides:  40 tons per year.

(C)  Sulfur dioxide:  40 tons per year.

(D)  Ozone:  40 tons per year of volatile organic compounds or of nitrogen oxides.

(E)  Lead:  0.6 tons per year.

(F)  PM-10:  15 tons per year of PM-10.

(ii)  Notwithstanding the significant emissions rate for ozone in R 336.2901(gg)(i)(D), significant means, in reference to an emissions increase or a net emissions increase, any increase in actual emissions of volatile organic compounds that would result from any physical change in, or change in the method of operation of, a major stationary source located in a serious or severe ozone nonattainment area that is subject to subpart 2, part D, title 1 of the clean air act, if such emissions increase of volatile organic compounds exceeds 25 tons per year.

(iii)  For the purposes of applying the requirements of R 336.2902(8) to modifications at major stationary sources of nitrogen oxides located in an ozone nonattainment area or in an ozone transport region, the significant emission rates and other requirements for volatile organic compounds in

R 336.2901(gg)(i)(D), R 336.2901(gg)(ii) and R 336.2901(gg)(v) shall apply to nitrogen oxides emissions.

(iv) Notwithstanding the significant emissions rate for carbon monoxide in R 336.2901(gg)(i)(A), significant means, in reference to an emissions increase or a net emissions increase, any increase in actual emissions of carbon monoxide that would result from any physical change in, or change in the method of operation of, a major stationary source in a serious nonattainment area for carbon monoxide if such increase equals or exceeds 50 tons per year, provided that the United States environmental protection agency has determined that the stationary sources contribute significantly to carbon monoxide levels in that area.

(v) Notwithstanding the significant emissions rates for ozone in R 336.2901(gg)(i)(D) and R 336.2901(gg)(ii), any increase in actual emissions of volatile organic compounds from any emissions unit at a major stationary source of volatile organic compounds located in an extreme ozone nonattainment area that is subject to subpart 2, part D, title 1 of the clean air act shall be considered a significant net emissions increase.

(hh) "Significant emissions increase" means, for a regulated new source review pollutant, an increase in emissions that is significant for that pollutant.

(ii) "Stationary source" means any building, structure, facility, or installation which emits or may emit a regulated new source review pollutant.

(jj) "Temporary clean coal technology demonstration project" means a clean coal technology demonstration project that is operated for a period of 5 years or less, and that complies with the state implementation plan and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

R 336.2901a  Adoption by reference.

Rule 1901a.  For the purpose of clarifying the definitions in these rules, the following documents are adopted by reference in these rules.  Copies of the documents are available for inspection and purchase at the Air Quality Division, Department of Environmental Quality, 525 West Allegan Street, P.O. Box 30260, Lansing, Michigan 48909-7760, at a cost as of the time of adoption of these rules (AQD price). Copies of may be obtained from the Superintendent of Documents, Government Printing Office, P.O. Box 371954, Pittsburgh, Pennsylvania, 15250-7954, at a cost as of the time of adoption of these rules (GPO), or on the United States government printing office internet web site at http://www.access.gpo.gov.

(a) Title 40 C.F.R. 51.902(b), 40 C.F.R., part 51, appendix S, section IV, "Sources That Would Locate in a Designated Nonattainment Area," (2006), AQD price $55.00/GPO price $45.00.

(b) Title 40 C.F.R., §52.21, "Prevention of Significant Deterioration of Air Quality," (2006), AQD price $70.00/GPO price $60.00.

(c) Title 40 C.F.R., part 60, "Standards of Performance for New Stationary Sources," (2006), AQD price $68.00/GPO price $58.00 for 60.1-end and AQD price $67.00/GPO price $57.00 for the appendices.

(d) Title 40 C.F.R., part 61, "National Emission Standards for Hazardous Air Pollutants," (2006), AQD price $55.00/GPO price $45.00.

(e) Title 40 C.F.R., part 63, "National Emission Standards for Hazardous Air Pollutants for Source Categories," (2006), AQD $68.00/GPO $58.00 for 63.1-63.599; AQD $60.00/GPO $50.00 for 63.600-63.1199; AQD $60.00/GPO $50.00 for 63.1200-63.1439; AQD $42.00/GPO $32.00 for 63.1440-63.6175; AQD $42.00/GPO $32.00 for 63.6580-63.8830; and AQD $45.00/GPO $35.00 for 63.8980-end.

(f) Table 1 of the United States environmental protection agency's "Recommended Policy on Control of Volatile Organic Compounds," 42 FR 35314, July 8, 1977, at no cost.  Copies of table 1 may

be obtained from the Library of Michigan, State Law Library, 525 West Ottawa Street, P.O. Box 30007, Lansing, Michigan 48909, E-mail lmlawlib@michigan.gov, at no cost.

R 336.2902  Applicability.
  Rule 1902.  (1)  This part applies to the construction of each new major stationary source or major modification that is both of the following:
  (a)  Located in a nonattainment area.
  (b)  Major for the pollutant for which the area is designated nonattainment.
  For areas designated as nonattainment for ozone, this part shall apply only to any new major stationary source or major modification that is major for volatile organic compounds or nitrogen oxides.
  (2)  This part applies to the construction of new major sources and major modifications to existing sources as follows:
  (a)  Except as otherwise provided in subrule (3) of this rule, and consistent with the definition of major modification, a project is a major modification for a regulated new source review pollutant if it causes both of the following emissions increases:
  (i)  A significant emissions increase.
  (ii)  A significant net emissions increase.
The project is not a major modification if it does not cause a significant emissions increase.  If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.
  (b)  The procedure for calculating whether a significant emissions increase will occur depends upon the type of emissions units being modified.  The procedure for calculating whether a significant net emissions increase will occur at the major stationary source is contained in the definition of net emissions increase.  Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.
  (c)  The actual-to-projected-actual applicability test may be used for projects that only involve existing emissions units.  A significant emissions increase of a regulated new source review pollutant is projected to occur if the sum of the difference between the projected actual emissions and the baseline actual emissions, for each existing emissions unit, equals or exceeds the significant amount for that pollutant.
  (d)  The actual-to-potential test may be used for projects that involve construction of new emissions units or modification of existing emissions units.  A significant emissions increase of a regulated new source review pollutant is projected to occur if the sum of the difference between the potential to emit from each new and modified emissions unit following completion of the project and the baseline actual emissions of these units before the project equals or exceeds the significant amount for that pollutant.
  (e)  The hybrid test may be used for projects that involve multiple types of emissions units.  A significant emissions increase of a regulated new source review pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the appropriate methods specified above in this subrule as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant.
  (3)  Any major stationary source for a plantwide applicability limit for a regulated new source review pollutant shall comply with R 336.2907.
  (4)  The provisions of this rule do not apply to a source or modification that would be a major stationary source or major modification only if fugitive emissions to the extent quantifiable are considered in calculating the potential to emit of the stationary source or modification and the source does not belong to any of the following categories:
  (a)  Coal cleaning plants, with thermal dryers.
  (b)  Kraft pulp mills.

