## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF MICHIGAN

---

UNITED STATES OF AMERICA

          Plaintiff,

                                    Case No. 2:22-cv-11191-GAD-CI

and

CITY OF RIVER ROUGE,

          Intervenor-Plaintiff,

-vs-

EES COKE BATTERY, LLC

          Defendant.

---

## **COMPLAINT**

## **NATURE OF THE ACTION**

1.  EES Coke Battery, LLC operates a battery of 85 ovens at a facility in River Rouge, Michigan ("Coke Oven Battery") that emits sulfur dioxide pollution ("$SO_2$"). Located on Zug Island and near residential neighborhoods, the operation

1

results in thousands of tons of $SO_2$ per year—about 3,600 tons of $SO_2$ in 2021. The Coke Oven Battery is one of the largest sources of $SO_2$ pollution in Michigan.

2.      In 1990, EES Coke accepted a limit in its state permit that restricted its operations and pollution. It did so to avoid triggering New Source Review, a program under the Act that can require stringent pollution controls.

3.      In 2014, EES Coke asked the State of Michigan to remove the limit, stating that doing so would not result in a significant increase in emissions. On November 21, 2014, the Michigan Department of Environmental Quality granted EES Coke's request and issued Permit to Install 50-08C.

4.      Removing the permit limit increaseD $SO_2$ emissions. After the permit was changed, Defendant's pollution increased by more than 1,000 tons of $SO_2$ per year in several different years—an increase that would not have been possible with the old permit limit.

5.      This pollution increase triggered a New Source Review, but Defendant failed to obtain the required permits and failed to install and operate the required pollution controls.

6.      As a result, the Coke Oven Battery emitted thousands of additional tons of $SO_2$ into the air and is continuing to do so.

7.      $SO_2$ is harmful in its own right and can combine with other elements in the air to form tiny particulate matter. These pollutants cause harm to human health and the environment once emitted into the air, including premature death, heart attacks, respiratory problems, and adverse environmental effects.

8.     According to the Michigan Department of Health and Human Services, the age-adjusted hospitalization rate for the years 2016 to 2019 for the zip code within the City of River Rouge is 17.2 per 100,000 people. That figure is almost triple the statewide asthma hospitalization rate of 6.3 per 100,000 people.

9.     The City of River Rouge seeks pursuant to Section 304(b)(1)(B) of the Act, 42 U.S.C. sections 7604(b)(1)(B), injunctive relief and the assessment of civil penalties for violations of: (a) the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-7492; (b) the nonattainment New Source Review ("Nonattainment NSR") provisions of the Act, 42 U.S.C. §§ 7501-7515; and (c) the State Implementation Plan ("SIP") adopted by the State of Michigan and approved by EPA pursuant to 42 U.S.C. § 7410. *See* 42 U.S.C. §§ 7413(b) and 7477.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction of the subject matter of this action. 42 U.S.C. §§ 7413(b) and 7477; 28 U.S.C. §§ 1331, 1345, and 1355.

11.     Venue is proper in this District because the violations occurred and are occurring in this District, the facilities at issue are operated by Defendant in this District, and Defendant resides in this District. 42 U.S.C. § 7413(b); 28 U.S.C. §§ 1391(b), (c) and 1395(a).

NOTICES

12.    EPA issued Defendant a Notice and Finding of Violation on September 16, 2020. EPA provided a copy of this Notice to the State of Michigan, as required by 42 U.S.C. § 7413(a)(1).

13.    The 30-day period established in 42 U.S.C. § 7413 between issuance of the Notice and Finding of Violation and commencement of this action has elapsed.

14.    The United States initiated the within action on June, 1, 2022 against Defendant EES Coke, alleging violations of the CAA.

## DEFENDANT

15.    Defendant EES Coke is a Michigan corporation with its principal place of business at One Energy Plaza, Detroit, Michigan. EES Coke is a wholly- owned subsidiary of DTE Energy Co., a Michigan corporation.

