UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

                                  Case No. 22-11191
                                  Honorable Gershwin A. Drain

v.

EES COKE BATTERY, LLC, et al.,

                Defendant.

_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT [ECF No. 77]

### I.    Introduction

The United States Government (the "United States", "Plaintiff", or the "Government"), brings this civil action on behalf of the Environmental Protection Agency (the "EPA") against EES Coke Battery, LLC ("Defendant" or "EES Coke"). Filed on June 1, 2022, the complaint seeks injunctive relief and the assessment of civil penalties for violations of: (a) the Prevention of Significant Deterioration ("PSD") provisions of the Clean Air Act (the "CAA"), 42 U.S.C. §§ 7470-7492; (b) the nonattainment New Source Review ("Nonattainment NSR") provisions of the CAA, 42 U.S.C. §§ 7501-7515; and (c) the State Implementation Plan ("SIP") adopted by the State of Michigan and approved by the Environmental Protection Agency (the "EPA") pursuant to 42 U.S.C. § 7410. *See* ECF No. 1. Sierra Club and

1

City of River Rouge filed intervenor complaints alleging the same claims. *See* ECF Nos. 40 and 41.

Before the Court is the United States' Motion for Leave to File an Amended Complaint [ECF No. 77]. It was filed on February 9, 2024. EES Coke responded on February 23, 2024, and the United States and Sierra Club filed reply briefs on March 1, 2024. The matter is fully briefed. Upon review of the parties' briefing and applicable authority, the Court concludes oral argument will not aid in the resolution of this matter. Accordingly, the Court will resolve the United States' motion for leave to amend on the briefs. See E.D. Mich. L.R. 7.1(f)(2).

For the reasons set forth below, Plaintiff's motion for leave is granted.

## II.    Factual and Procedural Background

The EES Coke facility (the "Facility") is located on Zug Island in River Rouge, Michigan. It processes coal in a Coke Oven Battery of 85 ovens, which emits a substantial amount of sulfur dioxide pollution ("$SO_2$"). Until 2014, EES Coke's state permit restricted its operations and pollution. In 2014, however, EES Coke asked the State of Michigan to remove the emissions limit. Removing the permit limit allegedly resulted in an increase in EES Coke's $SO_2$ emissions by more than 40 tons per year over a period of several years. As alleged, this increase in $SO_2$ emissions triggered New Source Review, a program under the CAA that requires

certain pollution emitting facilities to have a permit and implement the best possible pollution controls.

The United States says that Defendant failed to obtain the required permits and failed to install and operate the required pollution controls under NSR. Consequently, the EPA issued a Notice of Violation to EES Coke on September 16, 2020 ("September 2020 NOV"), and EES Coke responded. *See* ECF Nos. 75-3 and 77-8. The increase in $SO_2$ emissions also allegedly triggered a requirement for EES Coke to inform the State of the increase, which EES Coke allegedly failed to do until after the September 2020 NOV was issued.

After the complaint was filed, the parties engaged in fact discovery, which closed on March 11, 2024. *See* ECF No. 74. The United States says it learned during fact discovery that three additional entities were "heavily involved in the environmental decision making that led to the violations alleged in the original complaint." ECF No. 77, PageID.3272. These entities include DTE Energy Services, Inc. ("DTE Energy Services"); DTE Energy Resources, Inc. d/b/a DTE Vantage ("DTE Vantage"); and DTE Energy Company ("DTE Energy Co.") (collectively, the "Proposed Defendants"). Accordingly, the EPA issued a Notice of Violation to the Proposed Defendants on January 12, 2024 ("January 2024 NOV"). *See* ECF No. 75-3. The January 2024 NOV identified the Proposed Defendants as additional

"owners/operators" of the Facility, and claimed that they, along with EES Coke, were responsible for the violations identified in the September 2020 NOV. *Id*.

