UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

> Plaintiff,

Case No. 22-11191

v.

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

EES COKE BATTERY, LLC, *et al.*,

> Defendants.

_____/

## OPINION AND ORDER GRANTING THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [#159]; DENYING DEFENDANT EES COKE BATTERY, LLC'S MOTION FOR SUMMARY JUDGMENT [#168]; DENYING DEFENDANTS DTE ENERGY COMPANY, DTE ENERGY RESOURCES, LLC, AND DTE ENERGY SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT [#169]; DENYING SIERRA CLUB'S MOTION FOR PARTIAL SUMMARY JUDGMENT [#162]; AND DENYING AS MOOT DEFENDANTS' MOTION TO BIFURCATE [#239]

## I.   INTRODUCTION

Presently before the Court are the following: (1) the Government's Motion for Partial Summary Judgment [#159]; (2) Defendant EES Coke Battery, LLC's ("EES Coke") Motion for Summary Judgment [#168]; (3) Defendants DTE Energy Services, Inc. ("DTEES"), DTE Energy Resources, LLC ("DTEER"), and DTE Energy Company ("DTEEC") (collectively, the "DTE Defendants") Motion for

Summary Judgment [#169]; (4) Sierra Club's Motion for Summary Judgment [#162]; and Defendants' Motion to Bifurcate [#239]. The Court held oral argument on the parties' motions for summary judgment on August 4, 2025. For the reasons that follow, the Government's Motion for Partial Summary Judgment [#159] is GRANTED; EES Coke's Motion for Summary Judgment [#168] is DENIED; the DTE Defendants' Motion for Summary Judgment [#169] is DENIED; Sierra Club's Motion for Summary Judgment [#162] is DENIED; and Defendants' Motion to Bifurcate [#239] is DENIED AS MOOT.

## II.  **BACKGROUND**

### A. Statutory and Regulatory Framework

This case arises from alleged violations of the Clean Air Act, a federal law that aims to safeguard "the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). It imposes strict liability on owners or operators who violate its provisions, *United States v. Anthony Dell'Aquilla, Enterprises and Subsidiaries*, 150 F.3d 329, 332 (3d Cir. 1998), broadly defining the term "owner or operator" as "any person who owns, leases, operates, controls, or supervises a stationary source." 42 U.S.C. § 7411(a)(5).

The Act charges the EPA with formulating national ambient air quality standards ("NAAQS") for certain air pollutants, including sulfur dioxide ("$SO_2$")

and particulate matter ("PM$_{2.5}$"). Each state, in turn, must develop a State Implementation Plan ("SIP") that sets forth how the NAAQS will be achieved and maintained within the state. 42 U.S.C. § 7407(a). The SIPs must be approved by the EPA, and once approved, they are "added to the Code of Federal Regulations and become[] federal law." *Sierra Club v. Korleski*, 681 F.3d 342, 343 (6th Cir. 2012). In this way, the Clean Air Act utilizes a "cooperative federalism" structure under which the federal government develops baseline standards that the states individually implement and enforce. *Ellis v. Gallantin Steel Co.*, 390 F.3d 461, 467 (6th Cir. 2004). Michigan's SIP is developed and enforced by the Michigan Department of Environment, Great Lakes, and Energy ("EGLE").

A key component of the Clean Air Act is the New Source Review ("NSR") program. NSR prohibits the construction of new sources of air pollution without first following specific permitting requirements.[1] *United States v. DTE Energy Co.*, 711 F.3d 643, 644-45 (6th Cir. 2013) (citing 42 U.S.C. § 7475). State SIPs are responsible for administering NSR. 42 U.S.C. § 7410. The Clean Air Act defines a "new source" as "any stationary source, the construction or modification of which is

---

[1] NSR consists of the Prevention of Significant Deterioration provisions ("PSD") and the Non-Attainment New Source Review provisions ("NNSR"). PSD applies to areas that are in compliance with NAAQS, referred to as "attainment" areas. NNSR, on the other hand, applies to "nonattainment" areas, which are areas that do not meet NAAQS.

commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source." 42 U.S.C. § 7411(a)(2). Sources that were in existence at the time of NSR's adoption need only obtain a permit when they undergo a "major modification," which is "[a]ny physical change in or change in the method of operation of a major stationary source that would result in . . . (A) a significant emissions increase of a regulated new source review pollutant[,] [and] (B) a significant net emissions increase of that pollutant from the major stationary source." Mich. Admin. Code R. 336.2901(t)(i).

Michigan regulations broadly define a "major stationary source" as including, among other things, "[a]ny stationary source of air pollutants that emits or has the potential to emit 100 tons per year or more of any regulated new source review pollutant[.]" Mich. Admin. Code R. 336.2901(u)(i)(A). A "stationary source" is "any building, structure, facility, or installation which emits or may emit a regulated new source review pollutant." Mich. Admin. Code R. 336.2901(jj). In turn, a "building, structure, facility, or installation" is "all of the pollutant-emitting activities which [1] belong to the same industrial grouping, [2] are located on 1 or more contiguous or adjacent properties, and [3] are under the control of the same person, or persons under common control[.]" Mich. Admin. Code R. 336.2901(e).

When the proposed modification involves only existing emissions units, the actual-to-projected-actual test is typically used to determine whether the modification will result in a significant emissions increase. *See* Mich. Admin. Code R. 336.2902(2)(c); *DTE Energy Co.*, 711 F.3d at 646-47. Under this test, the source must first calculate the unit's projected actual emissions ("PAE") following the guidelines set forth in the regulations. Mich. Admin. Code R. 336.2902(2)(c); Mich. Admin. Code R. 336.2901(ee); *DTE Energy Co.*, 711 F.3d at 647. Under what is known as demand growth exclusion, the operator may exclude from this figure any projected emissions increases that are attributable to independent factors. *DTE Energy Co.*, 711 F.3d at 647; Mich. Admin. Code R. 336.2901(ee)(ii)(C). Emissions are excludable under the demand growth exclusion if the following requirements apply: (1) the source was able to legally and physically accommodate the emissions at issue, and (2) the emissions must be unrelated to the proposed change. Mich. Admin. Code R. 336.2901(ee)(ii)(C); *DTE Energy Co.*, 711 F.3d at 646.

