IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA

       Plaintiff,

and

SIERRA CLUB and
CITY OF RIVER ROUGE,

       Intervening-Plaintiffs,

v.

EES COKE BATTERY, LLC;
DTE ENERGY SERVICES, INC.;
DTE ENERGY RESOURCES, LLC; and
DTE ENERGY CO.,

       Defendants.

Case No. 2:22-cv-11191-GAD-CI

Judge Gershwin A. Drain

Magistrate Judge Curtis Ivy, Jr.

---

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ......................................................................iv

BACKGROUND FINDINGS OF FACT ...................................................1

FINDINGS OF FACT AND CONCLUSIONS OF LAW FROM TRIAL ..............4

I.    OPERATOR LIABILITY ............................................................4

    A.    Legal Framework .............................................................4

    B.    Findings of Fact on Operator Liability.................................5

        i.    DTEES did not operate the Facility............................5

        ii.    DTEER did not operate the Facility. ..........................6

        iii.    DTEEC did not operate the Facility. .........................7

        iv.    EES Coke has sole operational control over the Facility. ..........8

    C.    Conclusions of Law on Operator Liability.........................10

        i.    During its case-in-chief, Plaintiff failed to establish operator liability for any Investor Defendant. .........................10

        ii.    The Investor Defendants' Evidence confirmed that the Investor Defendants do not operate EES Coke's Facility. .......13

II.    INJUNCTIVE RELIEF ..............................................................14

    A.    Legal Framework ...........................................................14

    B.    Findings of Fact on Injunctive Relief.................................16

        i.    Plaintiff did not prove that it suffered irreparable harm..........16

        ii.    Plaintiff did not prove what BACT or LAER would require. .....................................................................19

|     |     | iii. | EGLE would need to determine BACT and LAER requirements, and applying either limit would take years. | 21 |
|     |     | iv. | Plaintiff did not prove what the desulfurization it requests would look like or that it is technically and economically viable. | 23 |
|     |     | v. | Plaintiff proposed an impossible emissions reduction | 23 |
|     |     | vi. | Claus technology is technically and economically viable, would have avoided the violations at issue, and can be installed quickly. | 24 |
|     |     | vii. | EES Coke and the public would suffer significant hardships if the Court required installation of anything other than Claus. | 25 |
|     | C. | Conclusions of Law on Injunctive Relief | | 26 |
|     |     | i. | Plaintiff may not obtain injunctive relief | 26 |
|     |     | ii. | Plaintiff did not satisfy its burden for injunctive relief | 28 |
|     |     | iii. | Injunctive relief could not extend to BACT or LAER. | 30 |
|     |     | iv. | If injunctive relief were warranted, it would extend only to installation of Claus technology | 31 |
| III. | CIVIL PENALTIES | | | 32 |
|     | A. | Legal Framework | | 32 |
|     | B. | Findings of Fact on Civil Penalties | | 33 |
|     |     | i. | EES Coke made good-faith efforts to comply with the CAA. | 33 |
|     |     | ii. | No harm resulted from EES Coke's excess emissions. | 36 |
|     |     | iii. | By not installing Claus in 2018, EES Coke realized an economic benefit of $10,048,220. | 39 |
|     |     | iv. | EES Coke's violation of reasonable possibility reporting requirements was inconsequential. | 41 |

        v.     Plaintiff's requested penalty would be largest in history..........41

        vi.    Plaintiff's requested penalty would negatively affect EES Coke's operations and the steel industry more generally..........43

   C.   Conclusions of Law on Civil Penalties ................................................44

        i.      The penalty factors weigh against imposing any penalty at all, much less Plaintiff's requested penalty, for EES Coke's Claim 1 violation. ..........................................................46

        ii.     Plaintiff's requested penalty would have a crippling impact.........................................................................................46

        iii.    EES Coke made significant good-faith efforts to comply..........46

        iv.    EES Coke's Claim 1 violation was minimal. ............................48

        v.      The penalty factors weigh against imposing any penalty for EES Coke's Claim 2 violation and a nominal penalty is appropriate...............................................................................50

IV.   INTERVENING PLAINTIFFS' STANDING AND SIERRA CLUB'S REQUEST FOR REMEDIATION...................................................................51

   A.   Legal Framework ..................................................................................51

   B.   Findings of Fact on Intervening Plaintiffs' Standing............................52

   C.   Conclusions of Law on Standing ..........................................................53

   D.   Findings of Fact on Mitigation..............................................................55

   E.   Conclusions of Law on Mitigation........................................................55

V.    CONCLUSION.................................................................................................55

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

<small>**CASES**</small>

*Ailor v. City of Maynardville, Tennessee*,
  368 F.3d 587 (6th Cir. 2004) ...................................................................53

*Alabama Air Pollution Control Comm'n v. Republic Steel*,
  646 F.2d 210 (5th Cir. 1981) ...................................................................16

*Am. Premier Underwriters v. General Elec.*,
  14 F.4th 560 (6th Cir. 2021) ........................................................5, 12, 13

*Amoco v. Vill. of Gambell*,
  480 U.S. 531 (1987)...................................................................................15

*Audi v. D'Amato*,
  469 F.3d 534 (6th Cir. 2006) ...................................................................15

*Brooke Group v. Brown & Williamson Tobacco*,
  509 U.S. 209 (1993)...................................................................................10

*Builders & Contractors of Michigan v. Cowen*,
  2025 WL 488556 (6th Cir. Feb. 13, 2025) .............................................52

*Chapman v. Tristar*,
  940 F.3d 299 (6th Cir. 2019) .............................................................53, 55

*Charter Twp. of Huron, Mich. v. Richards*,
  997 F.2d 1168 (6th Cir. 1993) .................................................................30

*Children's Health Def. v. United States Food & Drug Admin.*,
  2022 WL 2704554 (6th Cir. July 12, 2022) .....................................51, 52

*Coleman v. Ann Arbor Transp. Auth.*,
  947 F. Supp. 2d 777 (E.D. Mich. 2013) .................................................27

*Commonwealth of Kentucky, et al. v. U.S. E.P.A., et al.*,
  USCA Case No. 24-1050 (D.C. Cir. Nov. 24, 2025) ...........................18

*Commonwealth v. Biden*,
  57 F.4th 545 (6th Cir. 2023) ....................................................................16

*D.T. v. Sumner Cnty. Sch.*,
    942 F.3d 324 (6th Cir. 2019) ................................................................28

*Engebretsen v. Fairchild Aircraft*,
    21 F.3d 721 (6th Cir. 1994) ..................................................................11

*Env't Texas Citizen Lobby v. ExxonMobil*,
    824 F.3d 507 (5th Cir. 2016) ..........................................................32, 44

*EOG Resources, Inc. v. Lucky Land Management, LLC*,
    134 F.4th 868 (6th Cir. 2025) ...............................................................29

*Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living*,
    124 F.4th 990 (6th Cir. 2025) ...............................................................52

*Friends of the Earth v. Laidlaw Env't Servs.*,
    528 U.S. 167 (2000) ......................................................................16, 49

*Friends of the Earth v. Laidlaw Envtl. Servs.*,
    956 F. Supp. 588 (D.S.C. 1997), *vacated on other grounds*, 149
    F.3d 303 (4th Cir. 1998), *rev'd on other grounds*, 528 U.S. 167
    (2000) ......................................................................................................45

*Grassi v. Grassi*,
    2024 WL 4715614 (6th Cir. Nov. 5, 2024) ...........................................28

*Harrison v. Indiana Auto Shredders*,
    528 F.2d 1107 (7th Cir. 1975) ...............................................................15

*Higuchi v. Autoliv*,
    103 F.4th 400 (6th Cir. 2024) ...............................................................29

*Hodgins v. Carlisle Engineered*,
    2006 WL 721762 (N.D. Ohio Mar. 20, 2006) ........................................15

*Idaho Conservation v. Atlanta Gold*,
    879 F. Supp. 2d 1148 (D. Idaho 2012) ..................................................46

*In re John Richards Homes Bldg.*,
    439 F.3d 248 (6th Cir. 2006) ................................................................10

*Kentuckians for Commonwealth v. Rivenburgh*,
    317 F.3d 425 (4th Cir. 2003) ................................................................16

*Madison v. Wood*,
410 F.2d 564 (6th Cir. 1969) ...............................................................28

*Marvel Characters v. Kirby*,
726 F.3d 119 (2d Cir. 2013) ...............................................................10

*MRP Props. v. United States*,
308 F. Supp. 3d 916 (E.D. Mich. 2018) ..................................5, 11, 14

*New York State Elec. & Gas v. FirstEnergy*,
766 F.3d 212 (2d Cir. 2014) ...............................................................13

*Platt v. Bd. of Comm'rs on Grievances*,
769 F.3d 447 (6th Cir. 2014) ...............................................................28

*Resurrection Bay Conservation All. v. City of Seward, Alaska*,
2008 WL 11340292 (D. Alaska Apr. 3, 2008) ....................................32

*Rhinehart v. Scutt*,
509 F. App'x 510 (6th Cir. 2013) ........................................................29

*Roche Diagnostics v. Shaya*,
2023 WL 7412918 (E.D. Mich. Nov. 9, 2023)....................................11

*Rodriguez v. Providence Cmty. Corr., Inc.*,
155 F. Supp. 3d 758 (M.D. Tenn. 2015) ............................................32

*Sharpe v. Cureton*,
319 F.3d 259 (6th Cir. 2003) ...............................................................31

*Sierra Club, Lone Star Chapter v. Cedar Point Oil*,
73 F.3d 546 (5th Cir. 1996) ...............................................................54

*Sierra Club v. Franklin Cnty. Power of Illinois*,
546 F.3d 918 (7th Cir. 2008) ...............................................................15

*Sierra Club v. Khanjee Holding*,
655 F.3d 699 (7th Cir. 2011) ...............................................................47

*Sierra Club v. Louisiana Dep't of Env't Quality*,
100 F.4th 555 (5th Cir. 2024) .............................................................49

*Sierra Club v. Otter Tail Power Co.*,
   615 F.3d 1008 (8th Cir. 2010) ...........................................................28

*Simpson-Vlach v. Michigan Dep't of Educ.*,
   616 F. Supp. 3d 711 (E.D. Mich. 2022) ...........................................54

*State v. Yellen*,
   539 F. Supp. 3d 802 (S.D. Ohio 2021) ..............................................55

*Tennessee Conf. of NAACP v. Lee*,
   139 F.4th 557 (6th Cir. 2025) .............................................................53

*United States v. Anthony Dell'Aquilla, Enters. & Subs.*,
   150 F.3d 329 (3rd Cir. 1998) .............................................................33

*United States v. Bay-Houston Towing*,
   197 F. Supp. 2d 788 (E.D. Mich. 2002) .....................................*passim*

*United States v. Bestfoods*,
   524 U.S. 51 (1998) .......................................................................*passim*

*United States v. City of Toledo*,
   867 F. Supp. 603 (N.D. Ohio 1994) ..................................................48

*United States v. Dico*,
   4 F. Supp. 3d 1047 (S.D. Iowa 2014), *aff'd in rel. part*, 808 F.3d
   342 (8th Cir. 2015)..............................................................................46

*United States v. EME Homer City Generation, L.P.*,
   727 F.3d 274 (3d Cir. 2013) ..............................................................26

*United States v. Luminant Generation Co., L.L.C.*,
   905 F.3d 874 (5th Cir. 2018) (Elrod, J., dissenting), *reh'g en banc
   granted*, 929 F.3d 316 (5th Cir. 2019)...............................................27