(c)  Portland cement plants.

(d)  Primary zinc smelters.

(e)  Iron and steel mills.

(f)  Primary aluminum ore reduction plants.

(g)  Primary copper smelters.

(h)  Municipal incinerators capable of charging more than 250 tons of refuse per day.

(i)  Hydrofluoric, sulfuric, or citric acid plants.

(j)  Petroleum refineries.

(k)  Lime plants.

(l)  Phosphate rock processing plants.

(m)  Coke oven batteries.

(n)  Sulfur recovery plants.

(o)  Carbon black plants, furnace process.

(p)  Primary lead smelters.

(q)  Fuel conversion plants.

(r)  Sintering plants.

(s)  Secondary metal production plants.

(t)  Chemical process plants.

(u)  Fossil-fuel boilers, or combination thereof, totaling more than 250 million British thermal units per hour heat input.

(v)  Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels.

(w)  Taconite ore processing plants.

(x)  Glass fiber processing plants.

(y)  Charcoal production plants.

(z)  Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input.

(aa)  Any other stationary source category which, as of August 7, 1980, is regulated under section 111 or 112 of the clean air act.

(5)  The following additional construction and permitting requirements apply:

(a)  Approval to construct shall not relieve any owner or operator of the responsibility to comply fully with any other applicable requirements and any other requirements under local, state, or federal law.

(b)  At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforcement limitation that was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements of R 336.2908 shall apply to the source or modification as though construction had not yet commenced on the source or modification.

(6)  The following provisions apply to projects at existing emissions units at a major stationary source that is subject to either prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations in circumstances where there is a reasonable possibility that a project that is not a part of a major modification may result in a significant emissions increase and the owner or operator elects to use the method in R 336.2901(dd) or R 336.2801(ll) for calculating projected actual emissions:

(a)  Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

(i)  A description of the project.

(ii)  Identification of the emissions units whose emissions of a regulated new source review pollutant may be affected by the project.

(iii)   A description of the applicability test used to determine that the project is not a major modification for any regulated new source review pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under R 336.2901(dd)(ii)(C) and an explanation for why such amount was excluded, and any netting calculations, if applicable.

  (b)  If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information required by subdivision (a) of this subrule to the department.  This subdivision does not require the owner or operator of such a unit to obtain any determination from the department before beginning actual construction.

  (c)  The owner or operator shall monitor the emissions of any regulated new source review pollutant that could increase as a result of the project and that is emitted by any emissions units identified under subdivision (a)(ii) of this subrule and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit of that regulated new source review pollutant at the emissions unit.

  (d)  If the unit is an existing electric utility steam generating unit, then the owner or operator shall submit a report to the department within 60 days after the end of each year during which records shall be generated under subdivision (c) of this subrule setting out the unit's annual emissions during the year that preceded submission of the report.

  (e)  If the unit is an existing unit other than an electric utility steam generating unit, then the owner or operator shall submit a report to the department if the annual emissions, in tons per year, from the project identified pursuant to this subrule, exceed the baseline actual emissions by a significant amount for that regulated new source review pollutant, and if such emissions differ from the preconstruction projection.  The report shall be submitted to the department within 60 days after the end of such year.  The report shall contain all of the following information:

  (i)  The name, address and telephone number of the major stationary source.

  (ii)  The annual emissions as calculated under subdivision (c) of this subrule.

  (iii)  Any other information that the owner or operator wishes to include in the report, for example, an explanation as to why the emissions differ from the preconstruction projection.

  (f)  A reasonable possibility that a project may result in a significant emissions increase occurs when the project is subject to R 336.1201(1)(a) and is not exempted from the requirement to obtain a permit to install by R 336.1278 to R 336.1290.  If the owner or operator determines that the project is exempted by R 336.1278 to R 336.1290, then the owner or operator may proceed with the project without obtaining a permit to install.  If an owner or operator develops calculations for the project pursuant to R 336.2901(dd) or R 336.2801(ll), the calculations may be used for the purpose of demonstrating compliance with R 336.1278a(1)(c).

  (7)  The owner or operator of the source shall make the information required to be documented and maintained under this rule available for review upon a request for inspection by the department, or the general public under section 5516(2) of the act, MCL 324.5516(2).

  (8)  The requirements of this part that apply to major stationary sources and major modifications of volatile organic compounds shall also apply to nitrogen oxides emissions from major stationary sources and major modifications of nitrogen oxides in an ozone transport region or in any ozone nonattainment area, except in ozone nonattainment areas or portions of an ozone transport region where the United States environmental protection agency has granted a NOx waiver applying the standards set forth under section 182(f) of the clean air act and the waiver continues to apply.

R 336.2903  Additional permit requirements for sources impacting nonattainment areas.

Rule 1903.  (1)  No new major stationary source or major modification shall be constructed in an area designated as attainment or unclassifiable for any national ambient air quality standard under section 107 of the clean air act, without first applying for a permit to install under R 336.1201(1)(a).  The department shall not approve any permit to install that would cause or contribute to a violation of any national ambient air quality standard.