16.    EES Coke owns and operates the Coke Oven Battery.

17.    EES Coke is a "person" within the meaning of the Act. 42 U.S.C. § 7602(e).

## STATUTORY AND REGULATORY BACKGROUND

18.    As described below, the Clean Air Act and its regulations include both a PSD program for areas in attainment with air quality standards and a Nonattainment NSR program for areas out of attainment with air quality standards. Together, these programs are referred to as New Source Review or NSR.

4

19. The Act requires the Administrator of EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality standards") for "criteria pollutants," those for which air quality criteria have been issued pursuant to 42 U.S.C. § 7408. *See* 42 U.S.C. § 7409. The primary NAAQS are to be adequate to protect the public health with an adequate margin of safety, and the secondary NAAQS are to be adequate to protect the public welfare from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

20. The Act requires each state to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data. 42 U.S.C. § 7407(d). An area that meets the NAAQS for a particular pollutant is an "attainment" area. An area that does not meet the NAAQS is a "nonattainment" area.

21. The Coke Oven Battery is located in Wayne County, Michigan. At all times relevant to this Complaint, Wayne County was classified as nonattainment for $SO_2$ and as in attainment for particulate matter with an aerodynamic diameter of 2.5 microns or less ("$PM_{2.5}$"). *See* 78 Fed. Reg. 47,191 (Aug. 5, 2013); 78 Fed. Reg. 53,272 (Aug. 29, 2013).

22. Each state must adopt and submit to EPA for approval a SIP that provides for the attainment, maintenance, and enforcement of the NAAQS. 42 U.S.C. § 7410. Each SIP must include a permit program to regulate the modification and construction of any stationary source of air pollution. 42 U.S.C. § 7410(a)(2).

## Prevention of Significant Deterioration Requirements

23. Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in areas designated as in attainment with the NAAQS. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process. These provisions are referred to here as the "PSD program."

24. The PSD program applies in this case because the Coke Oven Battery is located in an area designated as attainment for PM$_{2.5}$.

25. Each state must adopt and submit to EPA for approval a SIP that includes, among other things, regulations to prevent the significant deterioration of air quality under 42 U.S.C. §§ 7471-7475. *See* 42 U.S.C. § 7410.

26. Upon EPA approval, state SIP requirements are federally enforceable. *See* 42 U.S.C. § 7413(a), (b); 40 C.F.R. § 52.23.

27.    On March 25, 2010, EPA fully approved Michigan's PSD SIP provisions. 75 Fed. Reg. 14,352. The Michigan PSD SIP provisions are codified at Michigan Admin. Code R. 336.2801 *et. seq*.

28.    As relevant here, the PSD program requires that certain types of sources obtain PSD permits and install stringent pollution controls when they are modified. 42 U.S.C. § 7475(a); Mich. Admin. Code R. 336.2802(3).

29.    Under the Michigan SIP the triggering modification is known as a "major modification" and defined as "any physical change in or change in method of operation of a major stationary source that would result in" a significant emissions increase and a significant net emissions increase of a regulated pollutant. Mich. Admin. Code R. 336.2801(aa); *see also* 42 U.S.C. § 7411(a)(4). The relaxation or removal of a permit term limiting pollution is a change that can trigger PSD if a significant emission increase and significant net emissions increase of a regulated pollutant result. Mich. Admin. Code R. 336.2801(aa), 336.2818(2).

30.    A "significant emissions increase" occurs when the difference between "baseline emissions" before the change, as defined by Mich. Admin. Code R. 336.2801(b), and "projected actual emissions" for the period after the change, as defined by Mich. Admin. Code R. 336.2801(ll), exceeds the significance threshold for the pollutant at issue. Mich. Admin. Code R. 336.2801(rr). A "net emissions increase" is the difference between the emissions increase calculated as required by Mich. Admin. Code R. 336.2802(4) and any other increases or decreases allowed in

the netting process under Mich. Admin. Code R. 336.2801(ee). Such an increase is "significant" if it exceeds the significance threshold for the pollutant at issue. An increase of 40 tons per year of $SO_2$ or more is a significant increase of $SO_2$ and a significant increase of $PM_{2.5}$. Mich. Admin. Code R. 336.2801(qq).