The United States now moves to amend the complaint and join the Proposed Defendants in the instant matter. Plaintiff believes that the "Proposed Defendants are organized in a corporate hierarchy that ultimately owns EES Coke." ECF No. 77, PageID.3273. Specifically, it alleges that: "(1) DTE Energy Services owns EES Coke through an intermediate company; (2) DTE Energy [Vantage] owns DTE Energy Services; and (3) DTE Energy Co. is the ultimate parent company of the other Proposed Defendants and EES Coke." *Id*. The United States believes that the corporate decision making at EES Coke is "largely made by employees of the Proposed Defendants." ECF No. 77, PageID.3274. Plaintiff says it learned during discovery that,

(1) individuals in EES Coke's technology group, which was charged with assessing potential pollution controls at the Facility, were employed by DTE Energy Services, not EES Coke;

(2) individuals in the environmental group responsible for obtaining and ensuring compliance with air permits at the Facility were employed by DTE Energy Resources, not EES Coke;

(3) all of the business unit managers for EES Coke, which handles the day-to-day operations of the Facility, are employed by DTE Energy Services, not EES Coke; and

(4) the hierarchy for the decision-making process at the Facility starts with the Steel Group, a subgroup within DTE Energy Services, then

goes to DTE Energy Resources, and then, for significant decisions, up to DTE Energy.

*Id*.

Based on the foregoing, Plaintiff believes that the Proposed Defendants may face operator liability for the Facility under the CAA. Accordingly, the United States requests that DTE Vantage, DTE Energy Services, and DTE Energy Company be added to the case as defendants. The Court will discuss the applicable law and analysis below.

## III.    Applicable Law and Analysis

### A. Fed. R. Civ. P. 15

Leave to amend should be "freely" granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Sixth Circuit relies on the *Foman* factors to elucidate this liberal standard for amendment. Indeed, the court has determined that "[i]n the absence of any apparent or declared reason—such as [(1)] undue delay, bad faith or dilatory motive on the part of the movant, [(2)] repeated failure to cure deficiencies by amendments previously allowed, [(3)] undue prejudice to the opposing party by virtue of allowance of the amendment, [(4)] futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Pittman v. Experian Info. Sols., Inc*., 901 F.3d 619, 640–41 (6th Cir. 2018) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

Where undue delay exists, the Sixth Circuit has also required "'at least some significant showing of prejudice' to deny a motion to amend based solely upon delay." *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 445 (6th Cir. 2007) (citation omitted). However, "[t]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Phelps v. McClellan*, 30 F.3d 658, 662 (6th Cir. 1994) (citation omitted). And it is well established that "[a]mendment of a complaint is futile when the proposed amendment would not permit the complaint to survive a motion to dismiss." *Miller v. Calhoun Cnty*., 408 F.3d 803, 807 (6th Cir.2005) (citing *Neighborhood Dev. Corp. v. Advisory Council on Historic Pres*., 632 F.2d 21, 23 (6th Cir.1980)).

### B. *Foman* Factors

In its motion, the Government maintains that the "Proposed Defendants controlled and supervised the operation of the Facility," thus, "the most efficient way to proceed is to amend the complaint." ECF No. 77, PageID.3276.  The claims that the United States intends to bring against the Proposed Defendants are the same as its claims against EES Coke. And "even if the motion for leave to amend is denied," the Government says, it "could still bring these claims against the Proposed Defendants in a separate action." *Id*. Because the claims are the same, the United States believes that "the remedy for any violations found would be most efficiently determined with all the responsible parties in the same action." *Id*., at PageID.3277.

6

On the other hand, EES Coke argues that the motion should be denied because it is: "(1) dilatory and prejudicial, as it will substantially increase the scope of litigation and delay the case schedule; and (2) brought in bad faith because it relies on factual misstatements and omissions." ECF No. 81, PageID.3450. Lastly, Defendant says "amendment would be futile because it fails to state a claim against the newly added defendants and any such claim is barred by the applicable statute of limitations." *Id*. EES Coke's arguments relate to the first, third, and fourth *Foman* factors, which the Court will discuss each below.

### 1. Undue Delay and Unfair Prejudice

Regarding undue delay, EES Coke submits that "Plaintiff has had the information upon which the Motion ostensibly is premised for well over a year." ECF No. 81, PageID.3459. The United States relies in large part on the Declaration of Fadi Mourad, which was filed on October 4, 2022, more than a year and a half before the instant motion.