Next, the operator must determine the emissions unit's baseline actual emissions ("BAE"), which is "the average rate, in tons per year, at which the emissions unit actually emitted the [NSR] pollutant during any consecutive 24-month period selected by the owner or operator within the 10-year period immediately preceding" the proposed change. Mich. Admin. Code. R. 336.2901(b)(ii). Once that is determined, the PAE (less any emissions attributable

to the demand growth exclusion) is compared to the BAE, and "if the sum of the difference between the [PAE] and the [BAE] . . . equals or exceeds the significance amount for that pollutant," then a significant emissions increase of the NSR pollutant is projected to occur. Mich. Admin. Code R. 336.2902(c).

As for the second prong, a "net emissions increase" is "the amount by which the sum of the following exceeds zero": (A) the PAE, and (B) "[a]ny other increases and decreases in actual emissions at the major stationary source that occur within the contemporaneous period and are otherwise creditable." Mich. Admin. Code R. 336.2901(w)(i).

Even where a source's pre-change projections suggest otherwise, a project can still be classified as a major modification based on its actual, post-project emissions. The regulations provide that "[r]egardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase." Mich. Admin. Code R. 336.2902(2)(b). Simply put, if a source initially determines that the proposed change is not a major modification but it ultimately results in a significant emissions increase and a significant net emissions increase, the source violated NSR by failing to comply with its permitting requirements before implementing the change. In such instances, the determination of whether a significant emissions increase and a significant net

emissions increase occurred is made by comparing the relevant emission unit's actual, post-change emissions to the BAE. *See id.*

Furthermore, recognizing that initial projections may underestimate a project's potential emissions, the regulations also impose reporting requirements when there is a "reasonable possibility" that the change, though not a major modification, may result in a significant emissions increase. *See* Mich. Admin. Code R. 336.2902(6). Specifically, the regulations require a facility to "monitor the emissions of any regulated new source review pollutant that could increase as a result of the project" for ten years "if the project increases the design capacity or potential to emit" that pollutant. Mich. Admin. Code R. 336.2902(6)(c). For emission units other than electric utility steam generating units, the facility "shall submit a report to [EGLE] if the annual emissions, in tons per year, from the project . . . exceed the [BAE] by a significant amount for that regulated new source review pollutant, and if such emissions differ from the preconstruction projection." Mich. Admin. Code R. 336.2902(6)(e).

### B. EES Coke

Defendant EES Coke owns and operates the EES Coke Facility ("the Facility") located on Zug Island, River Rouge in Michigan. The Facility maintains a coke oven battery consisting of 85 six-meter-high ovens used to produce blast furnace coke, an essential component in steel manufacturing. The ovens are powered

by burning fuel at the underfire, and EES Coke has historically fueled the battery by using a mixture of blast furnace gas ("BFG") and coke oven gas ("COG"). As a byproduct of the coking process, the Facility generates COG, which can be used in three ways: (1) burned at the underfire as fuel, (2) sent to other facilities (primarily to its neighbor, U.S. Steel) for use as fuel, or (3) burned at the flare, a safety mechanism used to dispose of excess COG. Burning COG at the flare is a last-resort option because it yields no beneficial use, while using it as fuel serves a productive purpose. Any COG that is not used as fuel at underfire or sent to other facilities must be burned at the flare. When burned, COG emits $SO_2$ into the air, among other pollutants.

Over time, EES Coke's use of BFG as fuel began to cause premature structural damage to the battery. To mitigate further damage, EES Coke submitted a permit application to EGLE in May 2013 for the temporary removal of the heat input limit on COG combustion at underfire ("2013 Permit"). That limit—2,850,000 million British thermal units ("mmBtu") per year—had been imposed by a permit issued to EES Coke's predecessor. In its application, EES Coke explained that eliminating this limit would allow it to reduce its reliance on BFG by enabling it to solely use COG as fuel at underfire, thereby mitigating further structural damage. EES Coke also indicated that it was going to file a separate permit application for the permanent removal of the underfire COG combustion limit, and that it wished for the temporary

change to remain in effect "until final permit action is taken on the 'long-term' permit, not to exceed one (1) year." ECF No. 168-10, PageID.9640. EGLE approved the permit in November 2013.

On June 13, 2014, EES Coke submitted a second permit application requesting the permanent removal of the underfire COG combustion limit ("2014 Permit"). Similar to its 2013 Permit application, EES Coke explained that it had been operating the battery on 100% COG since 2012 to prevent premature failure of the ovens. The application further noted that permanent removal of the underfire COG combustion limit was necessary for EES Coke to meet future production needs while operating on 100% COG.

EES Coke conducted a NSR analysis to determine whether the proposed change would constitute a "major modification." The Facility is located in a nonattainment area for $SO_2$ and an attainment area for $PM_{2.5}$. Based on its analysis, EES Coke concluded that the proposed change was not a major modification with respect to $SO_2$ and $PM_{2.5}$. EGLE approved the permit application on November 21, 2014.

U.S. Steel owns the steel-making facility that neighbors EES Coke's Facility. The two facilities were originally developed in the early 1990s as an integrated steel mill with multiple coke batteries, steel production, and other related functions and, for many years, were both owned by National Steel Corporation. This common

ownership, however, ended in the late nineties. For years, EES Coke sent a significant amount of COG to U.S. Steel. In 2016, however, U.S. Steel unexpectedly began curtailing its demand for COG, leaving EES Coke with more COG than it had anticipated when it sought the permit.

### C. DTE Defendants

EES Coke is a subsidiary of DTE Coke Holdings LLC ("Coke Holdings"), which is not a party to this case. Coke Holdings, in turn, is a subsidiary of Defendant DTEES. In 2008, DTEES entered into a Management Services Agreement with EES Coke, under which DTEES "provide[s] all services as may be required to facilitate the proper management and administration of [EES Coke's] activities in respect of the Facility." ECF No. 289-2, PageID.20723. The Agreement enumerates services that fall within its scope and states that such services "shall include[,] . . . to the extent relevant to the Facility, the ownership, construction, and *operation* of the Facility." *Id.* at PageID.20747.

DTEES, in turn, is a subsidiary of DTEER. In 2017, DTEER and DTEES entered into a Management Services Agreement under which DTEER "provide[s] to DTEES general management, accounting, legal, human resources, and administrative services necessary for DTEES to perform any obligations that it may have as of the date of this Agreement or thereafter." ECF No. 262-10, PageID.17295. The Agreement also grants DTEER broad "authority to do on behalf of DTEES, in

DTEES' name, all things that are necessary, proper or desirable to carry out the duties and responsibilities of DTEER under this Agreement, including the authority to perform on DTEES' behalf any agreement entered into by DTEES with respect to" its energy projects. ECF No. 262-10, PageID.17295. DTEER, in turn, is a subsidiary of DTEEC.