*United States v. Mountain State Carbon*,
   2014 WL 3548662 (N.D.W. Va. July 17, 2014) ...............................33

*United States v. Ohio Edison*,
   725 F. Supp. 928 (N.D. Ohio 1989) ..................................................48

*United States v. Packorp, Inc.*,
   246 F. Supp. 963 (W.D. Mich. 1965) ................................................27

vii

*United States v. Roll Coater*,
  21 E.L.R. 21073, 1991 U.S. Dist. LEXIS 8790...................................................47

*United States v. Smith*,
  2014 WL 3687223 (S.D. Ala. July 24, 2014)....................................................46

*United States v. Smithfield Foods*,
  191 F.3d 516 (4th Cir. 1999) .........................................................................33, 44

*United States v. WCI Steel*,
  72 F. Supp. 2d 810 (N.D. Ohio 1999) ...............................................................45

*United States v. Westvaco*,
  2015 WL 10323214 (D. Md. Feb. 26, 2015).......................................................15

*Utah Physicians for a Healthy Env't v. Diesel Power Gear*,
  21 F.4th 1229 (10th Cir. 2021) ..........................................................................48

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982).............................................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).................................................................................................14

## STATUTES

42 U.S.C. § 7409 ......................................................................................................16

42 U.S.C. § 7413(b) .................................................................................................27

42 U.S.C. § 7413(e)(1).................................................................................44, 45, 50

42 U.S.C. § 7602.........................................................................................................4

Clean Air Act ...................................................................................................*passim*

## OTHER AUTHORITIES

40 CFR Part 51, Appendix S ¶ II.A.18 ...................................................................30

87 Fed. Reg. 33,095 .................................................................................................17

90 Fed. Reg. 29148 ..................................................................................................16

90 Fed. Reg. 54517 ................................................................................25, 26

Fed. R. Civ. P. 52(c)..........................................................................10, 12, 13

Fed. R. Evid. 201(d)..................................................................................38

Fed. R. Evid. 201 ...............................................................................37, 42

Fed. R. Evid. 702 and 703..........................................................................11

Mich. Admin. Code R. § 336.2908 ...............................................................4

## BACKGROUND FINDINGS OF FACT

1.     Defendant EES Coke is the owner and operator of the EES Coke Facility ("Facility").[1] (*See, e.g.*, ECF 372, PageID.25714 ¶ 2.)

2.     In September 2020, EPA issued a Notice of Violation ("NOV") to EES Coke alleging that its 2014 Permit resulted in a major modification because actual emissions exceeded baseline and projected emissions and because EES Coke did not submit reasonable possibility reports. (PX 390, ¶¶ 45, 46.)

3.     The NOV was not based on the Facility burning more than 2.85 million MMBtu of COG at Underfire. (ECF 385, PageID.26865; PX 390.)

4.     Plaintiff United States filed suit asserting claims under the Clean Air Act (the "CAA") and Michigan's State Implementation Plan ("SIP"). (ECF 1.)

5.     EPA later issued an NOV to DTE Energy Services, Inc. ("DTEES"), DTE Energy Resources, LLC ("DTEER"), and DTE Energy Company ("DTEEC," and collectively the "Investor Defendants"), asserting that they acted as "additional owners/operators" of the Facility. (ECF 91; PX 866 at 2.)

6.     Plaintiff then amended its claims to add the Investor Defendants. (ECF 91.) Its sole alleged basis for their liability was that they were "operators of the Coke Oven Battery[.]" (ECF 91, PageID.3815, 25-6 ¶¶ 21, 24, 27, 65, 66(a)-(d).)

---

[1] Capitalized terms have the same meaning as in the JFPTO unless stated otherwise. (ECF 372, PageID.25713.) All emphasis is added unless otherwise noted.

7.     Sierra Club and City of River Rouge (together, "Intervening Plaintiffs") intervened as plaintiffs and asserted the same claims and amended claims. (ECF 98 and 99.)

8.     The Court granted partial summary judgment against EES Coke. (ECF 331, PageID.24349-52.) The Court found EES Coke liable but did not resolve the claims against the Investor Defendants, the appropriate penalty and injunctive relief, or Intervening Plaintiffs' standing. (*Id.*, PageID.24355-64.)

9.     At trial, Plaintiff indicated that, as a result of the violation, the Court should impose injunctive relief by requiring Defendants to install desulfurization technologies and that Defendants should be required to pay a civil penalty of $140 million.  (ECF 396, PageID.27860.)

10.     The Court finds that Plaintiff has not met its burden of showing that the Investor Defendants are liable as operators of the EES Coke Facility. Plaintiff did not present factual evidence showing that Investor Defendants engaged in any affirmative act of control at the Facility.

11.     The Court further finds that Plaintiff has not shown that injunctive relief in the form of "full" desulfurization is appropriate or required.  Plaintiff did not present evidence showing that any such control technology was necessary or that any particular control technology could actually be installed and operated at the Facility.  Instead of requiring EES Coke to install desulfurization achieving 95%

2

control efficiency, the Court finds that installation of the Claus technology at the Facility will remedy the harm from EES Coke's violation by reducing excess $SO_2$ emissions resulting from the major modification while preventing harm to EES Coke and the broader community and economy that would occur if more extensive desulfurization were required.

12.     The Court also rejects Plaintiff's request for a $140 million civil penalty.  A penalty of that size would be the largest penalty ever imposed on a source under the CAA.  The nature of EES Coke's violation does not warrant imposition of the largest penalty in CAA history, given that EES Coke sought and obtained a permit that allowed them to engage in the conduct that was later found to be a violation, complied with the annual $SO_2$ emission limits actually contained in the Permit, does not have a history of violations, acted in good faith, and did not receive a substantial economic benefit from its non-compliance.  Instead, the Court finds a total penalty of $5 million to be warranted and appropriate.

13.     Finally, the Court finds that Intervening Plaintiffs lack standing to seek remedies beyond those to which Plaintiff is entitled.  Consequently, the Court declines to order EES Coke to engage in mitigation activities as requested by Sierra Club, as such relief is not warranted and Sierra Club is not entitled to this additional relief.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FROM TRIAL

## I.   OPERATOR LIABILITY

### A.   Legal Framework

14.   Nonattainment New Source Review ("NNSR") and Prevention of Significant Deterioration ("PSD") impose requirements on "owners and operators" of emitting facilities, but the applicable statutes and regulations do not define those terms. *See, e.g.*, 42 U.S.C. § 7602; Mich. Admin. Code R. § 336.2908.

15.   An affiliated company's "investor status" is insufficient to impose operator liability. *United States v. Bestfoods*, 524 U.S. 51 (1998). Instead, Plaintiff must show that (1) Investor Defendants "operate[d] the facility in the stead of [EES Coke] or alongside [EES Coke] in some sort of a joint venture"; (2) a dual officer or director "depart[ed] so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility"; or (3) "an agent of the parent with no hat to wear but the parent's hat [] manage[d] or direct[ed] activities at the facility." *Id*. at 71. And, even then, "[a]ctivities that involve the facility, but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." *Id*. at 72.

16.   Overlapping corporate officers or directors do not establish operator liability. It "is entirely appropriate for directors of a parent corporation to serve as

4

directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *Id.* at 69.

17.     The Sixth Circuit has "adopted an 'actual control' test to help resolve whether an entity is an operator." *Am. Premier Underwriters v. General Elec.*, 14 F.4th 560, 574 (6th Cir. 2021). Under that test, a parent company must perform "affirmative acts" to be an operator. *Id.* "The failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator." *Id.* The mere "'authority to control' is insufficient to give rise to operator liability[.]" *MRP Props. v. United States*, 308 F. Supp. 3d 916, 925 (E.D. Mich. 2018). Instead, "the exercise of 'actual control' is required". *Id.*

### B.      Findings of Fact on Operator Liability

### i.      DTEES did not operate the Facility.

18.     DTE Coke Holdings, LLC ("Coke Holdings") is a wholly-owned subsidiary of DTEES and the sole member of EES Coke. (ECF 372, PageID.25721 ¶¶ 45-46; ECF 391, PageID.27442.)

19.     DTEES provides management services to other entities under Management Services Agreements ("MSAs"). (ECF 391, PageID.27441, 46-47; DX 303; DX 383.) When DTEES employees perform services for EES Coke, they act under DTEES's MSA with Coke Holdings. (DX 383; ECF 391, PageID.27442, 46; ECF 377, PageID.26274, 79; ECF 378, PageID.26288, 26301-02.)

20.    Although DTEES and EES Coke share certain officers, when those officers make operational decisions at the Facility, they act only on behalf of EES Coke in their role as officers of EES Coke. (ECF 391, PageID.27439, 43.)

21.    DTEES did not exercise operational control over the Facility and took no affirmative act related to the alleged violation. (ECF 378, PageID.26306, 16-17.)

### ii.    DTEER did not operate the Facility.

22.    DTEES is a wholly-owned subsidiary of DTEER. (ECF 372, PageID.25722 ¶ 48.)

23.    DTEER provides administrative services to DTEES pursuant to specific services agreements. (DX 303; ECF 391, PageID.27454.) DTEES pays DTEER for such services, including services DTEES provides to Coke Holdings, which are in turn provided to EES Coke in Coke Holdings' role as EES Coke's manager. (ECF 391, PageID.27451-54.) When DTEER employees perform high-level management and administrative services for EES Coke, they do so under DTEER's MSA with DTEES. (*Id.*, PageID.27441, 51-54; DX 303; DX 383.)

24.    EES Coke's officers direct and supervise the DTEER employees and make the ultimate decisions at the Facility. (ECF 391, PageID.27455.)

25.    Plaintiff asserts that the alleged violations of the CAA took place in 2018. (ECF 159, PageID5802; ECF 228, PageID.16438.) DTEER's involvement at the Facility in 2014, long before the alleged violations and prior to subsequent

services agreements and a corporate reorganization, does not prove that DTEER had any control or authority over the Facility in 2018. (ECF 289, PageID.20670.)

26.    DTEER did not engage NTH consultants to prepare EES Coke's Permit application.  While DTEER was listed as the counter-party on NTH's proposal, NTH corrected the proposal and cost-estimate to reflect that EES Coke was its client.  (*See* PX 470; ECF 378, PageID.26310-11.)

27.    DTEER did not exercise operational control over the Facility and took no affirmative act related to the alleged violation. (ECF 377, PageID.26270-71; ECF 378, PageID.26316-17.)

### iii.    DTEEC did not operate the Facility.

28.    DTEER is a subsidiary of DTEEC. (ECF 372, PageID.25722 ¶ 50.)

29.    DTEEC has no employees. (ECF 377, PageID.26262.) No officers of DTEEC were involved in the management or operations of the Facility. (*Id.*, PageID.26261-63.) The individuals Plaintiff believed to have been employed by DTEEC, including Skiles Boyd and Fadi Mourad, are employed by non-party DTE Energy Corporate Services. (*Id.*, PageID.26263; ECF 378, PageID.26331-32.)

30.    The only connection identified by Plaintiff between EES Coke and DTEEC are intercompany loan agreements. (ECF 392, PageID.27538-39.) Those agreements do not concern environmental compliance or day-to-day operations at the Facility. (*Id.*) EES Coke has no right to borrow money from DTEEC under the

intercompany loan agreements. (ECF 391, PageID.27474.) EES Coke has no obligation to make any expenditure or proceed with any project for which DTEEC has agreed to loan funds. (ECF 392, PageID.27538-39.)