(2)  A major source or major modification shall be considered to cause or contribute to a violation of a national ambient air quality standard when the source or modification would, at a minimum, exceed the following significance levels in Table 191 at any locality that does not or would not meet the applicable national standard:

Table 191

| | Averaging time (hours) | | | | |
|---|---|---|---|---|---|
| Pollutant | Annual | 24 | 8 | 3 | 1 |
| Sulfur dioxide | 1.0 ug/m$^3$ | 5 ug/m$^3$ | | 25 ug/m$^3$ | |
| PM-10 | 1.0 ug/m$^3$ | 5 ug/m$^3$ | | | |
| Nitrogen dioxide | 1.0 ug/m$^3$ | | | | |
| Carbon Monoxide | | | 500 ug/m$^3$ | | 2000 ug/m$^3$ |

(3)  The owner of a major stationary source or major modification subject to this rule may reduce the impact of its emissions upon air quality by obtaining sufficient emission reductions to, at a minimum, compensate for its adverse ambient impact where the major source or major modification would otherwise cause or contribute to a violation of any national ambient air quality standard.  In the absence of such emission reductions, the department shall deny the proposed construction.

(4)  This rule shall not apply to a major stationary source or major modification with respect to a particular pollutant if the owner or operator demonstrates that, as to that pollutant, the source or modification is located in a nonattainment area.

R 336.2907  Actuals plantwide applicability limits or PALs.
Rule 1907.  (1)  The following definitions apply to the use of actuals PALs.  If a term is not defined in these paragraphs, then it shall have the meaning given in R 336.2901:

(a)  "Actuals PAL for a major stationary source" means a PAL based on the baseline actual emissions of all emissions units at the source that emit or have the potential to emit the PAL pollutant.

(b)  "Allowable emissions" means allowable emissions as defined in R 336.1101(k), except this definition is modified in the following manner:

(i)  The allowable emissions for any emissions unit shall be calculated considering any emission limitations that are enforceable as a practical matter on the emissions unit's potential to emit.

(ii)  An emissions unit's potential to emit shall be determined using the definition in R 336.2901(z), except that the words "or enforceable as a practical matter" shall be added after "legally enforceable."

(c)  "Small emissions unit" means an emissions unit that emits or has the potential to emit the PAL pollutant in an amount less than the significant level for that PAL pollutant.

(d)  "Major emissions unit" means either of the following:

(i)  Any emissions unit that emits or has the potential to emit 100 tons per year or more of the PAL pollutant in an attainment area.

(ii)  Any emissions unit that emits or has the potential to emit the PAL pollutant in an amount that is equal to or greater than the major source threshold for the PAL pollutant as defined by the clean air act for nonattainment areas.  For example, in accordance with the definition of major stationary source in section 182(c) of the clean air act, an emissions unit is a major emissions unit for volatile organic

compounds if the emissions unit is located in a serious ozone nonattainment area and it emits or has the potential to emit 50 or more tons of volatile organic compounds per year.

(e)  "Plantwide applicability limitation" or "PAL" means an emission limitation, expressed in tons per year, for a pollutant at a major stationary source that is enforceable as a practical matter and established source-wide in accordance with this rule.

(f)  "PAL effective date" generally means the date of issuance of the PAL permit. However, the PAL effective date for an increased PAL is the date any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(g)  "PAL effective period" means the period beginning with the PAL effective date and ending 10 years later.

(h)  "PAL major modification" means, notwithstanding R 336.2901(s) and (v), the definitions for major modification and net emissions increase, any physical change in or change in the method of operation of the PAL source that causes it to emit the PAL pollutant at a level equal to or greater than the PAL.

(i)  "PAL permit" means the permit to install that establishes a PAL for a major stationary source.

(j)  "PAL pollutant" means the pollutant for which a PAL is established at a major stationary source.

(k)  "Significant emissions unit" means an emissions unit that emits or has the potential to emit a PAL pollutant in an amount that is equal to or greater than the significant level  for that PAL pollutant, but less than the amount that would qualify the unit as a major emissions unit.

(2)  The following requirements pertain to applicability:

(a)  The department may approve the use of an actuals PAL for any existing major stationary source if the PAL meets the requirements of this rule.  "PAL" means "actuals PAL" in this rule.

(b)  The department shall not allow an actuals PAL for volatile organic compounds or nitrogen oxides for any major stationary source located in an extreme ozone nonattainment area.

(c)  For physical change in or change in the method of operation of a major stationary source that maintains its total source-wide emissions below the PAL level, meets the requirements of this rule, and complies with the PAL permit, all of the following shall apply:

(i)  Is not a major modification for the PAL pollutant.

(ii)  Does not have to be approved through the permitting requirements of this rule.

(iii)  Is not subject to the provisions in R 336.2902(5)(b), restrictions on relaxing enforceable emission limitations that the major stationary source used to avoid applicability of the nonattainment major new source review program.

(d)  Except as provided under subdivision (c)(iii) of this subrule, a major stationary source shall continue to comply with all applicable federal, state, or local requirements, emission limitations, and work practice requirements that were established before the effective date of the PAL.

(3)  As part of a permit application requesting a PAL, the owner or operator of a major stationary source shall submit all of the following information to the department for approval:

(a)  A list of all emissions units at the source designated as small, significant, or major based on their potential to emit.  In addition, the owner or operator of the source shall indicate which, if any, federal, state, or local applicable requirements, emission limitations, or work practices apply to each unit.

(b)  Calculations of the baseline actual emissions with supporting documentation. Baseline actual emissions shall include emissions associated not only with operation of the unit, but also emissions associated with startup, shutdown, and malfunction.

(c)  The calculation procedures that the major stationary source owner or operator proposes to use to convert the monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total for each month as required by subrule (13)(a) of this rule.