31. Because $SO_2$ can convert to $PM_{2.5}$ once in the atmosphere, it is regulated as a "precursor" to $PM_{2.5}$. 73 Fed. Reg. 28,321, 28,327-28 (May 16, 2008). Thus, a significant net emissions increase of $SO_2$ can require New Source Review compliance for $PM_{2.5}$. Mich. Admin. Code R. 336.2818.

32. A "major modification" occurs where actual emissions data after the completion of the change shows a significant emission increase and a significant net emissions increase. Mich. Admin. Code R. 336.2802(4).

33. A source with a major modification in an attainment or unclassifiable area must install and operate best available control technology, known as BACT and defined in 42 U.S.C. § 7479(3) and Mich. Admin. Code R. 336.2801(f). 42 U.S.C. § 7475(a)(4); Mich. Admin. Code R. 336.2802(3), 336.2810. Such sources have an ongoing obligation to operate BACT. Mich. Admin. Code R. 336.2810(3).

34. The relevant law defines BACT, in pertinent part, as "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility ...... " Section 169(3) of the Act, 42

U.S.C. § 7479(3); Mich. Admin. Code Rule 336.2801(f).

## Nonattainment New Source Review Requirements

35.    Part D of Title I of the CAA, 42 U.S.C. §§ 7501-7515, sets forth provisions for New Source Review requirements for areas designated as nonattainment for purposes of meeting the NAAQS standards. The Nonattainment NSR program is intended to reduce emissions of air pollutants in areas that have not met the NAAQS so that the areas make progress towards meeting the NAAQS. These provisions are referred to here as "Nonattainment NSR."

36.    The Nonattainment NSR program applies in this case because the Coke Oven Battery is located in an area designated as nonattainment for $SO_2$.

37.    A state is required to adopt Nonattainment NSR SIP rules that include provisions that require that all permits for the construction and operation of modified major stationary sources within nonattainment areas conform to the requirements of 42 U.S.C. § 7503. *See* 42 U.S.C. § 7502(c)(5). The Act sets forth a series of requirements for the issuance of permits for major modifications to major stationary sources within nonattainment areas. 42 U.S.C. § 7503.

38.    On December 16, 2013, EPA approved Mich. Admin. Code R. 336.2901 to 336.2908 ("Part 19") as part of the federally enforceable SIP for Michigan, titled, "New Source Review for Major Sources Impacting Nonattainment Areas." 78 Fed. Reg. 76064. These provisions are federally enforceable. 42 U.S.C. § 7413(a), (b); 40 C.F.R. § 52.23.

39. Like the PSD program, the Nonattainment NSR program requires that certain types of sources obtain permits and install stringent pollution controls when they are modified. 42 U.S.C. § 7503, Mich. Admin. Code R. 336.2908.

40. Under the Michigan SIP, the relevant modification is known as a "major modification" and is defined as any physical change or change in the method of operation that results in both a significant emission increase and a significant net emission increase of a regulated NSR pollutant from a major stationary source. Mich. Admin. Code R. 336.2901(s). The relaxation or removal of a permit term limiting pollution is a change that can trigger Nonattainment NSR if a significant emission increase and significant net emissions increase of a regulated pollutant result. Mich. Admin. Code R. 336.2901(s), 336.2902(5)(b).

41. "Net emissions increase" means the amount by which the sum of the following exceeds zero: (a) any increase in actual emissions from a particular change at a stationary source; and (b) any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable as calculated under the applicable rules. A net emissions increase is significant if it is significant for that pollutant. Mich. Admin. Code R. 336.2901(w). An increase of 40 tons per year or more of $SO_2$ is a "significant" emissions increase. Mich. Admin. Code R. 336.2901(gg).

42. A "major modification" occurs where actual emissions data after the completion of the change shows a significant emission increase and a significant net emissions increase. Mich. Admin. Code R. 336.2902(2)(b).