Additionally, Defendant says that "many months before this lawsuit was filed," and approximately one year ago, "the United States received correspondence from EES Coke indicating that various personnel had affiliations with DTE Vantage and DTE Energy Services." ECF No. 81, PageID.3459. The United States also relies on: (1) deposition testimony given as early as October 23, 2023, and (2) DTE Energy

Corporation's 10-K, "which has always been publicly available to the United States." *Id*. EES Coke believes that it is prejudiced because the United States served discovery requests related to the Proposed Defendants on February 9, 2024, nearly a month before the March 11, 2024 deadline for fact discovery. *See* ECF No. 74.

The discovery requests were timely served under the scheduling order. However, Defendant argues that "amendment near the close of discovery creates enough prejudice to justify denial of a motion to amend." ECF No. 81, PageID.3460. In support of this argument, EES Coke relies on *Moody*, where this Court determined that undue delay and undue prejudice precluded amendment because "Plaintiffs were aware of their claims at the time they filed their original complaint[,]" and "their Sixth Amendment claim contain[ed] new legal theories for recovery, which w[ould] prejudice Defendants by requiring them to defend a claim wholly distinct from the claims brought in the original Complaint." *Moody v. Michigan Gaming Control Bd.*, No. 12-CV-13593, 2013 WL 1664380, at *4 (E.D. Mich. Apr. 17, 2013) (Drain, J.). Notably, the delay was undue because the *Moody* plaintiffs "offer[ed] no compelling reason why they waited until [seven months after filing the original complaint] to seek leave to amend the Complaint." *Id*. And the "[p]laintiffs d[id] not argue that [the] [d]efendants' discovery responses alerted them to these claims, nor could they[,]" the court said, "since they were aware of the underlying facts prior to the filing of the original Complaint." *Id*.

*Moody* is distinguishable because, here, the Government explains the reasons for delay, and the record does not suggest that—at the time the original complaint was filed—it was aware of the full scope of its claims against the Proposed Defendants. Additionally, the claims of the original complaint are not wholly distinct from the amended claims. The Government says that Mourad's declaration "could not suffice to amend against all three proposed Defendants." ECF No. 84, PageID.3575. And the Government submits that the depositions it "relies on to help establish that the relevant people were *all* employed by EES Coke's parent companies did not begin until October 2023, and were continuing at the time" the instant motion was filed. ECF No. 84, PageID.3575. As its argument goes, the United States "had to balance moving as soon as possible with continuing to discover additional information." *Id*. And "[t]hat balance was complicated by EES Coke's refusal to produce information in its possession about the Proposed Defendants[,]" the Government says. *Id*.

Because the Government offers a reasonable explanation for the delay, and substantial similarities exist between the claims brought in the original complaint and the amended claims, the Court declines to find that undue delay exists. *Contra Duggins v. Steak 'N Shake, Inc*., 195 F.3d 828, 834 (6th Cir. 1999) ("[T]here appears to be no justification for the delay, and the plaintiff proposes none. Allowing amendment at this late stage in the litigation would create significant prejudice to

the defendants in having to reopen discovery and prepare a defense for a claim quite different from the sex-based retaliation claim that was before the court."). Additionally, the Court finds that, although amendment may require reopening discovery, any prejudice to EES Coke is relatively light, given that the proposed amendment does not materially alter the substance of the original complaint and dispositive motions are not due until November 19, 2024. *See* ECF No. 63.

### 2. Bad Faith, or Dilatory Motive

Next, EES Coke argues that the Government engaged in bad faith in filing its motion for leave to amend. Specifically, it says the Government filed its motion "with a total disregard for relevant testimony from witnesses and misrepresentations about the discovery attached to its motion . . ." ECF No. 81, PageID.3462. The Government believes that Fadi Mourad (an employee of DTE Energy Co. or nonparty DTE Corporate Services, Mark Stiers, and David Smith (President and Vice President of DTE Vantage) made decisions on behalf of the Facility. While EES Coke says the Government ignores those portions of the respective declarations and testimonies that refute the Government's claims. This dispute deals with EES Coke's futility argument under the *Foman* analysis and is better discussed *infra*. At this juncture, however, the Court is not persuaded that the United States proposed the amendment in bad faith.