### D. Procedural Background

On September 15, 2020, the EPA issued a Notice of Violation to EES Coke, alleging that the 2014 Permit's elimination of the underfire COG combustion limit caused a significant emissions increase and significant net increase of $SO_2$ emissions, rendering the change a "major modification" under NNSR. The EPA further asserted that, because $SO_2$ is a precursor to $PM_{2.5}$, the increase also rendered the change a major modification under PSD.

The Government initiated the present lawsuit on June 1, 2022, alleging that EES Coke violated the Clean Air Act and Michigan's SIP by (1) undertaking a major modification without first complying with NSR's permitting requirements (Count I), and (2) failing to comply with NSR's "reasonable possibility" reporting requirements (Count II). Three months later, the Government moved for summary judgment. The Court denied this motion without prejudice, finding that it was premature because the parties had not yet conducted any discovery. The Court

indicated that the Government may file a second motion for summary judgment at the close of discovery.

On September 7, 2022, Sierra Club filed a motion to intervene, which the Court granted. In so doing, the Court imposed limitations on Sierra Club's participation in this case, including requiring it to confer with the Government before filing any pleadings or motions in the case to confirm they are not duplicative.

On February 9, 2024, the Government filed a motion for leave to amend its complaint to add the DTE Defendants to this case. The Government argued that these entities are EES Coke's corporate parents and that, subsequent to the filing of its initial complaint, it had learned that they played key roles in the decisions underlying the Facility's $SO_2$ emissions increase. As such, the Government argued, the DTE Defendants are liable for the Clean Air Act violations, alongside EES Coke, because they are operators of the Facility. The Court granted the motion on May 20, 2024.

On February 18, 2025, the Government and EES Coke filed motions for summary judgment. The Government's motion seeks summary judgment solely on EES Coke's liability. In contrast, EES Coke contends that it is entitled to summary judgment because: (1) the 2014 Permit is valid and has not been violated; (2) the change in question did not cause a significant emissions increase; (3) the regulations requiring reasonable reporting were not in effect when the change first occurred; and (4) the Government's claims are barred by the statute of limitations.

Sierra Club also filed a motion for summary judgment on February 18, 2025. It seeks summary judgment on three issues: (1) Defendant EES Coke's liability on the Government's claims; (2) Sierra Club's standing to seek relief for EES Coke's violations of the Clean Air Act; and (3) an award of equitable relief for those violations in the form of "an injunction requiring best available control technology and compliance with the lowest achievable emissions rate for $SO_2$ and $PM_{2.5}$, respectively," and "an order requiring mediation between the Sierra Club and EES Coke to determine appropriate mitigation measures for EES Coke to take." ECF No. 162, PageID.6016.

The DTE Defendants filed a motion for summary judgment on February 18, 2025. They claim they are not liable for the alleged Clean Air Act violations because they do not own or operate the Facility.

## III.   <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution will affect the outcome of the lawsuit." *Martingale LLC v. City of Louisville*, 361 F.3d 297, 301 (6th Cir. 2004) (citation omitted). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Rocheleau v. Elder Living Const., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (citation omitted). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Id.*

## IV. <u>ANALYSIS</u>

### A. The Government's and EES Coke's Motions for Summary Judgment

#### i. <u>Count I: The 2014 Permit's Removal of COG Underfire Heat Limit was a "Major Modification"</u>

The Government and EES Coke cross-move for summary judgment on whether the 2014 Permit's removal of the COG underfire heat limit was a "major modification" with respect to $SO_2$ and $PM_{2.5}$. As discussed above, a "major modification" is "[a]ny physical change in or change in the method of operation of a major stationary source that would result in . . . (A) a significant emissions increase of a regulated new source review pollutant[,] [and] (B) a significant net emissions increase of that pollutant from the major stationary source." Mich. Admin. Code R. 336.2901(t)(i).

At the Court's summary judgment hearing, EES Coke argued, for the first time, that determining whether a significant emissions increase occurred requires an

14

examination of the *entire* major stationary source's emissions, rather than just those of the affected emissions units. It claims that, based on a determination by EGLE, EES Coke and U.S. Steel constitute a single major stationary source, and that when their emissions are considered collectively, there has been no significant emissions increase.

As an initial matter, it is unclear whether EGLE has conclusively determined that EES Coke and U.S. Steel are a single major stationary source for purposes of New Source Review. Historically, they have been treated as the same stationary source, as they were once commonly owned by National Steel and were accordingly permitted as a single stationary source. Those circumstances, however, have changed, as EES Coke and U.S. Steel are now separately owned and operated. The regulations contemplate treating multiple facilities as a single stationary source for purposes of New Source Review if they (1) belong to the same industrial grouping, (2) are located on one or more contiguous or adjacent properties, and (3) are under common control. Mich. Admin. Code R. 336.2901(e). The evidence before the Court suggests that it has been decades since the two entities were under common control.

Indeed, in 2012, EGLE explored issuing each entity a separate operating permit, at U.S. Steel's request, stating in a letter that "[t]he issuance of two separate [operating permits] is for administrative purposes only," and that "U.S. Steel and EES Coke Battery shall remain a single stationary source with respect to ROP

requirements." ECF No. 310-5, PageID.22711. It then stated that "the approval of this request does not address or contain a determination with respect to new source review requirements," suggesting that EGLE treats the stationary source determination differently for purposes of New Source Review than it has in its historical context. While the 2014 Permit's EGLE evaluation memorandum states that EES Coke and U.S. Steel are the same stationary source,[2] it is unclear whether this statement was made in reference to the historical circumstances of the two facilities or whether this determination relates to New Source Review.

Even assuming, *arguendo*, that EES Coke and U.S. Steel are a single stationary source for purposes of New Source Review, the regulations addressing the significant emissions increase prong measure significance based on the pollutants emitted by the *emissions units* affected by the modification, not the stationary source as a whole. They provide that "[t]he procedure for calculating whether a significant emissions increase will occur depends upon the type of *emissions units* being modified," and that the actual-to-projected-actual test applies to "projects that only involve existing *emissions units*." Mich. Admin. Code. 336.2902(2)(b), (2)(c) (emphasis added). Under that test, "[a] significant emissions increase of a regulated new source review pollutant is projected to occur if the sum

_____

[2] ECF No. 168-16, PageID.9886 ("The source, EES Coke . . . is the same stationary source as US Steel.").

of the difference between the potential to emit *from each new or modified emissions unit* following completion of the project and the baseline actual emissions *of these units before the project* equals or exceeds the significant amount for that pollutant." Mich. Admin. Code. 336.2902(2)(d). The plain language of the regulations makes clear that determining whether an emissions increase occurred is measured based on the pollution emitted by the emission units that are modified by the proposed project, not those of the stationary source as a whole.