31.    DTEEC took no affirmative act to exercise operational control over the Facility, including any such act related to the alleged violations. (ECF 377, PageID.26270-71; ECF 378, PageID.26316-17.)

### iv.    EES Coke has sole operational control over the Facility.

32.    All employees providing services to EES Coke, regardless of their employer, report to the Vice President of EES Coke—currently David Smith. (ECF 391, PageID.27443.) EES Coke's plant manager, Ron Burnette, and Director of Technical Services, Michael Shafer, report directly to Mr. Smith. (*Id.*, PageID.27443-44.) Mr. Smith, or EES Coke President Mr. Mark Stiers, as officers of EES Coke, make all operational decisions. (*Id.*, PageID.27436-39, 42-45, 56-57.)

33.    Employees of DTEES or DTEER who perform work on behalf of EES Coke under the MSAs report to the President or Vice President of EES Coke for final decision-making. (*Id.*) The Vice President of EES Coke decides what services the DTEES or DTEER personnel will provide. (ECF 391, PageID.27455.)

34.    Most individuals working on behalf of EES Coke log their time spent doing so. (ECF 392, PageID.27548-50.) For those who do not log their time, EES Coke still allocates and pays for it. (*Id.*; ECF 377, PageID.26260.)

8

35.     EES Coke, through its officers, made operational and managerial decisions at the Facility, including the decision to apply for the permits at issue in this case ("PTI 51-08C"). (ECF 391, PageID.27436-37, 43, 58-59.)

36.     At trial, Plaintiff offered no fact witness with personal knowledge of: EES Coke's operations; the officers and employees of EES Coke, or the duties of those personnel.  Plaintiff's expert witness, Daniel Leistra-Jones, was Plaintiff's sole source of testimony on operator liability.

37.     Mr. Leistra-Jones admitted he lacks personal knowledge of how EES Coke operates. His testimony was derived from sources not in evidence, such as discovery depositions and unadmitted documents. (*See* ECF 374, PageID.26062; ECF 375, PageID.26101, 03, 20, 26-27, 32, 39, 69-70; ECF 378, PageID.26332.) Mr. Leistra-Jones opined on operator liability even though no fact evidence (except his own resume) had been admitted.

38.     Plaintiff did not later offer fact testimony from any witness with personal knowledge on operator liability.   (*See* ECF 386, PageID.26982-84.) Plaintiff failed to call any witnesses employed by or working on behalf of EES Coke. Despite identifying numerous individuals on their witness list, none of these witnesses were called at trial, including Fadi Mourad, Steve Zervas, and Ron Burnette.  (*See* ECF 396, PageID.27817-19, 924; ECF 372, PageID.25737.)

### C.    Conclusions of Law on Operator Liability

### i.    During its case-in-chief, Plaintiff failed to establish operator liability for any Investor Defendant.

39.    Plaintiff's proofs related to operator liability are legally insufficient.[2]

40.    Plaintiff's only witness on the issue of operator liability, Leistra-Jones, was an expert witness only, and not a fact witness.  He did not offer an opinion regarding the duties of officers and directors, or that any Investor Defendant was an operator of the Facility.  (ECF 377, PageID.26246-47.)

41.    Even if Plaintiff had offered expert testimony on this issue, "expert testimony may not be used to establish underlying facts not otherwise in evidence[.]" *In re John Richards Homes Bldg.*, 439 F.3d 248, 264 (6th Cir. 2006). Expert testimony is not a substitute for fact evidence.  *Brooke Group v. Brown & Williamson Tobacco*, 509 U.S. 209, 242 (1993).

42.    It is improper to use an expert as a "conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis for his testimony." *Marvel Characters v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013). The "appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events." *Id.*

43.    The federal rules allowing an expert in certain circumstances to rely on

---

[2] After Plaintiff's case-in-chief, Investor Defendants moved under Fed. R. Civ. P. 52(c) for judgment on their liability. The Court deferred its ruling.

inadmissible facts to form an opinion do not additionally allow admitting that inadmissible fact evidence at trial. "Rules 702 and 703 *do not*…permit the admission of materials, relied on by an expert witness, for the truth of the matters they contain if the materials are otherwise inadmissible." *Engebretsen v. Fairchild Aircraft*, 21 F.3d 721, 728 (6th Cir. 1994). Therefore, "inadmissible evidence relied on by the expert is not somehow transmogrified into admissible evidence simply because an expert relies on it." *Roche Diagnostics v. Shaya*, 2023 WL 7412918, at *6 (E.D. Mich. Nov. 9, 2023). "Rather, the hearsay is admitted solely to explain the basis of the expert's opinion, not as proof of the underlying matter." *Id*.

44.     Mr. Leistra-Jones conceded he had no personal knowledge of the facts or documents concerning operator liability to which he testified, and that there was no fact testimony at all that supported his opinions.  (ECF 377, PageID.26245, 48.) Nor did Plaintiff ever call another witness to testify to those facts. The Court does not, indeed it cannot, accept Mr. Leistra-Jones's gap-filling fact testimony as substantive evidence. *Engebretsen*, 21 F.3d at 728.

45.     Even if Mr. Leistra-Jones had opined on control of officer and employee duties, and even if Plaintiff had offered any fact testimony or document through a fact witness, his testimony and the documents admitted through him do not show actual control by any Investor Defendant or any affirmative act related to the environmental decisions at issue. *MRP Props.*, 308 F. Supp. 3d at 925 ("mere

11

authority to control is insufficient"); *Am. Premier*, 14 F.4th at 574.

46.     Individuals working on behalf of EES Coke (even if employed by DTEER/DTEES) made recommendations to EES Coke's officers but did not have decision-making authority. Instead, they were required to obtain approval from EES Coke's officers before acting.  (*See, e.g.,* PX 639; PX 652; PX 836.)  The documents introduced by Plaintiff (PX 652, PX 836, PX 90, PX 88, and PX 1) do not show any person acting on behalf of DTEER/DTEES (while Mr. Smith's testimony is not considered for Rule 52(c) purposes, each of these documents is consistent with his unrebutted testimony on the MSAs and the limits on delegated authority).

47.     Similarly, documents introduced by Plaintiff showing the letterhead or branding in the signature block of the Investor Defendants (*see* PX 1; PX 44; PX 88; PX 90; PX 639; PX 644; PX 247; PX 146) do not establish that any of the Investor Defendants actually exercised operational control over EES Coke.

48.     Nor are financial relationships enough to establish liability.  *Bestfoods, supra*, at 72.  The Investor Defendants acted only as investors, not as operators.  (*See, e.g.,* PX 557; PX 604; PX 631; ECF 378, PageID.26315, 26-27.)  As investors, Investor Defendants could exercise approval authority over significant transactions involving EES Coke (*see* PX 1016; PX 247), without acting as operators of the Facility.  *Bestfoods, supra*, at 72 (activities that are consistent with investor status, such as supervision of performance and capital decisions, do not give rise to direct

12

liability).

49.     Plaintiff failed to introduce sufficient evidence to establish operator liability before resting its case.

50.     Investor Defendants' Fed. R. Civ. P. 52(c) motion is thus granted, and judgment is entered against Plaintiff on its claims against Investor Defendants.

### ii.     The Investor Defendants' Evidence confirmed that the Investor Defendants do not operate EES Coke's Facility.[3]

51.     Investor Defendants do not exercise "actual control" over EES Coke. *Am. Premier*, 14 F.4th at 574.  All major decisions at EES Coke are subject to the oversight of its Vice President (Mr. Smith) or its President (Mr. Stiers).

52.     DTEEC is not an operator of the Facility. Because DTEEC has no employees, it is impossible for a DTEEC employee to control EES Coke. No board decision was made concerning pollution at the Facility. The intercompany loan agreements between EES Coke and DTEEC did not grant DTEEC authority to control the Facility. *Bestfoods*, 524 U.S. at 72; *see also New York State Elec. & Gas v. FirstEnergy*, 766 F.3d 212, 223 (2d Cir. 2014) (agreements between subsidiary and parent are not enough to establish operator liability, even if agreements covered "services as general operator and financial manager of [subsidiary]'s properties").

53.     DTEER is not an operator of the Facility. DTEER does not control the

---

[3] If the Court denies the Rule 52(c) motion, the following findings apply.

facility merely because it provides high-level management services to EES Coke pursuant to an MSA. Any services provided by DTEER employees are ultimately directed and approved by Mr. Smith or Mr. Stiers and paid for by EES Coke. *MRP Props.*, 308 F. Supp. 3d at 925 ("the exercise of actual control is required.").

54.     DTEES is not an operator of the Facility. Plaintiff did not call any witnesses with personal knowledge of DTEES' involvement at EES Coke. The fact there is an MSA between DTEES and Coke Holdings does not give rise to operator liability. EES Coke's officers had exclusive authority to make decisions at EES Coke. While DTEES employs them, "[i]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary." *Bestfoods,* 524 U.S. at 69.

55.     The only evidence based on personal knowledge shows that the Investor Defendants are not operators.  Any actions by personnel employed by DTEER or DTEES were done pursuant to MSAs and done on the legal behalf of EES Coke.  EES Coke, through its officers, is the sole operator of the coke battery.

## II.     <u>INJUNCTIVE RELIEF</u>

### A.     **Legal Framework**

56.     A permanent injunction is an extraordinary remedy. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

57.    A "grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances[.]" *United States v. Bay-Houston Towing*, 197 F. Supp. 2d 788, 796 (E.D. Mich. 2002) (quoting *Weinberger*, 456 U.S. at 313). A "federal judge…is not mechanically obligated to grant an injunction for every violation of law." *Id.* (quoting *Weinberger*, 456 U.S. at 313); *accord Amoco v. Vill. of Gambell*, 480 U.S. 531, 543 and 534 n.1 (1987); *Hodgins v. Carlisle Engineered*, 2006 WL 721762, at *2 (N.D. Ohio Mar. 20, 2006).

58.    Injunctions under the CAA thus remain constrained by equity. *United States v. Westvaco*, 2015 WL 10323214, at *7 (D. Md. Feb. 26, 2015); *accord Amoco*, 480 U.S. at 545. That is especially true when a plaintiff "sue[s] an already operational facility and claim[s] it was polluting in excess of permissible limits." *Sierra Club v. Franklin Cnty. Power of Illinois*, 546 F.3d 918, 936 (7th Cir. 2008). A "permanent injunction that shuts down a…factory without consideration of the extent of the harm that its pollution caused" is "unreasonable." *Harrison v. Indiana Auto Shredders*, 528 F.2d 1107, 1123 (7th Cir. 1975).

59.    "A plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted, and that it is the public interest to issue the injunction." *Audi v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006).

15

60.    "Federal courts should not issue relief that extends further than necessary to remedy the plaintiff's injury." *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Sometimes an injunction would be "an excessively intrusive remedy" because it would "entail continuing superintendence of the permit holder's activities by a federal court—a process burdensome to court and permit holder alike." *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 193 (2000).

61.    As such, the Court may only issue injunctions that are as narrow as possible, and no broader than what is required to afford complete relief in CAA cases. *See, e.g.*, *Kentuckians for Commonwealth v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003); *Alabama Air Pollution Control Comm'n v. Republic Steel*, 646 F.2d 210, 214 (5th Cir. 1981).