(4)  The following general requirements apply for establishing PALs:

(a)  The department may establish a PAL at a major stationary source, provided that, at a minimum, all the following requirements are met:

(i)  The PAL shall impose an annual emission limitation in tons per year, which is enforceable as a practical matter, for the entire major stationary source.  For each month during the PAL effective period after the first 12 months of establishing a PAL, the major stationary source owner or operator shall show that the sum of the monthly emissions from each emissions unit under the PAL for the previous 12 consecutive months is less than the PAL (a 12-month total, rolled monthly).  For each month during the first 11 months from the PAL effective date, the major stationary source owner or operator shall show that the sum of the preceding monthly emissions from the PAL effective date for each emissions unit under the PAL is less than the PAL.

(ii)  The PAL shall be established in a permit to install that meets the public participation requirements in subrule (5) of this rule.

(iii)  The PAL permit to install shall contain all the requirements of subrule (7) of this rule.

(iv)  The PAL shall include fugitive emissions, to the extent quantifiable, from all emissions units that emit or have the potential to emit the PAL pollutant at the major stationary source.

(v)  Each PAL shall regulate emissions of only 1 pollutant.

(vi)  Each PAL shall have a PAL effective period of 10 years.

(vii)  The owner or operator of the major stationary source with a PAL shall comply with the monitoring, recordkeeping, and reporting requirements provided in subrules (12) to (14) of this rule for each emissions unit under the PAL through the PAL effective period.

(b)  At no time, during or after the PAL effective period, are emissions reductions of a PAL pollutant, which occur during the PAL effective period, creditable as decreases for purposes of offsets under R 336.2908(5) unless the level of the PAL is reduced by the amount of such emissions reductions and such reductions would be creditable in the absence of the PAL.

(5)  PALs for existing major stationary sources shall be established, renewed, or increased through a permit to install issued under R 336.1201(1)(a).  The department shall provide the public with notice of the proposed approval of a PAL permit and at least a 30-day period for submittal of public comment. The department shall address all material comments before taking final action on the permit.

(6)  The following apply to setting the 10-year actuals PAL level.

(a)  Except as provided in subdivision (b) of this subrule, the actuals PAL level for a major stationary source shall be established as the sum of the baseline actual emissions of the PAL pollutant for each emissions unit at the source; plus an amount equal to the applicable significant level for the PAL pollutant.  When establishing the actuals PAL level, for a PAL pollutant, only 1 consecutive 24-month period shall be used to determine the baseline actual emissions for all existing emissions units. However, a different consecutive 24-month period may be used for each different PAL pollutant. Emissions associated with units that were permanently shut down after this 24-month period shall be subtracted from the PAL level.  The department shall specify a reduced PAL level, in tons per year, in the PAL permit to become effective on the future compliance date of any applicable federal or state regulatory requirements before issuance of the PAL permit.  For instance, if the source owner or operator will be required to reduce emissions from industrial boilers in half from baseline emissions of 60 parts per million nitrogen oxides to a new rule limit of 30 parts per million, then the permit shall contain a future effective PAL level that is equal to the current PAL level reduced by half of the original baseline emissions of such unit.

(b)  For newly constructed units, which do not include modifications to existing units, on which actual construction began after the 24-month period, instead of adding the baseline actual emissions as specified in subdivision (a) of this subrule, the emissions shall be added to the PAL level in an amount equal to the potential to emit of the units.

(7)  The PAL permit shall contain, at a minimum, all of the following information:

(a)  The PAL pollutant and the applicable source-wide emission limitation in tons per year.

(b)  The PAL permit effective date and the expiration date of the PAL (PAL effective period).

(c) Specification in the PAL permit that if a major stationary source owner or operator applies to renew a PAL under subrule (10) of this rule before the end of the PAL effective period, then the PAL shall not expire at the end of the PAL effective period. The PAL shall remain in effect until a revised PAL permit is issued by the department.

(d) A requirement that emission calculations for compliance purposes include emissions from startups, shutdowns, and malfunctions.

(e) A requirement that, once the PAL expires, the major stationary source is subject to subrule (9) of this rule.

(f) The calculation procedures that the major stationary source owner or operator shall use to convert the monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total for each month as required by subrule (13)(a) of this rule.

(g) A requirement that the major stationary source owner or operator monitor all emissions units under subrule (12) of this rule.

(h) A requirement to retain on-site the records required under subrule (13) of this rule. The records may be retained in an electronic format.

(i) A requirement to submit the reports required under subrule (14) of this rule by the required deadlines.

(j) Any other requirements that the department determines necessary to implement and enforce the PAL.

(8) The following shall apply to the PAL effective period and reopening of the PAL permit:

(a) The department shall specify a PAL effective period of 10 years.

(b) The following shall apply to reopening of the PAL permit:

(i) During the PAL effective period, the department shall reopen the PAL permit to do any of the following:

(A) Correct typographical or calculation errors made in setting the PAL or reflect a more accurate determination of emissions used to establish the PAL.

(B) Reduce the PAL if the owner or operator of the major stationary source creates creditable emissions reductions for use as offsets under R 336.2908(5)(b) through (h).

(C) Revise the PAL to reflect an increase in the PAL as provided under subrule (11) of this rule.

(ii) The department may reopen the PAL permit for any of the following:

(A) Reduce the PAL to reflect newly applicable federal requirements with compliance dates after the PAL effective date.

(B) Reduce the PAL consistent with any other requirement, that is enforceable as a practical matter, and that the department may impose on the major stationary source under the state implementation plan.

(C) Reduce the PAL if the department determines that a reduction is necessary to avoid causing or contributing to a national ambient air quality standard or PSD increment violation, or to an adverse impact on an air quality related value that has been identified for a federal class I area by a federal land manager and for which information is available to the general public.

(iii) Except for a permit reopening for the correction of typographical or calculation errors that do not increase the PAL level, all other reopenings shall be carried out in accordance with the public participation requirements of subrule (5) of this rule.