43.    Among other requirements, a source that performs a major modification must install and operate pollution controls to comply with the lowest available emission rate, known as LAER. Mich. Admin. Code R. 336.2908(3). Such sources have an ongoing obligation to comply with LAER. Mich. Admin. Code R. 336.2908(3).

44.    The relevant law defines LAER, in pertinent part, as "the most stringent emissions limitation which is contained in [any SIP] for such class or category of sources, unless . . . the proposed source demonstrates that such limitations are not achievable, or . . . which is achieved in practice by such class or category of source, whichever is more stringent." 42 U.S.C. § 7501(3); Mich. Admin. Code R. 336.2901(r).

**New Source Review Recordkeeping and Reporting Requirements**

45.    The Michigan SIP requires sources to assess NSR applicability before undergoing a physical or operational change, and maintain and report certain information where there is a "reasonable possibility" that a change may qualify as a major modification. Mich. Admin. Code R. 336.2818(3). Under the Michigan SIP, the requirements differ for PSD and Nonattainment NSR, both of which apply to EES Coke.

46.    Under Michigan's PSD program, a "reasonable possibility" exists where the projected emissions increase—though below the significance level for immediately triggering NSR—is at least 50% of the significance level. Mich. Admin. Code R. 336.2818(3)(f). In that case, the source must preserve the emissions

11

calculations it performed before embarking on the change and, in some cases, report any actual increases after the change.

47. Under Michigan's Nonattainment NSR program, a reasonable possibility exists whenever a source is required to obtain a permit to install under the Michigan SIP and does not qualify for an exemption. Mich. Admin. Code R. 336.2902(6)(f). When the Nonattainment NSR reasonable possibility provision applies, the source must (i) preserve its pre-change emissions analysis and (ii) submit a report to the state should actual emissions after the change exceed the baseline emissions by a significant amount and differ from the source' preconstruction pre-change projection. Mich. Admin. Code R. 336.2902(6)(e). Any post-change report is due 60 days after the year of increased emissions ends. *Id.*

## ENFORCEMENT PROVISIONS

48. The Act provides that the Administrator may bring a civil action whenever, on the basis of any information available, the Administrator finds that any person has violated or is in violation of any other requirement or prohibition of, *inter alia*, the PSD, Nonattainment NSR, or Title V requirements of the Act, or any rule or permit issued thereunder; or the provisions of any approved SIP or any permit issued thereunder. 42 U.S.C. § 7413(a), (c); *see also* 40 C.F.R. § 52.23.

49. The Act authorizes EPA to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $25,000 per day for each violation, a figure that has been updated for inflation over time. 42 U.S.C. § 7413(b). As relevant here, the maximum penalty is $37,500 per day per

violation for violations occurring through November 2, 2015, and $109,024 for

violations occurring after November 2, 2015. *See* Federal Civil Penalties Inflation

Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701; 40

C.F.R. § 19.4; 87 Fed. Reg. 1676, 1679 (Jan. 12, 2022).

50.    In addition, the Act authorizes EPA to initiate an action for injunctive

relief as necessary to prevent the construction, modification, or operation of a major

emitting facility which does not conform to the PSD requirements in Part C of Title

I of the Act.

## GENERAL ALLEGATIONS

### The Coke Oven Battery

51.    The Coke Oven Battery is a collection of 85 ovens located on Zug Island

in River Rouge, Michigan. The ovens use coal and other raw materials to produce

metallurgical coke, a raw material for making steel. Through this coking process, the

ovens also produce coke oven gas, a volatile gas that can be used as a fuel and

produces $SO_2$ when burned.

52.    The Coke Oven Battery can send the coke oven gas to other facilities to

use as fuel, burn the gas to power its own operations, or burn it at a flare at the

facility. When used to power its own operations, the process is called "underfire

combustion."

53.    At all times relevant to this Complaint, EES Coke was the owner and

operator of the Coke Oven Battery.