The Court now turns to discuss the purported futility of the proposed amendment.

### 3. Whether Amendment Would be Futile

A proposed amendment is "futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co*., 203 F.3d 417, 420 (6th Cir. 2000). Thus, the failure to state a claim, or the existence of a statute-of-limitations defense renders a proposed amendment futile. *See Wallace Sales & Consulting LLC v. Tuopu North America*, 2016 WL 5662065, at *6–8 (E.D. Mich. Oct. 3, 2016) (denying motion to amend and finding the amended claims would be barred by the statute of limitations).

EES Coke avers that the proposed amended complaint fails to state a claim "because the United States will be unable to establish owner/operator liability as to the Proposed Defendants as a matter of law and because any claims against these Proposed Defendants are time-barred." ECF No. 81, PageID.3465. The Court will address each argument in turn.

### A. Whether the Proposed Amended Complaint States a Claim Against the Proposed Defendants

The complaint alleges that the "Proposed Defendants exercised significant control and supervision over operations at the facility—including operations specific to air pollution and permitting." ECF No. 77, PageID.3285. On this basis, the United

States argues that it can assert causes of action against them under: (a) the Prevention of Significant Deterioration ("PSD") provisions of the Clean Air Act (the "CAA"), 42 U.S.C. §§ 7470-7492; (b) the nonattainment New Source Review ("Nonattainment NSR") provisions of the CAA, 42 U.S.C. §§ 7501-7515; (c) Michigan SIP provisions relating to NSR requirements (Mich. Admin. Code R. 336.2901 et seq.), and (d) Michigan provisions relating to the PSD requirements (Mich. Admin. Code R. 336.2801 *et seq*.).

The CAA imposes strict liability upon owners and operators who violate the Act. *See United States v. Anthony Dell'Aquilla, Enterprises & Subsidiaries*, 150 F.3d 329, 332 (3d Cir. 1998) (citing *United States v. B & W Inv. Properties*, 38 F.3d 362, 367 (7th Cir.1994). Courts have previously explained that, under the CAA, even "a non-owner can still be liable as an 'operator'" if he or she has "significant or substantial or real control and supervision of a project." *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009) (quoting *Dell'Aquilla,* 150 F.3d at 333).

The caselaw does not explicitly define "owner" or "operator" in the PSD or NSR context, so the parties rely on the contours of owner/operator liability explained in *United States v. Bestfoods*. In *Bestfoods*, the Supreme Court interpreted the term "owner or operator" under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). It decided: "whether a parent corporation that actively participated in[] and exercised control over[] the operations

of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). The Court determined that the court of appeals was "correct in holding that [only when] the corporate veil [is] pierced [under state law principles], may a parent corporation be charged with derivative CERCLA liability for its subsidiary's actions. *Id.* at 63-64. "If the Act rested liability entirely on ownership of a polluting facility, this opinion might end here;" the Court said, "but CERCLA liability may turn on operation as well as ownership, and nothing in the statute's terms bars a parent corporation from direct liability for its own actions in operating a facility owned by its subsidiary." *Id.* at 64.

For purposes of assessing direct liability to a parent operator under the CERCLA, the *Bestfoods* Court concluded that a parent company must "manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.*, at 66-67. Along these lines, the Court concluded that it was an error for the district court to premise liability on the parent's "100 – percent ownership" of the subsidiary who operated the facility; and it was an error for the district court to assess liability to the parent based on its "active participation in[,] and . . . majority control over[,]" the subsidiary's board of directors. *Id.* at 68. "In imposing direct liability on these grounds," the Court said,

"the District Court failed to recognize that 'it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.'" *Id*. at 69. However, the Court ultimately remanded the case because an issue of fact pertaining to the parent's operation of the facility—and its direct liability—existed due to the district court's acknowledgment that an agent of the parent—who was not an employee of the subsidiary—"played a role in dealing with the toxic pollution risks emanating from the operation of the facility." *Id*. at 73.