The Sixth Circuit's reading of the actual-to-potential-actual test accords with this reading of the regulations, providing that under this test, "the operator [first] calculates the *unit*'s projected emissions" and "subtracts from that number the *unit*'s current emissions and any emissions increase that qualifies for the demand growth exclusion. The resulting number is the projected emissions increase." *United States v. DTE Energy Co.*, 711 F.3d 643, 647 (6th Cir. 2013) (emphasis added). Then, [t]he operator compares the projected emissions increase to the relevant number from the significance chart," and "[i]f the projected emissions increase is greater, then the operator's inquiry is over and it must seek a permit from EPA or the relevant [state] agency[.]" *Id.* Against this backdrop, it is clear that for purposes of determining whether a significant emissions increase occurred, one must look to the emissions of the relevant emissions units, not the emissions of the entire major stationary source.

17

Indeed, it is the significant *net* emissions increase prong—not the significant emissions increase prong—that accounts for contemporaneous emissions decreases that occur elsewhere at the major stationary source. As discussed above, a net emissions increase is "the amount by which the sum of the following exceeds zero": (1) the increase in emissions resulting from the modification, and (2) "[a]ny other increases and decreases in actual emissions *at the major stationary source* that occur within the contemporaneous period and are otherwise creditable." Mich. Admin. Code R. 336.2901(w). This prong, in essence, allows a source to offset a significant emissions increase with a contemporaneous, creditable emissions increase that took place elsewhere at the source. Accepting Defendant's position that the significant emissions increase determination must account for the emissions of the *entire* stationary source would effectively render the net emissions increase requirement superfluous.

With this in mind, the Court now addresses whether the 2014 Permit's removal of the underfire COG combustion limit was a "major modification." The Court finds that it was.

### 1.  Major Stationary Source

First, it is undisputed that EES Coke alone satisfies the statutory definition of a "major stationary source," as it has emitted at least 100 tons per year of $SO_2$ from 2018 to 2021. ECF No. 9-2, PageID.119-20. It necessarily follows, then, that even

if EES Coke and U.S. Steel are a single stationary source for purposes of New Source Review, it is still a major stationary source as the source has emitted $SO_2$ above the 100 tons per year threshold.

### 2. Significant Emissions Increase

Second, the 2014 Permit's removal of the COG underfire combustion limit caused a significant emissions increase. As illustrated in the chart below, there were multiple 12-month periods between 2018 and 2021 where the Facility's $SO_2$ emissions exceeded the BAE. At least 40 tons of these excess emissions are attributable to increased underfire COG combustion above the limit that was in place prior to the 2013 and 2014 Permits. Because the regulatory significance threshold for $SO_2$ is 40 tons per year, this emissions increase was significant. Furthermore, but for the 2014 Permit's permanent removal of the limit on underfire COG combustion, EES Coke would not have been allowed to burn enough COG at underfire to reach this significance threshold. Accordingly, the 2014 Permit's removal of the underfire COG combustion limit caused a significant emissions increase of $SO_2$.

| 12-Month rolling period | Facility[3]-wide $SO_2$ as reported by EES Coke, in tons | Increase in actual $SO_2$ emissions after the project vs. BAE, in tons | Increase in $SO_2$ caused by underfire over prior limit, in tons |
|---|---|---|---|
| Dec-17  to  Nov-18 | 3,133.6 | 1,094.2 | 549.3 |
| Jan-18  to  Dec-18 | 3,272.8 | 1,233.4 | 573.0 |
| Feb-18  to  Jan-19 | 3,337.6 | 1,298.2 | 586.8 |
| Mar-18  to  Feb-19 | 3,372.6 | 1,333.2 | 585.5 |
| Apr-18  to  Mar-19 | 3,409.6 | 1,370.2 | 581.0 |
| May-18  to  Apr-19 | 3,590.5 | 1,551.1 | 576.4 |
| Jun-18  to  May-19 | 3,609.6 | 1,570.2 | 568.3 |
| Jul-18  to  Jun-19 | 3,516.3 | 1,476.9 | 563.1 |
| Aug-18  to  Jul-19 | 3,467.9 | 1,428.5 | 549.4 |
| Sep-18  to  Aug-19 | 3,427.1 | 1,387.7 | 528.6 |
| Oct-18  to  Sep-19 | 3,346.8 | 1,307.4 | 506.6 |
| Nov-18  to  Oct-19 | 3,275.7 | 1,236.3 | 485.2 |
| Dec-18  to  Nov-19 | 3,235.2 | 1,195.8 | 478.4 |
| Jan-19  to  Dec-19 | 3,193.3 | 1,153.9 | 464.0 |
| Feb-19  to  Jan-20 | 3,219.7 | 1,180.3 | 457.6 |
| Mar-19  to  Feb-20 | 3,176.6 | 1,137.2 | 456.5 |
| Apr-19  to  Mar-20 | 3,109.6 | 1,070.2 | 443.7 |
| May-19  to  Apr-20 | 2,998.2 | 958.8 | 425.1 |
| Jun-19  to  May-20 | 2,884.1 | 844.7 | 377.8 |
| Jul-19  to  Jun-20 | 2,896.6 | 857.2 | 325.5 |
| Aug-19  to  Jul-20 | 2,793.2 | 753.8 | 271.4 |
| Sep-19  to  Aug-20 | 2,697.5 | 658.1 | 224.8 |
| Oct-19  to  Sep-20 | 2,549.1 | 509.7 | 176.1 |

---

[3] The Government appears to argue that the relevant emissions units affected by the modification are encompassed within the Facility as a whole. Beyond claiming that determining whether a significant emissions increase occurred requires consideration of both EES Coke's and U.S. Steel's emissions, EES Coke does not argue that the emissions should be considered from a more narrowly defined set of emissions units. As such, the Court accepts the Government's position that consideration of the Facility as a whole is appropriate.