## B.    Findings of Fact on Injunctive Relief

### i.    Plaintiff did not prove that it suffered irreparable harm.

62.    $SO_2$ and $PM_{2.5}$ are emitted through normal operation of the Facility.

63.    EPA sets National Ambient Air Quality Standards ("NAAQS") to protect human health. 42 U.S.C. § 7409. The area around Zug Island has met NAAQS for years. In May 2025, EGLE sought to redesignate parts of Wayne County, including Zug Island, as attainment for $SO_2$. (DX 195.)  EPA proposed approval of this request, 90 Fed. Reg. 29148, and determined that no reductions from

EES Coke are needed to maintain NAAQS compliance, 87 Fed. Reg. 33,095. (DX 157.)

64.     EPA also establishes Significant Impact Levels ("SILs") below which emissions are considered insignificant.

65.     Ambient impacts resulting from EES Coke's $PM_{2.5}$ emissions are thousands of times below EPA's NAAQS and only a fraction of the SILs. (ECF 379, PageID.26447-48; ECF 382, PageID.26635; ECF 388, PageID.27136-39.)

66.     NAAQS protect public health and welfare with "an adequate margin of safety" from "any known or anticipated adverse effects." (ECF 388, PageID.27132-36; ECF 367, PageID.25655.) Concentrations below the SIL have "an insignificant effect on ambient air quality" and are "*de minimis*" impacts that are not meaningful. (ECF 388, PageID.27132-36.) The NAAQS and SILs help determine the seriousness of harm caused to the public by a source's emissions. (ECF 367, PageID.25655.)

67.     Mr. Chinkin modeled the maximum offsite $SO_2$ and $PM_{2.5}$ concentrations that would occur in a scenario where EES Coke was required to reduce its emissions by 95%. (ECF 378, PageID.26351.)

68.     The maximum $SO_2$ concentration at the Zug Island fence line modeled by Mr. Chinkin was 52.58 parts per billion (ppb) based on Plaintiff's 95% control scenario, which is below EPA's NAAQS for $SO_2$ of 75 ppb. (ECF 379, PageID.26433; PX 989.)

17

69.     Mr. Chinkin's maximum $PM_{2.5}$ impact modeled from EES Coke's emissions was 0.009 µg/m³, which is significantly below the NAAQS for $PM_{2.5}$ (9 µg/m³) and SIL (.13 µg/m³).[4] (ECF 388, PageID.27136, 39; PX 996.)

70.     Put differently, even when EES Coke's excess $SO_2$ emissions are overstated, Plaintiff's experts still modeled the highest level of public exposure as below the levels which EPA indicates are harmful to human health.

71.     EES Coke's excess emissions therefore have not caused harm, much less irreparable harm, to people or the environment. (Defs' Proposed Findings of Fact ("FOF") ¶¶ 63-70.)[5]   On the contrary, in recent decades, $SO_2$ and $PM_{2.5}$ emissions have substantially declined in Detroit and nationally. (ECF 382, PageID.26586; ECF 388, PageID.27123-24.)

---

[4] Notably, even the 9 µg/m³ level is, according to the EPA, the wrong metric.  EPA has argued in public court filings that the lowering of the NAAQS for $PM_{2.5}$ from 12 µg/m³ to 9 µg/m³ in 2024 was "unlawful" and an "error," because it was based "on a novel interpretation of the [CAA] and without the thorough review of the underlying air quality criteria and related standards required by the Act."  *See* Mot. for Vacatur, Doc. #2147050 at 1, *Commonwealth of Kentucky, et al. v. U.S. E.P.A., et al.*, USCA Case No. 24-1050 (D.C. Cir. Nov. 24, 2025) (available at https://perma.cc/56UK-ZHDX).  When the 12 µg/m³ level argued for by EPA is used, EES Coke's emissions are even further below the level that, with an "adequate margin of safety," protects human health.

[5] Plaintiff's motion to stay this litigation undermines its claim that EES Coke's emissions are causing harm to the public. Indeed, Plaintiff concedes this is not a case "involving the safety of human life or the protection of property." (ECF 397, PageID.27967.)

### ii.     Plaintiff did not prove what BACT or LAER would require.

72.     Neither Best Available Control Technology ("BACT") nor Lowest Achievable Emissions Rate ("LAER") may be based on generalizations. (ECF 385, PageID.26876-77; ECF 390, PageID.27267; DX 690 at B.1-B.2, G.2-G.4.)

73.     Plaintiff did not establish what would constitute BACT for $SO_2$ at EES Coke. Plaintiff offered no evidence or analysis regarding the BACT emissions limit that would be appropriate. (*See, e.g.*, *id.*; DX 690 at B.56). Plaintiff never identified a specific technology that would allow EES Coke to implement a BACT limitation. (*See, e.g.*, ECF 396, PageID.27824 (identifying only "desulfurization" as a potential control method).) Generalized assertions as to the economic or technical feasibility of control technologies in generic and/or outdated documents (*see* PX-788; PX 472; PX 18; PX 666), without any showing specific to EES Coke's Facility or to the implementation of any specific control technology, does not constitute BACT.  The only specific evidence propounded by Plaintiff as to the costs of specific control technology shows that the installation and operation would be prohibitively expensive.  (*See* PX 270; PX 184; ECF 395, PageUD,27798-99; ECF 378, PageID.26324-27.)  As a result, there is insufficient evidence for the Court to determine what BACT limit would apply at EES Coke, what modifications would be needed to apply that limit, or what control efficiency would be achieved if that technology were implemented.

74.    Plaintiff also did not establish what would constitute LAER for $PM_{2.5}$ at EES Coke. Ms. Galinsky admitted she lacked the expertise to analyze the feasibility of control technology at EES Coke or the technical requirements of different coke batteries. (ECF 385, PageID.26877-78; ECF 386, PageID.26914, 23.) Her analysis was based only on review of different permits and SIP limits, which is inadequate. (ECF 385, PageID.26877-78; ECF 390, PageID.27267; DX 690 at G.2-G.3.)

75.    To identify class or category of source for purposes of determining LAER and to ensure that any proposed LAER limit is actually transferable between sources, the technical realities of the source and relevant emissions units must be specifically analyzed and compared.  (ECF 385, PageID.26876-77.) An emissions limit applicable to a source in a different class or category is not a limit on which LAER may be based.  (ECF 386, PageID.26942.)

76.    Plaintiff's proposed LAER limit of 10 grains $H_2S$ per 100 standard cubic feet (scf) of COG ("10 Grain Limit"), is based solely on provisions of the Allegheny County, Pennsylvania SIP.  Those particular provisions are inapplicable to EES Coke. (ECF 384, PageID.26789-91.) That SIP provides that the 10 Grain Limit applies only to batteries with a rated production capacity equal to or more than 70 million scf of COG per day. (PX 747 at 181 § 2105.21(h)(2); ECF 385, PageID.26884.) EES Coke does not have a rated production capacity that high. (ECF

385, PageID.26884.) Moreover, the Pennsylvania SIP contains a *different* provision applicable to batteries smaller than 70 million scf COG per day.  That provision does not provide for a 10 Grain Limit for batteries such as EES Coke.  The Pennsylvania SIP thus demonstrates that EES Coke is not in the same class or category of sources to which the 10 Grain Limit applies.  (*Id.*, PageID.26884-85.)

77.     No other SIP contains a 10 Grain Limit, and that limit is not contained in any permit. (*Id.*, PageID.26880-81 ("There's not a permit that has it."), 85.) Plaintiff has not presented evidence showing what any other LAER limit could be.

78.     As a result, Plaintiff has failed to establish that LAER would require a 10 Grain Limit.

79.     The Court is unable to determine what LAER would require at EES Coke or the control efficiency and emission reductions that would be achieved as a result.

>               **iii.     EGLE would need to determine BACT and LAER requirements, and applying either limit would take years.**

80.     EGLE has the primary responsibility of issuing NSR permits and determining the requirements of BACT and LAER at stationary sources in Michigan. (*Id.*, PageID.26877; ECF 383, PageID.26688-89; ECF 384, PageID.26788, 819; ECF 386, PageID.26924; ECF 391, PageID.27389, 400.)

81.     EGLE must determine the requirements of BACT and LAER through the permitting process, wherein it can analyze the cost of compliance with a given

emission limit, the unique circumstances applicable to EES Coke that make the emission limit achievable, and the appropriate class or category by which to determine applicable emission limits. (ECF 384, PageID.26788; ECF 385, PageID.26877; ECF 386, PageID.26924; DX 690 at G.3.)

82.     EES Coke does not have a complete design for installation of any desulfurization technology at the Facility. (ECF 392, PageID.27501.)

83.     EES Coke would need six to eight months to complete preliminary engineering studies before it could even apply for a new permit related to any desulfurization technology (other than Claus, discussed below, which would not require a permit).  (ECF 393, PageID.27595-97.)

84.     After preliminary engineering studies were complete, preparing a PSD permit application can take from twelve to eighteen months. After the permit application is submitted, EGLE needs eight to eighteen months to review that application. (ECF 390, PageID.27265-66.) As such, it would take at least three years after permit issuance for new desulfurization technology to be operational. (ECF 393, PageID.27595-97.)

85.     The Court does not have before it sufficient information to require EES Coke to install any particular control technology or limit for $SO_2$ emissions or to ensure that EES Coke could meet the time requirements that Plaintiff has proposed to design, permit, and install desulfurization technology.

### iv.   Plaintiff did not prove what the desulfurization it requests would look like or that it is technically and economically viable.

86.    Desulfurization is a process and does not refer to any specific control technology. (ECF 383, PageID.26731; ECF 393, PageID.27597-98.) The viability and efficiency of different control technologies must be analyzed based on the specific realities of the Facility. (ECF 383, PageID.26662.) Different desulfurization control technologies have different technical requirements, vary in cost, and achieve different outcomes. (*Id.*)

87.    Although Plaintiff asked the Court to order the installation of "full desulfurization control technology," (ECF 396, PageID.27821), Plaintiff did not present evidence sufficient to allow the Court to determine the technical feasibility of different desulfurization technologies and their associated control efficiencies. (ECF 385, PageID.26877; ECF 386, PageID.26914.) Because Plaintiff failed to identify a specific technology beyond the generic category of "desulfurization," Plaintiff failed to show that any specific desulfurization technology would be technologically feasible or cost effective. (ECF 386, PageID.26914; ECF 393, PageID.27598-602; ECF 394, PageID.27674-76.)

### v.   Plaintiff proposed an impossible emissions reduction.

88.    Plaintiff argued that "full" desulfurization technology would reduce EES Coke's $SO_2$ emissions by 95%. (ECF 396, PageID.27827.) A control efficiency of 95% for total $SO_2$, however, could not be achieved at EES Coke by any available

23

technology because of the amount of organic sulfur in the COG and the fugitive emissions, which desulfurization technology cannot control. (ECF 386, PageID.26921, 24-25; ECF 393, PageID.27598-602; ECF 394, PageID.27674-76.) An $SO_2$ control efficiency of 95% is not credible, achievable, or supported by fact.

### vi. Claus technology is technically and economically viable, would have avoided the violations at issue, and can be installed quickly.

89.     EES Coke's excess emissions are those that would have been avoided if control technology had been installed to reduce EES Coke's emissions and prevent the violation from occurring. (*See, e.g.*, ECF 384, PageID.26804.)

90.     EES Coke could have avoided the CAA violation the Court found by using Claus desulfurization technology ("Claus"). (ECF 331, PageID.24343-45.)