(9) Any PAL, which is not renewed in accordance with the procedures in subrule (10) of this rule, shall expire at the end of the PAL effective period, and the following requirements of this paragraph shall apply:

(a) Each emissions unit, or each group of emissions units, that existed under the PAL shall comply with an allowable emission limitation under a revised permit established according to the following procedures:

(i)  Within the time frame specified for PAL renewals in subrule (10)(b) of this rule, the major stationary source shall submit a proposed allowable emission limitation for each emissions unit, or each group of emissions units, if such a distribution is more appropriate as determined by the department, by distributing the PAL allowable emissions for the major stationary source among each of the emissions units that existed under the PAL.  If the PAL had not yet been adjusted for an applicable requirement that became effective during the PAL effective period, as required under subrule (10)(e) of this rule, then the distribution shall be made as if the PAL had been adjusted.

(ii)  The department shall determine whether and how the PAL allowable emissions will be distributed and issue a revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as the department determines is appropriate.

(b)  Each emissions unit shall comply with the allowable emission limitation on a 12-month rolling basis.  The department may approve the use of monitoring systems  other than CEMS, CERMS, PEMS or CPMS to demonstrate compliance with the allowable emission limitation.

(c)  Until the department issues the revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, the source shall continue to comply with a source-wide, multi-unit emissions cap equivalent to the level of the PAL emission limitation.

(d)  Any physical change or change in the method of operation at the major stationary source shall be subject to the nonattainment major new source review requirements if the change meets the definition of major modification in R 336.2901(s).

(e)  The major stationary source owner or operator shall continue to comply with all state, federal, or local applicable requirements that may have applied either during the PAL effective period or before the PAL effective period, except for those emission limitations that were eliminated by the PAL under subrule (2)(c)(iii) of this rule.

(10)  The following shall apply to renewal of a PAL:

(a)  The department shall follow the procedures specified in subrule (5) of this rule in approving any request to renew a PAL for a major stationary source, and shall provide both the proposed PAL level and a written rationale for the proposed PAL level to the public for review and comment.  During such public review, any person may propose a PAL level for the source for consideration by the department.

(b)  A major stationary source owner or operator shall submit a timely application to the department to request renewal of a PAL.  A timely application is one that is submitted at least 6 months before, but not earlier than 18 months from, the date of permit expiration.  This deadline for application submittal is to ensure that the permit will not expire before the permit is renewed. If the owner or operator of a major stationary source submits a complete application to renew the PAL within this time period, then the PAL shall continue to be effective until the revised permit with the renewed PAL is issued.

(c)  The application to renew a PAL permit shall contain all of the following information:

(i)  The information required in subrule (3) of this rule.

(ii)  A proposed PAL level.

(iii)  The sum of the potential to emit of all emissions units under the PAL with supporting documentation.

(iv)  Any other information the owner or operator wishes the department to consider in determining the appropriate level for renewing the PAL.

(d)  In determining whether and how to adjust the PAL, the department shall consider either of the options outlined in paragraphs (i) and (ii) of this subdivision.  The adjustment shall comply with paragraph (iii) of this subdivision.

(i)  If the emissions level calculated in accordance with subrule (6) of this rule is equal to or greater than 80% of the PAL level, the department may renew the PAL at the same level without considering the factors in paragraph (ii) of this subdivision.

(ii)  The department may set the PAL at a level that it determines to be more representative of the source's baseline actual emissions, or that it determines to be appropriate considering air quality needs, advances in control technology, anticipated economic growth in the area, desire to reward or encourage the source's voluntary emissions reductions, or other factors as specifically identified by the department in its written rationale.

(iii)  Notwithstanding paragraphs (i) and (ii) of this subdivision, both of the following shall apply:

(A)  If the potential to emit of the major stationary source is less than the PAL, then the department shall adjust the PAL to a level not greater than the potential to emit of the source.

(B)  The department shall not approve a renewed PAL level higher than the current PAL, unless the major stationary source has complied with subrule (11) of this rule.

(e)  If the compliance date for a state, federal, or local requirement that applies to the PAL source occurs during the PAL effective period, and if the department has not already adjusted for such requirement, then the PAL shall be adjusted at the time of PAL permit renewal or renewable operating permit renewal, whichever occurs first.

(11)  The following shall apply to increasing a PAL during the PAL effective period:

(a)  The department may increase a PAL emission limitation only if the major stationary source complies with the following provisions:

(i)  The owner or operator of the major stationary source shall submit a complete application to request an increase in the PAL limit for a PAL major modification.  The application shall identify the emissions units contributing to the increase in emissions so as to cause the major stationary source's emissions to equal or exceed its PAL.

(ii)  As part of this application, the major stationary source owner or operator shall demonstrate that the sum of the baseline actual emissions of the small emissions units, plus the sum of the baseline actual emissions of the significant and major emissions units assuming application of BACT equivalent controls, plus the sum of the allowable emissions of the new or modified emissions units exceeds the PAL.  The level of control that would result from BACT equivalent controls on each significant or major emissions unit shall be determined by conducting a new BACT analysis at the time the application is submitted, unless the emissions unit is currently required to comply with a BACT or LAER requirement that was established within the preceding 10 years.  In such a case, the assumed control level for that emissions unit shall be equal to the level of BACT or LAER with which that emissions unit shall currently comply.

(iii)  The owner or operator obtains a major new source review permit for all emissions units identified in paragraph (i) of this subdivision, regardless of the magnitude of the emissions increase resulting from them (that is, no significant levels apply).  These emissions units shall comply with any emissions requirements resulting from the nonattainment major new source review program process (for example, LAER), even though they have also become subject to the PAL or continue to be subject to the PAL.

(iv)  The PAL permit shall require that the increased PAL level shall be effective on the day any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(b)  The department shall calculate the new PAL as the sum of the allowable emissions for each modified or new emissions unit, plus the sum of the baseline actual emissions of the significant and major emissions units, assuming application of BACT equivalent controls as determined in subdivision (a)(ii) of this subrule, plus the sum of the baseline actual emissions of the small emissions units.

(c)  The PAL permit shall be revised to reflect the increased PAL level under the public notice requirements of subrule (5) of this rule.