54. At all times relevant to this Complaint, the Coke Oven Battery has had the potential to emit more than 100 tons per year of pollutants subject to regulation under the Act, including $SO_2$ and $PM_{2.5}$.

55. In 2021, the Coke Oven Battery emitted 3,608 tons of $SO_2$.

56. At all times relevant to this Complaint, the Coke Oven Battery has been a coke oven battery as that term is used in 42 U.S.C. § 7479(1).

57. At all times relevant to this complaint, the Coke Oven Battery was a "major emitting facility" and a "major stationary source," within the meaning of the Act and the Michigan SIP for $SO_2$ and $PM_{2.5}$.

## Permitting History

58. In the late 1980s, the owner of the Coke Oven Battery decided to rebuild the battery. The owner told Michigan that doing so would not increase pollution and so would not require a New Source Review permit. Michigan issued a permit in 1990 that included certain limits to ensure that New Source Review was not triggered.

59. As revised, that permit remained in place when EES Coke sought to change it in 2014. One of those proposed changes is particularly relevant here: EES Coke sought to remove the limit on underfire combustion of coke oven gas which had been in place since the 1990 permit for rebuilding the battery. In seeking the change, EES Coke predicted its future pollution levels and told the state that there would not be a significant emission increase of $SO_2$ or $PM_{2.5}$.

60. In seeking to revise the permit, EES Coke submitted information concerning its baseline and projected emissions for $SO_2$ in order to determine New

14

Source Review applicability. After review by the State, EES Coke proposed and the final permit reflects that the "baseline" $SO_2$ emissions were 2,039 tons per year and the projected future $SO_2$ emissions were 3,117 tons per year. While the projection was for a 1,078 ton per year increase, EES Coke determined that virtually all of the increase could be excluded under the rules. The company concluded that there would not be a significant net emission increase and thus there was no major modification. Michigan issued the permit removing the coke oven gas underfire limit, as EES Coke requested, among other changes.

### Pollution Data

61.   However, since the removal of the limits, the Coke Oven Battery has emitted more pollution than before the change and more than EES Coke predicted in its submission to the State. At EPA's request, EES Coke provided emissions data for the Coke Oven Battery to the United States.

62.   The data EES Coke provided shows that annual $SO_2$ emissions surpassed 3,600 tons—over 500 tons more than the maximum amount EES Coke had projected it would emit. In addition, the data shows that $SO_2$ emissions from underfire combustion went from 1,271 tons per year before the permit modification to nearly 2,000 tons per year afterward—well more pollution than EES Coke could have emitted before the permit change.

# FIRST CLAIM FOR RELIEF

## (Major Modification under PSD and Nonattainment NSR)

63.   Paragraphs 1 through 63 are realleged and incorporated herein by reference.

64.   In 2014, Defendant sought and obtained the removal of the permit limit on the amount of coke oven gas that can be burned as underfire combustion at the Coke Oven Battery. Such a removal of a permit limit is a "change in the method of operation" and can be a "major modification," as defined in the Michigan SIP, if it results in a pollution increase. This change in the method of operation resulted in a significant emission increase and a significant net emission increase of $SO_2$ from the Coke Oven Battery by allowing Defendant to burn more coke oven gas as underfire combustion than would have been allowed with the prior permit. Because $SO_2$ is regulated as a precursor to fine particulate matter, the significant emissions increase also constitutes a major modification for $PM_{2.5}$.

65.   Defendant did not comply with the Nonattainment NSR or PSD requirements in the Act and the Michigan SIP with respect to the major modification and subsequent operations at the Coke Oven Battery for $SO_2$ and $PM_{2.5}$. Among other things, Defendant:

   (i)   undertook the major modification without first obtaining Nonattainment NSR (for $SO_2$) or PSD (for $PM_{2.5}$) permit(s) for the construction and operation of the modified facility;

(ii)   undertook the major modification without undergoing LAER or

BACT determinations for $SO_2$ and $PM_{2.5}$ in connection with the

major modification;

(iii)   undertook the major modification without installing LAER or

BACT for control of $SO_2$ emissions as a direct pollutant and as a

precursor to $PM_{2.5}$;

(iv)   failed to operate LAER or BACT for control of $SO_2$ emissions

pursuant to a LAER or BACT determination;

(v)   failed to operate in compliance with LAER or BACT emission

limitations; and

(vi)   operated the unit after undergoing an unpermitted major

modification for $SO_2$ and $PM_{2.5}$.