*Bestfoods*' interpretation of operator liability is relevant here because "[a]lthough the Court was there addressing the definition of 'operator' in [the] CERCLA, and not the Clean Air Act, the purposes of the two statutes [are] the same, and the language in question is nearly identical." *Dell'Aquilla*, 150 F.3d at 334. In the wake of *Bestfoods*, "th[e Sixth] Circuit adopted an 'actual control' test to help resolve whether an entity is an operator." *American Premier Underwriters, Inc. v. General Electric Company*, 14 F.4th 560, 574–577 (6th Cir. 2021) (citing *U.S. v. Twp. of Brighton*, 153 F.3d 307, 314 (6th Cir. 1998)).

Under the Sixth Circuit's "actual control" test, a party must also "perform affirmative acts" to be an operator. *Id*. at 574-75. And "[t]he failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator." *Id*. (citing *Brighton*, 153 F.3d at 314). But once a party takes an

14

affirmative action that makes it an operator, its inaction about a "particular hazard" does not save it from liability. *Id*. (internal citations omitted). The Sixth Circuit has also clarified that the actual control test does not supplant the "'primary question [of] whether'" an entity's "'activities satisfy the ordinary meaning of the term 'operation.'" *Id*. (quoting *Brighton* 153 F.3d at 313). The test involves a "fact-intensive inquiry" in view of the "totality of the circumstances."

Thus, under *Bestfoods* and *American Premier*, and to obtain leave to amend the complaint, the Government must allege facts supporting an inference that respective agents of the Proposed Defendants performed affirmative acts to manage, direct, or conduct operations of the facility, and it must allege that those acts were specifically related to pollution or decisions about compliance with environmental regulations. In light of the actual control test, the Court will discuss below whether the Government states a "facially plausible" claim supported by "factual content that permits the Court to reasonably infer" that the Proposed Defendants, respectively, are "liable" as operators of the facility's pollutions controls or compliance with environmental regulations. *Amir v. AmGuard Ins. Co*., 606 F. Supp. 3d 653, 658 (E.D. Mich. 2022) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### (1) DTE Energy Co.

The Proposed Amended Complaint alleges that "an employee of DTE Energy was responsible for environmental permitting at the Coke Oven Battery, including the 2014 permit revision that led to this case." ECF No. 77-2, PageID.3307. Integral to the Government's allegations is the declaration of Fadi Mourad[1], who declared that he was the Director of Environmental Strategy and Non-Utility Environmental for DTE Energy Co. *See* ECF No. 29-8, PageID.1349. "One of my responsibilities at DTE Energy[,]" Mourad said, was "to oversee environmental permitting for the EES Coke facility[.]". *Id*. He has "overseen several permitting efforts at the facility[,]" including "supervising and reviewing [his] team's work and the consultants work during the preparation of permit applications including the NSR applicability analysis . . ." *Id*.

"[T]he Declaration of Mr. Mourad does not say that he is 'employed' by DTE Energy Company[,]" Defendant says. ECF No. 81, PageID.3453. Instead, EES Coke alleges that "Mr. Mourad himself (under oath) and counsel for EES Coke have informed the United States on multiple occasions." *Id*., (citing Mourad's January 22, 2024 Deposition Transcript, ECF No. 81-5, PageID.3535-36, PageID.3537).

---

[1] The Court may consider documents integral to or attached to the pleadings when ruling on a Rule 12 motion to dismiss without converting the motion to one for summary judgment. *See Commercial Money Ctr., Inc. v. Ill. Union Ins. Co*., 508 F.3d 327, 336 (6th Cir.2007).

Mourad's January 22, 2024 deposition testimony stated that he works for DTE Energy Corporate Services, LLC. *Id.* EES Coke also submitted a new declaration for Mourad, in which he denies being an employee of DTE Energy Co., denies having made the decision to seek an amendment to EES Coke's 2014 Permit to Install, and he denies making any "'critical decisions' concerning the operations or management of the EES Coke Facility." ECF No. 81-6, PageID.3544. "Other than the incorrect assertion that Mr. Mourad is employed by DTE Energy Company," EES Coke says, "there are no allegations that suggest in any way that DTE Energy Company operated or made any decisions for the facility." ECF No. 81, PageID.3468.