| | | | |
|---|---|---|---|
| Nov-19 to Oct-20 | 2,350.7 | 311.3 | 119.7 |
| Dec-19 to Nov-20 | 2,173.7 | 134.3 | 75.8 |
| Jan-20 to Dec-20 | 2,107.7 | 68.3 | 62.0 |
| Feb-20 to Jan-21 | 2,101.4 | 62.0 | 70.9 |
| Mar-20 to Feb-21 | 2,111.1 | 71.7 | 84.5 |
| Apr-20 to Mar-21 | 2,113.2 | 73.8 | 97.5 |
| May-20 to Apr-21 | 2,173.4 | 134.0 | 121.5 |
| Jun-20 to May-21 | 2,288.9 | 249.5 | 168.1 |
| Jul-20 to Jun-21 | 2,401.9 | 362.5 | 222.7 |
| Aug-20 to Jul-21 | 2,623.7 | 584.3 | 285.3 |
| Sep-20 to Aug-21 | 2,863.5 | 824.1 | 351.4 |
| Oct-20 to Sep-21 | 3,115.3 | 1,075.9 | 418.5 |
| Nov-20 to Oct-21 | 3,359.2 | 1,319.8 | 491.5 |
| Dec-20 to Nov-21 | 3,558.4 | 1,519.0 | 542.9 |
| Jan-21 to Dec-21 | 3,608.40 | 1,569.0 | 557.9 |

ECF No. 9-2, PageID.119-20.[4]

Defendant argues that the 2014 Permit did not *cause* an increase in emissions.[5]

Instead, EES Coke posits, its "normalized COG production" and U.S. Steel's

---

[4] This data was compiled by Government expert witness Virginia Galinsky, an environmental engineer at the EPA who has been involved in the EES Coke enforcement action since its inception. It is based on information EES Coke provided to the EPA during its investigation and appears in her first declaration. ECF No. 9-2, PageID.114. At the summary judgment hearing, EES Coke indicated that it did not dispute the factual accuracy of this data, but instead disputes "that it's legally relevant in any way" because of its belief that significance ought to be measured by looking at both EES Coke *and* U.S. Steel's emissions. ECF No. 317, PageID.23831. As such, the Court treats this data as undisputed.

[5] EES Coke also argues that "[t]he permit change did not cause a significant emissions increase based on the actual-to-projected actual analysis." ECF No. 168, PageID.9260. But because the Government's claim hinges on EES Coke's actual post-change emissions increase, its pre-change analyses are irrelevant. As such, this argument is disregarded.

unexpected reduction in COG demand caused this increase because "every Btu of COG that was sold during the baseline period and not sold in [the violation period] represents a Btu of COG that EES Coke was forced to combust at either the underfire or the flare, assuming production is held constant." ECF No. 168, PageID.9263-64. According to EES Coke, the 2014 Permit allowed EES Coke to redirect COG it could no longer sell to U.S. Steel from the flare to the underfire, where it could be used productively as fuel. It further asserts that "[e]very additional cubic foot of COG combusted at the underfire results in an exact corresponding *decrease* in COG combusted at the flare." *Id.* at PageID.9262.

This argument is unavailing. At bottom, the 2014 Permit allowed EES Coke to burn more COG at underfire, and EES Coke did just that, resulting in a significant emissions increase. Arguments about where the COG *might* have gone absent the 2014 Permit (i.e., to the flare) are besides the point.[6] Likewise, while U.S. Steel's

---

[6] Indeed, this argument appears to rest on the assumption that EES Coke was capable of using other fuels besides than COG to power the Facility. Even assuming, *arguendo*, that this assumption is correct, the fact remains that EES Coke has exclusively used COG as fuel since 2012. Furthermore, in support of its 2014 Permit application, EES Coke represented that "[t]he current permit application replaces the use of Rich Gas and Lean Gas *with the exclusive use of Coke Oven Gas*." ECF No. 228-1, PageID.16445 (emphasis added). The increase in emissions resulted from quantities of COG burned at underfire in excess of the previous limit. EES Coke's hypothetical ability to burn a different fuel at underfire, and thereby divert COG to the flare, is irrelevant. It does not change the factual reality of this case: the Facility relied exclusively on COG for fuel, and the resulting emissions increase was a direct result of doing so.

reduction in COG demand might explain *why* EES Coke burned more COG at underfire than it otherwise would have, this does not change the fact that, but for the 2014 Permit, EES Coke could not have legally burned COG at underfire in excess of the prior COG limit. Indeed, "[b]ecause pollution, like any effect, can have more than one 'but for' cause, it is not enough for [a source] to simply point out that some of its . . . actual increases in emissions" may have also been caused by other factors. *United States v. Ameren Missouri*, 229 F. Supp. 3d 906, 1004 n.17 (E.D. Mo. 2017). As such, the 2014 Permit's removal of the COG combustion limit at underfire caused the significant emissions increase and the significant net emissions increase.

### 3. Demand Growth Exclusion

EES Coke also argues that the emissions increase is excludable under the demand growth exclusion, claiming it could have accomodated the emissions during the baseline period and that the emissions are unrelated to the 2014 Permit's removal of the underfire COG combustion limit. EES Coke also claims it is the Government—not EES Coke—bears the burden of proving the applicability of this exclusion.

First, the Sixth Circuit has acknowledged that the burden of proving the applicability of the demand growth exclusion rests with the stationary source. *See United States v. DTE Energy Co.*, 845 F.3d 735, 739 (6th Cir. 2017); *see also United States v. Ameren Missouri*, 9 F.4th 989, 1005 (8th Cir. 2021) ("As recognized in . . .

*DTE Energy*, it is the source's burden to prove the applicability of the demand-growth exclusion. This is in accordance with the Supreme Court precedent that the party asserting the exception bears the burden of proving its applicability."). Indeed, Michigan regulations assign the duty to exclude qualifying emissions to the source, and the exclusion of such emissions is not mandatory. Mich. Admin. Code R. 336.2901(ee)(ii) (providing that "the owner or operator of the major stationary source *shall* . . . [e]xclude, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project" that are attributable to the demand growth exclusion). In this way, demand growth exclusion functions as an exception that the source may choose to utilize, and generally, the party seeking to benefit from an exception carries the burden of proving that it applies. *See United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967). As such, the Court finds that EES Coke bears the burden of demonstrating that the emissions increase is excludable under the demand growth exclusion.

Second, EES Coke's excess emissions are not excludable under the demand growth exclusion. As set forth above, there are two requirements that must be satisfied for emissions to qualify for the demand growth exclusion. First, the emissions unit must have been able to accommodate the emissions during the consecutive 24-month period used to establish the baseline actual emissions, and

24

second, the emissions must be unrelated to the modification. Mich. Admin. Code R. 336.2901(ee)(ii)(c). As stated above, the 2014 Permit's removal of the underfire COG combustion limit is a but-for cause of the emissions increase. It necessarily follows, then, that the 2014 Permit is related to the emissions increase. Therefore, EES Coke has failed to meet its burden of proving that the increased emissions are unrelated to the 2014 Permit. Because this conclusively demonstrates that EES Coke's excess emissions do not qualify for the demand growth exclusion, the Court need not address whether the emissions could have been accomodated during the baseline period. As such, EES Coke's excess emissions are not excludable under the demand growth exclusion.