91.     EES Coke could have installed Claus in 2018. (ECF 393, PageID.27605-06; ECF 391, PageID.27472-73.) Installing Claus at the Facility is and has been technologically feasible. (ECF 393, PageID.27602, 05-06.)

92.     Installing Claus would reduce EES Coke's total $SO_2$ emissions by 33%. (*Id.*, PageID.27605; ECF 391, PageID.27472-73.) If Claus had been installed in 2018, the resulting 33% reduction in emissions would have eliminated all of the $SO_2$ emission exceedances in this case. (ECF 393, PageID.27607-17.)

93.     Claus would have present-day installation costs of $18 million and annual ongoing operational costs of $2.5 million. (*Id.*, PageID.27606; ECF 391, PageID.27473; ECF 394, PageID.27721-22.)

24

### vii.   EES Coke and the public would suffer significant hardships if the Court required installation of anything other than Claus.

94.     The costs of desulfurization technology with control efficiency higher than Claus would make the Facility unprofitable. (ECF 394, PageID.27710-11.) A shutdown of EES Coke would cause a loss of approximately $450 million in economic output to the surrounding community, a loss of approximately $900 million to Michigan's economy, a direct job loss to 130 unionized employees, and an indirect job loss of about 2,700 jobs throughout Michigan. (*Id.*, PageID.27707.)

95.     EES Coke's closure would also affect the steel industry nationally. As one of the last remaining coke oven batteries in North America, EES Coke's closure would have a negative effect on the coke market and steel industry. (*Id.*, PageID.27704-05.) The coke produced by EES Coke annually is used to produce roughly two and a half million tons of steel. (ECF 392, PageID.27552.)

96.     The government has recognized the critical role that metallurgical coke, such as that produced by EES Coke, plays in the United States economy and steel production.  A November 21, 2025 presidential proclamation indicates that "a strong coke industry is therefore vital to building and maintaining critical infrastructure and military readiness."  90 Fed. Reg. 54517.  The proclamation further notes that EPA regulatory requirements that "threaten[] facility closures, production halts, and lasting harm to the domestic coke production industry" pose "unacceptable risks" that would "undermine national security, as these effects would substantially impact

local and national economies and would undermine the coke and steel sectors' vital role in producing the iron and steel needed to support critical infrastructure and defense." *Id.*

97.    With average annual earnings of $12 million to $22 million, EES Coke cannot pay to install and operate technology achieving Plaintiff's proposed 95% control efficiency for hydrogen sulfide (H$_2$S). (ECF 394, PageID.27710-13.)

98.    If ordered to comply with the installation of full desulfurization technology and/or compliance with the SO$_2$ emission limits Plaintiff seeks, EES Coke will not be able to reduce its SO$_2$ emissions prior to the installation of emissions control technology without ceasing operations.    (ECF 393, PageID.27561.)   EES Coke cannot shut down or pause its operations (or its emissions) without causing significant damage to the Facility associated with the cooling down of the ovens and refractory bricks, which would render the Facility inoperable.   (ECF 392, PageID.27560-61; ECF 393, PageID.27586-88.)   Such damage would be irreparable and irreversible, and would lead to the permanent closure of the Facility.  (ECF 393, PageID.27560-61.)

### C.    Conclusions of Law on Injunctive Relief

### i.    Plaintiff may not obtain injunctive relief

99.    This Court lacks jurisdiction to award injunctive relief.  *See United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 293 (3d Cir. 2013)

("[A]ny injunctive relief available [in 42 U.S.C. § 7413(b)] must be limited to ongoing violations[.]").

100.   The injunction Plaintiff seeks is improper because it is "really just [a] time-barred penalt[y] in disguise." *United States v. Luminant Generation Co., L.L.C.*, 905 F.3d 874, 891 (5th Cir. 2018) (Elrod, J., dissenting), *reh'g en banc granted*, 929 F.3d 316 (5th Cir. 2019).

101.   Given EPA's proposal to redesignate the area in which EES Coke is located as being in attainment for $SO_2$, imposition of injunctive relief based on the requirements of LAER is not appropriate.[6]   Requiring EES Coke to comply with LAER would not be remedial and would instead function as a penalty given that LAER will not be required once the redesignation proposal is approved.  *Coleman v. Ann Arbor Transp. Auth.*, 947 F. Supp. 2d 777, 784 (E.D. Mich. 2013) (past injury is insufficient to warrant injunctive relief where it will not prevent future injury); *United States v. Packorp, Inc.*, 246 F. Supp. 963, 965 (W.D. Mich. 1965) ("injunctions are not to be used as punitive measures, but only to prevent future

---

[6] *See* EPA's 1983 Delco Determination, available at: https://perma.cc/U8GC-Z7KU ("The original permitting requirements were established based on the nonattainment status of the Montgomery County, Ohio area.  Inasmuch as this area has now been redesignated to attainment, EPA can no longer require the continued application of the nonattainment requirements.").

27

violations"). LAER requirements would exceed the emission reductions warranted under the facts and law.

102. The concurrent-remedies doctrine likewise bars Plaintiff from obtaining injunctive relief. *See Madison v. Wood*, 410 F.2d 564, 567–68 (6th Cir. 1969); *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1018–19 (8th Cir. 2010).

### ii.   Plaintiff did not satisfy its burden for injunctive relief.

103. Plaintiff has the burden of meeting the requirements for injunctive relief. *Platt v. Bd. of Comm'rs on Grievances*, 769 F.3d 447, 453 (6th Cir. 2014). Plaintiff did not satisfy that burden.

104. The "existence of an irreparable injury is mandatory." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). "Mere speculation about, or bald assertion of, irreparable harm is insufficient." *Grassi v. Grassi*, 2024 WL 4715614, at *4 (6th Cir. Nov. 5, 2024).

105. Plaintiff did not establish irreparable harm from EES Coke's $SO_2$ and $PM_{2.5}$ emissions. Ambient $SO_2$ concentrations around Zug Island, even with EES Coke's alleged excess emissions, have been below the NAAQS threshold for years.

106. Similarly, the alleged $PM_{2.5}$ emission impacts are below the SILs. Indeed, existing monitoring instruments cannot even detect the *de minimis* concentrations that Plaintiff's expert modeled. (ECF 389, PageID.27182.)

107. The balancing-of-harms and the public-interest factors support

28

Defendants as well. The balancing-of-harm factor "refers to the balance of equities between the movant and other parties, not just third parties to the litigation." *Rhinehart v. Scutt*, 509 F. App'x 510, 515 (6th Cir. 2013). The real-world costs of full desulfurization outweigh any purported harm. The economic injury to EES Coke would be substantial. Installation of full desulfurization technology would render the Facility economically unviable and would negatively affect the local and national economy tremendously. (FOF ¶ 94, 97.) That weighs heavily against granting any such injunction. *See, e.g.*, *Higuchi v. Autoliv*, 103 F.4th 400, 409 (6th Cir. 2024) (denying injunction when party "put forth evidence" it would "force [it] out of business").

108.   As for the public-interest factor, EES Coke undisputedly sought, obtained, and complied with its permits from EGLE. "The public interest in leaving the administration of state [permitting] to state [permitting authorities] is another factor weighing against" injunctive relief. *Rhinehart*, 509 F. App'x at 516. Penalizing a source for proactively seeking and obtaining a permit would not only undermine the integrity of EGLE's permitting process but also send a dangerous message to all: compliance with a valid permit offers no protection against severe damages and crippling injunctive relief. The "public interest is served by…protecting vested rights[.]" *EOG Resources, Inc. v. Lucky Land Management, LLC*, 134 F.4th 868, 887 (6th Cir. 2025). And it would "clearly be against the public

interest" to require EES Coke to implement Plaintiff's requests when far less would have avoided any CAA violation in the first place. *See Charter Twp. of Huron, Mich. v. Richards*, 997 F.2d 1168, 1175 (6th Cir. 1993). Thus, the public interest would not be served by an injunction at all, and certainly not an injunction requiring full desulfurization.

### iii.   Injunctive relief could not extend to BACT or LAER.

109.   Plaintiff did not provide any evidence of what BACT would require.

110.   LAER is the "more stringent rate of emissions" of two standards. 40 CFR Part 51, Appendix S ¶ II.A.18. The first rate must be found in a state SIP, concern the same class or category of a stationary source, and be achievable by the source. *Id.* The second rate can be based on a permit applied to the same class or category of source, so long as it is actually achieved. *Id.* Plaintiff offered testimony regarding other classes and categories of facilities but did not provide evidence regarding EES Coke's Facility or what it could achieve. And Plaintiff's technical expert disclaimed that she was offering any opinion on the second type of emissions rate. (ECF 385, PageID.26881.) The record therefore contains no evidence of a LAER emissions rate that would be applicable to EES Coke, and the Court cannot fashion such a rate from nothing. Although Plaintiff requests imposition of a 10 Grain Limit, that limit is not found in a state SIP concerning the same class or category of stationary source and is not found in any permit, so the limit is

inappropriate here.

111.   Plaintiff provided no evidence of feasibility for any technology, including that which would meet BACT or LAER. (FOF ¶¶ 86-87.)

112.   Because Plaintiff has not conducted—and presented no evidence of— a BACT or LAER analysis, or otherwise demonstrated what constitutes BACT or LAER, Plaintiff failed to meet its burden for an order requiring BACT or LAER.

113.   In any event, this Court is not the proper forum to complete the statutorily mandated procedure to determine BACT or LAER. The proper forum for such an analysis is EGLE. (FOF ¶ 80-81.)

### iv.   If injunctive relief were warranted, it would extend only to installation of Claus technology.

114.   When required, injunctive relief should only be as broad as necessary to address the harm shown. *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003). Here, an injunction need be no broader than ordering EES Coke to: (i) install Claus and (ii) continue reasonable possibility reporting until EGLE directs otherwise.

115.   It is undisputed that a 33% reduction in $SO_2$ emissions would have avoided—and would cure—the violation the Court found. (FOF ¶¶ 89-93.) Such a reduction is feasible through Claus. (*Id.*) Claus will fit on EES Coke's physical property, will work with the existing battery and byproducts plant design, and will avoid rendering continued operations economically unviable. (*Id.*)

116.   EES Coke will be required to install Claus technology within one year.

31

This timeline is appropriate to ensure that emissions are reduced without causing irreparable harm to EES Coke's ability to continue future operations. *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758, 771 (M.D. Tenn. 2015) (court must consider harm that would result from injunction in crafting relief, and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction"). Until Claus is installed, EES Coke will not be required to reduce emissions below its current levels.

117. Requiring the installation of Claus serves the public interest. It would reduce emissions levels below what violated the CAA. Its costs, while significant, would be costs EES Coke could afford, thus avoiding significant job losses and negative impacts on domestic steel and automotive production. The stated policy of the United States government is to protect the domestic coke and steel industry, and a limited injunction accomplishes those aims because it would not result in the closure of the EES Coke Facility. (FOF ¶¶ 94-97.)

## III.   **CIVIL PENALTIES**

### A.   **Legal Framework**

118. "Imposition of a civil penalty is not mandatory under the CAA[.]" *Env't Texas Citizen Lobby v. ExxonMobil*, 824 F.3d 507, 524 (5th Cir. 2016). Indeed, many courts have elected not to impose a penalty for CAA violations. *See, e.g.*, *Resurrection Bay Conservation All. v. City of Seward, Alaska*, 2008 WL 11340292,

at *2 (D. Alaska Apr. 3, 2008) (awarding a nominal $1 civil penalty); *United States v. Mountain State Carbon*, 2014 WL 3548662, at *42 (N.D.W. Va. July 17, 2014).