(12)  The following shall apply to monitoring requirements for PALs:

(a)  The following general requirements shall apply:

(i)  Each PAL permit shall contain enforceable requirements for the monitoring system that accurately determines plantwide emissions of the PAL pollutant in terms of mass per unit of time.  Any monitoring system authorized for use in the PAL permit shall be based on sound science and meet generally acceptable scientific procedures for data quality and manipulation.  Additionally, the information generated by the system shall meet minimum legal requirements for admissibility in a judicial proceeding to enforce the PAL permit.

(ii)  The PAL monitoring system shall employ 1 or more of the 4 general monitoring approaches meeting the minimum requirements set forth in subdivision (b) of this subrule and shall be approved by the department.

(iii)  Notwithstanding paragraph (ii) of this subdivision, an owner or operator may also employ an alternative monitoring approach that meets paragraph (i) of this subdivision if approved by the department.

(iv)  Failure to use a monitoring system that meets the requirements of this rule renders the PAL invalid.

(b)  Minimum performance requirements for approved monitoring approaches.  The following are acceptable general monitoring approaches when conducted in accordance with the minimum requirements in subdivisions (c) to (i) of this subrule:

(i)  Mass balance calculations for activities using coatings or solvents.

(ii)  CEMS.

(iii)  CPMS or PEMS.

(iv)  Emission factors.

(c)  An owner or operator using mass balance calculations to monitor PAL pollutant emissions from activities using coating or solvents shall meet all of the following requirements:

(i)  Provide a demonstrated means of validating the published content of the PAL pollutant that is contained in or created by all materials used in or at the emissions unit.

(ii)  Assume that the emissions unit emits all of the PAL pollutant that is contained in or created by any raw material or fuel used in or at the emissions unit, if it cannot otherwise be accounted for in the process.

(iii)  Where the vendor of a material or fuel, which is used in or at the emissions unit, publishes a range of pollutant content from such material, then the owner or operator shall use the highest value of the range to calculate the PAL pollutant emissions unless the department determines there is site-specific data or a site-specific monitoring program to support another content within the range.

(d)  An owner or operator using CEMS to monitor PAL pollutant emissions shall meet both of the following requirements:

(i)  CEMS shall comply with applicable performance specifications found in 40 C.F.R. part 60, appendix B, adopted by reference in R 336.2901a.

(ii)  CEMS shall sample, analyze, and record data at least every 15 minutes while the emissions unit is operating.

(e)  An owner or operator using CPMS or PEMS to monitor PAL pollutant emissions shall meet both of the following requirements:

(i)  The CPMS or the PEMS shall be based on current site-specific data demonstrating a correlation between the monitored parameters and the PAL pollutant emissions across the range of operation of the emissions unit.

(ii)  Each CPMS or PEMS shall sample, analyze, and record data at least every 15 minutes, or at another less frequent interval approved by the department, while the emissions unit is operating.

(f)  An owner or operator using emission factors to monitor PAL pollutant emissions shall meet all of the following requirements:

(i)  All emission factors shall be adjusted, if appropriate, to account for the degree of uncertainty or limitations in the factors' development.

(ii)  The emissions unit shall operate within the designated range of use for the emission factor, if applicable.

(iii)  If technically practicable, the owner or operator of a significant emissions unit that relies on an emission factor to calculate PAL pollutant emissions shall conduct validation testing to determine a site-specific emission factor within 6 months of PAL permit issuance, unless the department determines that testing is not required.

(g)  A source owner or operator shall record and report maximum potential emissions without considering enforceable emission limitations or operational restrictions for an emissions unit during any period of time that there is no monitoring data, unless another method for determining emissions during such periods is specified in the PAL permit.

(h)  Notwithstanding the requirements in subdivision (c) to (g) of this subrule, if an owner or operator of an emissions unit cannot demonstrate a correlation between the monitored parameters and the PAL pollutant emissions rate at all operating points of the emissions unit, then the department shall, at the time of permit issuance do either of the following:

(i)  Establish default values for determining compliance with the PAL based on the highest potential emissions reasonably estimated at such operating points.

(ii)  Determine that operation of the emissions unit during operating conditions when there is no correlation between monitored parameters and the PAL pollutant emissions is a violation of the PAL.

(i)  All data used to establish the PAL pollutant must be re-validated through performance testing or other scientifically valid means approved by the department.  Testing shall occur at least once every 5 years after issuance of the PAL.

(13)  All of the following recordkeeping requirements shall apply:

(a)  The PAL permit shall require an owner or operator to retain a copy of all records necessary to determine compliance with this rule and of the PAL, including a determination of each emissions unit's 12-month rolling total emissions, for 5 years from the date of the record.

(b)  The PAL permit shall require an owner or operator to retain a copy of all of the following records for the duration of the PAL effective period plus 5 years:

(i)  A copy of the PAL permit application and any applications for revisions to the PAL.

(ii)  Each annual certification of compliance pursuant to renewable operating permit and the data relied on in certifying the compliance.

(14)  The owner or operator shall submit semiannual monitoring reports and prompt deviation reports to the department in accordance with the source's renewable operating permit.  The reports shall meet all of the following requirements:

(a)  The semiannual report shall be submitted to the department within 30 days of the end of each reporting period.  This report shall contain all of the following information:

(i)  The identification of owner and operator and the permit number.

(ii)  Total annual emissions, tons per year, based on a 12-month rolling total for each month in the reporting period recorded under subrule (13)(a) of this rule.

(iii)  All data relied upon, including, but not limited to, any quality assurance or quality control data, in calculating the monthly and annual PAL pollutant emissions.

(iv)  A list of any emissions units modified or added to the major stationary source during the preceding 6-month period.

(v)  The number, duration, and cause of any deviations or monitoring malfunctions, other than the time associated with zero and span calibration checks, and any corrective action taken.

(vi)  A notification of a shutdown of any monitoring system, whether the shutdown was permanent or temporary, the reason for the shutdown, the anticipated date that the monitoring system will be fully

37

operational or replaced with another monitoring system, whether the emissions unit monitored by the monitoring system continued to operate, and the calculation of the emissions of the pollutant or the number determined by method included in the permit, as provided by subrule (12)(g) of this rule.