66.   Defendant has violated and continues to violate the Nonattainment NSR and PSD provisions of the Michigan SIP. Unless restrained by an order of this Court, these violations will continue.

67.   As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief and a civil penalty of up to $109,024 per day.

## SECOND CLAIM FOR RELIEF

### (Reasonable Possibility Emissions Reporting)

68. Paragraphs 1 through 67 are realleged and incorporated herein by reference.

69. Defendant sought and obtained a permit to install in 2014 that included the removal of the coke oven gas limit at underfire.

70. Because a permit to install was required, there was a "reasonable possibility," as used in the Michigan SIP's Nonattainment NSR provisions, that the underlying change was a major modification. Mich. Admin. Code R. 336.2902(6)(f). In such circumstances, the Michigan SIP requires, *inter alia*, that sources submit a post-change report to the State if actual emissions after the change exceed the baseline emissions by a significant amount and differ from the source's pre-change projection. Mich. Admin. Code R. 336.2902(6)(e).

71. Based on data collected by Defendant, the Coke Oven Battery post-change emissions have exceeded the baseline emissions level by a significant amount and differed from Defendant's pre-change projection in the 2014 permitting process.

72. Defendant did not submit any post-change reports to the State, as required by Mich. Admin. Code R. 336.2902(6)(e), until after the United States' September 16, 2020 notice of violation. On November 20, 2020, Defendant sent a letter to the State providing reports for calendar years 2018 and 2019. For both years, actual emissions exceeded the baseline emissions by a significant amount and differed from the pre-change projection. *See* Mich. Admin. Code R. 336.2902(6)(e).

The reports for calendar years 2018 and 2019 were provided at least eight months after the regulations required. *See id.*

73.    Defendant has violated the Michigan SIP.

74.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violation set forth above subject Defendant to a civil penalty of up to $109,024 per day.

## PRAYER FOR RELIEF

**WHEREFORE**, based upon all the allegations set forth above, the City of River Rouge, respectfully, requests that this Court:

1.    Permanently enjoin Defendant from operating the Coke Oven Battery, including the construction of future modifications, except in accordance with the Clean Air Act and any applicable regulatory requirements;

2.    Order Defendant to apply for New Source Review permit(s) under Parts C and/or D of Title I of the Clean Air Act, as appropriate, that conform with the permitting requirements in effect at the time of the permitting action, for each pollutant in violation of the New Source Review requirements of the Clean Air Act;

3.    Order Defendant to install and operate the best available control technology and/or comply with the lowest achievable emission rate, as appropriate, at the Coke Oven Battery, for each pollutant in violation of the New Source Review requirements of the Clean Air Act;

4. Order Defendant to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act alleged above;

5. Assess a civil penalty against Defendant of up to $109,024 per day per violation;

6. Award Plaintiff its costs of this action; and,

7. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/ David A. Bajorek*
DAVID A. BAJOREK (P39096)
Attorney for Intervenor-Plaintiff
City of River Rouge
6715 Park Avenue
Allen Park, Michigan 48101
(313) 381-9701
bajorek@bajoreklawfirm.com

*/s/ Robert M. Morgan*
ROBERT M. MORGAN (P23144)
Attorney for Intervenor-Plaintiff
City of River Rouge
14290 Northline Rd.
Southgate, Michigan 48195
(313) 961-7070
morgancrdefense@ameritech.net

*/s/ David A. Bower*
DAVID A. BOWER (P38004)
Attorney for Intervenor-Plaintiff
City of River Rouge
10600 W. Jefferson Avenue
River Rouge, Michigan 48218
(313) 842-1292
rrdabower@gmail.com

September 9, 2022
Date