In reply, Plaintiff says that "[e]ven crediting the company's belated retraction of Mr. Mourad's declaration, other evidence suggests DTE Energy took relevant actions for the Facility." ECF No. 84, PageID.3577. Specifically, the Government alleges that "an outside consultant who worked on the 2014 permit application provided a contract proposal. The proposal stated the company would work with DTE Energy Resources 'under the existing contract and project with DTE Energy.'" ECF No. 84, PageID.3577. This dispute treads too closely into summary judgment territory, that is, there appears to be an issue of fact pertaining to Mourad's employment at DTE Energy Corporate Services, or DTE Energy Co.

What matters more for purposes of assessing the sufficiency of the pleadings, however, is the Government's allegation that "a DTE Energy Co. employee was responsible for environmental permitting at the Coke Oven Battery, including the 2014 permit revision that led to this case." ECF No. 77-2, PageID.3307. Though Mourad's January 2024 testimony and his new declaration refute the evidence suggesting that he had a hand in the 2014 permit revision, it does not contradict Plaintiffs allegation that a DTE Energy Co. was responsible for the 2014 permit revision, in addition to overall permitting and compliance with environmental regulations for the Facility. This is so because Plaintiff also alleges that a consultant contracted and worked with DTE Energy Co. on a project related to the 2014 permit application. Therefore, Plaintiff sufficiently alleges that agents of DTE Energy Co. exercised actual control and made an affirmative acts and decisions related to the Facility's pollution controls, including the 2014 permit application.

In this way, the Government alleges facts that create a plausible entitlement of relief against DTE Energy Co. as an operator of the facility. *See Am. Premier*, 14 F.4th at 576 (citing *Exxon Mobil v. United States*, 108 F. Supp. 3d 486 (S.D. Tex. 2015) (the government had acted as an operator by approving the designs and expenditures for the plants, the disposal of waste, scrap, byproducts, and surplus materials and equipment, and increasing employee salaries and benefits. The government stationed an employee at one plant who "played a substantial role in

overseeing day-to-day operations."  And it also made specific decisions about waste disposal and environmental compliance at the plants.). Mourad's declaration and deposition testimony do not trump Plaintiff's allegations that DTE Energy Co. played a key role in EES Coke's permit changes and subsequent decisions regarding compliance with environmental regulations. *See generally Amir v. AmGuard Ins. Co.*, 606 F. Supp. 3d 653, 664 (E.D. Mich. 2022) ("although a court must generally accept all well-pled facts as true, if a document referenced in the complaint . . . contradicts the factual allegations in the complaint, the document 'trumps the allegations'").

Accepting the Government's allegations as true with respect to DTE Energy Co., an employee or agent of DTE Energy Co. managed, directed, or conducted the permit application that led to the 2014 emissions increase at the Facility, DTE Energy Co. made decisions related to the Facility's subsequent emissions, and it operated aspects of the Facility that led to the alleged violations of the NSR provisions of the CAA. Pursuant to the parameters of operator liability stated in *Bestfoods* and *American Premier*, the Court reasonably infers, solely for purposes of assessing the sufficiency of the pleadings, that DTE Energy Co. had actual control over the permitting process and certain emission levels related to the alleged violations of the NSR provisions of the CAA and associated Michigan SIP provisions. At the very least, the alleged facts raise a reasonable expectation that

further discovery will reveal evidence of operator liability for DTE Energy. *See generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (the 12(b)(6) standard does not "impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]").

### (2) DTE Vantage and DTE Energy Services

The Government says "[o]ther employees involved in the environmental permitting relevant to this case were employees of" DTE Energy Vantage. ECF No. 77-2, PageID.3308. It further alleges that (2) "[e]mployees involved in the operation of the Coke Oven Battery and assessment of pollution controls and other technology studies were employees of" DTE Energy Services and DTE Vantage. *Id*. And, as alleged, (3) "much of the decision-making and approvals for business and environmental compliance related to the Coke Oven Battery are made by management and/or executives at" DTE Energy Services, DTE Energy Vantage, "and/or" DTE Energy Co. *Id*.

In response, EES Coke says that "the first two allegations above are insufficient to allege []operator liability, as mere involvement alone in environmental permitting, pollution control and technology studies is not sufficient

20

to create []operator liability." ECF No. 81, PageID.3470. And it avers that the third allegation "is both factually inaccurate and legally incorrect." *Id*.