### 4. Net Significant Emissions Increase

Finally, the 2014 Permit's removal caused a net significant emissions increase. The Government asserts—and EES Coke does not dispute—that there were no creditable emissions decreases to offset the Facility's increased emissions. As such, there was a significant net emissions increase.

In conclusion, the Court finds that the 2014 Permit's removal of the underfire COG combustion limit was a "major modification." It resulted in a significant emissions increase of $SO_2$ and $PM_{2.5}$, and a net emissions increase of the same. The emissions increase cannot be excluded under the demand growth exclusion because these emissions are related to the change. Accordingly, by failing to comply with

NSR's permitting requirements, EES Coke violated the Clean Air Act and Michigan's SIP. The Court thus grants summary judgment on EES Coke's liability on Count I in favor of the Government and against EES Coke.

> ii. Count II: EES Coke's Failure to Comply with "Reasonable Possibility" Reporting Requirements

Next, the Government and EES Coke cross-move for summary judgment on whether EES Coke failed to comply with NSR's "reasonable possibility" reporting requirements. As discussed above, a stationary source must submit a report to EGLE if there is a reasonable possibility that a project, though not a major modification at the time it is executed, may result in a significant emissions increase. Mich. Admin. Code R. 336.2902(6). Specifically, "if the unit is an existing unit other than an electric utility steam generating unit, then the owner or operator shall submit a report to [EGLE] if the annual emissions, in tons per year, from the project . . . [(1)] exceed the [BAE] by a significant amount for that regulated new source review pollutant, and [(2)] if such emissions differ from the [PAE]." Mich. Admin. Code R. 336.2902(6)(e).

The Government argues that EES Coke was required to adhere to these reporting requirements for the years 2018 and 2019, as its post-change $SO_2$ emissions exceeded the BAE by at least 40 tons and differed from its PAE during these years. EES Coke, on the other hand, contends that it was not subject to these reporting requirements for two reasons. First, it argues that the reporting

requirements were not in effect at the time the underfire combustion limit was first removed in 2013. Because the pre-permit underfire COG combustion limit was never reinstated, EES Coke asserts, this change was completed in 2013, which was before the "reasonable reporting" regulation went into effect. Second, EES Coke asserts that EGLE explicitly determined that no such reporting was required for $SO_2$ and $PM_{2.5}$, and it did not submit reports for 2018 and 2019 based on this determination.

EES Coke's arguments are unavailing. First, the 2013 Permit has no bearing on whether EES Coke was subject to the reporting requirements with respect to the 2014 Permit. While the 2014 Permit made permanent the 2013 Permit's removal of the underfire COG combustion limit, the two permits are legally distinct instruments. Each was granted based on their own application, and each underwent their own EGLE approval proceedings. Moreover, although the pre-2013 COG combustion limit was never reinstated, there was no assurance that the 2014 Permit would be approved. As such, the 2013 Permit cannot be relied upon to bypass the regulatory framework that was in place at the time the 2014 Permit application was submitted and approved.

Second, that EGLE indicated that the 2014 Permit did not impose these reporting requirements does not negate the EPA's ability to enforce them. These reporting requirements are codified in Michigan's SIP, which the EPA approved and

adopted as federal law. Pursuant to its "cooperative federalism" scheme, the Clean Air Act grants the EPA broad authority to directly enforce SIP requirements. 42 U.S.C. § 7413(a)(1). Consequently, even if EGLE represented that such reporting was not required, the EPA has independent power to enforce compliance with these reporting requirements.

The Court finds that EES Coke was required to comply with the "reasonable possibility" reporting requirements. For both 2018 and 2019, EES Coke's BAE for $SO_2$ were 2,039 tons per year, and its PAE for $SO_2$ were 3,117 tons per year. ECF No. 9-2, PageID.122. Its actual $SO_2$ emissions for 2018 and 2019 were 3,272.8 tons and 3,193.3 tons, respectively. *Id.* Accordingly, because EES Coke's actual $SO_2$ emissions exceeded its BAE and PAE, it had an obligation to comply with the "reasonable possibility" reporting requirements and submit such reporting to the State within 60 days of the end of the emissions period. It did not do so. Therefore, EES Coke failed to comply with the reporting requirements. Accordingly, the Court grants summary judgment with respect to liability for Count II in favor of the Government and against EES Coke.

### 1. EES Coke's Remaining Arguments

EES Coke raises two arguments in its motion for summary judgment that are unavailing. First, EES Coke contends that the Government's claims must fail as a matter of law, arguing that the Government is impermissibly "attempting to

collaterally attack the Permit through a civil penalty action years after the Permit was issued and relied upon by EES Coke." ECF No. 168, PageID.9257. In response, the Government asserts that its claims do not challenge the Permit itself and are instead based on EES Coke's conduct in the years following its issuance.

While EES Coke correctly points out that the Supreme Court has cautioned against the EPA engaging in the "inequitable conduct" of invalidating state permitting decisions, *Alaska Dep't of Env. Conservation v. EPA*, 540 U.S. 461, 495 (2004), the present case does not raise any questions about the validity of the 2014 Permit. That validity is undisputed and immaterial to the Government's causes of action. Instead, the crux of the Government's claims is that the removal of the underfire COG combustion limit caused a significant emissions increase and net significant emissions increase beginning in 2018, constituting a major modification. EES Coke's NSR violations stem from its failure to obtain the necessary NSR permit at that time and its failure to submit reasonable possibility reports to EGLE following the emissions increase. Critically, the 2014 Permit did not give EES Coke unfettered authority to emit emissions without restriction. The regulations plainly allow for NSR enforcement when a significant emissions increase actually occurs.

Second, EES Coke claims the Government's claims are time barred. It argues that the statute of limitations began to run in December 2013, which is when EES Coke began combusting COG in excess of the prior limit. In contrast, the

Government asserts that while the permit change occurred in 2014, the Government's claims did not accrue until the end of 2018, when the Facility's pollution levels triggered New Source Review.