119.   Courts usually calculate Clean Air Act penalties using one of two methods: "the 'top-down' and the 'bottom-up' approaches." *Mountain State Carbon*, 2014 WL 3548662, at *34. The top-down method begins with the statutory maximum penalty, then considers how much the penalty factors warrant reducing that amount. *Id*. The bottom-up method starts with the "estimated economic benefit from non-compliance," then adjusts up or down based on the penalty factors. *United States v. Smithfield Foods*, 191 F.3d 516, 528 (4th Cir. 1999).

120.   The top-down method need not be used "when doing so will initially set the bar so high that it will remain at a height that is inconsistent with the mitigating factors in Section 7413 even after it is lowered." *United States v. Anthony Dell'Aquilla, Enters. & Subs.*, 150 F.3d 329, 338 (3rd Cir. 1998).

### B.   Findings of Fact on Civil Penalties

#### i.   EES Coke made good-faith efforts to comply with the CAA.

121.   In 2013, EES Coke applied for and EGLE granted a permit allowing it to temporarily remove the annual COG combustion limit at Underfire ("PTI 71-13"). (ECF 390, PageID.27277-78, 330; *Id.*, PageID.27281, 349.)

122.   EES Coke then applied for a permit to permanently remove the COG limit at Underfire ("PTI 51-08C") in June 2014. (*Id*., PageID.27286.) The process

involved extensive communication with EGLE to address EGLE's requests for information and assist its evaluation of the change. (*Id.*, PageID.27279, 84-85, 333.)

123.   In its permit application, EES Coke projected the very emissions that the Court concluded caused a violation of the CAA. (*Id.*, PageID.27286-88; DX 299 at US-EPA-12411.) The application projected that EES Coke would combust 3.763 million MMBtu of COG at Underfire, that 2,072 tpy of $SO_2$ would result from that combustion, and that 1,570 tons of the projected 2,072 tpy was related to the combustion of COG up to the prior permit's limit. In other words, EES Coke projected that 502 tpy of its projected $SO_2$ emissions would result from Underfire combustion of more than 2.85 million MMBtu of COG. (*Id.*)

124.   EGLE conducted a thorough technical review of the permit application, including the projected emissions. (DX 192; ECF 390, PageID.27335-36, 40.) Through that review, EGLE concluded the project was not a "major modification" for $SO_2$, despite EES Coke's projections. (ECF 391, PageID.27371; DX 316; ECF 385, PageID.26863-64, 44; ECF 390, PageID.27270-71.)

125.   EPA may comment on or object to a permit. (ECF 384, PageID.26828-30.) EPA did not comment on or object to the issuance of the Permit despite being notified of the applications. (ECF 385, PageID.26845-46, 64, 66; ECF 390, PageID.27283, 334; ECF 391, PageID.27391, 399-400, 415, 421-22.)

126.   EGLE issued the Permit on November 21, 2014. (DX 213.) Plaintiff

concedes the Permit was valid at the time it was issued. (ECF 384, PageID.26820.)

127.   In issuing the Permit, EGLE also determined that reasonable possibility reporting requirements did not apply. (ECF 390, PageID.27306, 44.) EGLE expressly considered these reporting requirements and removed them from a draft version of the Permit. (ECF 385, PageID.26859-60; DX 213; DX 705; DX 316 at 4.)

128.   In all relevant respects, EES Coke has followed the terms of its permits and provided all information requested by EGLE or EPA. (*Id.*, PageID.26831; ECF 385, PageID.26840-42, 54-55; ECF 386, PageID.26932-33, 40-41.)

129.   EES Coke's conduct was at all times in good faith and consistent with the validly issued Permit.

130.   In June of 2022, after EPA began its investigation that culminated in this litigation, EGLE separately analyzed EPA's allegations of a CAA violation against EES Coke and concluded EES Coke's emissions did not violate the Permit or the CAA. (DX 347; DX 314; ECF 391, PageID.27369-72.) EGLE's internal analysis, memorialized in a formal memo, included the following:

- Ambient air monitoring by EGLE showed that the area around EES Coke had been "in compliance with the [federal standards] for sulfur dioxide, which is health protective, since 2013 and during the time period of the alleged violations" and "EES did not exceed any permitted limits." (DX 314 at EGLE_0019977.)
- EGLE "informed EPA it did [not] intend to join [this] case as the permit review was done properly meeting state and federal requirements in our view." (*Id.* at EGLE_0019978.)
- EGLE determined that "the emissions from the actual to projected actual

analysis were less than 50% of significance levels and did not require an annual recordkeeping provision be included in the permit (known as reasonable possibility." (*Id.*)

- EGLE stated that it "does not agree with USEPA that these exceedances are automatic violations of the Clean Air Act and Michigan's air quality rules and regulations for the following reasons: these emissions did not exceed emission limits in PTI No. 51-08C; and there were legitimate reasons unrelated to the project that caused higher than anticipated emissions." (*Id.*)

131. EES Coke, in not submitting reasonable possibility reports, acted in line with EGLE's analysis that the reports were not required. (ECF 385, PageID.26844.)

132. EES Coke has not been previously penalized for any violation concerning the emissions here, including excess emissions or reporting.

133. EES Coke remedied any violation by submitting information consistent with "reasonable possibility" reporting since the NOV. (ECF 386, PageID.26933.)

134. At all times, EES Coke complied with the annual $SO_2$ emissions limits contained in the Permit. (ECF 386, PageID.26939; ECF 390, PageID.27322, 49, 53.) While Plaintiff presented evidence of other violations at the Facility (*see* PX 194; PX 196; PX 198; PX 202; PX 203), the violations are unrelated to the violation that is the subject of this litigation. (*See* ECF 396, PageID.27854.)

135. Plaintiff has not provided a single example of the EPA prevailing in an enforcement action against a defendant where the defendant had and complied with a valid permit concerning the same emissions that the EPA alleged were violative.

### ii. No harm resulted from EES Coke's excess emissions.

136. In recent decades, $SO_2$ and $PM_{2.5}$ emissions have substantially declined

in Detroit and nationally. (ECF 382, PageID.26586; ECF 388, PageID.27123-24.)

137.   Ambient impacts resulting from EES Coke's $PM_{2.5}$ emissions are thousands of times below EPA's NAAQS and SILs. (ECF 379, PageID.26447-48; ECF 382, PageID.26635; ECF 388, PageID.27136-39.)

138.   As noted above, the NAAQS and SILs help determine the seriousness of harm caused to the public by a source's emissions.  The NAAQS and SILs have not been exceeded here. (ECF 367, PageID.25655.)

139.   Plaintiff's experts modeled a scenario where EES Coke was required to reduce its $SO_2$ emissions by 95%. (ECF 378, PageID.26351.) There is no evidence supporting a conclusion that EES Coke would have been required to reduce $SO_2$ emissions by 95% to avoid a CAA violation. (*See, e.g.*, *id.*; ECF 379, PageID.26426-28; ECF 386, PageID.26929-31; FOF ¶¶ 88-92.) There is no credible evidence concerning harm caused by EES Coke's violation.

140.   As shown by publicly available information in the Michigan Air Emissions Reporting System ("MAERS") for EES Coke and U.S. Steel, during the time in which the Court has found EES Coke's emissions to have violated the CAA, the $SO_2$ emissions from the stationary source as a whole decreased.[7]  (*See* ECF 384,

---

[7]  2005-2021 data accessed via "MAERS Query" (Last accessed 4/30/25) https://www.deq.state.mi.us/maers/emissions_query.asp. 2022-2023 data accessed via Michigan Point Source Inventory (Last accessed 4/30/25). https://perma.cc/NP8R-KGS4. Under Federal Rule of Evidence 201, the Court may

PageID.26824-25.)

| Year | SO$_2$ (tpy ) | | |
|---|---|---|---|
| | U.S. Steel (SRN A7809) | EES Coke (SRN P0408)[8] | Total |
| 2005 | 4,431 | | 4,431 |
| 2006 | 6,041 | | 6,041 |
| 2007 | 5,629 | | 5,629 |
| 2008 | 6,755 | | 6,755 |
| 2009 | 2,368 | | 2,368 |
| 2010 | 5,845 | | 5,845 |
| 2011 | 5,604 | | 5,604 |
| 2012 | 2,874 | 1,901 | 4,775 |
| 2013 | 2,294 | 2,180 | 4,475 |
| 2014 | 2,208 | 2,068 | 4,276 |
| 2015 | 2,273 | 2,452 | 4,725 |
| 2016 | 1,488 | 1,556 | 3,044 |
| 2017 | 1,502 | 2,819 | 4,321 |
| 2018 | 1,483 | 3,254 | 4,737 |
| 2019 | 1,031 | 3,193 | 4,224 |
| 2020 | 523 | 2,089 | 2,612 |
| 2021 | 577 | 3,594 | 4,171 |
| 2022 | 390 | 2,950 | 3,340 |
| 2023 | 430 | 3,045 | 3,476 |

141.   Thus, there is no evidence that there was any real-world increase in SO$_2$

---

take judicial notice of this publicly available information.  *See* Fed. R. Evid. 201(d) ("The court may take judicial notice at any stage of the proceeding").

[8] Emissions data on MAERS is accessible by SRN (state registration number), which are assigned by the State of Michigan.  Prior to 2012, U.S. Steel and EES Coke's emissions were reported together.  (ECF 310-5.)  In 2012, EGLE agreed to an administrative separation as to U.S. Steel and EES Coke's reporting data, and issued EES Coke a separate SRN.  (*See id.*, PageID.22712 ("U.S. Steel will retain the same registration number, A7809.  EES Coke Battery's new State Registration Number is P0408.").)

emissions from the source or demonstrated public health impacts in the surrounding community. (*See* ECF 386, PageID.26916; ECF 385, PageID.26844-57.)

142.   As set forth above, EES Coke's emissions had an insignificant impact on air quality and did not cause material harm to the public.

### iii.   By not installing Claus in 2018, EES Coke realized an economic benefit of $10,048,220.

143.   The economic benefits of noncompliance are the avoided and delayed costs (one-time and recurring) from installing Claus, as that would have avoided the violation here. (ECF 391, PageID.27472; ECF 393, PageID.27606; *see also* ECF 394, PageID.27721-22.)  Plaintiff offered no witness or document that challenges the efficacy of Claus as a means of eliminating the emissions increase.

144.   The economic benefit realized by EES Coke from noncompliance with the CAA and failure to install Claus in 2018 amounts to a present-day value of $10,048,220. (ECF 394, PageID.27221-22.)   Plaintiff did not challenge the economic benefit that would arise from failure to install Claus.

145.   EES Coke has average annual earnings between $12 million and $22 million. (*Id.*, PageID.27710; ECF 377, PageID.26208.) Thus, EES Coke can afford to install and operate Claus. While Plaintiff would prefer the Court order different technology, at trial Plaintiff did not dispute the viability or cost of installing Claus.

146.   Plaintiff presented evidence of the economic benefit of failure to install unspecified desulfurization technologies that allegedly would result in control

efficiencies of 95%, but there is no factual basis to conclude that a control efficiency of 95% is possible or is required for EES Coke to avoid the CAA violation. Moreover, Plaintiff's economic benefit calculations based on 95% control efficiencies fail to account for significant cost offsets from use of low-sulfur coal that could reduce economic benefit to zero. (ECF 394, PageID.27724-26.)  Plaintiff also conceded that the annual cost of operating control technology achieving 95% efficiency exceeds projected cash flows for EES Coke, meaning that an order requiring these purported control technologies would result in EES Coke's shutdown.  (ECF 395, PageID.27799.)