(vii) A signed statement by the responsible official, as defined by the applicable renewable operating permit, certifying the truth, accuracy, and completeness of the information provided in the report.

(b) The major stationary source owner or operator shall promptly submit reports of any deviations or exceedance of the PAL requirements, including periods where no monitoring is available. A report submitted under R 336.1213(3)(c)(i) shall satisfy this reporting requirement. The deviation reports shall be submitted within the time limits prescribed by the source's renewable operating permit. The reports shall contain all of the following information:

(i) The identification of owner and operator and the permit number.

(ii) The PAL requirement that experienced the deviation or that was exceeded.

(iii) Emissions resulting from the deviation or the exceedance.

(iv) A signed statement by the responsible official, as defined by the source's renewable operating permit, certifying the truth, accuracy, and completeness of the information provided in the report.

(c) The owner or operator shall submit to the department the results of any re-validation test or method within 3 months after completion of the test or method.

R 336.2908 Conditions for approval of a major new source review permit in a nonattainment area.

Rule 1908. (1) The department may only issue a permit approving the construction of a new major stationary source or major modification in a nonattainment area if the department has determined that the owner or operator of the major stationary source or major modification will comply with all of the provisions of this rule.

(2) The owner or operator of the proposed major stationary source or major modification shall provide an analysis of alternative sites, sizes, production processes, and environmental control techniques for the proposed major stationary source or major modification which demonstrates that the benefits of the proposed major stationary source or major modification significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.

(3) The major stationary source or major modification shall comply with the lowest achievable emissions rate for each regulated new source review pollutant for which the area is designated as nonattainment.

(4) All stationary sources which have a potential to emit 100 or more tons per year of any air contaminant regulated under the clean air act, which are located in the state, and which are owned or controlled by the owner, operator, or an entity controlling, controlled by, or under common control with, the owner or operator of the proposed major stationary source or major modification shall be in compliance with all applicable local, state, and federal air quality regulations or shall be in compliance with a legally enforceable permit condition or order of the department specifying a plan and timetable for compliance.

(5) Before the start-up of the new major stationary source or major modification, an emission reduction offset for each major nonattainment air contaminant shall be provided consistent with the following provisions:

(a) The baseline for determining credit for emissions reductions is the emissions limit under the state implementation plan in effect at the time the application to construct is filed, except that the offset baseline shall be the actual emissions of the source from which offset credit is obtained where either of the following occurs:

(i) The demonstration of reasonable further progress and attainment of ambient air quality standards is based upon the actual emissions of sources located within the nonattainment area.

(ii)  The state implementation plan does not contain an emissions limitation for that source or source category.

(b)  The following requirements apply to emissions offset credits:

(i)  Where the allowable emissions are greater emissions than the potential to emit of the source, emissions offset credit shall be allowed only for control below this potential.

(ii)  For an existing fuel combustion source, credit shall be based on the source's allowable emissions for the type of fuel being burned at the time the application to construct is filed.  If the existing source commits to switch to a cleaner fuel at some future date, then emissions offset credit based on the allowable, or actual, emissions for the fuels involved is not acceptable, unless the permit is conditioned to require the use of a specified alternative control measure which would achieve the same degree of emissions reduction should the source switch back to a dirtier fuel at some later date.  The department shall ensure that adequate long-term supplies of the new fuel are available before granting emissions offset credit for fuel switches.

(c)  An emission reduction credit shall not be creditable as an emission offset unless it meets the following requirements:

(i)  Emissions reductions that have been achieved by shutting down an existing emission unit or curtailing production or operating hours may be generally credited for offsets only if they meet all of the following requirements:

(A)  The reductions are surplus, permanent, quantifiable and federally enforceable.

(B)  The shutdown or curtailment occurred after the last day of the base year for the SIP planning process.  The department may choose to consider a prior shutdown or curtailment to have occurred after the last day of the base year if the projected emissions inventory used to develop the attainment demonstration explicitly includes emissions from such previously shutdown or curtailed emission units.  However, credit shall not be given for shutdowns that occurred before August 7, 1977.

(ii)  Emissions reductions that are achieved by shutting down an existing emissions unit or curtailing production or operating hours and that do not meet the requirements of R 336.2908(5)(c)(i)(B) may be generally credited only if they meet either of the following:

(A)  The shutdown or curtailment occurred on or after the date the construction permit application is filed.

(B)  The applicant can establish that the proposed new emissions unit is a replacement for the shutdown or curtailed emissions unit, and the emissions reductions are surplus, permanent, quantifiable and federally enforceable.

(d)  Emissions credit shall not be allowed for replacing 1 hydrocarbon compound with another of lesser reactivity, except for those compounds listed in table 1 of the United States environmental protection agency's "Recommended Policy on Control of Volatile Organic Compounds," 42 FR 35314, July 8, 1977, adopted by reference in R 336.2901a.

(e)  All emission reductions claimed as offset credit shall be federally enforceable.

(f)  Offsets shall be obtained from the same nonattainment area as the proposed major source or major modification, except another nonattainment area may be used if both of the following conditions are met:

(i)  The other area has an equal or higher nonattainment classification than the area in which the proposed source is located.

(ii)  Nonattainment air contaminant emissions from the other area contribute to a violation of a national ambient air quality standard in the nonattainment area in which the proposed major source or major modification would be located.

(g)  Credit for an emissions reduction may be claimed to the extent that the reviewing authority has not relied on it in issuing any permit required by R 336.1220 or R 336.2902 and the department has not relied on it in demonstrating attainment or reasonable further progress.

(h)  The total tonnage of increased emissions, in tons per year, resulting from a major modification that must be offset shall be determined by summing the difference between the allowable emissions after the modification and the actual emissions before the modification for each emissions unit.  Unless specified otherwise in this rule, the offset ratio for each nonattainment air pollutant that will be emitted in significant amounts from a new major source or major modification located in a nonattainment area that is subject to subpart 1, part D, title 1of the clean air act shall be 1:1.