The Government identifies David Smith and Mark Stiers, who are executives at both EES Coke and DTE Vantage. EES Coke believes that David Smith's and Mark Stiers' position as officers of both DTE Vantage and EES Coke "has no bearing on whether DTE Vantage is an owner or operator of EES Coke." *Id*. (citing *United States v. Bestfoods*, 524 U.S. 51, 69–70, (1998) ("Since courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary, . . . it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility." The Government "would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as . . . officers and directors [of the subsidiary], and not as [the parent's] officers and directors, when they committed those acts.") (Internal quotations omitted).

The United States alleges that DTE Vantage and DTE Energy Services personnel engaged in "decision-making and approvals for business and environmental compliance related to the Coke Oven Battery," ECF No. 77-2, PageID.3308. It also sufficiently alleges that "at all times relevant to this Complaint, [DTE Energy Resources], [DTE Energy Services], and DTE Energy [Co.] were operators of the Coke Oven Battery based on their involvement in operations and

decision-making for the Coke Oven Battery." *Id.* For purposes of assessing the sufficiency of the pleadings, the Court finds that Plaintiff plausibly alleges that DTE Vantage and DTE Energy services made decisions related to environmental compliance for the facility, and these allegations raise a reasonable expectation that further discovery will reveal the extent of the Proposed Defendants' decision making and actual control over the Facility's compliance with environmental regulations. EES Coke's argument that the personnel of the parent corporations acted on behalf of EES Coke and not the parent corporations raises an issue of fact well suited for summary judgment stage.

EES Coke also argues that any employees of the Proposed Defendants who made decisions for the Facility were "borrowed servants[,]" and "[w]here personnel of DTE Vantage and DTE Energy Services were performing services at the direction and under the control of the President/ CEO of EES Coke and the Vice President of EES Coke, the original master—DTE Vantage and DTE Energy Services—are not liable." ECF No. 81, PageID.3471. The "borrowed servant doctrine" is an exception to respondeat superior liability that delineates liability based on an employer's degree of control over the loaned employee. *See In re Flint Water Cases*, 584 F. Supp. 3d 383, 410 (E.D. Mich. 2022). EES Coke cites *In re Flint Water Cases*; *Anderson v. Fru-Con Const. Corp.*, 125 Fed. Appx. 5, 10–11 (6th Cir.2004); and *Carpenter v. Laxton*, 96 F.3d 1448 (6th Cir. 1996). But all those cases deal with respondeat

superior liability, and EES Coke cites no authority suggesting that the borrowed servant doctrine applies to operator liability under the CAA. Further, *In re Flint Water Cases* found that applying the borrowed servant doctrine required weighing the evidence and making factual determinations. 584 F. Supp. 3d at 416. Generally, it is not the Court's duty to weigh evidence and determine facts at the motion to dismiss stage.

EES Coke's argument is well suited for the summary judgment stage, for purposes of assessing the sufficiency of the pleadings, however, the Court finds that the Government sufficiently alleges a claim for operator liability against the Proposed Defendants. Thus, the Court is not persuaded that amendment would be futile.

The turns next to EES Coke's statute of limitations argument.

## B. The Statute of Limitations

The Government believes that "[e]ach day that the Facility operates without the required permits and pollution controls is thus a new violation of the law*." ECF No. 77, PageID.3277. And "each day the Facility operated without submitting the emission report that it was required to deliver to the State[,]" Plaintiff says, "is also a separate violation." *Id*.  As alleged, "EES Coke neither obtained the necessary permit nor installed the required controls," and the required reports were submitted

on November 20, 2020. ECF No. 77, PageID.3272. Thus, the Government believes that the proposed amendment, filed on February 9, 2024, falls within the five-year statute of limitations period for the enforcement of civil penalties. *Id*.