The Court considered and rejected this argument in its opinion and order granting the Government's motion for leave to file an amended complaint. ECF No. 90, PageID.3806-09. There, the Court found that under the Sixth Circuit's decision in *Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 480 F.3d 410, 418-19 (6th Cir. 2007), EES Coke's "alleged failure to operate [NSR controls] is a continuing violation that tolls the statute of limitations." ECF No. 90, PageID.3808. The Court also acknowledged the Sixth Circuit's decision in *United States v. DTE Energy Co.*, 711 F.3d 643, 651 (6th Cir. 2013), where it stated that "[n]either the statute nor the regulations create a time barrier" to enforcing New Source Review, and that "EPA can bring an enforcement action whenever emissions increase, so long as the increase is traceable to the construction."

Under the law-of-the-case doctrine, "findings made at one stage in the litigation should not be reconsidered at subsequent stages of that same litigation." *Burley v. Gagacki*, 834 F.3d 606, 618 (6th Cir. 2016) (citation omitted). The doctrine aims to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit," and recognizes "that for cases to reach resolution, issues cannot be argued and reargued without end." *Edmonds v.*

*Smith*, 922 F.3d 737, 739-40 (6th Cir. 2019) (citations omitted). Because the Court has already found that the Government's claims are not time barred, the Court finds this argument without merit.

### B. The DTE Defendants' Motion for Summary Judgment

Turning next to the DTE Defendants' liability, the Government and the DTE Defendants cross-move for summary judgment on whether the DTE Defendants are "operators" of the Facility, subjecting them to liability for EES Coke's Clean Air Act violations. The Clean Air Act imposes strict liability on owners and operators who violate its provisions. *United States v. Anthony Dell'Aquilla, Enterprises and Subsidiaries*, 150 F.3d 329, 332 (3d Cir. 1998). The Act broadly defines the term "owner or operator" as "any person who owns, leases, operates, controls, or supervises a stationary source." 42 U.S.C. § 7411(a)(5). In the absence of a more precise definition of this term, courts look to the Supreme Court's decision in *United States v. Bestfoods*, 524 U.S. 51 (1998), where it interpreted the term as used in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). *See, e.g.*, *United States v. Anthony Dell'Aquilla Enter. & Subsidiaries*, 150 F.3d 329, 332 (3d Cir. 1998) (applying *Bestfoods* and observing that "the

purposes of [CERCLA and the Clean Air Act] is the same, and the language in question is nearly identical.").[7]

The question before the *Bestfoods* Court was "whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary." *Bestfoods*, 524 U.S. at 55. The Court held that a parent company cannot be held liable solely by virtue of its control over the subsidiary, unless the corporate veil can be pierced. *Id.* This conclusion rests on the "general principle of corporate law . . . that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *Id.* at 61.

Critically, however, the Court distinguished between a parent company's control over the *subsidiary* and its control over the *facility*. The former, which typically involves activities that "are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures," does not, without more, give rise to operator liability. *Id.* at 72. Rather, to be directly liable as an operator under CERCLA, the parent must have "actively

---

[7] Indeed, the parties agree that *Bestfoods* governs the operator liability issue.

participated in, and exercised control over, the operations of the *facility itself*." *Id.* at 61 (emphasis added). Furthermore, this control must "specifically relate[] to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66-67. The Court further noted that "the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 71.

The Court articulated three potential ways in which a parent corporation's operation of a facility can lead to direct liability. First, "a parent can be held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture." *Id.* Second, in instances where the parent company and the subsidiary share corporate officers, the parent company is an operator where "a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility." *Id.* Lastly, operator liability can be found where "an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility." *Id.* At bottom, "[t]he critical question is whether, in degree and detail, actions directed to

the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* at 72.

Following *Bestfoods*, the Sixth Circuit adopted the "actual control" test to determine whether an entity is an operator under CERCLA. *United States v. Township of Brighton*, 153 F.3d 307, 314 (6th Cir. 1998). This test requires a party to "perform affirmative acts" in order to be an operator. *Id.* "The failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator." *Id.* Once a party performs an affirmative act that makes it an operator, however, its inaction about a "particular hazard" does not absolve it from liability. *Id.* at 315. The Sixth Circuit has cautioned that "[a]s helpful as the 'actual control' test may be," it "does not supplant the primary question of whether an entity's activities satisfy the ordinary meaning of the term 'operator.'" *Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*, 14 F.4th 560, 575 (6th Cir. 2021) (cleaned up). The Sixth Circuit has also advised that determining whether an entity is an operator is a "fact-intensive inquiry" that requires analyzing the "totality of the circumstances." *Id.*

Applying this legal framework to the present case, there is evidence demonstrating that the DTE Defendants actively participated in and exercised control over the Facility's operations regarding emissions, thereby supporting a finding that they are "operators" under the Clean Air Act.

## 1.  DTEES

Beginning with DTEES, there is evidence demonstrating that it actively participated in and exercised control over the Facility's operations as they relate to pollution. Pursuant to its Management Services Agreement with EES Coke, DTEES is responsible for providing "all services as may be required to facilitate the proper management and administration of [EES Coke's] activities in respect of the Facility, including those services more particularly described in Schedule A." ECF No. 289-2, PageID.20723. Among the responsibilities listed in Schedule A are: (1) "[d]ay-to-day management and administration of [EES Coke's] business relating to the Facility"; (2) "maintain[ing] and monitor[ing] compliance with all Permits; (3) [p]roperty management of the Facility"; (4) performing "routine, periodic and occasional visual inspection of the Facility"; (5) "[c]ause to be corrected any damage, deterioration and malfunctions, and monitor, report and advise of any such damage, deterioration and malfunctions and correction thereof"; and (7) "monitor[ing] the environmental health and safety of the Facility . . . including (a) identifying the existence of any significant environmental issues and (b) evaluating any new or alternate technologies to address any significant environmental issues." ECF No. 289-2, PageID.20747, PageID.20748, PageID.20752, PageID.20753. This Agreement demonstrates that DTEES has broad control over the Facility itself, and

its responsibilities relate directly to the Facility's ability to emit pollutants. In this way, DTEES operates the Facility "in the stead" of EES Coke.

Furthermore, DTEES employees perform pollution-related operational tasks at the Facility. For example, Ronald Burnette, a DTEES employee who has served as the Facility's Director of Operations since 2015, is responsible for coke production at the Facility. ECF No. 289-4, PageID.20773-74. Given that SO2 emissions are a byproduct of the coking process, Mr. Burnette—as DTEES agent—exercises some control over the pollution emitted at the Facility.