147.   EES Coke currently uses low-sulfur coals to comply with sulfur emission limits imposed by EES Coke's permits. (ECF 392, PageID.27555.) EES Coke's low-sulfur coal has an average price premium of $60 per ton of coal over other available coals with higher sulfur content. (ECF 391, PageID.27474.)

148.   Assuming desulfurization technology achieving control efficiencies of 95% was feasible and had been installed in 2018, EES Coke could have offset the installation costs by purchasing higher-sulfur coal at lower prices. (ECF 392, PageID.27554-55, 58; ECF 394, PageID.27723-24.) That would have saved around $90 million in costs as of 2024—and $110-$155 million as of 2025. (*Id.*)  Plaintiff offered no testimony to challenge these calculations, and Leistra-Jones' opinion that it was unreliable is not based on any facts in the record.  (ECF 395, PageID.27799.)

149.   The Court finds Plaintiff's calculation of economic benefit to not be credible or supported by fact.

      **iv.**   **EES Coke's violation of reasonable possibility reporting requirements was inconsequential.**

150.   EES Coke routinely submitted emissions information to EGLE.  (ECF 390, PageID.27308-09.)  EGLE and EPA had access to emissions information that would have been included in reasonable possibility reports and which allowed EPA to investigate EES Coke's violation of the CAA.  (ECF 385, PageID.26854-55; ECF 386, PageID.26931-33.)  EPA has not alleged that any information reported by EES Coke was missing or inaccurate.   (ECF 385, PageID.26855; ECF 386, PageID.26933.)

151.  Upon being notified that it was required to submit reasonable possibility reports, EES Coke submitted to EGLE all reports identified by the EPA within two months.  (ECF 386, PageID.26933.)  At all times since being put on notice by the EPA, EES Coke has submitted all necessary reports.  (*Id.*)

152.   There is no evidence that EES Coke experienced any economic benefit associated with its violation of the reasonable possibility reporting requirements.

      **v.**   **Plaintiff's requested penalty would be largest in history.**

153.   Plaintiff's requested penalty of $140 million would dwarf prior CAA penalties, and would be the largest penalty ever imposed on a source under the CAA,

in total and on a per facility basis.[9]  For instance, in 2024, EPA announced a penalty

with Marathon Oil Company which contained a civil penalty of $64.5 million, which

EPA touted as "the largest ever for violations of the Clean Air Act at stationary

sources."  That penalty was awarded for violations at nearly 90 different facilities,

meaning that the per-facility penalty is less than $1 million.  The penalty Plaintiff

now requests is more than double the "largest ever" for violations of the CAA on an

absolute basis.

154.   The penalty requested by Plaintiff is also more than three times larger

than the highest ever single facility penalty for violations of the CAA, which was a

civil penalty of $40 million for NESHAP violations at the BP Whiting refinery.[10]

Even then, the $40 million penalty in the BP Whiting matter was for substantially

more egregious violations, which involved not only hazardous pollutants but also

stipulated penalties for violations of earlier settlements with EPA.

155.   Unlike the penalty value requested by Plaintiff, public sources indicate

that the average penalty in CAA cases is less than $1 million, a number which is

---

[9] *See* 7/11/24 Press Release, available at https://perma.cc/26S3-C6FW (referring to
"a civil penalty of $64.5 million, the largest ever for violations of the Clean Air Act
at stationary sources," which covered CAA violations at 90 separate facilities).  The
Court takes judicial notice of historic penalty amounts under Federal Rule of
Evidence 201.  *See supra* at n. 7.

[10] *See* 5/17/23 Press Release, available at https://perma.cc/GH8T-D4A3 (noting
historic penalty amount of $40 million for Clean Air Act violations occurring at the
BP Whiting refinery).

significantly less than that requested by Plaintiff.[11]

156.   Plaintiff's requested penalty is substantially larger than any previous penalty awarded under the CAA and far exceeds the average penalty for these cases. There is no justification in the record or in EES Coke's conduct for such a significant departure from historic penalty awards.

### vi.   Plaintiff's requested penalty would negatively affect EES Coke's operations and the steel industry more generally.

157.   Due to its limited annual earnings, EES Coke cannot pay a large penalty. With average annual earnings of $12-22 million, EES Coke cannot pay a significant penalty and also pay for the installation and operation of desulfurization technology achieving 95% control efficiency. (ECF 378, PageID.26328; ECF 394, 27710-13.)  The penalty requested by Plaintiff would lead to the shutdown of the EES Coke Facility.  (ECF 394, PageID.27710.)

158.   A shutdown would have a serious negative impact on hundreds of people's livelihoods and the local and national economy. (FOF ¶ 94.) EES Coke's closure would also negatively affect the steel industry nationally. (FOF ¶ 95.)  The stated policy of the United States government is to protect the domestic coke and steel industry, and Plaintiff's requested penalty is contrary to those aims because it would result in the closure of the EES Coke Facility.  (FOF ¶ 96.)

---

[11] *See* Mapistry, *Clean Air Act Enforcement Trends* (2025), https://perma.cc/R2KZ-DKUE.

### C.     Conclusions of Law on Civil Penalties

159.   Plaintiff has asserted two claims and sought a collective penalty to be imposed for both violations of $140 million.  (ECF 396, PageID.27858.)  Plaintiff's requested penalty is based almost entirely on EES Coke's Claim 1 violation, rather than EES Coke's violation of the reasonable possibility reporting requirements asserted in Claim 2.  (*See id.*, PageID.27852-58.)  The penalty factors to be assessed are the same for both claims.  42 U.S.C. § 7413(e)(1).

160.   No party has advocated for the top-down approach to determining a civil penalty. Instead, all agree that the bottom-up approach to penalty calculation is appropriate. (*See* ECF 351, PageID.25218 (Plaintiff starting with economic benefit, *i.e.*, bottom-up approach).) The Court will therefore use the bottom-up approach, which starts with the economic benefit of noncompliance and adjusts up or down depending on other penalty factors. *Smithfield Foods*, 191 F.3d at 528. The economic benefit is equal to how much it would have cost EES Coke to comply with the CAA. *ExxonMobil*, 824 F.3d at 528.

161.   Installing Claus would have more than offset the emission increases the Court found to violate the CAA. (FOF ¶¶ 89-92.) The law is concerned only with the avoided costs of complying with the CAA, not the avoided cost of installing superfluous technology. *ExxonMobil*, 824 F.3d at 528.  The Court will determine economic benefit based on EES Coke's avoided costs from not installing Claus in

2018.

162.   A risk-free rate is the appropriate discount rate when calculating the economic benefit of noncompliance because it ensures that "all firms are treated equal." (ECF 394, PageID.27695); *United States v. WCI Steel*, 72 F. Supp. 2d 810, 831 (N.D. Ohio 1999) ("an after-tax, risk free rate is correct").

163.   The economic benefit realized by EES Coke is no greater than $10,048,220. (FOF ¶ 144.)

164.   From there, the Court may adjust the penalty based on: (1) the size of the business, (2) the penalty's economic impact, (3) the violation's duration, (4) compliance history and good-faith efforts to comply, (5) the economic benefit of noncompliance, (6) the violation's seriousness, and (7) other factors justice may require. 42 U.S.C. § 7413(e)(1).

165.   Those factors weigh heavily against imposing a penalty at all. (ECF 394, PageID.27702-03; ECF 395, PageID.27746.) And each factor weighs in favor of EES Coke, so the penalty should not exceed the economic benefit of $10,048,220. *Friends of the Earth v. Laidlaw Envtl. Servs.*, 956 F. Supp. 588, 597 (D.S.C. 1997), *vacated on other grounds*, 149 F.3d 303 (4th Cir. 1998), *rev'd on other grounds*, 528 U.S. 167, 120 (2000) (finding economic benefit to be ceiling).

i.    **The penalty factors weigh against imposing any penalty at all, much less Plaintiff's requested penalty, for EES Coke's Claim 1 violation.**

166.   The Court does not find that Plaintiff's requested penalty is appropriate for EES Coke's violation of Claim 1.  Instead, applying the statutory penalty factors, the Court finds a penalty of $4,999,999 to be appropriate for EES Coke's violation of Claim 1.

ii.    **Plaintiff's requested penalty would have a crippling impact.**

167.   The Court must consider the economic impact that a penalty will have on EES Coke. The ability to pay is a relevant factor—and the costs associated with injunctive relief act as an offset to the company's ability to pay a penalty. *Idaho Conservation v. Atlanta Gold*, 879 F. Supp. 2d 1148, 1169–70 (D. Idaho 2012).

168.   Courts typically confine their assessment to the subsidiary's ability and not its investors'/parents' abilities. *United States v. Dico*, 4 F. Supp. 3d 1047, 1065 n.43 (S.D. Iowa 2014), *aff'd in rel. part*, 808 F.3d 342 (8th Cir. 2015).

169.   Imposing the penalty requested by the Plaintiff would have a ruinous effect on EES Coke, negatively affect millions of people, and "have a more drastic effect on [the] defendant [and community] than is needed to ensure future compliance." *United States v. Smith*, 2014 WL 3687223, at *15 (S.D. Ala. July 24, 2014); (FOF ¶¶ 94-98.) This factor weighs against imposing a penalty on EES Coke.

iii.    **EES Coke made significant good-faith efforts to comply.**

170.   EES Coke worked hand-in-hand with EGLE to obtain a permit and to

achieve compliance, which weighs against the imposition of a penalty. *United States v. Roll Coater*, 21 E.L.R. 21073, 1991 U.S. Dist. LEXIS 8790, \*22; (FOF ¶¶ 121-127.)

171.   When it received its Permit, EES Coke operated the Facility as projected in the application. (FOF ¶¶ 123, 128.) EPA did not object to the issuance of the Permit. (FOF ¶ 125.) "Given the fact that no governing agency attempted to in any way alter or stop [EES Coke's] activity during the application process, [EES Coke] should not be penalized for its activities, particularly where [EGLE] and EPA were fully aware of such activities." *Bay-Houston*, 197 F. Supp. 2d at 825. "At no time from the initial filing of the [permit] application…, to the issuance of the permit [], did EPA involve itself in any way in the permitting process." *Id*. at 811.

172.   Neither EGLE nor EES Coke believed that EES Coke violated the CAA.[12] (DX 347.) Courts have "expressed discomfort with the idea that a penalty may be imposed where a defendant is unaware of a violation." *Sierra Club v. Khanjee Holding*, 655 F.3d 699, 708 (7th Cir. 2011). The CAA's "penalty provisions must out of fundamental fairness contain an implied requirement of reasonableness." *Id*. EES Coke's "history of []good-faith adherence to [EGLE's]

---

[12] The EPA has the right to enforce the CAA regardless of EGLE's position. However, the Court must consider EGLE's position in determining the reasonableness of EES Coke's good faith efforts to comply with the CAA.

directives and guidance" thus warrants a significant reduction of civil penalties. *United States v. Ohio Edison*, 725 F. Supp. 928, 933 (N.D. Ohio 1989); *accord United States v. City of Toledo*, 867 F. Supp. 603, 608 (N.D. Ohio 1994).