(i)  The provisions of this subrule do not apply to emissions resulting from proposed major sources or major modifications to the extent that the emissions are temporary and will not prevent reasonable further progress towards attainment of any applicable standard.  Examples of temporary emissions include emissions from all of the following:

(i)  Pilot plants.

(ii)  Portable facilities which will be relocated outside the nonattainment area within 18 months.

(iii)  The construction phase of a new major stationary source or major modification.

(6)  For facilities meeting the emissions offset requirements of R 336.2908(5) for ozone nonattainment areas that are subject to subpart 2, part D, title 1 of the clean air act, the facility must meet the following requirements:

(a)  The ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be as follows:

(i)  In any marginal nonattainment area for ozone, the ratio shall be 1.1:1.

(ii)  In any moderate nonattainment area for ozone, the ratio shall be 1.15:1.

(iii)  In any serious nonattainment area for ozone, the ratio shall be 1.2:1.

(iv)  In any severe nonattainment area for ozone, the ratio shall be 1.3:1, except that the ratio may be 1.2:1 if all existing major sources in the severe nonattainment area use BACT for the control of VOC.

(v)  In any extreme nonattainment area for ozone, the ratio shall be 1.5:1, except that the ratio may be 1.2:1 if all existing major sources in the extreme nonattainment area use BACT for the control of VOC.

(b)  Not withstanding the requirements of R 336.2908(6)(a) for meeting the requirements of R 336.2908(5), the ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be 1.15:1 for all areas within an ozone transport region that is subject to subpart 2, part D, title 1 of the clean air act except for serious, severe, and extreme ozone nonattainment areas that are subject to subpart 2, part D, title 1 of the clean air act.

(c)  For each facility meeting the emissions offset requirements of R 336.2908(5) for ozone nonattainment areas that are subject to subpart 1, part D, title 1 of the clean air act but are not subject to subpart 2, part D, title 1 of the clean air act, including 8-hour ozone nonattainment areas subject to 40 C.F.R. 51.902(b), the ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be 1:1.  Title 40 C.F.R. 51.902(b) is adopted by reference in R 336.2901a.

(7)  The requirements of this section that apply to major stationary sources and major modifications of PM-10 shall also apply to major stationary sources and major modifications of PM-10 precursors, except when the department determines that such sources do not contribute significantly to PM-10 levels that exceed the PM-10 ambient standards in the area.


R 336.2910  Administrative hearings.

Rule 1910.  A person aggrieved by an action or inaction of the department under prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations may request a formal hearing, under 1969 PA 306, MCL 24.201.  The following apply:

(a)  The request shall be received by the department within 30 days after the person received notice of the decision to approve or deny the permit.

2007 MR 10 – June 15, 2007

(b)  The final decision in granting a contested case hearing lies with the department.  To receive a contested case hearing, a person shall demonstrate 1 of the following:

(i)  The person is the permit applicant.

(ii)  The person participated in the permit review process, either by submitting written comments during the 30-day public notice period or by attending the public hearing and making comments for the official record, and the comments were not adequately addressed by the department in the permit review process.

(iii)  The terms or conditions of the permit for which the person requests a hearing were added by the department after the 30-day notice period expired, and no additional opportunity for public input was offered by the department.

(c)  When the department issues a permit pursuant to the requirements of the prevention of significant deterioration of air quality regulations or new source review for major sources in nonattainment areas regulations, the permit is valid upon issuance and it is not automatically stayed if a person requests a formal hearing pursuant to this rule.  A permittee may immediately initiate construction after permit issuance.  However, the permittee faces the risk that a subsequent hearing may alter the terms or conditions of the permit.

2007 MR 10 – June 15, 2007

---

---

SOAHR 2004-054
NOTICE OF PUBLIC HEARING
DEPARTMENT OF ENVIRONMENTAL QUALITY
AIR QUALITY DIVISION

The Michigan Department of Environmental Quality (DEQ), Air Quality Division, will conduct a second public hearing on proposed administrative rules promulgated pursuant to Part 55, Air Pollution Control, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (Act 451); R 336.2901, R 336.2901a, R 336.2902, R 336.2903, R 336.2907, R 336.2908, and R 336.2910.  The second public hearing is to address the revisions to the definitions of "replacement unit" and "net emissions increase."  This rulemaking will add Part 19, New Source Review for Major Sources Impacting Nonattainment Areas.  The proposed rules are necessary to implement a complete, modern New Source Review program that meets federal requirements for permitting major sources in nonattainment areas.

The public hearing will be held on July 19, 2007, at 10:00 a.m., in the Brake Conference Room, Constitution Hall, Atrium South, 525 West Allegan Street, Lansing, Michigan.

Copies of the proposed rules (SOAHR 2004-054EQ) can be downloaded from the Internet at: http://www.michigan.gov/deqair.  These rules can also be downloaded from the Internet through the State Office of Administrative Hearings and Rules at http://www.michigan.gov/orr.  Copies of the rules may also be obtained by contacting the Lansing office at:

Air Quality Division
Michigan Department of Environmental Quality
P.O. Box 30260
Lansing, Michigan 48909-7760
Phone:  517-373-7045
Fax:  517-241-7499
E-Mail:  halbeism@Michigan.gov

All interested persons are invited to attend and present their views.  It is requested that all statements be submitted in writing for the hearing record.  Anyone unable to attend may submit comments in writing to the address above.  Written comments must be received by 5:00 p.m. on July 19, 2007.

Persons needing accommodations for effective participation in the meeting should contact the Air Quality Division at 517-373-7045 one week in advance to request mobility, visual, hearing, or other assistance.

This notice of public hearing is given in accordance with Sections 41 and 42 of Michigan's Administrative Procedures Act, 1969 PA 306, as amended, being Sections 24.241 and 24.242 of the Michigan Compiled Laws.  Administration of the rules is by authority conferred on the Director of the DEQ by Sections 5503 and 5512 of Act 451, being Sections 324.5503 and 324.5512 of the Michigan Compiled Laws, and Executive Order 1995-18.  These rules will become effective immediately after filing with the Secretary of State.