In support of this position, the Government relies on *Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth*., 480 F.3d 410, 418-419 (6th Cir. 2007). In that case, the Sixth Circuit determined that, for purposes of the five-year statute of limitations, a cause of action under the CAA for failure to apply best available control technology ("BACT") manifests "itself anew each day the plant operated without BACT limits on its emission" because the PSD requirement of Tennessee's SIP create an ongoing obligation to apply the BACT. *Id*., at 419. CAA violations for failure to obtain permits for "any pollutant emitted following a major modification[,]"  also manifested itself anew each day the plant operated without a permit because Tennessee's SIP imposed an ongoing obligation on the defendant to obtain the appropriate permit after construction of a major modification. *See Id.*

Conversely, EES Coke, relying on several out-of-circuit district court cases, argues that "under the federal PSD permit provisions at issue here, the five-year period begins to run, at the latest, when the construction or modification at issue is commenced, and is not a 'continuing violation' that would toll the limitations period." ECF No. 81, PageID.3472. "Therefore," Defendant says, "the statute of limitations began to run, at the latest, on November 21, 2014, when the alleged

'major modification' occurred. Thus, the limitations period expired in November 2019." *Id*. (citing *New York v. Niagara Mohawk Power Corp*., 263 F.Supp.2d 650 (W.D.N.Y. 2003) (holding that "a violation of the Clean Air Act's preconstruction permit requirement is singular in nature, and does not constitute an ongoing violation."); *Pennsylvania v. Allegheny Energy, Inc*., 2006 WL 1509061 (W.D. Pa. 2006); *U.S. v. Southern Indiana Gas and Electric Co*., 2002 WL 1760752 (S.D. Ind. 2002); *U.S. v. Illinois Power Co*., 245 F.Supp.2d 951 (S.D. Ill. 2003).

The cases cited by EES Coke are unpersuasive because they do not apply Michigan provisions of law. In Michigan, a source with a major modification must install and operate BACT and defined in 42 U.S.C. § 7479(3), and Mich. Admin. Code R. 336.2801(f). 42 U.S.C. § 7475(a)(4); Mich. Admin. Code R. 336.2802(3), 336.2810. Such sources, like the state provisions at issue in *Nat'l Parks*, have an ongoing obligation to operate BACT. Mich. Admin. Code R. 336.2810(3).[2] Thus, pursuant to *Nat'l Parks*, EES Coke's alleged failure to operate BACT is a continuing violation that tolls the statute of limitations.

---

[2] Mich. Admin. Code R. 336.2810(3) ("A major modification shall apply best available control technology for each regulated new source review pollutant for which it would be a significant net emissions increase at the source. This subrule applies to each proposed emissions unit at which a net emissions increase in the pollutant would occur as a result of a physical change or change in the method of operation in the unit").

Further, the Government alleges that, due to the permit change, EES Coke increased its emissions, reaching 3,608 tons of $SO_2$ in 2021. ECF No. 77-2, PageID.3308. And the Sixth Circuit has determined that "[w]hile EPA does presume that emissions increases after five years are unrelated" to modification, "that presumption can be overcome, for example, by demonstrating that the pre[modification] facility could not handle such an increase." *United States v. DTE Energy Co.*, 711 F.3d 643, 651 (6th Cir. 2013). In this way, "[n]either the statute nor the regulations create a time barrier" and the "EPA can bring an enforcement action whenever emissions increase, so long as the increase is traceable to the [modification]." *Id*. Here, the 2021 emissions increase, which occurred less than five years ago, is alleged to be attributable to the 2014 permit change. And, allegedly, "[m]uch of the decision-making and approvals for business and environmental compliance related to the Coke Oven Battery are made by management and/or executives at" the Proposed Defendant companies. *Id*. These allegations give way to the reasonable inference that the Proposed Defendants operated the Facility and were responsible for the 2021 emissions increase. However, the Court can only address this question upon review of the evidence, at the summary judgment stage. For now, the Court concludes that the statute of limitations does not bar the Government's claims against the Proposed Defendants.

Accordingly, the Court does not find that amendment would be futile.

## IV.    Conclusion

For the reasons stated above, the Government's motion for leave to amend the complaint is **GRANTED.**

**SO ORDERED**.

Dated: May 20, 2024                                   /s/ GERSHWIN A. DRAIN

                                                              United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, May 20, 2024, by electronic and/or ordinary mail.

s/ Teresa McGovern
Case Manager

27