The DTE Defendants argue that "[t]o the extent any DTEES employee appears to have been involved in operations, such an employee was necessarily acting under a Management Services Agreement at all relevant times, so their actions are attributable to EES Coke only." ECF No. 262, PageID.17190. This argument is unpersuasive. The existence of the Management Services Agreement does not, by itself, shield DTEES from operator liability. The *Bestfoods* test looks beyond corporate formalities and evaluates the actual control possessed and exerted by the parent company. Indeed, to hold otherwise would allow companies to design their affairs in a way that obscures operational control, allowing them to evade liability under the guise of an arms-length contractual agreement.

Viewing the evidence in the light most favorable to the Government, a trier of fact could reasonably find that DTEES actively participated in and exercised control

over the Facility's emissions operations, rendering it an operator of the Facility under *Bestfoods*. Accordingly, a triable issue of fact exists, and summary judgment on this issue is denied.

## 2. DTEER

As for DTEER, there is also evidence demonstrating that it actively participated in and exercised control over the Facility's operations as they relate to pollution. While, unlike DTEES, DTEER does not have a management services agreement with EES Coke directly, the Agreement between DTEES and DTEER delegates broad management authority over the Facility to DTEER. Specifically, it states that DTEER is "granted the authority to do on behalf of DTEES, in DTEES' name, *all* things that are necessary, proper or desirable to carry out the duties and responsibilities of DTEER under this Agreement, *including the authority to perform on DTEES' behalf any agreement entered into by DTEES with respect to*" the Facility. *See* ECF No. 262-10, PageID.17295. In essence, DTEER possesses a level of control over the Facility that is materially similar to that of DTEES. In this way, DTEER is authorized to operate the Facility "in the stead of" both EES Coke and DTEES.

Furthermore, like DTEES, DTEER employees perform pollution-related operational tasks at the Facility. For instance, Robert Sanch, a DTEER employee who has served as EES Coke's Environmental Supervisor since at least 2013,

oversees air permit compliance and waste disposal. ECF No. 289-9, PageID.20838-40. He also evaluates pollution controls that might be required under the law. *Id.* at PageID.20840. In so doing, Mr. Stanch, as DTEER's agent, exercises a degree of control over activities that bear on the Facility's pollution emissions.

Viewing the evidence in the light most favorable to the Government, a trier of fact could reasonably find that DTEER actively participated in and exercised control over the Facility's emissions activities, rendering it an operator of the Facility under *Bestfoods*. Accordingly, a triable issue of fact exists, and summary judgment on this issue is denied.

### 3. DTEEC

Lastly, there is evidence suggesting that DTEEC actively participated in and exercised control over the Facility's operations as they relate to pollution. For instance, in 2020, DTE's Vice President of Environmental Management and Resources Skiles Boyd was involved in coordinating and approving testing to verify the accuracy of the Facility's emissions monitoring system. ECF No. 289-16. The emissions monitoring system directly relates to the Facility's pollution emissions. As such, viewing this evidence in the light most favorable to the Government, a trier of fact could reasonably find that DTEEC is an operator of the Facility. Thus, summary judgment on this issue is denied.

### C. Sierra Club's Motion for Summary Judgment

Sierra Club seeks summary judgment on three issues: (1) Defendant EES Coke's liability on the Government's claims; (2) Sierra Club's standing to seek relief for EES Coke's violations of the Clean Air Act; and (3) an award of equitable relief for those violations in the form of "an injunction requiring best available control technology and compliance with the lowest achievable emissions rate for SO2 and PM2.5, respectively," and "an order requiring mediation between the Sierra Club and EES Coke to determine appropriate mitigation measures for EES Coke to take." ECF No. 162, PageID.6016.

Beginning first with Sierra Club's request for summary judgment on EES Coke's liability, Sierra Club does not offer any arguments that have not already been presented to the Court by the Government. In granting Sierra Club's motion to intervene in this case, the Court required Sierra Club to confer with the Government prior to filing briefing in this case to ensure its arguments are not duplicative of the Government's. Because the Court is already granting the Government's motion for summary judgment and Sierra Club's motion offers no new arguments, denial of Sierra Club's request for summary judgment on EES Coke's liability is appropriate.

Second, Sierra Club seeks summary judgment on whether it has standing to seek relief for EES Coke's violations of the Clean Air Act. But as Sierra Club itself acknowledges, an intervening plaintiff does not need to demonstrate Article III standing "where the [original] plaintiff has standing" and "the intervenor does not

39

seek additional relief beyond that which the plaintiff requests." *Chapman v. Tristar Products, Inc.*, 940 F.3d 299, 304 (6th Cir. 2019). Here, the Government and Sierra Club seek the same relief. *Compare* ECF No. 91, *with*  ECF No. 98. As such, it is not necessary for the Court to make a standing determination.

Lastly, Sierra Club seeks equitable relief in the form of: (1) "an injunction requiring best available control technology and compliance with the lowest achievable emissions rate for $SO_2$ and $PM_{2.5}$, respectively," and (2) "an order requiring mediation between the Sierra Club and EES Coke to determine appropriate mitigation measures for EES Coke to take." ECF No. 162, PageID.6016. This request is premature. In its motion for summary judgment, the Government indicated that the question of appropriate relief should be determined at trial. Because the Government and Sierra Club seek the same relief, granting Sierra Club's request for equitable relief now may frustrate the Government's ability to fully pursue its remedies. As such, deferring resolution of the remedy for EES Coke's Clean Air Act violations is appropriate and consistent with the Court's restrictions on Sierra Club's participation in this case. Thus, Sierra Club's motion for summary judgment is denied.

### D. Defendants' Motion to Bifurcate

Lastly, Defendants seek an order bifurcating the trial in this matter into two phases. Specifically, Defendants "request that the Court order trial on the liability of

EES Coke Battery, LLC to proceed first, to be directly followed by a trial on the operator liability of the remaining Defendants and the remedy to be imposed only if and to the extent that the United States prevails in the first phase." ECF NO. 239, PageID.16712. Given, however, that the Court has found EES Coke liable on all counts, this motion is denied as moot.

## V.    CONCLUSION

Based on the foregoing, the Government's Motion for Partial Summary Judgment [#159] is GRANTED; EES Coke's Motion for Summary Judgment [#168] is DENIED; the DTE Defendants' Motion for Summary Judgment [#169] is DENIED; Sierra Club's Motion for Summary Judgment [#162] is DENIED; and Defendants' Motion to Bifurcate [#239] is DENIED AS MOOT.

SO ORDERED.

Dated: August 25, 2025                          /s/Gershwin A. Drain
                                               GERSHWIN A. DRAIN
                                               United States District Judge

### CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 25, 2025, by electronic and/or ordinary mail.
/s/ Marlena Williams
Case Manager