173.   Further, EES Coke complied with the $SO_2$ emission limits contained in its Permit.  (FOF ¶ 134.)

174.   EES Coke's conduct was not willful, and Plaintiff has never argued to the contrary. "The permitting authorities were aware of" EES Coke's activity before issuing the permit and when Plaintiff filed suit and concluded that no permit "limitations had been exceeded." *Bay-Houston*, 197 F. Supp. 2d at 814. Imposing the requested penalty would be unfair when EGLE and EES Coke both believed EES Coke was doing everything correctly and EES Coke complied with the annual $SO_2$ emissions limit contained in its Permit.

175.   EES Coke's good-faith efforts weigh against imposing a civil penalty, but any penalty should not exceed EES Coke's economic benefit of $10,048,220.

### iv.   EES Coke's Claim 1 violation was minimal.

176.   This "seriousness of the violation" factor involves "the significance of the violation" and "the actual or potential harm to human health and the environment." *Utah Physicians for a Healthy Env't v. Diesel Power Gear*, 21 F.4th 1229, 1258 (10th Cir. 2021).

177.   EES Coke's maximum $PM_{2.5}$ concentration impacts (.009 µg/m³) are

orders of magnitude below EPA's NAAQS (9 µg/m³) and SILs (.13 µg/m³).

178.    Based on EPA standards, EES Coke's emissions are "below which the EPA considers a source to have an insignificant effect on ambient air quality." *Sierra Club v. Louisiana Dep't of Env't Quality*, 100 F.4th 555, 565 (5th Cir. 2024).

179.    $SO_2$ emissions from the stationary source as a whole decreased during the relevant period.  (FOF ¶ 140.)  Because $SO_2$ emissions actually decreased, there is no actual or potential harm to human health associated with EES Coke's violations.  (FOF ¶ 141.)

180.    The violation thus is "at best technical and there is no evidence of substantive" environmental or public injury. *Bay-Houston*, 197 F. Supp. 2d at 825.

181.    The purpose of penalties is deterrence. *Laidlaw*, 528 U.S. at 186. Here, EES Coke sought, obtained, and followed a permit from EGLE.  There is no deterrent effect to imposing a penalty on a party that has followed a valid permit. While EPA is authorized to bring this case, EES Coke was justified in relying on EGLE's permit, and there is no need to deter complying with a permit.

182.    Even if there was some need for deterrence due to the existence of a CAA violation, Defendants' expert Dr. Cohen testified that deterrent effect can be achieved with as low as 5% of an economic benefit.  The Court need not reach a determination of the lower bounds of what is sufficient for a deterrent effect but does conclude that an amount less than the economic benefit will suffice here.

183.   Further, the Court does not conclude that a penalty which is higher than any CAA penalty previously awarded by any court is appropriate here, given the reality that EES Coke obtained a Permit and then complied with the express terms of the Permit.  (FOF ¶¶ 121-130, 153-156.)  It would act as a deterrent to the lawful operations of sources if such conduct was punished by a penalty in the amount requested by Plaintiff, and would be unjust.  *See* 42 U.S.C. § 7413(e)(1) (allowing consideration of "such other factors as justice requires" in the penalty determination).

### v.   The penalty factors weigh against imposing any penalty for EES Coke's Claim 2 violation and a nominal penalty is appropriate.

184.   There is no need to assess a further penalty based on EES Coke's Claim 2 violation of the CAA's reasonable possibility reporting requirements.  Applying the statutory penalty factors, the Court finds a penalty of $1 to be appropriate for EES Coke's violation of Claim 2.

185.   EGLE gave EES Coke written confirmation that no reasonable possibility reporting was required.  EES Coke at all times made good-faith efforts to comply with its reporting requirements and submitted all information necessary for regulators to assess its emissions.  As a result, EES Coke's violation of the reasonable possibility reporting requirements was merely technical, but had no substantive impact or harm.  *Bay-Houston*, 197 F. Supp. 2d at 825.

186.   EES Coke promptly remedied its violation of the reporting

requirements by submitting reports in the requested format within two months after being put on notice that its emissions reporting was technically deficient. (FOF ¶¶ 150-151.) EES Coke's prompt effort to remedy the violation weighs against imposition of a penalty.

187. EES Coke experienced no economic benefit associated with its non-compliance with the reasonable possibility reporting requirements.

188. There is no need to deter EES Coke's further violation of the reporting requirements, given that EES Coke routinely submits all emissions reporting requested or required by any regulatory body.

189. Given the technical nature of EES Coke's violation, the lack of harm resulting from its non-compliance, its good-faith efforts to comply, its actual compliance with EGLE's guidance, and the lack of economic or other benefit associated with EES Coke's non-compliance, no penalty is required as to EES Coke's Claim 2 violation. Accordingly, the Court finds a nominal penalty of $1 to be appropriate.

## IV.   INTERVENING PLAINTIFFS' STANDING AND SIERRA CLUB'S REQUEST FOR REMEDIATION

### A.   Legal Framework

190. An organization can have Article III standing either "by suing on its own behalf, called 'organizational standing,' or by suing on behalf of its members, called 'associational' or 'representative' standing." *Children's Health Def. v. United*

*States Food & Drug Admin.*, 2022 WL 2704554, at *2 (6th Cir. July 12, 2022).

191.   For organizational standing, a plaintiff "must demonstrate that the purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action." *Id.* The "expenditure of resources in opposition to a defendant's actions" is insufficient. *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living*, 124 F.4th 990, 992 (6th Cir. 2025). Instead, a defendant must have interfered with the organization's core business activities. *Id.* at 993.

192.   For associational standing, members must "have standing to sue in their own right[.]" *Builders & Contractors of Michigan v. Cowen*, 2025 WL 488556, at *3 (6th Cir. Feb. 13, 2025). Thus, an organization must show that a specific member had an actual, concrete, particularized, and redressable injury "fairly traceable to the challenged action[.]" *Id.*

### B.   Findings of Fact on Intervening Plaintiffs' Standing

193.   Intervening Plaintiffs provided no evidence supporting their standing in this case.

194.   City of River Rouge presented no evidence at trial, and therefore did not show that any of EES Coke's conduct interfered with its activities or that it suffered any particular harm associated with EES Coke's activities.

195.   Likewise, Sierra Club provided no evidence that any of the alleged conduct interfered with Sierra Club's core activities.

196.   Sierra Club members testified to general concerns about air pollution. (ECF 387 and 388.) Sierra Club provided no evidence that any specific member has suffered an injury in fact (including adverse health consequences or harm from excess emissions) attributable to EES Coke's violation. (*See* ECF 387, PageID.27019; *id.*, PageID.27039-40, 45-48, 54; ECF 388, PageID.27066.)

### C.     Conclusions of Law on Standing

197.   Sierra Club is seeking different relief than Plaintiff through mitigation projects to benefit neighboring communities. (ECF 98, PageID.3887 ¶ 7; ECF 388, PageID.27084-85.) It must therefore establish standing. *See Chapman v. Tristar*, 940 F.3d 299, 304 (6th Cir. 2019).

198.   To establish standing, Sierra Club was required to show (1) an injury in fact that is concrete and particularized; (2) the injury is fairly traceable to EES Coke; and (3) it is likely, not speculative, that the injury will be redressed by a favorable decision. *Ailor v. City of Maynardville, Tennessee*, 368 F.3d 587, 596 (6th Cir. 2004).

199.   Sierra Club did not put forth evidence that EES Coke interfered with its core business activities—and therefore has not shown organizational standing. *See, e.g.*, *Tennessee Conf. of NAACP v. Lee*, 139 F.4th 557, 565-69 (6th Cir. 2025).

200.   Sierra Club did not submit evidence of associational standing. Sierra Club members testified about generalized concerns about air pollution, but those

concerns are not caused by EES Coke's violation of the CAA and cannot be attributed to it. Even if Sierra Club's members did introduce evidence of particularized harm, such harm cannot be traced to EES Coke's emissions.

201.   Sierra Club's reliance on *Sierra Club, Lone Star Chapter v. Cedar Point Oil*, 73 F.3d 546, 557 (5th Cir. 1996), is misplaced. EES Coke did not violate the emission limits set out in its state-issued permit. Also, the Fifth Circuit's opinion was restricted to narrow geographical areas like the smaller water way at issue and recognized that an area "may be so large that plaintiffs should rightfully demonstrate a more specific geographic or other causative nexus in order to satisfy the 'fairly traceable' element of standing." *Id.* at 558 n. 24. That more specific causative nexus was required here and Sierra Club failed to put forth any evidence to satisfy it.

202.   Finally, there is not a substantial likelihood that Sierra Club's members' injuries will be redressed by a "favorable decision." EES Coke is far from the only source of $SO_2$ and $PM_{2.5}$ in Wayne County. No form of relief the Court may order will stop emissions from the many other nearby sources. *See, e.g.*, *Simpson-Vlach v. Michigan Dep't of Educ.*, 616 F. Supp. 3d 711, 726 (E.D. Mich. 2022).

203.   Sierra Club therefore lacks standing and cannot obtain relief beyond that to which Plaintiff is entitled.

204.   City of River Rouge presented no evidence or argument establishing that it was seeking any relief in this case.   It also failed to establish standing.

Accordingly, City of River Rouge cannot obtain relief beyond that to which Plaintiff is entitled.  *Chapman*, 940 F.3d at 304.

### D.   Findings of Fact on Mitigation

205.   Sierra Club did not put forth evidence at trial as to the specific form its requested mitigation would take or how that mitigation would redress any purported harm that is fairly traceable to EES Coke specifically. (ECF 388, PageID.27086-87, 89-90.) Sierra Club did not establish the specific nature of the relief sought, the factual basis for that relief, or how the purported relief would benefit Sierra Club's members or further its institutional mission. (*Id.*) The member witnesses instead testified that Sierra Club has not consulted with its members in seeking relief in this case. (*See id.*, PageID.27069, 85-86; ECF 387, PageID.27018-19, 51.)

### E.   Conclusions of Law on Mitigation

206.   Because Sierra Club failed to present any evidence of as to the specific form the requested mitigation would take or how that mitigation would redress any purported harm that is fairly traceable to EES Coke specifically, it has failed to meet its burden to show that mitigation is warranted. *See State v. Yellen*, 539 F. Supp. 3d 802, 821 (S.D. Ohio 2021) (party seeking injunctive relief must show how the relief will remedy or address the alleged harm).

## V.   <u>CONCLUSION</u>

207.   The Court enters judgment in favor of Investor Defendants.

208.   EES Coke is ordered to install Claus within one year.

209.   EES Coke is ordered to pay a civil penalty of $5,000,000.

210.   Sierra Club is not entitled to any additional relief.

Respectfully submitted,
HONIGMAN LLP

Dated: December 5, 2025

*/s/ Michael P. Hindelang* _____
Michael P. Hindelang (P62900)
S. Lee Johnson (P48907)
Khalilah V. Spencer(P63933)
Morgan L. Esters (P83072)
Kory M. Steen (P83170)
Jalen R. Farmer (P86859)
HONIGMAN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-2506
T: 313-465-7412
mhindelang@honigman.com

Molly K. McGinley (P6285809)
Anna C. Transit (P85632)
HONIGMAN LLP
155 North Wacker Dr. Suite 3100
Chicago, IL  60606-1734
T: 312-429-6032
mmcginley@honigman.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2025, I caused the electronic filing of the foregoing papers with the Clerk of the Court using the court's electronic filing system, which will send notification of such filing to all counsel of record.

/s/ *Michael P. Hindelang*
Michael P. Hindelang

62560871